No. 25-1527

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN DOE 4; JOHN DOE 5; JOHN DOE 6; JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE DOE 5,

Plaintiffs-Appellees,

v.

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; CENTRAL INTELLIGENCE AGENCY; JOHN RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency; TULSI GABBARD, in her official capacity as Director of National Intelligence,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia

_____

## BRIEF FOR APPELLANTS

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

CHARLES W. SCARBOROUGH
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ........................................................... 4

STATEMENT OF THE ISSUES ................................................................ 5

STATEMENT OF THE CASE .................................................................... 5

    A.    Statutory Background ................................................................ 5

    B.    Factual Background ................................................................. 10

    C.    Prior Proceedings ................................................................... 13

SUMMARY OF ARGUMENT ................................................................. 16

STANDARD OF REVIEW ....................................................................... 21

ARGUMENT ............................................................................................. 21

I.    The Decisions to Terminate Plaintiffs' Employment Are Committed to Agency Discretion and Nonjusticiable Under the National Security Act .......... 21

    A.    The National Security Act Precludes Judicial Review of Plaintiffs' Statutory and Regulatory Challenges ............................ 21

    B.    Plaintiffs Have Not Established a Justiciable Constitutional Due Process Claim .......................................................................... 23

    II.    The District Court Abused Its Discretion by Concluding that the Balance of Equitable Factors Weighed in Favor of a Preliminary Injunction .......................................................................................... 37

    III.    The Injunction Is Overbroad and Improperly Intrudes on the Directors' Discretionary and Otherwise Unreviewable Authority .......... 42

CONCLUSION ......................................................................................... 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Farm Lines v. Black Ball Freight Serv.*,
397 U.S. 532 (1970) ................................................................. 31

*Board of Curators of the Univ. of Mo. v. Horowitz*,
435 U.S. 78 (1978) ................................................................. 28

*Crosby-Bey v. District of Columbia*,
786 F.2d 1182 (D.C. Cir. 1986) ............................................. 28

*Department of the Navy v. Egan*,
484 U.S. 518 (1988) ............................................................. 45

*Doe v. Casey*,
796 F.2d 1508 (D.C. Cir. 1986), *aff'd in part, rev'd in part sub nom.*
*Webster v. Doe*, 486 U.S. 592 (1988) ................................ 27, 34, 36

*Doe v. Gates*,
981 F.2d 1316 (D.C. Cir. 1993) ......................................... 25, 27

*Elhady v. Kable*,
993 F.3d 208 (4th Cir. 2021) ................................................ 40

*Evans v. Chalmers*,
703 F.3d 636 (4th Cir. 2012) ................................................ 41

*Guerra v. Scruggs*,
942 F.2d 270 (4th Cir. 1991) ............................................... 25, 39

*Hegab v. Long*,
716 F.3d 790 (4th Cir. 2013) ................................................ 45

*Kentucky Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989) ............................................................. 25

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ................................................ 21

*Mallette v. Arlington Cty. Emps. Supplemental Ret. Sys. II*,
91 F.3d 630 (4th Cir. 1996) .................................................. 24

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*,
918 F.3d 353 (4th Cir 2019) .............................................. 21, 39

*Neely v. CIA,*
2 M.S.P.B. 534 (1980), *aff'd,*
744 F.2d 878 (D.C. Cir. 1984) ................................................................ 23

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................ 42

*Olim v. Wakinekona,*
461 U.S. 238 (1983) ................................................................ 30

*Sampson v. Murray,*
415 U.S. 61 (1974) ................................................................ 19, 38, 39

*Smith v. Ashcroft,*
295 F.3d 425 (4th Cir. 2002) ................................................................ 17, 24

*Steenholdt v. FAA,*
314 F.3d 633 (D.C. Cir. 2003) ................................................................ 28

*Stewart v. Bailey,*
7 F.3d 384 (4th Cir. 1993) ................................................................ 25

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................................ 45

*United States v. Morgan,*
193 F.3d 252 (4th Cir. 1999) ................................................................ 18, 31

*United States ex rel. Accardi v. Shaughnessy,*
347 U.S. 260 (1954) ................................................................ 2, 15, 18, 27-28, 28

*Vietnam Veterans of Am. v. Secretary of the Navy,*
843 F.2d 528 (D.C. Cir. 1988) ................................................................ 31

*Webster v. Doe,*
486 U.S. 592 (1988) .................... 1, 7, 16, 17, 22, 23, 24, 27, 29, 32, 36, 37, 44-45, 45

*Wilkinson v. Legal Servs. Corp.,*
27 F. Supp. 2d 32 (D.D.C. 1998) ................................................................ 30, 31

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................ 39

**Statutes:**

Intelligence Reform and Terrorism Prevention Act of 2004,
Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-61, 3698-99 ............... 6

National Security Act of 1947, 61 Stat. 495 ...................................................... 5
    50 U.S.C. § 3001 *et seq.* .................................................................. 1
        50 U.S.C. § 3023(a)-(b) ......................................................... 6
        50 U.S.C. § 3024(m) ................................................ 1, 3, 17, 35, 43
        50 U.S.C. § 3024(m)(1) ........................................................ 6, 22
        50 U.S.C. § 3025(a)-(b) ......................................................... 6
        50 U.S.C. § 3035(a) ............................................................ 5-6
        50 U.S.C. § 3036(c)-(d) ........................................................ 5-6
        50 U.S.C. § 3036(e) ................................................... 1, 3, 17, 35
        50 U.S.C. § 3036(e)(1) ............................................. 6, 11, 22, 43
        50 U.S.C. § 3036(e)(3) ........................................................ 40

28 U.S.C. § 1292(a)(1) ............................................................. 4

28 U.S.C. § 1331 .................................................................... 4

50 U.S.C. § 403(c) (1947) .......................................................... 23

**Regulation:**

5 C.F.R. § 351.402 .................................................................. 11

**Other Authorities:**

Restatement (Second) of Torts § 564A (1977) ...................................... 41

90 Fed. Reg. 8339 (Jan. 29, 2025) ........................................... 1, 10, 11

Thomas W. Merrill, *The Accardi Principle*,
74 Geo. Wash. L. Rev. 569 (2006) ............................................... 31

Memorandum from Charles Ezell, Acting Dr., OPM, to Heads
and Acting Heads of Departments and Agencies Agency Heads
(Jan. 24, 2025), https://perma.cc/BH6A-LMNA ...................................... 11

# INTRODUCTION

Through the National Security Act, 50 U.S.C. § 3001 *et seq.*, Congress vested in the Director of the Central Intelligence Agency (CIA) and the Director of National Intelligence extraordinary discretion to terminate the employment of agency personnel whenever they "deem[] the termination . . . necessary or advisable in the interests of the United States." *Id.* § 3036(e); *id.* § 3024(m). As the Supreme Court confirmed in *Webster v. Doe*, 486 U.S. 592 (1988), this broad grant of authority reflects a deliberate congressional judgment to broadly foreclose judicial review of claims challenging the Directors' termination determinations, thereby prohibiting courts from second-guessing discretionary judgments about the appropriate composition of the agencies' workforces, judgments that they are neither authorized nor equipped to assess. Courts thus presumptively lack jurisdiction over challenges to termination decisions rendered pursuant to this statutory authority, except insofar as a plaintiff has plausibly alleged a colorable constitutional claim.

At issue here are claims by at will employees of the CIA and the Office of the Director of National Intelligence (ODNI) who were working in those agencies' respective diversity, equity, and inclusion (DEI) offices when those offices were closed pursuant to Executive Order 14,151. 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025). Director of the CIA Ratcliffe and Director of National Intelligence Gabbard (collectively, "the Directors") both determined that the termination of these employees was necessary or advisable in the interests of the United States and elected

to terminate them—as expressly permitted by the National Security Act and Agency Regulation 4-16 (AR 4-16) "[w]ithout [p]rocedures." JA067 (AR 4-16 § II.D). Rather than firing those employees immediately, however, the Directors placed the employees on administrative leave and offered them an opportunity to select one of several options that would effectuate their separation, including the deferred resignation program, early retirement (if applicable), or formal termination. Proceeding under pseudonyms, a group of employees in both agencies sued in district court seeking to enjoin the Directors' actions on various grounds, including that the agencies had violated certain procedures detailed in an internal, unpublished CIA regulation, AR 4-16 (JA062-071), governing the termination of "excess personnel" during a reduction in force.

The district court properly recognized that plaintiffs' non-constitutional claims were not justiciable under *Webster*. Nevertheless, the court granted plaintiffs' renewed motion for a preliminary injunction, concluding that they had demonstrated a substantial likelihood of success on a constitutional due process claim—ostensibly derived from *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)—that the agencies violated certain procedures set forth in AR 4-16. The district court thus enjoined the agencies from taking any further action to terminate plaintiffs without following the procedures the court believed AR 4-16 required and without express authorization from the court.

The preliminary injunction was improper for several reasons. Most notably, the district court erred in concluding that AR 4-16 creates any judicially enforceable procedural or substantive rights. To the contrary, the unpublished regulation repeatedly disavows any intent to create binding rights and expressly affirms the Directors' authority to bypass all procedures contained within the regulation when they deem an employee's termination to be necessary or advisable in the interest of the United States pursuant to their discretionary authority under the National Security Act. Because the regulation does not grant enforceable rights and instead preserves the Directors' unreviewable discretion, the district court erred in finding that it could provide a proper basis for a cognizable due process claim.

Furthermore, the district court erred in concluding that the procedures for consideration for reassignment and appeal set forth in AR 4-16 apply to the terminations here, which were made pursuant to the Directors' broad authority under 50 U.S.C. §§ 3024(m) and 3036(e). As the plain text of AR 4-16 makes clear, those procedures apply only to ordinary terminations for excess employment in which a lower-level official—that is, someone other than the Directors—initiates the termination; the procedures do not apply to terminations initiated by the Directors on the ground that the termination is necessary or advisable in the interest of the United States. Indeed, AR 4-16 plainly states that the Directors' authority to initiate and finalize determinations pursuant to their statutory authority is "[n]ot constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this

3

regulation or any other." JA068 (AR 4-16 § II.D). The district court's contrary holding cannot be reconciled with this provision.

Finally, the district court exceeded its remedial authority by prohibiting the agencies from taking any further action to terminate plaintiffs without first demonstrating to the court's satisfaction that the agencies had complied with the procedures set forth in AR 4-16. In so doing, the court mandated the Directors to provide procedures that, by their terms, are inapplicable to termination decisions initiated by the Directors themselves and whose application to plaintiffs' circumstances creates unreasonable or impracticable results. Moreover, the court set itself up to second-guess the kinds of discretionary judgments that *Webster* held are beyond the scope of judicial review. This requirement for ongoing judicial preclearance imposes real-world operational costs on the Directors of the CIA and National Intelligence and is plainly contrary to the broad grant of authority to the Directors over personnel decisions. This Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

The district court granted plaintiffs' motion for a preliminary injunction on March 31, 2025. JA235. A timely notice of appeal was filed on May 6, 2025. JA266. The district court had jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

4

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that plaintiffs demonstrated a substantial likelihood of success on a due process claim predicated on the agencies' alleged failure to follow procedures for terminating employees set forth in non-binding internal agency regulations.

2. Whether the district court abused its discretion in concluding that the equitable factors weighed in favor of issuing a preliminary injunction.

3. Whether the district court exceeded its remedial authority by prohibiting the agencies from taking any further action to terminate plaintiffs' employment without following various appeal and reassignment procedures outlined in internal agency regulations and without further authorization from the court.

## STATEMENT OF THE CASE

### A.    Statutory Background

1. At issue in this case are personnel claims brought against two national security and intelligence-related federal agencies—the CIA and ODNI.  The CIA was established by the National Security Act of 1947, § 102, 61 Stat. 495, 496-99, and is led by the Director of the CIA, who has been vested with the responsibility to, *inter alia*, "collect intelligence through human sources and by other appropriate means" and "correlate and evaluate intelligence related to the national security," 50 U.S.C. §§ 3035(a), 3036(c)-(d).  The position of the Director of National Intelligence was created in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No.

108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-61, 3698-99.  The Director of National Intelligence "serve[s] as head of the intelligence community"; "act[s] as the principal adviser to the President, to the National Security Council, and the Homeland Security Council for intelligence matters related to the national security"; and "oversee[s] and direct[s] the implementation of the National Intelligence Program." 50 U.S.C. § 3023(a)-(b).  ODNI was further established by Congress to assist the Director of National Intelligence in carrying out her duties and responsibilities as directed by law or the President.  *Id.* § 3025(a)-(b).

The National Security Act provides both the Director of the CIA and the Director of National Intelligence with exceptional discretion to terminate the employment of personnel within their agencies.  With respect to the CIA, the statute provides that: "[n]otwithstanding the provisions of any other law," the Director of the CIA may, in his discretion, "terminate the employment of any officer or employee of the [CIA] whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interests of the United States."  50 U.S.C. § 3036(e)(1).  Congress vested this same broad discretion in the Director of National Intelligence.  *Id.* § 3024(m)(1) ("[T]he Director of National Intelligence may exercise with respect to the personnel of the [ODNI] any authority of the Director of the CIA with respect to the personnel of the [CIA] to the same extent, and subject to the same conditions and limitations, that the Director of the [CIA] may exercise . . . .").

6

In *Webster v. Doe*, 486 U.S. 592 (1988), the Supreme Court held that this broad grant of authority grants the Directors considerable latitude in personnel decisions, permitting termination so long as the Directors "deem" termination to be necessary or advisable in the interests of the United States. *Id.* at 600-01. The Court concluded that the Directors' termination decisions are committed to agency discretion by law, and therefore not subject to judicial review, except insofar as a plaintiff alleges a colorable constitutional claim. *Id.*

**2.** Acting pursuant to the discretion that Congress conferred upon it, the CIA issued an internal regulation concerning "Termination of Employment," which provides that "[a]ll employment terminations, other than by mandatory or involuntary retirement under the Central Intelligence Agency Retirement Act of 1964 . . ., shall be pursuant to the Director of the Central Intelligence Agency's (D/CIA's) statutory authority." JA062. Consistent with the underlying statute and the Supreme Court's decision in *Webster*, the regulation explains that the Director's exercise of this authority need not be based on national security. JA062. Rather, the Director need only "deem such termination to be in the interests of the United States." JA062.[1]

AR 4-16 also "sets forth circumstances under which [CIA] employment may be terminated and provides for the manner in which such employment terminations may

---

[1] ODNI applies the same regulation with respect to terminations by the Director of National Intelligence. *See* JA076-078. For clarity, this brief describes the regulation as written, which refers to the CIA and the Director of the CIA, but these provisions apply with equal force to ODNI.

be effected." JA062. The regulation makes clear, however, that agency employees "do not have tenure" and that their employment "may be terminated pursuant to the terms of the National Security Act of 1947 . . . without regard to the procedural requirements of this regulation or any other provisions of law." JA063 (AR 4-16 § II.A).

AR 4-16 also addresses some "circumstances" under which an employee might have his or her employment terminated by lower-level officials pursuant to the Director of the CIA's authority, including "failure to complete trial period satisfactorily," "failure to meet the work and efficiency requirements of the agency," and "termination of excess personnel." JA063-065 (AR 4-16 § II.B) (formatting altered). In a separate sub-provision, the regulation identifies the "procedures" that apply for many of the aforementioned rationales for termination. JA065-067 (AR 4-16 § II.C). With respect to the "termination of excess personnel," the regulation provides a "procedure" that generally requires the particular employee's "Career Service"—the area of the agency's work that is responsible for the employee—to "take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth." JA066 (AR 4-16 § II.C(4)(a)) (formatting altered). Once that is accomplished, "[i]f the employee wishes, the Career Service will make an effort to arrange placement in another component within that Career Service." JA066-067 (AR 4-16 § II.C(4)(b)).

Section II.E then identifies the circumstances under which an employee can notice an "appeal" of a "termination decision." JA068 (AR 4-16 § II.E). That portion of the regulation states that in certain circumstances not applicable here, there is either no right to appeal or any appeal is governed by a separate regulation. JA068 (AR 4-16 § II.E(1)-(2)). "In all other cases, the termination decision may be appealed to the" Chief Operating Officer of the CIA and then to the Director of the CIA "in cases where the [Chief Operating Officer] denies the initial appeal or where the [Chief Operating Officer] serves as the terminating authority." JA068 (AR 4-16 § II.E(3)-(4)).

Critically, however, the list of circumstances justifying termination concludes with a catch-all provision that expressly recognizes the Director of the CIA's broader statutory discretion and makes clear that it is not subject to the procedural restrictions outlined elsewhere in the regulation: "In addition to the circumstances specified in paragraphs 1 through 10 above, an employee may have his or her employment be terminated whenever the [Director of the CIA], in his discretion, deems such termination necessary or advisable in the interests of the United States." JA065 (AR 4-16 § II.B(11)).

Likewise, Section II.D of the regulation provides for "Termination Without Procedures" when a termination is effectuated by a determination of the Director of the CIA pursuant to his statutory authority. JA067-068 (AR 4-16 § II.D). That section provides that "any employee may be terminated from the [CIA] at any time

without regard to any procedural steps set forth in this regulation or elsewhere" if the Director, "in his discretion, deems it necessary or advisable in the interests of the United States." JA068 (AR 4-16 § II.D). That section further states that the Director's authority is "entirely discretionary," that he "need not provide to anyone the reasons for exercising this authority," and that a "national security basis for the exercise of this authority is not required." JA068 (AR 4-16 § II.D).

## B. Factual Background

On January 20, 2025, President Trump issued Executive Order 14151, which mandated the "termination" of all "DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." 90 Fed. Reg. at 8339. The Executive Order also mandated that "[e]ach agency head . . . in consultation with the Attorney General, the Director of [the Office of Management and Budget (OMB)], and the Director of [the Office of Personnel Management (OPM)]," take certain actions within the ensuing 60 days. *Id.* Amongst those actions was the "terminat[ion], to the maximum extent allowed by law," of "all DEI . . . offices and positions." *Id.*

To implement Executive Order 14151, the Acting Director of OPM issued a memorandum to all agency heads directing agencies to commence personnel actions regarding employees who were employed in now-shuttered DEI offices. *See* Memorandum from Charles Ezell, Acting Dr., OPM, to Heads and Acting Heads of Departments and Agencies Agency Heads (Jan. 24, 2025), https://perma.cc/BH6A-

LMNA (OPM Memorandum).  The OPM Memorandum further directed that agencies conduct any reduction in force according to this directive by defining the "competitive area"—that is, the segment of the agency in which the impacted employees would typically compete for any open positions, *see* 5 C.F.R. § 351.402— "solely in terms of the DEIA office where the employees worked."  OPM Memorandum.  In other words, OPM directed that impacted employees were authorized to compete for open positions only within agency components that, pursuant to the Executive Order, no longer existed.

On February 18, 2025, Director Ratcliffe signed a memorandum explaining that he had concluded—in an exercise of his discretionary authority under 50 U.S.C. § 3036(e)(1)—that the termination of employees who were then-employed in the agency's now shuttered "Diversity and Inclusion Office" was "necessary or advisable in the interests of the United States."  JA073-074; *see also* JA147-150.  Consistent with the provisions of the National Security Act and AR 4-16, these employees will retain their security clearances and are free to apply to federal agency employment vacancies, including those at the CIA.

CIA personnel subsequently informed the impacted employees that they would remain on administrative leave (with pay) and had until March 31, 2025, to determine

how to effectuate their separation.[2]  Impacted employees were given several options.

First, if the employee were eligible to retire, he would be entitled to elect a retirement

date prior to September 30, 2025, and would remain on administrative leave (with

pay) until that date.  Second, the employee could voluntarily resign pursuant to the

Deferred Resignation Program and remain on administrative leave (with pay) until the

date of the employee's deferred resignation.  Third, the employee could choose to

voluntarily resign immediately.  Fourth, the employee could elect formal termination,

in which case the employee would remain on administrative leave (with pay) for 90

additional days, after which the employee's termination would become effective.  On

March 17, 2025, plaintiffs were informed that "[t]here [was] no process to appeal this

decision within the [CIA] or otherwise seek reassignment within the [CIA]."  JA233.

The Director of National Intelligence largely followed the same process as the

CIA.  On March 9, 2025, ODNI informed affected employees that they too would

have a choice between taking a deferred or immediate resignation, retirement (if

eligible), or termination effective June 9, 2025.  For any employee who selected

termination, the Director of National Intelligence authorized—as an exercise of her

discretion—the employee to seek "reconsideration" of the decision.  The ODNI

---

[2]  Director Ratcliffe also placed on administrative leave certain employees who
worked on DEI-related issues as a collateral duty within their larger responsibilities
for another substantive component of the CIA.  That group includes some—but not
all—of the plaintiffs here.  Those individuals did not receive a separation notice and,
as of the current date, no final employment decisions have been made with respect to
those individuals.

plaintiffs in this action have exercised this option to seek "reconsideration" and be permitted to remain employed by ODNI. JA222. No determination has yet been made on the ODNI plaintiffs' requests.

### C.    Prior Proceedings

1. On February 17, 2025, plaintiffs—who represent some, but not all, of the ODNI and CIA employees impacted by these employment decisions—filed suit in the United States District Court for the Eastern District of Virginia. Plaintiffs' amended complaint challenged the notice of their separation of employment under the Administrative Procedure Act, the Administrative Leave Act, and the First and Fifth Amendments to the United States Constitution.

Shortly thereafter, plaintiffs filed a motion for a temporary restraining order, seeking to prevent the CIA and ODNI from terminating their employment. After full briefing and several hearings, the district court converted plaintiffs' motion into a motion for a preliminary injunction and denied it in full. In an oral ruling from the bench, the court concluded that it lacked subject-matter jurisdiction over plaintiffs' statutory claims. JA182-195. Although the court concluded that it could exercise jurisdiction over plaintiffs' constitutional claims, it determined that plaintiffs had not demonstrated a clear likelihood of success on the merits. With respect to plaintiffs' First Amendment claim, the court held that the current record suggested that plaintiffs "were slated for termination not because of their speech but simply because they had the misfortune of having been last assigned to a DEI program." JA187.

13

And in any event, any putative speech occurred "in the employees' official duties and was not protected speech." JA187.

As to plaintiffs' Fifth Amendment due process claim, the court held that the CIA's regulations and the governing statute "make[] clear that the employees have no" constitutionally protected "due process interest in their continued employment." JA188. The court suggested that it was "[l]ess clear" whether plaintiffs could make out a cognizable due process claim based on "reputational injury" or "post-termination consideration for reassignment" and suggested that plaintiffs might have a cognizable protected right under the CIA's regulations to be considered for reassignment or to request an appeal from the termination decision. JA189-190, JA192. In this respect, the court likened the Director of the CIA's decision to terminate the plaintiffs to a reduction-in-force, for which—in the court's view—AR 4-16's procedures regarding termination of excess personnel should apply. JA193. The court concluded, however, that it could not enter an injunction on the current record because it was unclear whether plaintiffs may seek such reassignment or appeal and what course of action the Directors would take in response to such a request. JA194.

2. On March 27, 2025, after plaintiffs were informed that there was no process to appeal the termination decision within the CIA, plaintiffs filed a renewed motion for a preliminary injunction, premised exclusively on their Fifth Amendment due process claim. The district court granted that motion in relevant part.

In a lengthy oral ruling, the court found that Director Ratcliffe had acknowledged in a declaration submitted to the court that he had "deemed" the termination of plaintiffs' employment to be necessary or advisable in the interest of the United States in order to comply with Executive Order 14,151 and the accompanying OPM Memorandum. JA254-255. From this, the court concluded that the Director's decision was essentially a reduction-in-force, and that he was bound to follow provisions in AR 4-16 § II.C(4) governing the termination of excess personnel. JA254-55. In so holding, the court rejected the government's argument that the alleged violation of internal CIA regulations does not give rise to a constitutional due process claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). JA259-260. The court further concluded that plaintiffs had established irreparable harm from the denial of their constitutional due process rights, finding that plaintiffs had demonstrated a sufficient likelihood that they might suffer reputational injury as a result of language in Executive Order 14151 disparaging DEI positions. JA261.

In addition to these oral findings, the court issued a written order enjoining the defendants from "effectuating or implementing any decision to terminate the Plaintiffs without further Court authorization." JA235. The court stated that if a decision to terminate a plaintiff were provided to the court for approval, the court would assess whether the plaintiff had "received the appeal and consideration for reassignment he or she was entitled to receive as set forth on the record during the hearing," and that plaintiffs "shall continue to remain on administrative leave with pay

15

and benefits, or be otherwise reinstated, pending further court order." JA235-236.

Finally, the court ordered defendants to provide plaintiffs with a process to appeal any termination decision on request, and that defendants consider any request for reassignment to open or available positions without regard to the OPM Memorandum's definition of a "competitive area" for purposes of this determination. JA236 (quotation marks omitted).

## SUMMARY OF ARGUMENT

1. The district court fundamentally erred in construing the limited exception recognized in *Webster v. Doe*, 486 U.S. 592 (1988), for judicial review of a constitutional claim as permitting review of plaintiffs' ordinary regulatory compliance claim. As this Court has long recognized, a plaintiff cannot allege a colorable due process violation unless he can establish that he "had a property or liberty interest at stake." *Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002). This requires plaintiffs to demonstrate an "*entitlement* to the benefit" established by statute, and the governing statute or regulation must "act to limit meaningfully the discretion of the decisionmakers." *Id.* at 249-30 (quotations omitted). But plaintiffs plainly do not have a cognizable property interest in their continued employment by statute or regulation.

As an initial matter, the National Security Act confers broad discretion on the Directors of the CIA and National Intelligence to discharge agency personnel. The Act provides that the Directors may, in their unreviewable discretion, terminate the employment of agency personnel whenever they "deem[]" such termination to be

16

"necessary or advisable in the interests of the United States."  50 U.S.C. §§ 3036(e),

3024(m); *Webster*, 486 U.S. at 600-01 (quotations omitted).  Plaintiffs thus are, in

effect, at-will employees.  While recognizing this broad discretion and acknowledging

that these statutes largely foreclose judicial review of the Directors' termination

decisions, the district court concluded that an internal CIA regulation, AR 4-16,

created procedural rights that constrained the Directors' broad discretion in this area.

That conclusion conflicts with the plain language of the regulation, which repeatedly

disclaims any intent to create binding and enforceable rights.  JA063, JA069 (AR 4-16

§§ II.A, II.F).  Indeed, the regulation expressly states that the Directors' authority to

terminate employment where they "deem" such termination to be necessary or

advisable in the interest of the United States under the National Security Act is "[n]ot

constricted, limited, affected, or otherwise controlled by any of the procedures set

forth in this regulation."  JA068.

The district court did not identify any aspects of AR 4-16 that could confer a

substantive liberty or property interest.  Instead, the court cited *United States ex rel.*

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954), for the general proposition that agencies

are required to follow their own regulations and concluded that plaintiffs had thus

stated a cognizable due process claim under *Webster* based on alleged violations of

procedures set forth in AR 4-16.  But neither the Supreme Court nor this Court has

ever held that an agency's alleged failure to follow its own regulations, without more,

constitutes a violation of *constitutional* due process, rather than simply a principle of

17

federal administrative law. That is significant because *Webster* makes clear that termination decisions made pursuant to the Director of the CIA's statutory authority under the National Security Act are not subject to judicial review absent a cognizable constitutional claim.

In any event, plaintiffs have not established a colorable *Accardi*-type claim. To prevail under that doctrine, plaintiffs must "demonstrate prejudice resulting from the" alleged violation of agency rules. *United States v. Morgan*, 193 F.3d 252, 267 (4th Cir. 1999). This requires them to show both (1) that the agency intended to be bound by the procedures contained within AR 4-16, and (2) that the rule confers procedural benefits that constrain otherwise unfettered discretion. But AR 4-16 contains none of the necessary hallmarks of a binding regulation. It is not published in the Code of Federal Regulations and repeatedly disclaims any intent to create rights or privileges that bind the agency or limit the Director of the CIA's unfettered discretion.

Moreover, the district court erred in holding that the procedures governing consideration for reassignment and appeal in the case of termination of excess employment apply to determinations made by the Directors rather than lower-level officials. Indeed, AR 4-16 expressly states that when the Director of the CIA invokes his statutory authority to terminate employees when he deems it necessary or advisable in the interest of the United States, he may do so "without regard to any procedural steps set forth in this regulation or elsewhere." JA068 (AR 4-16 § II.D); *see*

*also* JA063 (AR 4-16 § II.A). The district court thus erred in concluding that plaintiffs were likely to succeed on the merits of their *Accardi* claim.

2. The district court also abused its discretion in determining that the balance of equitable factors supported the issuance of a preliminary injunction. As the Supreme Court has explained, in the absence of a "genuine extraordinary situation," the imminent loss of government employment "will not support a finding of irreparable injury, however severely [it] may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). The district court did not identify any such extraordinary circumstances here.

Instead, the district court speculated that plaintiffs could potentially face irreparable reputational injury due to purportedly disparaging language about DEI programs contained in Executive Order 14,151 and the implementing OPM Memorandum. Critically, however, plaintiffs have not made any attempt to demonstrate that the broad, government-wide statements made in those documents can even theoretically be tied to them as individuals. Nor have plaintiffs alleged that the CIA or ODNI have disseminated or will likely disseminate *any* information about their termination or that the agencies intend to publicly link plaintiffs to the former diversity office. Indeed, AR 4-16 itself states that the reasons for a CIA employee's termination under the Director if the CIA's authority are generally *not* provided to any other employee—including other federal agencies—without the employee's consent. JA070 (AR 4-16 § II.H). There is accordingly no basis for the district court's finding

that plaintiffs face any threat of future reputational injury, much less a sufficient basis to support a finding of irreparable harm. And that harm is particularly speculative with respect to two subsets of plaintiffs for whom no final determination regarding their separation from the agency has been made. In any event, whatever hypothetical risk of reputational injury might exist does not outweigh the harms to the government and the public interest from allowing judicial oversight over employment decisions committed to the Directors' discretion.

3. By treating plaintiffs' ordinary regulatory compliance claim as a constitutional due process claim, the district court improperly expanded *Webster*'s limited allowance for judicial review of constitutional claims in a way that invites potentially limitless judicial intrusion into a realm Congress intended to remain committed to agency discretion. And the court compounded this error by enjoining the Directors from terminating plaintiffs' employment without first submitting proof that the internal procedures governing terminations for excess employment had been satisfied and seeking the court's prior approval. In so doing, the court subjected the agency to procedures that are plainly inapplicable and non-binding, and whose application to plaintiffs' circumstances creates unreasonable or impracticable results. Moreover, the ongoing oversight role that the court assigned to itself—in which it acts as a final arbiter before a termination can be finalized—subverts congressional design and improperly intrudes into the Directors' exercise of prerogatives that the Supreme Court has confirmed are largely unreviewable.

## STANDARD OF REVIEW

A party seeking a preliminary injunction must establish that: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." *Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir 2019).  This Court reviews the grant or denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo.  *Id.*; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) ("A district court abuses its discretion when it misapprehends or misapplies the applicable law.").

## ARGUMENT

## I.  The Decisions to Terminate Plaintiffs' Employment Are Committed to Agency Discretion and Nonjusticiable Under the National Security Act

### A.  The National Security Act Precludes Judicial Review of Plaintiffs' Statutory and Regulatory Challenges

The National Security Act provides the Directors of the CIA and National Intelligence with a substantial grant of discretion to terminate the employment of personnel within their respective agencies.  As relevant to the CIA, the law provides that "[n]otwithstanding the provisions of any other law, the Director of the [CIA] may, in the discretion of the Director, terminate the employment of any officer or employee of the [CIA] whenever the Director deems the termination of employment

of such officer or employee necessary or advisable in the interests of the United States." 50 U.S.C. § 3036(e)(1). The Director of National Intelligence possesses functionally identical authority. *Id.* § 3024(m)(1) ("[T]he Director of National Intelligence may exercise with respect to the personnel of the [ODNI] any authority of the Director of the [CIA] . . . to the same extent, and subject to the same conditions and limitations, that the Director of the [CIA] may exercise such authority with respect to personnel of the [CIA] . . . .").

In *Webster v. Doe*, 486 U.S. 592 (1988), the Supreme Court explained that the grant of authority in a predecessor to Section 3036(e)(1) "exhibits . . . extraordinary deference to the Director in his decision to terminate individual employees" and "indicate[s] that Congress meant to commit individual employee discharges to the Director's discretion" by law, thereby insulating them from judicial review. *Id.* at 601.[3] The Court stressed that the statute permits termination of employment "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States'",—not "simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600. And the Court concluded that this "standard fairly exudes deference to the Director," and "foreclose[s] the application of any meaningful judicial standard of review." *Id.*; *see also Neely v. CIA*, 2 M.S.P.B. 534, 535

---

[3] Like the current statute, the predecessor statute provided that "the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States." 50 U.S.C. § 403(c) (1947).

(1980) (explaining that CIA's "authority to remove under the National Security Act is not limited to" terminations for national security reasons), *aff'd*, 744 F.2d 878 (D.C. Cir. 1984) (unpublished table decision).

Indeed, the Court explained, given the broad standard set forth by Congress, there would be no "basis on which a reviewing court could properly assess an Agency termination decision" without undergoing the extraordinarily intrusive process of "permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests." *Webster*, 486 U.S. at 600. The Court accordingly determined that the statute "exhibits . . . extraordinary deference to the Director in his decision to terminate individual employees" and "indicate[s] that Congress meant to commit individual employee discharges to the Director's discretion" by law. *Id.* at 601. The Court thus concluded that this broad grant of discretionary authority forecloses judicial review of challenges to the Director of the CIA's termination decisions, except those seeking declaratory or injunctive relief for alleged constitutional violations. *Id.* at 600-01, 604-05.

**B.      Plaintiffs Have Not Established a Justiciable Constitutional Due Process Claim**

**1.      Plaintiffs Have Not Established a Cognizable Liberty or Property Interest in Their Continued Employment**

Plaintiffs here did not and cannot establish a colorable due process violation that is justiciable under *Webster*. As this Court has recognized, to allege a constitutional due process claim, a plaintiff must first establish that "he had a property

or liberty interest at stake." *Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002). To do so, plaintiffs must establish "more than a mere expectation (even one supported by consistent government practice) of a benefit." *Id.* Instead, there must be an "*entitlement* to the benefit as directed by statute, and the statute must "'act to limit meaningfully the discretion of the decision-makers.'" *Id.* at 429-30 (quoting *Mallette v. Arlington Cty. Emps. Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir. 1996)). "Discretionary statutory 'rights' do not create liberty or property interests protected by the Due Process Clause." *Id.* at 430.

As the district court properly recognized in denying plaintiffs' first motion for a preliminary injunction, plaintiffs do not have a protectable due process interest in their continued employment. JA188. To the contrary, as discussed, the National Security Act confers broad discretion on the Directors of the CIA and National Intelligence to discharge agency personnel—in effect, plaintiffs are at-will employees. This express grant of discretionary authority makes clear that plaintiffs have no property interest in their continued employment. *See Guerra v. Scruggs*, 942 F.2d 270, 278 (4th Cir. 1991); *see also Doe v. Gates*, 981 F.2d 1316, 1320-21 (D.C. Cir. 1993) (holding that there is no property right to continued employment in the CIA).

Nor have plaintiffs demonstrated a cognizable property interest arising out of agency regulations or rules. As this Court has recognized, regulations do not establish cognizable property interests unless they "prescribe substantive rules of decision: the regulation must create 'substantive predicates' to guide the decisionmaker's discretion,

such as 'specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.'" *Stewart v. Bailey*, 7 F.3d 384, 392 (4th Cir. 1993) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63 (1989)). Plaintiffs here have alleged—and the district court found—that the Directors of the CIA and National Intelligence failed to follow the procedures governing the termination of excess personnel detailed in the CIA's internal regulation, AR 4-16. But that regulation expressly disclaims any intent to create an enforceable property right or otherwise limit the Director of the CIA's discretion to terminate employees when he "deems" it to be necessary or advisable in the interests of the United States under the National Security Act.

Section II.A, for example, states that "[n]othing in this regulation or in any other regulation, document, or law shall be construed as creating for any employee any property or other interests or privileges in his or her employment." JA063 (AR 4-16 § II.A). Similarly, Section II.F states that nothing in the regulation "or any other [CIA] regulation or policy statement" should be "construed to create or confer on any person or entity any right to administrative or judicial review of [CIA] employment termination procedures, their implementation, or decisions or actions rendered thereunder," nor does the regulation "create[] or confer[] any right, benefit, or privilege, whether substantive or procedural, for continued [CIA] employment." JA069 (AR 4-16 § II.F). And, as further discussed below, the regulation expressly states that the Director of the CIA's authority to terminate employees is "[n]ot

constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or in any other" and the Director's exercise of this discretionary authority is "[i]n abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law."  JA068 (AR 4-16 § II.D).

In light of this clear language, AR 4-16 cannot plausibly be read as imposing substantive or procedural rights that constrain the Director of the CIA's discretionary authority under the National Security Act.  Indeed, in *Webster* itself, the Supreme Court declined to disturb the D.C. Circuit's prior finding that an earlier but functionally similar version of the regulation, CIA Reg. HR 20-27 (1978), "plainly protect[s] the discretion granted to the Director."  486 U.S. at 602 n.7; *see also Doe v. Casey*, 796 F.2d 1508, 1519 (D.C. Cir. 1986) ("We cannot imagine how the CIA could have more plainly expressed its intent to protect the discretion granted it by" the National Security Act), *aff'd in part, rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592 (1988).  Likewise, in a later case, the D.C. Circuit held that a terminated CIA employee had not established a cognizable property interest because that same then-existing version of AR 4-16 did not "contradict the statutory grant of discretion to the Director."  *Gates*, 981 F.2d at 1320.  For these same reasons, plaintiffs have no constitutional due process claim based on the Director's alleged failure to follow certain procedures detailed in AR 4-16.

## 2. The District Court Erred in Determining that Plaintiffs Were Likely to Succeed on the Merits of an *Accardi* Claim

Notwithstanding AR 4-16's repeated and express statements that it does not constrain the Director of the CIA's statutory authority in any manner, the district court concluded that the Directors were required, as a matter of constitutionally mandated procedural due process, to follow procedures set forth in AR 4-16 governing the termination of excess employment. In support of this startling conclusion, the district court relied exclusively upon *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which affirms the general principle that agencies must "follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). The district court's reliance on *Accardi* was misplaced for several reasons.

*First*, neither the Supreme Court nor this Court has ever endorsed the proposition that an agency's alleged failure to follow its own regulations, without more, constitutes a violation of *constitutional* due process. Although *Accardi* itself stated that the party seeking relief was entitled to an order requiring a federal agency to follow its own regulations in order to ensure that the party would be "afforded that due process required by the regulations," 347 U.S. at 268, the Supreme Court has subsequently explained that *Accardi* "enunciate[d] principles of federal administrative law rather than of constitutional law binding on the States," *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 n.8 (1978); *see also Crosby-Bey v. District of*

*Columbia*, 786 F.2d 1182, 1186 (D.C. Cir. 1986) (per curiam) (holding that the *Accardi*

principle is not required by the federal constitution but, rather, is a doctrine of federal

administrative law not enforceable against the District of Columbia government).

That is significant because in *Webster* the Supreme Court made clear that

termination decisions made pursuant to the Director's statutory authority under the

National Security Act are generally not subject to judicial review absent a cognizable

constitutional claim.  Because a claim that an agency failed to follow its own

regulations under *Accardi* cannot properly be characterized as a constitutional claim,

the district court erred in concluding that plaintiffs' *Accardi* claim here was justiciable.

By treating a run-of-the-mill Administrative Procedure Act claim as constitutional

claim, the district court expanded *Webster's* limited exception for constitutional claims

in a way that invites potentially limitless judicial intrusion into a realm Congress

intended to remain committed to agency discretion.[4]

The Supreme Court has cautioned against transforming ordinary regulatory

compliance claims into constitutional claims.  Indeed, *Webster* itself cautioned that

judicial review of ordinary statutory and regulatory claims asserted under the

---

[4] In a footnote, the Court noted that the government had "concede[d]" in *Webster* that courts would have jurisdiction to review an Administrative Procedure Act challenge to an *Accardi*-type claim involving the CIA's failure to follow its own regulations.  486 U.S. at 602 n.7.  But the Court did not endorse this position, concluding that it was unnecessary to opine on this issue given the D.C. Circuit's finding that the then-existing regulations did not constrain the Director of the CIA's otherwise unreviewable discretion.  *Id.*  In any event, as discussed further below, plaintiffs have not established the necessary elements of an *Accardi* claim.

Administrative Procedure Act would be inconsistent with the overall structure of the National Security Act, which vests in the Director of the CIA "very broad authority to protect" "intelligence sources and methods from unauthorized disclosure." 486 U.S. at 600-01 (quotations omitted). But under the district court's theory, so long as the same claim is recast in constitutional garb, plaintiffs may open the door to the same type of intrusive inquiries into the Director's underlying motivations that the National Security Act's discretionary standard was designed to avoid. *Id.* at 600 (explaining that the discretionary standard "foreclose[s] the application of any meaningful judicial standard of review," because there is no "basis on which a reviewing court could properly assess" the Director's termination decision "[s]hort of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests").

Likewise, in *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983), the Court held that a violation of state prison regulations governing prisoner transfer did not give rise to a constitutional due process claim because, like the agency regulation at issue here, the regulation preserved discretion and therefore did not create a cognizable liberty or property interest. As the Court explained, "[p]rocess is not an end in itself," and constitutional protections do not apply unless the plaintiff establishes "a substantive interest to which [he] has a legitimate claim of entitlement." *Id.*; *see also Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 58 (D.D.C. 1998) (explaining that *Olim* "reject[ed]" the notion that "the *Accardi* doctrine simply collapses into the Due

29

Process Clause," which would make violations of an "agency's gratuitous regulations" automatically actionable under the Fifth Amendment). Thus, because AR 4-16 does not create the type of protected liberty or property interest that would otherwise give rise to a constitutional due process claim, plaintiffs' claim that the Directors failed to follow certain procedures in that regulation is not a justiciable constitutional claim under *Webster*.

*Second*, even assuming the *Accardi* doctrine has some constitutional underpinnings, that doctrine does not apply unless plaintiffs "demonstrate prejudice resulting from the" alleged violation of agency rules. *United States v. Morgan*, 193 F.3d 252, 267 (4th Cir. 1999). This requires, at a minimum, that plaintiffs demonstrate that the agency "inten[ded] to be bound" by the procedural rules within AR 4-16. *Vietnam Veterans of Am. v. Secretary of the Navy*, 843 F.2d 528, 538 (D.C. Cir. 1988); *Wilkinson*, 27 F. Supp. 2d at 60. Plaintiffs did not, and cannot, make that showing here.

As discussed, AR 4-16 is not published in the Code of Federal Regulations and was not generally available outside of the agency until disclosed during this litigation. *See* Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569, 602-03 (2006) (explaining that the relevant "indicia of intent may boil down to whether the agency has published the rule in the [Code of Federal Regulations], cited a specific grant of legislative rulemaking authority, or is amending previous procedural rules clearly" (footnote omitted)). More importantly, as noted, *supra* pp. 24-26, the regulation

expressly and repeatedly disclaims any intent to create rights or privileges that bind the agency.

Plaintiffs must also demonstrate that the relevant regulations were intended "primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" or that the agency is "required by rule to exercise independent discretion [and the agency] has failed to do so." *Morgan*, 193 F.3d at 267 (quoting *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970)). Here again, they have not, and cannot, make the necessary showing. By its plain terms, AR 4-16 does not confer procedural benefits that restrict the Director of the CIA's otherwise unfettered discretion. To the contrary, the regulation expressly states that the Director's unfettered discretion to terminate employment under the National Security Act is "[n]ot constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law." JA068 (AR 4-16 § II.D); *see also Webster*, 486 U.S. at 602 n.7 (declining to disturb the court of appeals' holding that the then-existing and functionally identical regulation "plainly protect[s] the discretion granted [by] the Director" and "'provid[e] no independent source of procedural or substantive protections'" (third alteration in original)). The district court's holding that AR 4-16 nevertheless imposes significant procedural limits on the Director's discretion cannot be reconciled with this clear disclaimer.

*Third*, even accepting *arguendo* that AR 4-16 could form the basis of a justiciable *Accardi* claim in some hypothetical circumstance, the district court erred in concluding that plaintiffs had demonstrated a substantial likelihood of success on their specific *Accardi*-based claim that the agency was required to follow procedures governing consideration for reassignment and appeal in cases of termination for "excess employment" set forth in AR 4-16, § II.C(4) and II.E. Those procedures require, among other things, that employees be "advised in writing" if the "head of a component determines that [the] employee is excess to the needs of the component," and that the employee's Career Service will "make an effort to arrange a placement in another component" before the employee is declared excess to the needs of the Career Service. JA066-067 (AR 4-16 § II.C(4)). In addition, any termination decision may be appealed to the Chief Operating Officer of the CIA or to the Director of the CIA. JA068 (AR 4-16 § II.E).

Contrary to the district court's reasoning, these procedures plainly do not apply where, as here, the Director of the CIA has invoked his statutory authority to terminate employees when he deems it necessary or advisable in the interest of the United States. As already discussed, AR 4-16 unambiguously recognizes that the Director may invoke his statutory authority to terminate agency employment "without regard to the procedural requirements of this regulation." JA063 (AR 4-16 § II.A). Likewise, Section II.D, which provides for "Termination Without Procedures," states that "any employee may be terminated from the [CIA] at any time without regard to

any procedural steps set forth in this regulation or elsewhere when the [Director of the CIA] in his discretion, deems it necessary or advisable in the interests of the United States." JA068 (AR 4-16 § II.D).

Notwithstanding this unequivocally clear language, the district court found that the agencies must nevertheless permit plaintiffs an opportunity to compete for reassignment and appeal their terminations under AR 4-16 § II.C(4) and II.E. The court based this determination on the fact that the Director of the CIA stated in his declaration that he had deemed the termination of plaintiffs' employment to be necessary or advisable in the interest of the United States because of the Executive Order and OPM Memorandum directing the closure of DEI offices. JA255-256. The court thus concluded that the termination effectively constituted a reduction-in-force, for which the procedures set forth in Section II.C(4) governing the termination of excess employment would typically apply. The court held that these procedures must be followed because, in the district court's view, Section II.D "was not intended to address the specific situations addressed in the other parts of the regulations" and does not "eliminat[e] the operation of the other parts of the regulation." JA256.

That reasoning does not grapple with Section II.D's unequivocal statement that the Director of the CIA may initiate a termination in the exercise of his discretionary authority under the National Security Act "without regard to *any* procedural steps set forth in this regulation." JA068 (AR 4-16 § II.D) (emphasis added). And if that were not already sufficiently clear, Section II.D further states that the Director's authority is

"[n]ot constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other." JA068 (AR 4-16 § II.D). The district court's construction of the regulation as permitting termination without procedures under Section II.D only insofar as no other portion of the regulation "specifically address[es] the specific circumstances involved in a decision to terminate an employee" disregards these provisions. JA255-256 (Mar. 31 Tr. at 19-20); *see also Casey*, 796 F.2d at 1519 (D.C. Cir. 1986) ("We cannot imagine how the CIA could have more plainly expressed its intent to protect the discretion granted it by" the National Security Act.).

Moreover, on their face, the procedures governing consideration for reassignment and appeal outlined in Section II.C(4) and II.E apply only to employment determinations made by lower-level agency officials; they do not in any way constrain decisions by the Directors pursuant to the broad grants of authority in 50 U.S.C. §§ 3024(m) and 3036(e). Indeed, it is difficult to imagine *how* the Director of the CIA would comply with the reassignment or appeal procedures identified in Section II.C or II.E, as those procedures expressly contemplate a process that originates with employment decisions made by some official *other than* the Director himself. Section II.C(4), for example, discusses a reassignment consideration process that applies when the "head of a component" determines that an employee is excess to the needs of the service, and that process culminates in a final decision by the Chief Operating Officer. JA266-267 (AR 4-16 § II.C(4)). Likewise, Section II.E provides that termination decisions may, in some cases, be appealed to the Chief Operating

34

Officer, and eventually, to the Director. In short, these procedures make good sense when applied to determinations by lower-level agency officials, but they make no sense as applied to termination decisions made by the Director himself.

The district court nowhere acknowledged the obvious misfit between the procedures in AR 4-16 and decisions made by the Director of the CIA himself. But the D.C. Circuit long ago recognized this point when analyzing the then-existing and functionally similar version of the CIA's regulations in *Webster*. As the D.C. Circuit explained, the specific procedures in Section II.C "'normally' will govern separations from the CIA," but the regulation as a whole "cautions that these procedures need not be followed for terminations made" by the Director. *Casey*, 796 F.2d at 1519 (alteration omitted); *see also Webster*, 486 U.S. at 602 n.7 (declining to the disturb the D.C. Circuit's finding "that the CIA's own regulations plainly protect the discretion granted the Director by [the National Security Act] and that the regulations 'provid[e] no independent source of procedural or substantive protections'") (second alteration in original).

Furthermore, the district court's interpretation of Section II.D as applying only insofar as the other procedures for termination of employment outlined in Section II.C do not apply creates anomalous results. As already discussed, *Webster* held that the Director of the CIA has unfettered discretion to terminate the employment of agency personnel when he deems such termination necessary or advisable in the interests of the United States. That reflects a deliberate congressional judgment to

35

limit judicial inquiry and intrusive discovery into questions about the Director's subjective motivations for a termination, which could require, among other things, disclosure of classified or sensitive information about the plaintiff's employment. *Webster*, 486 U.S. at 600 ("Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision."); *see also id.* at 620-21 (Scalia, J. dissenting) (opining that constitutional claims should likewise be precluded from judicial review because both types of claims would require intrusive discovery and "bring[] a significant decision-making process of our intelligence services into a forum where it does not belong").

The district court's construction of AR 4-16 invites the same intrusion into prerogatives committed to the Director of the CIA's discretion by law. In the district court's view, the availability of termination without procedures under Section II.D applies only insofar as no other provision of the regulation "specifically address[es] the specific circumstances involved in a decision to terminate an employee." JA255-256. But under that view of the regulation, virtually every case in which an employee had been terminated pursuant to the Director's statutory authority would invite analysis into the specific reasons for the termination in order to determine whether the termination fell into any of the categories for which specific procedures outlined in the regulation might apply. That is precisely the type of judicial intrusion that

Congress sought to avoid. *See Webster*, 486 U.S. at 600; *see also* JA062 (AR 4-16 § I) (explaining that, under the National Security Act and the agency's internal regulation, the Director "need not provide to anyone the reasons for such termination if he decides not to do so"). The district court thus fundamentally erred in concluding that plaintiffs were likely to succeed on the merits of their *Accardi* claim.

## II. The District Court Abused Its Discretion by Concluding that the Balance of Equitable Factors Weighed in Favor of a Preliminary Injunction

The district court also abused its discretion in concluding that the remaining equitable factors support the issuance of a preliminary injunction. As an initial matter, in the absence of a "genuinely extraordinary situation," the imminent loss of government employment "will not support a finding of irreparable injury, however severely [it] may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). That is because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date," as is almost always the case in employment actions, "weighs heavily against a claim of irreparable harm." *Id.* at 90. In addition, the Court noted that the availability of an injunction must be weighed against "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,' and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee," all of which "cut[] against the general

availability of preliminary injunctions in Government personnel cases." *Id.* at 83-84 (citation omitted).

The district court here concluded that a denial of plaintiffs' constitutional rights constitutes per se irreparable injury. JA261. As noted, however, plaintiffs' *Accardi*-based claim that the agencies failed to follow the procedures in AR 4-16 cannot properly be characterized as a constitutional claim. Moreover, virtually every employment claim against the government involves some alleged violation of internal regulations or statutes, the district court's analysis would effectively compel a finding of irreparable harm in most such cases. But courts have consistently required more to obtain the "extraordinary remedy," *Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), of a preliminary injunction. Indeed, *Sampson* itself involved a claim that an employee's termination was not effectuated in accordance with the procedural requirements of a regulation. 415 U.S. at 66. The Court nevertheless concluded that the employee had not shown irreparable harm and cautioned that preliminary injunctions should not issue in "routine" employment cases. *Id.* at 92 n.68; *see also id.* at 84 ("[The] respondent at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases."); *see also Guerra*, 942 F.2d at 273-74. The district court's per se finding of irreparable injury based on an alleged constitutional violation resulting from

deviation from agency procedures cannot be reconciled with the high standard for irreparable injury that applies to government employment claims.

The district court also suggested that plaintiffs had "credibly raised the prospect of irreparable harm based on reputational injury" due to the language of Executive Order 14,151. JA261; *see also* JA191. Although the district court did not expressly hold that plaintiffs were likely to prevail on the merits of such a due process claim, it is clear that any such claim lacks merit and that any possible reputational injury is far too speculative to qualify as irreparable harm sufficient to support a preliminary injunction.

To prevail on a "stigma-plus" due process claim, a plaintiff must establish three elements: (1) "a statement stigmatizing his good name and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that alter[s] or extinguishe[s] one of his legal rights." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (alterations in original; quotation marks omitted). Here, however, plaintiffs have not alleged that CIA or ODNI have disseminated, or will disseminate, *any* information about their termination, much less that the agencies have made any defamatory or damaging statements. To the contrary, plaintiffs have acknowledged that "[a]t no time" has either agency "contended that [plaintiffs] individually engaged in any misconduct" or accused them of "poor performance." JA096 (Am. Compl. ¶ 4). Moreover, by statute, any termination of CIA employment by the Director of the CIA "shall not

affect the right of the officer or employee to seek or accept employment" in the federal government if declared eligible for such employment by OPM. *See* 50 U.S.C. § 3036(e)(2).

Nor have plaintiffs made any attempt to demonstrate that the broad, government-wide statements made in Executive Order 14,151 or the OPM Memorandum can even theoretically be tied to them as individuals, as would be required to support a claim based of reputational injury. *See* Restatement (Second) of Torts § 564A (1977) ("One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member."); *see also Evans v. Chalmers*, 703 F.3d 636, 659 (4th Cir. 2012) (Wilkinson, J., concurring) (concurring in dismissal of stigma-plus claim and opining that government officials should not be liable "for general statements that reference no individual and are therefore not even actionable under traditional defamation law"). Moreover, AR 4-16 itself states that the reasons for a CIA employee's termination under the Director of the CIA's authority are generally *not* provided to any other employe—including other federal agencies— without the employee's consent. JA070 (AR 4-16 § II.H). The agencies thus have not (and will not) publicly link plaintiffs to the former diversity office or DEI programs more generally.

Put differently, any risk of a potential future reputational injury based upon broad, government-wide statements is entirely speculative and cannot support a finding of irreparable harm sufficient to support the extraordinary remedy of a preliminary injunction. And that is particularly true with respect to two subsets of plaintiffs for whom no final determination regarding the termination of their employment has been made. First, although several of the CIA plaintiffs have been informed of their upcoming separation from the agency, some of the CIA plaintiffs— those who did not work in the agencies' DEI office at the time of its closure but who worked on DEI-related issues as a collateral duty within their larger responsibilities for another substantive component of the CIA—have never received such a notice. Those employees remain on administrative leave, and no final determination regarding their separation has been made. Second, the Director of National Intelligence, in her extra-regulatory discretion, has decided to allow a reconsideration process for the employees who were subject to termination, which the two ODNI plaintiffs here have pursued. No final determination regarding the ODNI plaintiffs' reconsideration has yet been made. Any reputational injury that might result from these plaintiffs' possible eventual separation from the agencies is thus entirely speculative and not an appropriate basis for a finding of irreparable harm warranting an injunction.

Finally, the balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009),

both support vacating the district court's preliminary injunction. As discussed further below, the preliminary injunction constrains the Directors of the CIA and National Intelligence from exercising their congressionally vested discretion to make personnel decisions consistent with their views concerning the best interests of the United States. This intrudes into a realm that Congress intended to be committed to agency discretion by law and subverts congressional design by requiring the Directors to seek judicial preapproval before effectuating a termination pursuant to their broad authority under 50 U.S.C. §§ 3024(m) and 3036(e)(1). These equities strongly weigh against an injunction.

## III.    The Injunction Is Overbroad and Improperly Intrudes on the Directors' Discretionary and Otherwise Unreviewable Authority

As discussed, the plenary termination authority under the National Security Act reflects a congressional judgment that the Directors should have broad discretion to act swiftly to separate employees from their respective agencies whenever either Director deems it necessary or advisable in the interests of the United States to terminate an individual's continued employment. The district court fundamentally erred in construing the limited exception recognized in *Webster* for judicial review of constitutional claims as permitting review of ordinary regulatory compliance claims even where those regulations, on their face, do not procedurally or substantively constrain the Directors' statutory authority. The district court compounded that error by prohibiting the Directors from terminating plaintiffs' employment without first

submitting evidence to the court that plaintiffs have "received the appeal and consideration for reassignment" and seeking the court's prior approval. JA235. This relief is overbroad in two significant respects.

First, as already discussed, the "appeal" and "reassignment" procedures contemplated by the district court are plainly inapplicable and non-binding, and the district court's injunction requiring the agencies to comply with these procedures creates unreasonable or impracticable results. For example, the appeal process identified by the district court in AR 4-16 § II.E states that termination decisions may be "appealed to the [Chief Operating Officer]" or, "in cases where the [Chief Operating Officer] denies the initial appeal" or "serves as the terminating authority," to the Director of the CIA himself. JA068 (AR 4-16 § II.E(3), II.E(4)). But it would be anomalous to apply that regulation where, as here, the Director himself makes the decision to terminate, as such a decision cannot plausibly be subject to further consideration by a lower-level official. Nor did the district court ever explain how an appeal could be taken from a decision of the Director when there is no higher authority to which the appeal could be noticed. Compliance with the injunction thus would require the agencies to invent new procedures that are not contained within AR 4-16, which is, in any event, non-binding.

Second, the district court improperly created an ongoing oversight role for itself to assess the Directors' exercise of prerogatives that the Supreme Court has confirmed are largely unreviewable. As already discussed, the extraordinary deference

granted to the Directors under the National Security Act reflects a deliberate congressional judgment to entrust critical decisions about operational effectiveness and national security to the Directors' discretion by law. As *Webster* recognizes, this provision is an "integral part" of the National Security Act, "because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Webster*, 486 U.S. at 601; *see also Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) ("[T]he protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it."). And by insulating the Directors' discretionary determinations from judicial review, Congress sought to avoid undue judicial interference, second-guessing by the courts, and potentially burdensome or invasive discovery, including potential depositions of the Directors themselves and disclosures that may involve classified information or other sensitive matters of national security. *Webster*, 486 U.S. at 600; *id.* at 620-21 (Scalia, J. dissenting); *cf. Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013) ("[A] court should not be put in the position of second-guessing the discretionary judgment of an executive agency assessing national security risk.").

The district court's injunction turns this scheme on its head by requiring the Directors to dedicate time and resources to reassess whether plaintiffs' continued employment is in the interests of the United States and to seek the court's blessing before finalizing a termination, even if new reasons for the termination have arisen.

The court's injunction thus constitutes precisely the sort of judicial intrusion into national security matters that has the potential to paralyze the intelligence community from taking necessary action in response to fluid circumstances. *See, e.g., Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("[J]udicial inquiry into the national-security realm raises concerns for the separation of powers . . . ."); *Egan*, 484 U.S. at 530 ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). This demonstrates that the district court's injunction is entirely overbroad and should be vacated.

# CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

CHARLES W. SCARBOROUGH

  *s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

June 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,108 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.


*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht