No. 25-1527

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN DOE 4; JOHN DOE 5;
JOHN DOE 6; JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE
DOE 5,

Plaintiffs-Appellees,

v.

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; CENTRAL
INTELLIGENCE AGENCY; JOHN RATCLIFFE, in his official capacity as
Director of the Central Intelligence Agency; TULSI GABBARD, in her official
capacity as Director of National Intelligence,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia

_____

### JOINT APPENDIX
_____

KEVIN T. CARROLL
KIA RAHNAMA
*Fluet & Associates PLLC*
*1751 Pinnacle Drive, Suite 1000*
*Fairfax, VA 22102*
*(703) 590-1234*


*Attorneys for Plaintiffs-Appellees*

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

ERIK S. SIEBERT
*United States Attorney*

CHARLES W. SCARBOROUGH
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9039*
*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries..........................................................................JA001

Complaint (Docket Entry 1) .........................................................................JA010

Plaintiffs' Memorandum of Law In Support of Plaintiffs' Motion for a
    Temporary Restraining Order (Docket Entry 7) ..............................JA027

    Exhibit 1: Declaration of John 1 Doe (Docket Entry 7-1) ..............JA040

Transcript of Motion for a Temporary Restraining Order Feb. 28, 2025
    (Docket Entry 13) ..................................................................JA043

Agency Regulation 4-16 (Docket Entry 14-1) ..............................................JA062

Memorandum of Director Ratcliffe (Docket Entry 14-2) ...........................JA073

Declaration of Robert A. Newton (Docket Entry 14-3) ............................JA076

Reply Memorandum of Law in Support of Plaintiffs' Motion for a Temporary
    Restraining Order (Docket Entry 15) ..................................................JA079

First Amended Complaint (Docket Entry 17) ...............................................JA095

Transcript of Continued Motion for a Temporary Restraining Order Feb. 24,
    2025 (Docket Entry 19) .....................................................................JA113

Declaration of Director John Ratcliffe (Docket Entry 20-1) ......................JA147

Supplemental Memorandum of Law in Support of Plaintiffs' Motion for a
    Preliminary Injunction (Docket Entry 21) .........................................JA151

Transcript of Continued Motion for a Temporary Restraining Order Feb. 27,
    2025 (Docket Entry 27) .....................................................................JA168

Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary
    Injunction (Docket Entry 33) ............................................................JA197

    Exhibit 1 (Docket Entry 33-1) ........................................................JA222

Exhibit 2 (Docket Entry 33-2) ............................................................JA224

Exhibit 3 (Docket Entry 33-3) ............................................................JA227

Exhibit 4 (Docket Entry 33-4) ............................................................JA229

Exhibit 5 (Docket Entry 33-5) ............................................................JA231

Defense Exhibit 1: Email dated March 17, 2024 (Docket Entry 37) .........JA233

Preliminary Injunction Order (Docket Entry 39).........................................JA235

Transcript of Plaintiffs' Motion for a Preliminary Injunction March 31, 2025
    (Docket Entry 27) ...............................................................................JA237

Notice of Appeal (Docket Entry 44)................................................................JA266

APPEAL,STAYED

# U.S. District Court
## Eastern District of Virginia – (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00300–AJT–LRV

| | |
|---|---|
| Doe 1 et al v. Office of the Director of National Intelligence et al | Date Filed: 02/17/2025 |
| Assigned to: District Judge Anthony J Trenga | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Lindsey R. Vaala | Nature of Suit: 899 Other Statutes: |
| Case in other court:  4CCA, case manager Anisha Walker,, 25–01527 | Administrative Procedures Act/Review or Appeal of Agency Decision |
| Cause: 05:551 Administrative Procedure Act | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**John Doe 1**                             represented by  **Kiarash Rahnama Moghaddam**
                                                           Fluet
                                                           1751 Pinnacle Drive
                                                           Suite 1000
                                                           Fairfax, VA 22102
                                                           703–590–1234
                                                           Fax: 703–590–0366
                                                           Email: krahnama@fluet.law
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kevin Thomas Carroll**
                                                           Fluet & Associates, PLLC
                                                           1751 Pinnacle Drive
                                                           Suite 1000
                                                           22102
                                                           Tysons, VA 22102
                                                           703–590–1234
                                                           Email: kcarroll@fluet.law
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Doe 2**                             represented by  **Kiarash Rahnama Moghaddam**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kevin Thomas Carroll**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Doe 3**                             represented by  **Kiarash Rahnama Moghaddam**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kevin Thomas Carroll**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Doe 4**                             represented by  **Kiarash Rahnama Moghaddam**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kevin Thomas Carroll**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Doe 5**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Doe 6**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe 1**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe 2**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe 3**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe 4**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe 5**                    represented by   **Kiarash Rahnama Moghaddam**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Kevin Thomas Carroll**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Office of the Director of National Intelligence**   represented by   **Dennis Carl Barghaan , Jr.**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703)299–3700
Email: dennis.barghaan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca S. Levenson**
DOJ–USAO
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
703–299–3700
Email: rebecca.s.levenson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Central Intelligence Agency**   represented by   **Dennis Carl Barghaan , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca S. Levenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tulsi Gabbard**
*in her official capacity as Director of National Security*   represented by   **Dennis Carl Barghaan , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca S. Levenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Ratcliffe**
*in his official capacity as Director of the Central Intelligence Agency*   represented by   **Dennis Carl Barghaan , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca S. Levenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2025 | 1 | Complaint ( Filing fee $ 405, receipt number AVAEDC–10012088.), filed by John Doe 6, Jane Doe 5, John Doe 3, Jane Doe 1, Jane Doe 3, John Doe 2, Jane Doe 2, John Doe 1, John Doe 4, Jane Doe 4, John Doe 5. (Attachments: # 1 Civil Cover Sheet)(Carroll, Kevin) (Entered: 02/17/2025) |
| 02/17/2025 | 2 | Proposed Summons re 1 Complaint, by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6 (Carroll, Kevin) (Entered: 02/17/2025) |

| 02/17/2025 | 3 | MOTION to Proceed Pseudonymously by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Attachments: # 1 Proposed Order)(Carroll, Kevin) (Entered: 02/17/2025) |
| --- | --- | --- |
| 02/17/2025 | 4 | Memorandum in Support re 3 MOTION to Proceed Pseudonymously filed by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Carroll, Kevin) (Entered: 02/17/2025) |
| 02/17/2025 | 5 | Waiver of re 3 MOTION to Proceed Pseudonymously *Waiver of Oral Argument* by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6 (Carroll, Kevin) (Entered: 02/17/2025) |
| 02/17/2025 | 6 | MOTION for Temporary Restraining Order by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Attachments: # 1 Proposed Order)(Carroll, Kevin) (Entered: 02/17/2025) |
| 02/17/2025 | 7 | Memorandum in Support re 6 MOTION for Temporary Restraining Order filed by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Attachments: # 1 Exhibit Declaration of John Doe 1)(Carroll, Kevin) (Entered: 02/17/2025) |
| 02/17/2025 | | Initial Case Assignment to District Judge Anthony J. Trenga and Magistrate Judge Lindsey R. Vaala. (jlan) (Entered: 02/17/2025) |
| 02/18/2025 | 8 | ORDERED that the Court will hold a hearing on the Motion on February 18, 2025 at 1:00 p.m. in Courtroom 900. Signed by District Judge Anthony J. Trenga on 2/18/2025. Motion Hearing set for 2/18/2025 at 01:00 PM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga.(dzir) (Entered: 02/18/2025) |
| 02/18/2025 | 9 | Summons Issued as to Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe, U.S. Attorney and U.S. Attorney General NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Summons Notice)(swil) (Entered: 02/18/2025) |
| 02/18/2025 | 10 | NOTICE of Appearance by Dennis Carl Barghaan, Jr on behalf of Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe (Barghaan, Dennis) (Entered: 02/18/2025) |
| 02/18/2025 | 11 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 2/18/2025 re 6 MOTION for Temporary Restraining Order filed by Jane Doe 2, John Doe 1, John Doe 2, John Doe 4, Jane Doe 3, John Doe 5, Jane Doe 4, John Doe 1, Jane Doe 5, John Doe 3, John Doe 6. Counsel appeared for Plaintiff and Defendant. Motion argued and continued. Matter is placed on an Administrative Stay. Motion Hearing as to 6 MOTION for Temporary Restraining Order set for 2/24/2025 at 01:00 PM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga. Order to follow. (Court Reporter R. Montgomery)(dzir) (Main Document 11 replaced on 2/19/2025) (dzir, ). (Entered: 02/18/2025) |
| 02/18/2025 | 12 | ORDERED that the hearing on the Motion is CONTINUED to Monday, February 24, 2025 at 1:00 p.m. ET, in Courtroom 900; and it is further ORDERED that Defendants file any response to the Motion by Thursday, February 20, 2025 at 5:00 p.m. ET; and it is further ORDERED that Plaintiffs file a reply, if any, to Defendants' response by Friday, February 21, 2025 at 5:00 p.m. ET; and it is further ORDERED that an ADMINISTRATIVE STAY is entered in this case until further order of this Court, during which, Defendants shall refrain from terminating Plaintiff John Does 1–6 and Jane Does 1–5 or placing these Plaintiffs on leave without pay, such that, these Plaintiffs shall continue to be on administrative leave with their full pay and benefits. Signed by District Judge Anthony J. Trenga on 2/18/2025. (dzir) (Entered: 02/18/2025) |
| 02/19/2025 | 13 | TRANSCRIPT of proceedings held on 02/18/25 ( 6 Motion for Temporary Restraining Order), before Judge Anthony J. Trenga, Court Reporter Rhonda Montgomery, |

| | | |
|---|---|---|
| | | Telephone No. 703–299–4599. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 3/21/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 5/20/2025.(Montgomery, Rhonda) Modified text on 2/21/2025 (jlan) (Entered: 02/19/2025)** |
| 02/20/2025 | 14 | Memorandum in Opposition re 6 MOTION for Temporary Restraining Order filed by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Levenson, Rebecca) (Entered: 02/20/2025) |
| 02/21/2025 | 15 | RESPONSE in Support re 6 MOTION for Temporary Restraining Order filed by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Carroll, Kevin) (Entered: 02/21/2025) |
| 02/21/2025 | 16 | ORDER granting 3 Motion to Proceed Pseudonymously; It is further ORDERED that all parties shall use the pseudonyms listed in the Complaint in all documents filed in this action. It is further ORDERED that by 5:00 p.m. on Monday, February 24, 2025, Plaintiffs shall file under seal a declaration containing their real names. Signed by Magistrate Judge Lindsey R. Vaala on 02/21/2025. (jlan) (Entered: 02/21/2025) |
| 02/24/2025 | 17 | AMENDED COMPLAINT against All Defendants, filed by John Doe 6, Jane Doe 5, John Doe 3, Jane Doe 1, Jane Doe 3, John Doe 2, Jane Doe 2, John Doe 1, John Doe 4, Jane Doe 4, John Doe 5.(Carroll, Kevin) (Entered: 02/24/2025) |
| 02/24/2025 | 18 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 2/24/2025 re 6 MOTION for Temporary Restraining Order filed by Jane Doe 2, Jane Doe 1, John Doe 2, John Doe 4, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 1, Jane Doe 5, John Doe 3, John Doe 6. Counsel appeared for Plaintiff and Defendant. Motion argued and continued to Thursday at 10:00 a.m. Parties are to submit additional briefing as directed. The deadline to respond to the DRP is continued on administrative stay until the next hearing. Motion Hearing as to 6 MOTION for Temporary Restraining Order set for 2/27/2025 at 10:00 AM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga. Order to follow. (Court Reporter R. Montgomery)(dzir) (Entered: 02/24/2025) |
| 02/24/2025 | 19 | TRANSCRIPT of proceedings held on 2/24/25 (Continued Motion for a Temporary Restraining Order), before Judge Anthony J. Trenga. Court Reporter Rhonda Montgomery, Telephone No. 703–299–4599. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 3/26/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 5/26/2025.(Montgomery, Rhonda) (Entered: 02/24/2025)** |
| 02/26/2025 | 20 | Memorandum *(Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order)* filed by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Attachments: # 1 Exhibit 1)(Levenson, Rebecca) (Entered: 02/26/2025) |
| 02/26/2025 | 21 | Memorandum *(Supplemental Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction)* to 15 Response in Support of Motion filed by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Carroll, Kevin) (Entered: 02/26/2025) |

| 02/26/2025 | 22 | ORDERED that the Court hereby DIRECTS the Defendants to be prepared to advise the Court, on February 27, 2025, as to the (i) accuracy of Plaintiffs' statements, excerpted above, and (ii) whether there is anything in Defendants' position or actions that would preclude Plaintiffs from receiving or accepting those offers in light of their proposed terminations (see Order for further details). Signed by District Judge Anthony J Trenga on 2/26/2025. (swil) (Entered: 02/26/2025) |
|---|---|---|
| 02/27/2025 | 23 | Declaration re 22 Order, *Supplemental Declarations of all Plaintiffs in Support of Motion for a Preliminary Injunction* by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Carroll, Kevin) (Entered: 02/27/2025) |
| 02/27/2025 | 24 | Letter *regarding Plaintiff Jane Doe 12*. (Carroll, Kevin) (Entered: 02/27/2025) |
| 02/27/2025 | 25 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 2/27/2025 re 6 MOTION for Temporary Restraining Order filed by Jane Doe 2, John Doe 1, John Doe 2, John Doe 4, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 1, Jane Doe 5, John Doe 3, John Doe 6. Counsel appeared for Plaintiff and Defendant. Motion argued and denied. Order to follow. (Court Reporter R. Montgomery)(dzir) (Entered: 02/27/2025) |
| 02/27/2025 | 26 | ORDERED that the administrative stay, entered on February 18, 2025, [Doc. No. 12], is VACATED, with Plaintiffs deadline to respond to the deferred resignation program (DRP) and other employment options, made available to them under the CIA Directors February 18, 2025 Memorandum, extended to at least to 5:00 p.m. ET on Monday, March 3, 2025; and it is further ORDERED that Plaintiffs Motion for a Temporary Restraining Order, which the Court treats as a Motion for a Preliminary Injunction, is DENIED. Signed by District Judge Anthony J. Trenga on 2/27/2025. (dzir) (Entered: 02/27/2025) |
| 02/27/2025 | 27 | TRANSCRIPT of proceedings held on 2/27/25 (Continued Motion for Temporary Restraining Order), before Judge Anthony J. Trenga. Court Reporter Rhonda Montgomery, Telephone No. 703–299–4599. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/29/2025. Release of Transcript Restriction set for 5/28/2025.(Montgomery, Rhonda) (Entered: 02/27/2025)** |
| 03/04/2025 | 28 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/26/2025 at 11:00 AM in Alexandria Courtroom 501 before Magistrate Judge Lindsey R. Vaala. Final Pretrial Conference set for 7/17/2025 at 10:00 AM in Alexandria Telephonically before District Judge Anthony J. Trenga. Discovery due by 7/11/2025. Signed by District Judge Anthony J. Trenga on 3/4/2025. (Attachments: # 1 Magistrate Consent, # 2 Pretrial Notice)(dzir) (Entered: 03/04/2025) |
| 03/19/2025 | 29 | *Joint* Discovery Plan by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe.(Barghaan, Dennis) (Entered: 03/19/2025) |
| 03/25/2025 | 30 | Order Rule 16(b) Scheduling Order – Pursuant to the Rule 16(b) Conference it is ordered that The Joint Discovery Plan filed by the parties is approved, as amended herein, and shall control discovery to the extent of its application unless further modified by the Court. The parties agree on the Joint Discovery Plan and the contents of the Joint Discovery Plan are satisfactory, the Court finds that the initial pretrial conference scheduled for March 26,2025 is not necessary. The initial pretrial conference is cancelled (see Order for further details). Signed by Magistrate Judge Lindsey R. Vaala on 3/25/2025. (nneb) (Entered: 03/25/2025) |
| 03/27/2025 | 31 | NOTICE of Appearance by Kiarash Rahnama Moghaddam on behalf of Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6 (Rahnama Moghaddam, Kiarash) (Entered: |

| | | |
|---|---|---|
| | | 03/27/2025) |
| 03/27/2025 | 32 | MOTION for Preliminary Injunction by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Attachments: # 1 Proposed Order)(Carroll, Kevin) (Entered: 03/27/2025) |
| 03/27/2025 | 33 | Memorandum in Support re 32 MOTION for Preliminary Injunction filed by Jane Doe 1, John Doe 1, Jane Doe 2, John Doe 2, Jane Doe 3, John Doe 3, Jane Doe 4, John Doe 4, Jane Doe 5, John Doe 5, John Doe 6. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Carroll, Kevin) (Entered: 03/27/2025) |
| 03/27/2025 | | ORDERED that Defendants' response, if any, be filed by Friday, March 28, 2025 at 5:00 p.m. eastern time; and it is further ORDERED that the Court will hold a hearing on the Motion on Monday, March 31, 2025 at 2:00 p.m. eastern time in Courtroom 900. Signed by District Judge Anthony J. Trenga on 3/27/2025. Set Deadlines as to 32 MOTION for Preliminary Injunction: Motion Hearing set for 3/31/2025 at 02:00 PM in Alexandria Courtroom 900 before District Judge Anthony J. Trenga.(dzir) (Entered: 03/27/2025) |
| 03/27/2025 | 34 | Emergency MOTION for Extension of Time to File Response/Reply as to 33 Memorandum in Support, by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Levenson, Rebecca) (Entered: 03/27/2025) |
| 03/27/2025 | 35 | ORDERED that Defendants' deadline to file a response, if any, to Plaintiffs' Renewed Motion for a Preliminary Injunction, [Doc. No. 32], is extended from Friday, March 28, 2025 at 5:00 p.m. eastern time, to Monday, March 31, 2025 at 9:00 a.m. eastern time. Signed by District Judge Anthony J. Trenga on 3/27/2025. (dzir) (Entered: 03/27/2025) |
| 03/31/2025 | 36 | Memorandum in Opposition re 34 Emergency MOTION for Extension of Time to File Response/Reply as to 33 Memorandum in Support, filed by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Levenson, Rebecca) (Entered: 03/31/2025) |
| 03/31/2025 | 37 | EXHIBIT DEX 1 by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe.. (Levenson, Rebecca) (Entered: 03/31/2025) |
| 03/31/2025 | 38 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 4/1/2025 re 32 MOTION for Preliminary Injunction filed by Jane Doe 2, Jane Doe 1, John Doe 2, John Doe 4, Jane Doe 3, John Doe 5, Jane Doe 4, John Doe 1, Jane Doe 5, John Doe 3, John Doe 6. Counsel appeared for Plaintiff and Defendant. Motion argued and granted in part/denied in part. Order to follow. (Court Reporter R. Montgomery)(dzir) (Entered: 04/01/2025) |
| 03/31/2025 | 39 | ORDERED that Plaintiffs' Renewed Motion for a Preliminary Injunction [Doc. No. 32] be, and the same hereby is, GRANTED in part, as set forth herein, and is otherwise DENIED; and it is further ORDERED that Defendants, and any of Defendants' officers, agents, servants, employees, and attorneys, as well as other persons who are acting in concert with them, be, and the same hereby are, ENJOINED from effectuating or implementing any decision to terminate the Plaintiffs without further Court authorization. To the extent that any such decision to terminate any Plaintiff is submitted to the Court for approval, the Court will assess the extent to which any such Plaintiff has received the appeal and consideration for reassignment he or she was entitled to receive as set forth on the record during the hearing; and Plaintiffs shall continue to remain on administrative leave with pay and benefits, or be otherwise reinstated, pending further Court order; and it is further ORDERED that Defendants provide Plaintiffs a requested appeal from any decision to terminate him or her, consistent with the steps set forth in CIA Regulation 4–16, including to permit Plaintiffs to submit "written comments" explaining why they should not be terminated, to provide Plaintiffs with a written notification of the Directors decision, and to provide reasonable notice of the status of any pending appeal. See [Doc. No. 14–1] § II. E. (Appeal of Termination Decision); and it is further ORDERED that Defendants consider any Plaintiffs' request for reassignment for open or available positions, in accordance with their qualifications and skills, without regard to the definition of a "competitive area" in the January 24, 2025 OPM Memorandum, and consistent with |

| | | |
|---|---|---|
| | | CIA Regulation 4–16 Section II. C. 4., including an Agency–wide review of available positions that Plaintiffs may be qualified for, notwithstanding any election that a Plaintiff may have made in response to the requirement that each Plaintiff select whether to retire, resign, or be terminated; and it is further ORDERED this Order shall issue and be in full force and effect, with the Court finding that, under the circumstances of this case, the posting of a bond by Plaintiffs is not necessary or proper. Signed by District Judge Anthony J. Trenga on 3/31/2025. (dzir) (Entered: 04/01/2025) |
| 04/04/2025 | 40 | TRANSCRIPT of proceedings held on 3/31/25 ( 32 Plaintiff's Motion for a Preliminary Injunction), before Judge Anthony J. Trenga. Court Reporter Rhonda Montgomery, Telephone No. 703–299–4599. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after ninety (90) calendar days. The policy is located on our website at www.vaed.uscourts.gov . Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 5/5/2025. Redacted Transcript Deadline set for 6/4/2025. Release of Transcript Restriction set for 7/3/2025.(Montgomery, Rhonda) (Entered: 04/04/2025)** |
| 04/14/2025 | 41 | MOTION for Leave to File Brief as Amicus Curaie. (Attachments: # 1 Brief as Amicus Curaie)(swil) (Entered: 04/16/2025) |
| 04/21/2025 | 42 | SUMMONS Returned Executed by John Doe 6, Jane Doe 5, John Doe 3, Jane Doe 1, Jane Doe 3, John Doe 2, Jane Doe 2, John Doe 1, John Doe 4, Jane Doe 4, John Doe 5. Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe, U.S. Attorney and U.S. Attorney General served on 4/14/2025, answer due on 6/13/2025. (Carroll, Kevin) Modified to add answer due date on 4/25/2025 (swil). (Entered: 04/21/2025) |
| 04/25/2025 | 43 | ORDERED that pro se movant James Linlor's Motion for Leave to File a Brief as Amicus Curiae in Support of Defendants, [Doc. No. 41] be, and the same hereby is, DENIED; and it is further ORDERED that since the movant is not a party to these proceedings, no additional submissions from him shall be docketed in this case. Signed by District Judge Anthony J Trenga on 4/25/2025. (swil) (Entered: 04/25/2025) |
| 05/06/2025 | 44 | NOTICE OF APPEAL as to 39 Order on Motion for Preliminary Injunction,,,,,,,,, by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Barghaan, Dennis) (Entered: 05/06/2025) |
| 05/08/2025 | 45 | Transmission of Notice of Appeal to US Court of Appeals re 44 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (swil) (Entered: 05/08/2025) |
| 05/09/2025 | 46 | USCA Case Number 25–1527 4CCA, case manager Anisha Walker, for 44 Notice of Appeal filed by Office of the Director of National Intelligence, Central Intelligence Agency, John Ratcliffe, Tulsi Gabbard. (dvanm) (Entered: 05/09/2025) |
| 05/16/2025 | 47 | Consent MOTION to Stay *Proceedings Pending Appellate Review* by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Attachments: # 1 Proposed Order)(Levenson, Rebecca) (Entered: 05/16/2025) |
| 05/16/2025 | 48 | Memorandum in Support re 47 Consent MOTION to Stay *Proceedings Pending Appellate Review* filed by Central Intelligence Agency, Tulsi Gabbard, Office of the Director of National Intelligence, John Ratcliffe. (Levenson, Rebecca) (Entered: 05/16/2025) |
| 05/19/2025 | 49 | ORDERED that Defendants' motion is GRANTED; it is further ORDERED that proceedings in this Court, including pending deadlines, are hereby STAYED pending the United States Court of Appeals for the Fourth Circuit's resolution of John Doe Iv. Office of the Director of National Intelligence, No. 25–1527 (4th Cir.); and it is further ORDERED that within 14 days of the issuance of the mandate by the Fourth Circuit, the parties shall submit a joint status report proposing deadlines for the expeditious |

| | | completion of proceedings in this Court in re <u>47</u> Consent Motion to Stay. Signed by District Judge Anthony J Trenga on 5/19/2025. (swil) (Entered: 05/20/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JOHN DOES 1-6; and | ) |
| | ) |
| JANE DOES 1-5, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 25-300 |
| v. | ) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official | ) |
| capacity as Director of National Security; | ) |
| and | ) |
| | ) |
| JOHN RATCLIFFE, in his official | ) |
| capacity as Director of the Central | ) |
| Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

### NATURE OF THE CASE

1.    Plaintiffs are nonpartisan civil servants serving in a vital national security role as highly-trained U.S. intelligence officers.  They currently serve in temporary assignments related to diversity, equity, inclusion and accessibility ("DEIA") within the Intelligence Community ("IC") at the Office of the Director of National Intelligence ("ODNI") and the Central Intelligence Agency ("CIA"), implementing federal civil rights laws.  None of these officer's activities was or is illegal, and at no time have the agencies employing Plaintiffs contended that they individually engaged in any misconduct, nor are they accused of poor performance.

2.　　　On January 20, 2025 Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, described such programs as "illegal and immoral."  On January 21, 2025 a White House statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* described DEIA programs as, *inter alia*, "dangerous," stigmatizing and demeaning hardworking Americans, and resulting in "disastrous consequences."

3.　　　E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law," all DEIA positions.  The executive order did *not* call for the termination of officers temporarily assigned to DEIA programs, and cautioned that the order shall be implemented consistent with applicable law.

4.　　　On January 22, 2025 Defendants ODNI or CIA, respectively, placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA.  On February 14, 2025 some Plaintiffs received telephone calls from human resources officers ordering them to report to the visitors' centers of ODNI or CIA offices with their IC access badges, but without counsel, as early as 8:00am on Tuesday, February 18.  In Plaintiffs' many years of experience within the IC, this summons means they are imminently to be terminated or placed on leave without pay.

5.　　　Defendants ODNI and CIA and their directors, Defendants the Hon. Tulsi Gabbard and the Hon. John Ratcliffe, violated the Administrative Leave Act by placing Plaintiffs on administrative leave for more than ten workdays, despite the absence of any individual accusation of misconduct.  Defendants further violated the Administrative Procedure Act.  While intelligence officers lack recourse to the Merit System Protection Board ("MSPB"), their own agencies classified internal regulations provide procedures for terminating officers.  Officers' basic rights

include notice, the development of a record, to consult with counsel, and the opportunities to be heard and to appeal. Plaintiffs have received none of these rights.

6.    CIA directors, for example, maintain statutory authority to terminate an Agency officer when he or she determines that this is necessary or advisable in the interests of the United States. However, as the Supreme Court has explained, this provision of the National Security Act is constitutional only because of the Agency's directors' unique responsibility to protect intelligence sources and methods from unauthorized disclosure due to counterintelligence threats. Here, Plaintiffs—career foreign intelligence officers—face termination *en masse* only because of their temporary assignment, and a domestic political dispute between the Republican and Democratic parties regarding the merits of DEIA programs.

7.    Plaintiffs' imminent termination is therefore arbitrary, capricious, an abuse of discretion, not in accordance with IC regulations, and unsupported by any evidentiary record whatsoever. It is also contrary to Plaintiffs' constitutional rights under the First and Fifth Amendments. Plaintiffs are being fired because of their *assumed* beliefs about a domestic political issue, and losing their property interest in their employment without due process of law.

## JURISDICTION

8.    The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter arises under the First and Fifth Amendments to the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; and the Administrative Leave Act, 5 U.S.C. § 6329a.

9.    The Court exercises personal jurisdiction over Defendants ODNI and CIA as they are federal agencies, and the Defendants Gabbard and Ratcliffe are named in their capacities as heads of their respective agencies.

3

## VENUE

10.     Venue in this District is proper because the constitutional and statutory violations took place in the Eastern District of Virginia, where Defendants' ODNI and CIA's headquarters are located, and where Plaintiffs are employed.

## THE PARTIES

11.     Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by ODNI and CIA to personnel functions involving DEIA matters.

12.     Defendants ODNI and CIA are U.S. Government agencies.

13.     The Hon. Tulsi Gabbard is the Director of National Intelligence, being confirmed in that role on February 12, 2025.  It is unknown if Defendant Gabbard possesses personal knowledge of the matters set forth in the Complaint.

14.     The Hon. John Ratcliffe is the Director of the Central Intelligence Agency, being confirmed in that role on January 23, 2025.  It is unknown if Defendant Ratcliffe possesses personal knowledge of the matters set forth in the Complaint.

## FACTUAL ALLEGATIONS

15.     Plaintiffs are nonpartisan civil servants serving in a vital national security role as U.S. intelligence officers.

16.     Plaintiffs are not somehow "DEIA officers."  Plaintiffs are career intelligence officers of different career services who Defendants believe, in some cases inaccurately, now serve in temporary positions related to DEIA.  Under their agencies' regulations and practices, Plaintiffs serve in numerous different roles within their agencies as part of their career progressions.  They may be assigned to new roles within their agencies in response to the specific needs of their agencies.

4

17.    Plaintiffs are temporarily assigned (or believed by Defendants to be so assigned) by their agencies to carry out duties of implementing federal civil rights laws, fulfilling a perceived need of promoting DEIA in their workplace.  These duties included advancing the hiring, promotion and advancement of members of protected classes under the civil rights laws applicable to the federal government as an employer under, inter alia, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.

18.    None of these employees' activities was or is illegal, violated law or regulation, were contrary to the well-established and regulatorily-supported interest of the federal government in prohibiting discrimination, retaliation, reprisal, harassment, bullying or the creation of hostile work environments for members of protected classes under the laws mentioned.  At no time have the agencies employing Plaintiffs contended that they individually engaged in any misconduct, nor are they accused of poor performance.

19.    On January 20, 2025 Donald Trump was inaugurated the forty-seventh president of the United States.  That same day, the President issued Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, describing existing such programs as "illegal and immoral."

20.    On January 21, 2025 the White House issued a statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*.  The statements describes DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system,"

stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."

21.    Accordingly, the E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions." *Id*. at § 2(b)(i).  Similarly, the January 21 White House statement called upon the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id*. at § 2.

22.    Notably, E.O. 14151 and the subsequent White House statement did *not* call for the termination of officers temporarily assigned to DEIA programs.  In fact, the E.O. cautioned that nothing in it impaired any legal authority granted to an executive agency, and that the order shall be implemented consistent with applicable law. *See id.* at § 8 (a)(i) and (b).

23.    On or about January 22, 2025 CIA or ODNI placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA.  On or about February 14, 2025 some Plaintiffs received telephone calls from human resources officers ordering them to report to the visitors' centers of ODNI or CIA offices within the Eastern District Virginia with their access badges, but without counsel, as early as 8:00am on Tuesday, February 18.

I.    **Administrative Leave Act**

24.    On January 16, 2025 Congress enacted and the Office of Personnel Management provided guidance on amendments to the Administrative Leave Act ("ALA").  Per 5 U.S.C. § 6329a(b)(1), an agency may now place an employee on administrative leave for no more than ten workdays.  Investigative leave and notice leave are permitted, subject to statutory and regulatory

6

requirements, only if an agency determines that an employee must be removed from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the continued presence of the employee in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in loss of or damage to Government property, or jeopardize legitimate Government interests.

25.    None of the specified conditions of the ALA are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments, and yet Plaintiffs have been on such leave since January 22, in an adverse employment action in violation of law.

**II.    Administrative Procedure Act**

26.    On the afternoon of February 14, 2025 Defendants ordered Plaintiffs—on a Friday headed into a federal holiday weekend—to report to the visitors centers of their workplaces first thing on the morning of the next workday, and to bring their Intelligence Community ("IC") identification badges with them.  This gave Plaintiffs little time to consult meaningfully with counsel about likely impending personnel actions.  On February 14, Jane Doe 1 asked CIA if she could bring security-cleared counsel to the February 18 meeting.  The Agency denied her permission to do so.

27.    Telling Plaintiffs to bring their IC access badges and to meet at the Defendants' visitors centers without counsel almost certainly means that Plaintiffs' employment is to be terminated at these February 18 meetings.  It is also possible that they may involuntarily be placed on leave without pay ("LWOP").  Most CIA and ODNI officers work inside Special Compartmented Information Facilities ("SCIFs"), and work on government computer and

telephone systems specially designed to handle classified information.  Plaintiffs cannot, without the IC's permission, even bring a paper copy of their own personnel file out of their workspaces.

28.     Unlike other federal civil servants, intelligence officers have no recourse to the Merit System Protection Board (MSPB): their agencies' regulations provide their only avenue of administrative appeal.  Pursuant to administrative regulations, which are classified, the IC has unique policies and procedures for terminating officers for misconduct, poor performance or unsuitability, such as CIA's Personnel Evaluation Board ("PEB") system.

29.     A redacted and unclassified version of CIA regulations available on the internet provides for example that CIA's executive director may "decide the first-level appeals of employees recommended for termination of such employees upon recommendation of an advisory board." *Termination of Employment* at ¶ 8(b)(5) (available at https://irp.fas.org/cia/term.pdf).  Ten grounds for termination are set forth in the regulation, none of which apply to Plaintiffs.  An eleventh, catch-all reason, provides for when the Director "deems such determination necessary or advisable in the interests of the United States," ¶ 8(d), language taken from the National Security Act, 50 U.S.C. § 403(c), the constitutionality of which is explained by Chief Justice Rehnquist in *Webster v. Doe*, 486 U.S. 596 (1988), discussed *infra*.

30.     In Plaintiffs' case, it appears they are about to be terminated by Defendants with only a holiday weekend's worth of notice, no meaningful ability to consult with counsel, no record developed, no opportunity to be heard, and no right of appeal.

31.     Courts traditionally give the IC broad deference in its decisions to suspend or even terminate officers, for a good reason that is inapplicable to Plaintiffs.  The judiciary gives a wide berth to CIA and ODNI on personnel decisions because such matters are sometimes inextricably

entwined with sensitive counterintelligence information bearing upon officers' loyalty to the United States, or suitability to handle classified information.

32.    In *Webster*, Chief Justice Rehnquist set forth the reason for CIA directors to hold such broad discretionary power under the National Security Act, Section § 403(c), to terminate Agency employees "whenever he shall deem such termination necessary or advisable in the interests of the United States...".

33.    Writing for the Court, the Chief Justice reasoned that DCIs and their successors are responsible "for protecting intelligence sources and methods from unauthorized disclosure," "the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees," "employment with the CIA entails a high degree of trust that is perhaps unmatched in Government service," and as such "Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Id*. at 600-01 (citing *Snepp v. United States,* 444 U.S. 507, 510 (1980) and *CIA v. Sims,* 471 U.S. 159, 168-69 (1985)).

34.    Here, Petitioners are suspended and face imminent termination not because of any national security issues. Rather, these civil servants face personnel action only because of a domestic political dispute between the Republican and Democratic parties regarding the efficacy and legality of DEIA initiatives within the federal government, in which they, their careers and their families are collateral damage. The rationale set forth by the Supreme Court in *Webster* to uphold the legality of CIA directors' broad authority under Section 403 does not apply here.

35.    The Agency regulations further provide for "procedures for termination of employment," ¶ 8(e) none of which are being followed here. The regulation also provides for "termination without procedures" at the director's discretion under his Section 403 authority, and

claims (dubiously) that this discretionary authority is not limited by any other law. *See Termination of Employment* at ¶ 8(f). Even still, the Agency's regulation provides at ¶¶ (g)(3)-(4) a right of appeal to CIA's third-ranking official as well as the director. It appears as if Plaintiffs are not to be given that right of appeal.

### III. The First Amendment and Fifth Amendments

36.    While called as a vocation to a special kind of public service, an intelligence officer possesses a cognizable property interest in their job, as does any federal employee. Concomitantly they possess a First Amendment right not to lose that interest only because of their perceived beliefs about the hot-button domestic political issue of DEIA being assumed only the basis of their temporary assignments, and a Fifth Amendment right not to lose that interest without the benefit of due process of law—including adequate notice, and the opportunity to be heard.

37.    Petitioners are not career DEIA officials, they are career intelligence officers. Rather than terminate Petitioners, even under the terms of E.O. 14151 and its companion policy statement, CIA and ODNI could simply reassign them to duties not involving DEIA, duties they performed well for years before their most recent assignment.

38.    Indeed, several Plaintiffs' career services within ODNI and CIA immediately identified other open and mission-critical positions into which these officers could immediately be slotted. Each Plaintiff appraised of their career service's intention to offer those jobs expressed their willingness to accept them.

39.    Instead, the IC is opting for the draconian, illegal and unnecessary alternative of arbitrarily terminating (or placing on LWOP) good officers recruited, vetted and trained at great taxpayer expense, capriciously wasting cumulatively over one-hundred of years of national security experience.

10

40.     Leaving aside the question of the merit of DEIA programs in other government agencies, CIA for example has specific national security reasons to value diversity.  The Agency needs some operations officers with, *inter alia*, the ability to blend in racially with foreign populations, the capability to meet female sources in cultures in which unmarried adults of the opposite sex rarely meet in private, dual citizenship documentation, foreign language skills, overseas living experiences, and more.  Recruiting, developing and retaining a diverse Intelligence Community workforce is therefore a national security imperative.

### CLAIMS FOR RELIEF

### Count One:
### Violation of the Administrative Procedure Act,
### 5 U.S.C. § 706, by all Defendants

41.     Plaintiff incorporates the allegations in paragraphs 1-40 as if fully set forth herein.

42.     The Administrative Procedure Act ("APA") provides at 5 U.S.C. § 706 that a U.S. district court may hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  *See* § 706(2).

43.     Defendants' scheme to terminate Plaintiffs on or about February 18 is a perfect example of arbitrary and capricious agency action amounting to an abuse of discretion.  Plaintiffs' suspension two days after the issuance of the Executive Order, only on the basis of their temporary assignments to DEIA roles, and their anticipated February 18 firings, even though E.O. 14151 does not call for their termination, is the definition of arbitrary, capricious and abusive agency action.

11

44.    Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a *domestic* political issue, an issue which is irrelevant while they serve in agencies dedicated to collecting and analyzing *foreign* intelligence.    Plaintiffs planned termination is also contrary to their right under the Fifth Amendments to due process, including adequate notice and the opportunity to be heard, before being denied their property interest in their employment.

45.    The IC plans to terminate Plaintiffs without following *any* legal procedure, as called for by agency regulations, and without any evidentiary record at all, as could be presented by Plaintiffs in their defense at a CIA PEB, for example.    Plaintiffs will receive no hearing at all, not even before the MSPB.

46.    The APA permits the Court to review final agency action, as well as action for which there is no other adequate remedy.    *See* 5 U.S.C. §§ 702, 704.    Defendants appear to have already taken final agency action.    The IC is prepared to present Plaintiffs with *faits accompli* on February 18: thus, their insistence that Plaintiffs appear at their employers' external visitors centers, instead of their offices, and with their IC access badges, but without counsel, so that their professional identification may be seized.    Defendants have taken their final action, Plaintiffs merely await to be informed of that action; certainly, Defendants do not plan to hold required administrative hearings at their visitors centers, without counsel, on February 18.

47.    Because of press attention understandably being paid to current events, Plaintiffs' terminations would amount to very public firings, crippling their ability to obtain private sector work within their professions, at defense and intelligence contractors for example.

48.    It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning,

immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

49.    There is no other remedy than a judicial remedy for the harm Plaintiffs will otherwise suffer on February 18.

**Count Two:
Violation of the Administrative Leave Act, 5 U.S.C. § 6329a,
by all Defendants**

50.    Plaintiffs incorporate the allegations in paragraphs 1-49 as if fully set forth herein.

51.    The Administrative Leave Act provides that an agency may only place an employee on administrative leave for ten workdays unless it determines that an employee must be removed from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the employee's continued presence in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in damage to Government property, or jeopardize legitimate Government interests.

52.    None of the ALA's conditions are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments.  Plaintiffs have been on such leave since January 22, in an adverse employment action in violation of law.

**Count Three:
Violation of U.S. CONST. AMEND. I,
by all Defendants**

53.    Plaintiffs incorporate the allegations in paragraphs 1-52 as if fully set forth herein.

54.    The First Amendment provides in pertinent part that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for a redress of grievances," such as the issues raised by DEIA.  Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a domestic political issue while serving in agencies dedicated to foreign intelligence.

**Count Four:**
**Violation of U.S. Const. Amend. V,**
**by all Defendants**

55.    Plaintiffs incorporate the allegations in paragraphs 1-54 as if fully set forth herein.

56.    The Fifth Amendment provides in pertinent part that no person shall be deprived of property without due process of law.  Defendants plan to terminate Plaintiffs with insufficient notice, without any of the agency administrative procedures required by law, and without any evidentiary record—no hearing at all, not even before the MSPB.  Plaintiffs' impeding termination is contrary to their constitutional right to due process before being denied their property interest in their employment.

**JURY DEMAND**

57.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all triable issues.

**PRAYER FOR RELIEF**

58.    Wherefore, Plaintiffs respectfully request that the Court enter an award and judgment in their favor, against Defendants as follows:

(a) Injunctive relief under the APA;

(b) Expenses and costs, including attorneys' fees, pursuant to 5 U.S.C. § 504; and

(e) Such other relief as the Court deems appropriate.

14

Dated: February 17, 2025    Respectfully submitted,

           */s/ Kevin T. Carroll*
           Kevin T. Carroll, VSB No. 95292
           **Fluet**
           1751 Pinnacle Dr., Ste. 1000
           Tysons, VA 22102
           T: (703) 590-1234
           F: (703) 590-0366
           kcarroll@fluet.law
           e-file@fluet.law

           *Attorney for Plaintiffs*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOHN DOES 1-6 and JANE DOES 1-5 | See attached. |

**(b)** County of Residence of First Listed Plaintiff    Fairfax
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** |  |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br>**SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609<br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331, 5 U.S.C. § 551 et seq., 5 U.S.C. § 6329a, U.S. Const. Amends. I and V

Brief description of cause:
Plaintiffs seek injunctive relief under the Administrative Procedures Act.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE    Feb 17, 2025

SIGNATURE OF ATTORNEY OF RECORD    /s/ Kevin T. Carroll

**FOR OFFICE USE ONLY**

RECEIPT #  _____    AMOUNT  _____    APPLYING IFP  _____    JUDGE  _____    MAG. JUDGE  _____

**Defendants:**
U.S. Office of the Director of National Intelligence
U.S. Central Intelligence Agency
Tulsi Gabbard, Director of National Intelligence
John Ratcliffe, Director of The Central Intelligence Agency

**Counsel for Plaintiffs:**
Kevin T. Carroll, Esq.
Fluet
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
(703) 590-1234

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE, *et al.* | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER**

1.      Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by senior supervisors at Defendants the Office of the Director of National Intelligence ("ODNI") and Central Intelligence Agency ("CIA") to personnel management functions involving diversity, equity, inclusion and accessibility ("DEIA") matters.

2.      On January 20, 2025 the President issued Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, describing existing such programs as "illegal and immoral," followed by a White House statement the next day condemning DEIA in even stronger terms.

3.      E.O. 14151 did *not* call for the termination of officers temporarily assigned to DEIA programs, and cautioned that it shall be implemented consistent with applicable law.  Yet on January 22, 2025 Defendants ODNI and CIA placed Plaintiffs upon administrative leave, only because of their temporary assignments, directed by senior supervisors, to personnel functions involving DEIA.  On February 14 Plaintiffs received telephone calls ordering them to report to the

visitors' centers of ODNI or CIA Headquarters with their access badges first thing on February 18, 2025.

4.     Plaintiffs are going to be fired (or placed on involuntary leave without pay, "LWOP") in violation of the Administrative Procedure Act ("APA"), in an unlawful agency action that is arbitrary and capricious abuse of discretion; contrary to their rights under the First and Fifth Amendments to the Constitution; without observance of Agency regulations requiring notice and granting the rights to be heard and to appeal; and unsupported by any record whatsoever.

5.     Plaintiffs seek a temporary injunction restraining Defendants from terminating them or placing them on LWOP, and ask for the same relief regarding other similarly-situated officers.  Plaintiffs are likely to succeed on the merits of their APA and constitutional claims. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging in illegal and immoral activity.  The balance of hardships is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all.  And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

## BACKGROUND

6.     This Motion incorporates the factual allegations of Plaintiffs' Complaint. This background is intended to provide the Court with a brief summary of operative events.

7.     Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by Defendants ODNI and CIA to personnel management functions involving DEIA matters.

8.     On January 20, 2025 Donald Trump was inaugurated the forty-seventh president of the United States.  That same day, the President issued Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, describing existing such

programs as "illegal and immoral." The E.O. provided no citation to any statute supporting the assertion that these programs are "illegal" or "immoral."

9.    On January 21, 2025 the White House issued a statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. The statements describes DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination." Again, no legal citations were provided for these sweeping statements.

10.    The E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions." *Id*. at § 2(b)(i). Similarly, the January 21 White House statement called upon the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id*. at § 2.

11.    Notably, E.O. 14151 and the subsequent White House statement did *not* call for the termination of officers assigned to DEIA programs, whether in temporary or permanent capacities. In fact, the E.O. cautioned that nothing in it impaired any legal authority granted to an executive agency, and directed that the order shall be implemented consistent with applicable law. *See id.* at § 8 (a)(i) and (b).

12.    On or about January 22, 2025 Defendants CIA or ODNI placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA. On or about February 14, 2025 Plaintiffs received telephone calls from

3

human resources officers ordering them to report to ODNI or CIA facilities in northern Virginia, bringing with them their access badges, as early as 8:00am on Tuesday, February 18. It is apparent that all of these officers will be summarily fired, or placed on indefinite leave without pay.

## LEGAL STANDARD

13. The standard in this jurisdiction for granting a temporary restraining order is a four-fold test: (1) Whether plaintiffs are likely to succeed on the merits of their statutory claim, (2) whether plaintiffs are likely to suffer irreparable harm in the absence of an injunction, (3) whether the balance of hardships weighs in their favor, and (4) whether an injunction serves the public interest. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325-26 (4th Cir. 2021) (upholding a temporary restraining order on the implementation of E.O. 13888, *Enhancing State and Local Involvement in Refugee Resettlement* (Sep. 26, 2019) on the basis of, *inter alia*, the Administrative Procedure Act).

14. Plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, but Plaintiffs need not show a certainty of success. *See Aziz v. Trump*, 234 F.Supp.3d 724, 733 (E.D.Va. 2017) (upholding a temporary restraining order on the implementation of E.O. 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States* (Jan. 27, 2017) on the basis of, *inter alia*, the Administrative Procedure Act and U.S. CONST. AMENDS. I and V, *citing League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

## ARGUMENT

15. In *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), the Court of Appeals upheld a preliminary injunction against the discharge of two Air Force servicemembers on the basis of their being Human Immunodeficiency Virus ("HIV")-positive, pursuant to the Administrative Procedure Act (APA) and their Fifth Amendment due process rights.

4

16.     In *Roe*, the Court of Appeals observed that the APA commands courts to hold unlawful and set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that courts retain an important role in ensuring that agencies have engaged in reasoned decision-making, as the APA embodies the basic presumption of judicial review to one suffering legal wrong because of agency action. *See id*. at 220 (internal citations and quotations omitted). While courts "accord substantial deference to an agency's final action and presume it valid, the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action." *Id*. (internal citations removed).

17.     The *Roe* court reasoned that to comply with the APA, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. Agency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider …" and in "reviewing an agency action, we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (internal citations and quotations omitted).

18.     The *Roe* court agreed with the District Court that discharging the airmen for being HIV-positive would amount to an irreparable injury, as the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," the airmen faced "a particularly heinous brand of discharge … that bears no relationship to their 'ability to perform their jobs," and the airmen could not address these harms through post-discharge military procedures. *Id*. at 229.

19.     Plaintiffs in the instant case are similarly situated to the plaintiff-respondents whose temporary restraining order was obtained and upheld in *Roe*. Defendants ODNI and CIA engaged in no reasoned decision-making whatsoever. Like uniformed servicemembers, intelligence

officers may not appeal to the Merit Systems Protection Board ("MSPB"), so judicial review is Plaintiffs' only avenue of appeal. Defendants ODNI and CIA appear to have failed to examine relevant data between January 20, 2025 when the E.O. was issued and January 22 when Plaintiffs were placed on leave. Defendants have articulated no satisfactory explanation, or rational or reasoned basis at all for Plaintiffs' terminations. As explained *infra*, Defendants appear to be relying on regulatory and statutory authority regarding terminations in an extreme way that Congress did not intend and the Supreme Court, per *Webster v. Doe*, 486 U.S. 596 (1988), has not supported. Similar to the *Roe* airmen, the circumstances surrounding Plaintiffs' impending public firings, together with the resultant effect on them, so far depart from a normal termination that they amount to irreparable injury, as they have been labeled by the President as engaging in illegal and immoral activity, an injury Plaintiffs cannot not address through post-termination appeals (even if such appeals are available). Plaintiffs' injuries would be the same if placed on indefinite LWOP.

**I.    Plaintiffs are likely to succeed on the merits.**

**A.    APA**

20.    The APA provides at 5 U.S.C. § 706 that a U.S. district court may hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. *See* § 706(2).

21.    Defendants' scheme to terminate Plaintiffs on or about February 18 is a perfect example of arbitrary and capricious agency action amounting to an abuse of discretion. Plaintiffs' suspension two days after the issuance of the Executive Order, only on the basis of their temporary

6

assignments to DEIA roles, and their anticipated February 18 firings, even though E.O. 14151 does not call for their termination, is the definition of arbitrary, capricious and abusive agency action.

22.    Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a *domestic* political issue, an issue which is irrelevant while they serve in agencies dedicated to collecting and analyzing *foreign* intelligence.    Plaintiffs planned termination is also contrary to their right under the Fifth Amendment to due process, including adequate notice and the opportunity to be heard, before being denied their property interest in their employment.

23.    Defendants ODNI and CIA plan to terminate Plaintiffs without following *any* legal procedure, as called for by agency regulations, and without any evidentiary record at all, could be presented by Plaintiffs in their defense at a CIA PEB, for example.    Plaintiffs will receive no hearing at all, not even before the MSPB.    They will apparently lack the regulatory right of appeal to CIA's third-ranking official as well as its director as provided for in that agency's regulations. *See Termination of Employment* at ¶¶ (g)(3)-(4) (available at https://irp.fas.org/cia/term.pdf).

24.    The APA permits the Court to review final agency action, as well as action for which there is no other adequate remedy. *See* 5 U.S.C. §§ 702, 704.    Defendants appear to have already taken final agency action.    The IC is prepared to present Plaintiffs with *faits accompli* on February 18th: thus, their insistence that Plaintiffs appear at their employers' external visitors centers, instead of their offices, and with their IC access badges, so that their professional identification may be seized.    Defendants have taken their final action, Plaintiffs merely await to be informed of that action; certainly, Defendants do not plan to hold required administrative hearings at their visitors centers on February 18.

25.    Classified Agency regulations which allow the Director of CIA (and presumably the Director of National Intelligence) to terminate an employe when the Director "deems such determination necessary or advisable in the interests of the United States," *Termination of Employment* at ¶ 8(d), based upon the National Security Act, 50 U.S.C. § 403(c), are constitutional only insofar as such a termination complies with the rationale set forth *Webster v. Doe*.

26.    In *Webster* Chief Justice Rehnquist reasoned CIA directors could wield such regulatory and statutory power because of their unique responsibility for protecting intelligence sources and methods from unauthorized disclosure. *See id*. at 600-01 (citing *Snepp v. United States,* 444 U.S. 507, 510 (1980) and *CIA v. Sims,* 471 U.S. 159, 168-69 (1985)).

27.    Here, Petitioners are suspended and face imminent termination (or involuntary LWOP) not because of any national security issues.  Rather, these civil servants face personnel action only because of a domestic political and legal dispute between other parties regarding the efficacy and legality of DEIA initiatives within the federal government, in which they, their careers and their families are collateral damage.  The rationale set forth by the Supreme Court in *Webster* to uphold the legality of CIA directors' broad authority under Section 403 does not apply here.

28.    The Agency regulations' claim that this discretion is not limited by any other law, *see Termination of Employment* at ¶ 8(f), stretches this authority beyond the breaking point; no mere agency regulation can exist without reference to any other statute, such as the Administrative Procedure Act, or constitutional provisions such as the First and Fifth Amendments.  The Director of National Intelligence and the Director of Central Intelligence obviously may not terminate an intelligence officer on the basis of their religion, race or sex, in derogation of constitutional prohibitions on religious tests for office, constitutional guarantees of equal protection and civil rights statutes.  Neither, here, may the directors terminate an intelligence officer on the basis of an

8

assumption about their support for a domestic political policy such as DEIA. Defendants' conduct appears to be based on an assumed ideological commitment to DEIA, which would be First Amendment-protected, when in fact Plaintiffs' association with DEIA-related "belief" is simply that they were assigned by senior supervisors to DEIA-related jobs.

              *i.*    *First Amendment*

29.    The First Amendment provides in pertinent part that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for a redress of grievances," such as the issues raised by DEIA. Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a domestic political issue while serving in agencies dedicated to foreign intelligence.

              *ii.*    *Fifth Amendment*

30.    The Fifth Amendment provides in pertinent part that no person shall be deprived of property without due process of law. Defendants plan to terminate Plaintiffs with insufficient notice, without any of the agency administrative procedures required by law and the agencies' own regulations, and without any evidentiary record—no hearing at all, not even before the MSPB— nor rights of appeal to senior agency officials. Plaintiffs' impeding termination is contrary to their constitutional right to due process before being denied their property interest in their employment.

**II.    Plaintiffs will suffer immediate, irreparable injury should they be terminated on February 18, 2025.**

31.    Because of press attention understandably being paid to current events, Plaintiffs' terminations would amount to very public firings, crippling their ability to obtain private sector work within their professions, at defense and intelligence contractors for example.

32.    It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning,

immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

33.    This bell cannot be unrung.  Indeed, if any private employer issued such a remarkable statement about a group of terminated employees, it would be liable for defamation. If as expected Plaintiffs are terminated on February 18 (again, with insufficient notice, and without any due process and without any record), Plaintiffs will enter the job market with this libelous statement from the presidential "bully pulpit" ringing in potential employers' ears.  Again, Plaintiffs' injuries in this regard are just as bad if they are placed on involuntary LWOP.

**III.    The balance of equities and the public interest favor Plaintiffs.**

34.    Petitioners are not career DEIA officials, they are career intelligence officers. Rather than terminate Petitioners, even under the terms of E.O. 14151 and its companion policy statement, Defendants CIA and ODNI could simply reassign them to duties not involving DEIA, duties they performed well for years before their most recent assignment.

35.    Indeed, several Plaintiffs' career services within ODNI and CIA immediately identified other open and mission-critical positions into which these officers could immediately be slotted.  Each Plaintiff appraised of their career service's intention to offer those jobs expressed their willingness to accept them.

36.    Instead, the IC is opting for the draconian, illegal and unnecessary alternative of arbitrarily terminating good officers recruited, vetted and trained at great taxpayer expense, capriciously wasting cumulatively hundreds of years of national security experience.

37.    Leaving aside the question of the merit of DEIA programs in other government agencies (or lack thereof), CIA for example has specific national security reasons to value diversity. The Agency needs some operations officers with, *inter alia*, the ability to blend in racially with foreign populations, the capability to meet female sources in cultures in which unmarried adults of the opposite sex rarely meet in private, dual citizenship documentation, foreign language skills, overseas living experiences, and more.

38.    These officers performed a necessary national security mission which is wholly apolitical, unique to the Intelligence Community, and unlike any other federal government DEIA role.    Plaintiffs performed an essential function in the intelligence cycle—from source development to recruitment, from to collection to analysis.    It is a key task of intelligence officers to assimilate, communicate and understand.    This critical function includes diversity in appearance, culture, language and sex, for example.

39.    Plaintiffs did a valuable public service, at the request or insistence of the IC, when they undertook temporary assignments to DEIA roles.    They deserve praise and reassignments, not obloquy and summary firings, for their efforts.

## CONCLUSION

Plaintiffs deserve a temporary injunction restraining Defendants from terminating them. Plaintiffs are likely to succeed on the merits of their APA and constitutional claims.    Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging—according to a White House statement—in illegal and immoral activity.    The balance of hardships is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all.    And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.    Plaintiffs did a valuable public service, at the request or insistence of the IC,

when they undertook temporary assignments to DEIA roles. They deserve praise and reassignments, not obloquy and summary firings, for their efforts.

Dated: February 17, 2025                    Respectfully submitted,

                                            _/s/ Kevin T. Carroll_____
                                            Kevin T. Carroll, VSB No. 95292
                                            **Fluet**
                                            1751 Pinnacle Dr., Ste. 1000
                                            Tysons, VA 22102
                                            T: (703) 590-1234
                                            F: (703) 590-0366
                                            kcarroll@fluet.law
                                            e-file@fluet.law

                                            *Attorney for Plaintiffs*

12

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2025, a copy of the foregoing was mailed first class

mail, postage prepaid, to:

U.S. Office of the Director of National Intelligence
Office of General Counsel
1500 Tysons McLean Dr.
McLean, VA 22102

Central Intelligence Agency
Office of General Counsel
Washington, DC 20505

Tulsi Gabbard
Director of National Intelligence
1500 Tysons McLean Dr.
McLean, VA 22102

John Ratcliffe
Director of Central Intelligence Agency
Litigation Division
Office of General Counsel
Central Intelligence Agency
Washington, DC 20505

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, *et al.*            ) | |
|                       ) | |
|        Plaintiffs,       ) | |
|                       ) | |
|         v.                ) | Case No. 25-300 |
|                       ) | |
| U.S. OFFICE OF THE DIRECTOR OF   ) | |
| NATIONAL INTELLIGENCE, *et al.*    ) | |
|                       ) | |
|        Defendants.     ) | |

**DECLARATION OF JOHN 1 DOE IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**

I, John Doe 1, am an adult over the age of eighteen and understand the meaning of an oath.

I state the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am a nonpartisan civil servant and have served a U.S. Central Intelligence Agency ("CIA") officer for fifteen years.  I hold the grade of GS-15, work in the executive staff office career service, have served overseas, and received numerous awards and commendations.

2.     CIA temporarily assigned me to carry out duties of implementing federal civil rights laws, fulfilling a perceived need of promoting diversity, equity, inclusion and accessibility ("DEIA") in the Agency's workplace.

3.     My duties included advancing the hiring, retention and advancement of members of  protected classes under civil rights laws applicable to the federal government as an employer under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990.

4.     I am unaware of any allegation against me of misconduct or poor performance.

5.      On January 22, 2025 CIA verbally placed me and all of my office colleagues on administrative leave, apparently only because of our temporary assignment to a personnel function involving DEIA.  On February 14, 2025 I received a telephone call from a human resources officer ordering me report to the visitors' center of a CIA facility within the Eastern District Virginia with my Intelligence Community ("IC") access badge, as early February 18, 2025.  I understand that a similarly-situated CIA colleague reportedly was told by her employer that she may not bring counsel to a similar meeting.

6.      In my experience, when a CIA officer is told to report to the visitors' center of an Agency facility with their IC badge, it presages negative employment action against the officer, including but not limited to termination or being placed on involuntary leave without pay.

7.      I work inside a Special Compartmented Information Facilities on government computer and telephone systems specially designed to handle classified information.  I may not, without CIA's permission, bring a paper copy of my own personnel file out of my workspace.

8.      Upon information and belief, CIA officers have no recourse to the Merit System Protection Board (MSPB).  In my experience, CIA regulations do however provide procedures for terminating officers for misconduct, poor performance or unsuitability, which include officers' rights of notice, to be heard and to appeal adverse decisions.

9.      CIA has specific national security reasons to value diversity for and within its enterprise workforce to further its mission effectiveness.  The Agency needs staff officers, including from various directorates within the Agency, with the ability to blend in racially and culturally with foreign populations; by way of example, there is a need for the capability to meet in private with female sources in cultures in which unmarried adults of the opposite sex rarely meet in private.  There are needs for dual citizenship documentation, foreign language skills and/or

overseas living experiences, amongst a myriad of other mission requirements and objectives. Recruiting, developing and retaining a diverse Intelligence Community workforce is therefore a critical and material national security imperative.

Dated: February 17, 2025

*/s/ John Doe 1*
John Doe 1
Officer
U.S. Central Intelligence Agency

3

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   JOHN DOE 1, et al.,              )  Case 1:25-cv-300
                                      )
 4                Plaintiffs,         )
                                      )
 5        v.                          )  Alexandria, Virginia
                                      )  February 18, 2025
 6   OFFICE OF THE DIRECTOR OF        )  1:00 p.m.
     NATIONAL INTELLIGENCE,           )
 7   et al.,                          )
                                      )
 8                Defendants.         )
     _____)  Pages 1 - 19
 9

10    TRANSCRIPT OF MOTION FOR A TEMPORARY RESTRAINING ORDER

11          BEFORE THE HONORABLE ANTHONY J. TRENGA

12             UNITED STATES DISTRICT COURT JUDGE


13
     APPEARANCES:
14
     FOR THE PLAINTIFF:
15
          KEVIN T. CARROLL, ESQUIRE
16        FLUET & ASSOCIATES, PLLC
          1751 Pinnacle Drive, Suite 1000
17        Tysons Corner, Virginia  22102
          (703) 590-1234
18
     FOR DEFENDANTS:
19
          REBECCA S. LEVENSON, ESQUIRE
20        DENNIS C. BARGHAAN, JR., ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
21        2100 Jamieson Avenue
          Alexandria, Virginia  22314
22        (703) 299-3700

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703)  299-4599

JA043

2

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Civil Action
 3   No. 1:25-cv-300, Doe 1, et al. v. Office of the
 4   Director of National Intelligence, et al.
 5              Counsel, will you please note your
 6   appearances for the record.
 7              MR. CARROLL:  Good afternoon, Your Honor.
 8   Kevin Carroll from the Fluet law firm for 11 unnamed
 9   U.S. intelligence community officers.  I have the names
10   of course.  And this is my associate, Kia Rahnama.
11   He's not admitted.  But if it's okay for him to sit
12   there, it's a good experience for him.
13              THE COURT:  Welcome.
14              MR. CARROLL:  Thank you, Your Honor.
15              MS. LEVENSON:  Good morning, Your Honor.
16   Rebecca Levenson, Assistant United States Attorney, for
17   the CIA and ODNI.  With me at the table is Dennis
18   Barghaan, Assistant United States Attorney.
19              THE COURT:  All right.  Welcome.
20              I understand we have some of the plaintiffs
21   on our line.
22              Is that right?  How many of the plaintiffs do
23   we have?
24              THE COURTROOM DEPUTY:  If there's any
25   plaintiffs on the line, would you please identify
```

3

1   yourselves -- or just say that you're connected.

2              THE COURT:  Do we have a connection?

3              THE COURTROOM DEPUTY:  We do, Judge.  I'm

4   just not sure who all has called in.

5              THE COURT:  All right.  We're going to

6   proceed.

7              We're here on a motion for a temporary

8   restraining order.  I've read the filings.

9              Counsel, what's happened since the filing, if

10  anything?

11             MR. CARROLL:  Good afternoon, Your Honor.

12             At 8:30 this morning, the intelligence

13  community began the process of discharging these

14  individuals.  I spoke to the third individual who was

15  called for -- I've given opposing counsel a copy of

16  this email.

17             When they appeared at 8:30, their

18  identification badge was seized, and they were told

19  that -- first of all, they said they were a represented

20  party and that the lawyers should talk to the lawyers.

21  They pressed ahead anyway.  The client asked the agency

22  official for their name, and they refused to give their

23  full name.

24             They were told that they had three options.

25  They could choose a deferred resignation, they could

4

1   resign immediately, or they could do a termination

2   subsequent to 90 days administrative leave on May 20.

3   They were told that if they did not make a choice by

4   5:00 p.m. tomorrow, that procedures would go forward to

5   terminate them, Your Honor.

6          THE COURT:  All right.  What's your position

7   in light of what's happened?

8          MR. CARROLL:  So, Your Honor, I think that,

9   as an initial matter, the agency is in violation of a

10  new provision of the Administrative Leave Act.  Each of

11  these individuals have been on paid administrative

12  leave for more than ten days despite the fact that they

13  aren't accused of any misconduct or under investigation

14  for anything.

15         More to the point, Your Honor, the

16  intelligence community is in violation of the

17  Administrative Procedure Act.  As the Court is well

18  aware, the Administrative Procedure Act forbids the

19  government from taking actions that are arbitrary,

20  capricious, an abuse of discretion, or not in

21  accordance with law.

22         Further, it prohibits actions that are short

23  of statutory right without observance of legal or

24  required procedure and unsupported by a record or

25  facts.

1          In each of these circumstances here, Your

2    Honor, I think that the plaintiffs are in the right and

3    the government is in the wrong.  It is arbitrary and

4    capricious to fire them in this manner.

5          The executive order that came out ordered

6    them to diversity, equity, and inclusion and --

7          THE COURT:  What regulations apply to this

8    circumstance?

9          MR. CARROLL:  So the government claims that

10   the only regulation that applies is Title 50, U.S.

11   Code, 3036, part of 3036(e) to be specific --

12          THE COURT:  Right.

13          MR. CARROLL:  -- which is part of the

14   National Security Act.

15          Your Honor, our position is that this

16   stretches *Webster v. DoD* -- excuse me, *Webster v. Doe*

17   to a breaking point.  As you know, the special

18   statutory authority that the CIA director in that case

19   was given was that he could -- it was legal for him to

20   use his statutory authority to fire an employee when it

21   was necessary or advisable in the interest of the

22   United States.

23          As Chief Justice Rehnquist made clear, that

24   was because the CIA director has a special duty to

25   preserve the safety of intelligence sources and

1  methods, human sources in the case of the CIA.  So

2  there could be a circumstance where because of

3  classified counterintelligence information, somebody

4  needs to be fired and can't even be told why.  So

5  that's why the CIA director has that exceptional power.

6          Here, this has nothing to do with former

7  failures at all.  This is a domestic political dispute

8  between the Republican and Democratic parties about

9  whether or not --

10         THE COURT:  The regulations, though, that you

11 had mentioned you say the government is relying on sets

12 forth a whole range of procedures that need to be

13 followed.

14         MR. CARROLL:  None of which are being

15 followed.

16         THE COURT:  You're not relying on that?

17         MR. CARROLL:  We rely on that as well, Your

18 Honor.  The government is relying on 3036(e) which I

19 thought you wanted me to address.

20         Marching right through, they're not following

21 any of the procedure here.  There's insufficient

22 notice.  There's no opportunity to be heard.  There's

23 no record that has been developed.  There's not

24 practically a right to consult with counsel.  They were

25 told this was going to happen at noon on Friday, and

1  they tried to fire them at 8:30 this morning.  So

2  that's not going to give notice --

3          THE COURT:  Have they been told what's the

4  basis for the termination?

5          MR. CARROLL:  They were told this morning

6  that they were not accused of any misconduct but that

7  this was entirely to be in accordance with the

8  executive order that was issued on January 20.  And,

9  Your Honor, even that doesn't really hold water because

10 the executive order says that DEI functions need to be

11 brought to an end in the United States government.

12         These people were intelligence officers long

13 before they were assigned to DEI functions.  They could

14 just be reassigned to something else within the

15 intelligence community and not fired.  To make an

16 analogy to the military, nobody joins the military to

17 become an equal opportunity noncommissioned officer.

18 It's a duty that's given to a mid-career NCO, you know,

19 after he's had regular combat on his assignments and

20 he's going to continue to have regular combat on his

21 assignments.

22         These officers are just similar.  They're

23 case officers.  They're analysts.  They're scientists.

24 They're administrative people at the CIA that have been

25 put in these roles, which are perfectly legal even if

8

1  they're not --

2          THE COURT:  All right.  I understand.

3          MR. CARROLL:  -- even if they're not favored

4  by policy.  And they could go back to being

5  intelligence officers.

6          I mean, I'm a former CIA officer.  I

7  remember, we were told that we were the most expensive

8  people to train and recruit except for fighter pilots

9  and nuclear submare.  It's just an incredibly costly

10 procedure to recruit and train someone in the CIA.

11         And some of these officer have 15 years.  So

12 they're really at the height of their career and their

13 utility to the United States government, but they're

14 short of their pensions.  And they're about to be fired

15 publicly pursuant to a statement by the President of

16 the United States that they were involved in illegal

17 and immoral activity.  A statement was given the day

18 after the E.O. that lards it on even more about how

19 they're dividing America and so forth.

20         THE COURT:  At this point, they have not been

21 terminated; is that correct?

22         MR. CARROLL:  At this point, they've not been

23 terminated.  If they refuse to give an answer to the

24 CIA by 5 o'clock tomorrow, they'll be terminated.  And

25 the only three options they were given were resignation

1    or termination.  There was no alternative to move on.

2            THE COURT:  All right.

3            MR. CARROLL:  And, Your Honor, if I could

4    just say one other thing without wading too deep into

5    the political dispute about DEI, the CIA has more of an

6    interest in DEI than anyone.  There's a national

7    security imperative for them to be able to mix in

8    culturally, speak foreign languages, to not appear to

9    the man on the street or a foreign internal security

10   service to necessarily be American.  So even if it is

11   reasonable to get rid of DEI and the entire rest of the

12   United States government, it's not the intelligence

13   community, Your Honor.

14           THE COURT:  All right.  Let me hear from the

15   government.

16           MS. LEVENSON:  Good afternoon again, Your

17   Honor.

18           THE COURT:  Yes.

19           MS. LEVENSON:  The first thing I think we

20   should make quite clear is that the procedures that my

21   colleague has pointed out pertain only to the CIA.  In

22   fact, ODNI has not begun any sort of process of

23   separating these individuals.  It is still in the DEI

24   offices.  It is still finalizing the procedure it will

25   use.  So that is a wholly separate set of facts, what's

1    happening at CIA versus what's happening at ODNI,
2    which --
3              THE COURT:  How many plaintiffs are in each
4    category?
5              MS. LEVENSON:  Your Honor, I don't know
6    because it doesn't make quite clear, and we've only had
7    the pseudonyms of the --
8              THE COURT:  All right.  Counsel, can you tell
9    me how many are in each category?
10             MR. CARROLL:  Your Honor, I have the names
11   right here obviously if the Court or counsel need them.
12             I'm not sure how many are ODNI.  Because
13   we've been communicating over open lines, people have
14   been somewhat vague about exactly within the
15   intelligence community they work.  They've said that
16   they work for the intelligence community.  Most are
17   CIA.  I know at least one is ODNI.
18             THE COURT:  With respect to the CIA
19   employees, what procedures/regulations do you say
20   apply?  The ones that were mentioned?  The AP
21   procedures?
22             MS. LEVENSON:  Your Honor, to be frank, we
23   learned of this action at 9:40 this morning, and the
24   merits of the process are something that I am still
25   trying to get up to speed on.  What I -- both agencies

1    have claimed the authority of the National Security Act

2    to proceed in this matter.

3            But what I would note, for the purposes of

4    this hearing right here, is that we're on a TRO

5    application where the government has not had the

6    opportunity to respond in any form to the merits.

7            And my colleague did not mention in his

8    presentation any sort of irreparable harm, which is a

9    clear showing of which is absolutely necessary to

10   prevail at this stage of the litigation.  We're not

11   even in a preliminary injunction status where we could

12   actually have the opportunity to respond to the merits

13   of the case.

14           And even if what plaintiff's counsel has laid

15   out, no one is facing the loss of pay tomorrow.  The

16   options that have been laid out for the CIA employees

17   allow for -- even in the case of someone who would

18   choose termination, 90 days of pay.  Certainly, someone

19   could resign on the spot.

20           THE COURT:  There's an issue, though, isn't

21   there, whether these choices are in compliance with the

22   applicable regulations, which no one can tell me which

23   they are at this point?

24           MS. LEVENSON:  Your Honor, certainly, that is

25   something that we can easily brief, much more

USCA4 Appeal: 25-1527    Doc: 14    Filed: 06/25/2025    Pg: 57 of 269
Case 1:25-cv-00300-AJT-LRV    Document 13    Filed 02/19/25    Page 12 of 19 PageID# 94

12

1  thoroughly brief for the Court on a preliminary

2  injunction at the very least application as opposed to

3  this extremely expedited period of time.  I've had the

4  opportunity to speak with -- only very preliminary

5  conversations with the agency clients to have an

6  understanding of what's going on.

7         THE COURT:  Did you say that this procedure

8  is applicable to the employees in the ODNI part are

9  not -- they're in the process of being formulated?

10        MS. LEVENSON:  Yes, Your Honor.

11        THE COURT:  What would apply until that

12  happens?

13        MS. LEVENSON:  Until now they are on paid --

14  they remain on paid administrative --

15        THE COURT:  In terms of their termination,

16  what regulations would apply to any process of

17  terminating them?

18        MS. LEVENSON:  Presumably, Your Honor -- and

19  again, this is all being formulated -- the National

20  Security Act also applies to the director of national

21  intelligence.  Presumably, it would proceed under --

22  any termination would proceed under the authority set

23  forth in that statute.  We'd be happy to provide

24  further information.  But at the very least, ODNI has

25  not even made a determination of how its procedure will

1  go forward.

2          And in light of the lack of showing of

3  irreparable harm, which even judges on this court have

4  been quite clear is not -- Judge Brinkema in the *Roe*

5  case, for example, that plaintiffs cite say termination

6  of employment does not constitute irreparable injury

7  because of the possibility of adequate compensatory or

8  other corrective relief that will be available at a

9  later date.

10          This is an employment action that we can

11  certainly more fully present to the Court for the Court

12  to be able to consider as it does repeatedly in

13  employment actions in front of this Court the merits of

14  this action without irreparable harm to the plaintiffs,

15  Your Honor.

16          THE COURT:  All right.

17          MS. LEVENSON:  Oh, and I would just make note

18  that Judge Brinkema's discussion in this case relies on

19  *Sampson*, the Supreme Court case that established that

20  irreparable harm is not typically established in

21  employment actions.

22          Thank you, Your Honor.

23          THE COURT:  All right.  Counsel.

24          MR. CARROLL:  Your Honor, if I may, I think

25  the irreparable harm here comes from the remarkable

1  statement made by the White House.  In the *Roe* case

2  which counsel mentioned, the airmen were about to be

3  discharged for being HIV positive.  And the Fourth

4  Circuit found that it was proper to enjoin the military

5  from discharging them for that reason.  Because they

6  were being discharged under -- they used some very

7  strong language, like terrible circumstances or with a

8  bad imputation.  I think in this day and age, we would

9  say HIV is just a disease and not read anything into

10  that.

11          Here, what the President said -- and this is

12  following up the E.O. where he says it's illegal and

13  immoral -- is that DEI programs, which these people are

14  assigned to work with, are dangerous, demeaning, and

15  immoral, illegal, violating the civil rights laws and

16  undermining national unity as they deny, discredit, and

17  undermine the traditional American values in favor of

18  an unlawful, corrosive, and pernicious identity-based

19  system stigmatizing and demeaning hard-working

20  Americans resulting in tragic and disastrous

21  consequences on the basis of discrimination.

22          Your Honor, I don't know if you ever had a

23  job search, but usually the first question is why are

24  you looking to move on?  Hopefully, the answer is my

25  company is downsizing or I want more responsibility.

1  I'd hate to have to say, well, the President said I was

2  involved in illegal and immoral and pernicious activity

3  that tears at the fabric of the nation.

4          It would be defamatory if a private employer

5  said that when they were firing somebody, any other

6  person.  But that's the irreparable harm here, Your

7  Honor.  They're going to get canned as soon as

8  5:00 p.m. tomorrow if they can't make up their mind

9  about exactly what to do.  And this is what's going to

10  be ringing in a potential employer's ear, that they

11  were fired because they were involved in pernicious

12  discrimination, unlawful discrimination, and so forth.

13  Of course, they're just on a temporary assignment doing

14  something totally legal.

15          So, Your Honor, I would ask you -- the agency

16  is in a great rush here to fire these people giving

17  them, you know, basically just two work days to decide

18  what to do.  Please just pump the brakes on them,

19  freeze the situation, and we'd be happy to, you know,

20  argue all of these issues and brief these issues at

21  length.  Please don't let these good Americans be fired

22  tomorrow, Your Honor.

23          THE COURT:  Counsel, let me ask you a

24  question.  You mentioned the President's executive

25  order.  The executive order is not self-executing; is

1   it?  It has to be implemented through the applicable

2   regulations for termination of people; isn't that the

3   case?

4           MS. LEVENSON:  My preliminary understanding,

5   Your Honor, is that the agencies are tasked with --

6           THE COURT:  I'm sorry?

7           MS. LEVENSON:  That individual agencies and

8   OPM are tasked with implementing those orders.

9           THE COURT:  I understand, but they have to do

10  that in accordance with the applicable regulations;

11  don't they?

12          MS. LEVENSON:  Presumably so, Your Honor.  I

13  would not say that the E.O. entitles agencies to ignore

14  other law.

15          THE COURT:  Can you tell why what's been

16  proposed is -- and I know you have limited information.

17  But based on your understanding, why what's been

18  proposed by way of these three choices is in compliance

19  with the applicable regulations either as to the CIA

20  people or the ODNI people?

21          MS. LEVENSON:  Your Honor, it would -- that

22  does ask me -- your question does ask for more

23  information than I have.  I am aware that the

24  government is entitled to reduce in force and to look

25  at particular offices to do so and that agency

1  regulations with additional process are usually trained

2  on accusations of wrongdoing in the intelligence

3  community particularly, which, as plaintiff's counsel

4  has made clear, has not been accused here.

5          I would also note that with respect to the

6  statements on which plaintiff's counsel is relying from

7  the President, that doesn't constitute irreparable

8  harm.  Those statements have been made, and the

9  plaintiff's status is as workers in those offices.

10 It's not disclosure of private, sensitive medical

11 information.  Whether they've been working there has

12 been well known at least to their colleagues

13 presumably.  So the different circumstances between *Roe*

14 and this case are quite apparent, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Anything else?

17          MR. CARROLL:  Just very quickly, Your Honor.

18 To answer your question, what the order says is that

19 the order shall be implemented consistent with

20 applicable law, which is not surprising.  That's the

21 usual language that's in there.  Here, the regulations,

22 which are classified within the CIA as to how to

23 terminate someone, are not being followed.  There's an

24 unclassified version that's been posted online under a

25 Freedom of Information Act request.  It lays out the

18

1    procedures about how to fire somebody, and they're

2    simply not being followed here at all.

3                 THE COURT:  All right.  Obviously, there's a

4    lot of information the Court doesn't have, and I think

5    the best course is for the Court to get additional

6    information before it can rule substantively on the

7    merits from the complaint.  There are regulations that

8    may be implicated that based on what I've been told may

9    not be complied with based on these three choices that

10   are being given.  The government simply can't tell me

11   what the situation is with sufficient detail for the

12   Court to really have any confidence that it understands

13   what it's ruling on.

14                So what I'm going to do is I am going to

15   issue, as the Court is entitled to under the All Writs

16   Act, just an administrative stay.  All right.  And I'm

17   going to continue this case for additional hearing on

18   Monday at 1 o'clock.  I'd like the government to file

19   its position -- and hopefully, you will have more

20   information in that briefing -- by close of business on

21   Thursday, and I'd like to have any reply by close of

22   business on Friday.

23                And in the interim, these plaintiffs will

24   remain on administrative leave with full pay and

25   benefits.  All right.

19

```
 1              MR. CARROLL:  Thank you, Your Honor.

 2              THE COURT:  Anything further?

 3              MS. LEVENSON:  Thank you, Your Honor.

 4              THE COURT:  All right.  The Court will stand

 5    in recess.

 6              ------------------------------------
                      Time:  1:21 p.m.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
          I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                               _____
25                                          /s/
                               Rhonda F. Montgomery, CCR, RPR
```

UNCLASSIFIED//AIUO

(U//AIUO) Disseminating or sharing any part of this document outside CIA must comply with AR 10-16.

AR 4-16 (U) Termination of Employment (Formerly AR 13-8)

DS - Agency Regulation Series 4 (Conduct, Accountability, Discipline) Published on 11 December 2006
Revision Summary

(U//AIUO) AR 4-16 *Termination of Employment* is being administratively revised to reflect the title change from Associate Deputy Director of the Central Intelligence Agency (ADD/CIA) to Chief Operating Officer of the CIA (COO), effective 01 June 2017. The titles of Chief, Security Center (C/SC) and Deputy Chief, Security Center (DC/SC) were updated to the current titles of Director, Office of Security (D/OS) and Deputy Director, Office of Security (DD/OS).

Regulation Summary

(U) This regulation sets forth circumstances under which Agency employment may be terminated and provides for the manner in which such employment terminations may be effected.

I.        (U) Authorities

(U) All employment terminations, other than by mandatory or involuntary retirement under the Central Intelligence Agency Retirement Act of 1964 for Certain Employees, as amended (50 U.S.C. Sec. 2001 *et seq.*), shall be pursuant to the Director of the Central Intelligence Agency's (D/CIA's) statutory authority, including section 104(g) of the National Security Act of 1947, as amended (50 U.S.C. Sec. 403-4(g), which states that:

> (U) "Notwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, in the Director's discretion, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director shall deem such termination necessary or advisable in the interests of the United States. Any such termination shall not affect the right of the officer or employee terminated to seek or accept employment in any other department or agency of the Government if declared eligible for such employment by the Office of Personnel Management."

(U) By the terms of this statute, to terminate the employment of an Agency officer or employee, the Director of the Central Intelligence Agency (D/CIA) need only deem employment termination necessary or advisable in the interests of the United States. It is not required that an employment termination under this statute be in the interests of the national security, but only that the D/CIA, in his discretion, must deem such termination to be in the interests of the United States. Notwithstanding any provisions of this regulation or any other regulation, document, or law, the D/CIA need not provide to anyone the reasons for such termination if he decides not to do so. Any decision not to provide the reasons for employment termination is entirely discretionary, and a national security basis for such a decision is not required. However, under the terms of this statute, the decision of the D/CIA to terminate the employment of an Agency employee, regardless of the reasons for such termination, does not foreclose the employee from

AR 4-16

other employment with the Federal Government. Employment may be terminated by the D/CIA or by an official of the Agency to whom the D/CIA delegates appropriate authority. No redelegations of this authority shall be made by officials to whom this authority has been delegated except to Agency personnel lawfully designated to act in the capacity of such officials in their absence. Any reference in this regulation to the D/CIA shall be deemed to include Agency officials to whom appropriate authority has been delegated.

II.    (U) Policy

# A.    Tenure

Agency employees do not have tenure and their employment may be terminated pursuant to the terms of the National Security Act of 1947, as amended, without regard to the procedural requirements of this regulation or any other provisions of law. Except as provided by this regulation and AR 13-5, the termination of an Agency employee is not subject to appeal under the provisions of any regulation, document, or law. Notice is hereby given that nothing in this regulation or in any other regulation, document, or law shall be construed as creating for any employee any property or other interests or privileges in his or her employment.

# B.    Circumstances for Termination of Employment

## 1.    Termination for Failure to Complete Trial Period Satisfactorily

Any employee determined to be unsuitable for Agency employment during the trial period may be terminated from the Agency. (See AR 4-15 (formerly AR 20-24))

## 2.    Termination Prior to Expiration of Contract

For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination. However, nothing in the contract shall be construed to prevent the Director, Office of Security (D/OS) or designee from suspending or revoking a contract employee's access to classified information at any time.

## 3.    Termination for Failure to Meet the Work and Efficiency Requirements of the Agency

Any employee who fails to meet Career Service work and efficiency requirements or to perform assigned duties adequately may be terminated from the Career Service and the Agency.

UNCLASSIFIED//AIUO

## 4. Termination for Failure to Meet Security Standards

Any employee who fails to meet the Agency's security standards may be terminated from the Agency. Any determination that an employee fails to meet security standards may be appealed only pursuant to the provisions of AR 7-7 (formerly AR 10-16).

## 5. Termination for Failure to Meet Medical Standards

Any employee who fails to meet the Agency's medical standards may be terminated from the Agency.

## 6. Termination for Failure to Meet Agency Standards of Conduct

The Agency standards of employee conduct are set forth in AR 4-1, Standards of Conduct (formerly AR 13-1); AR 13-1, Conflict of Interest, Lack of Impartiality, and so forth (formerly AR 13-2). An employee may have his or her employment terminated for failure to meet these standards.

## 7. Termination for Abandonment of Position

Any employee who fails to report for scheduled duty for more than ten consecutive workdays without being on approved leave may be terminated from employment for abandonment of position.

## 8. Termination upon Determination of Legal Incompetence

An employee who is declared by a court of competent jurisdiction to be mentally incompetent may be terminated from employment.

## 9. Termination of Excess Personnel

An employee who is found to be excess to the needs of the Agency may be terminated from employment. An employee may be determined to be excess to the needs of the Agency if his or her Career Service has declared the employee excess and a job search within the Agency is unsuccessful or is not requested by the employee. The grounds for declaring an employee excess to Career Service needs are:

*a.*    The Career Service is over strength overall or in a particular grade or functional element.

UNCLASSIFIED//AIUO

*b.*    There is no longer a requirement in the Career Service for the particular skills or qualifications possessed by the employee.

*c.*    There is a reduction or elimination of the functions of the Career Service, thereby requiring a reduction in staff.

## 10.    Termination Prior to Not-to-Exceed Date of Reserve Appointment

A Reserve Employee may be terminated from employment prior to the not-to-exceed date of his or her appointment if the employee's services are no longer needed, the employee's performance has been inadequate, the employee is not suitable for continued Agency employment, the employee's security clearance has been revoked, or termination of employment otherwise is deemed to be necessary or advisable in the interests of the United States.

## 11.    Termination in Other Circumstances

In addition to the circumstances specified in paragraphs 1 through 10 above, an employee may have his or her employment be terminated whenever the D/CIA, in his discretion, deems such termination necessary or advisable in the interests of the United States.

## C.    Procedures for Termination of Employment

Except as noted in paragraphs C.1. to C.6. and paragraph D. below, terminations pursuant to this regulation shall be carried out in accordance with the procedures set forth in AR 4-2 (formerly AR 13-3) and AR 4-6 (formerly AR 13-5). Notwithstanding any other provision of this regulation, all termination recommendations shall be routed through the Office of General Counsel (OGC).

## 1.    Procedures for Termination Prior to Expiration of Contract

For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination. Directors or Heads of Independent Offices who exercise operational control over contract employees may terminate a contract. However, nothing in the contract shall be construed to prevent the D/OS or designee from suspending or revoking a contract employee's access to classified information at any time. The PEB ordinarily will not be convened for separation of contract employees.

## 2.    Procedures for Termination for Abandonment of Position

UNCLASSIFIED//AIUO

If an employee fails to report for duty or to return from leave, an effort will be made to determine the employee's intentions. If the employee's intentions cannot be determined within 10 business days or if it appears that the employee intentionally abandoned his or her position, Chief, Human Resources may terminate the employee from the Agency for abandonment of position. The termination will be effective at close of business on the last day of active duty or of approved leave, whichever is later. The PEB ordinarily will not be convened for separation of employees who have abandoned their positions. Unless security considerations dictate otherwise, the Special Activities Staff, Security Center (SAS/SC) will mail notice of termination to the employee's last known address. If security conditions preclude notice by mail, other reasonable efforts to notify the employee will be undertaken. If subsequent evidence indicates that the abandonment was not the employee's fault, the employee will be reinstated by Chief, Human Resources and paid appropriately as if the termination had not occurred.

## 3.     Procedures for Termination for Legal Incompetence

Upon a judgment by a court of competent jurisdiction that an employee is legally incompetent, Chief, Human Resources may terminate the employee from the Agency unless the employee is determined to be eligible for disability retirement. When a decision is made to terminate employment due to legal incompetence, SAS will notify the employee's legal guardian in writing about the action to be taken. The PEB ordinarily will not be convened for separation of employees who have been declared legally incompetent.

## 4.     Procedure for Termination of Excess Personnel

*a.*     In considering whether an employee is excess to the needs of a Career Service, the Head of the Employee's Career Service will take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth. In any case involving an employee with a disability who is unable to perform essential job functions with or without reasonable accommodation, the decision to declare the employee excess to the needs of the service must be in accordance with the provisions of AR 3-25 (formerly AR 9-4).

*b.*     If the head of a component determines that an employee is excess to the needs of the component, both the Head of the Career Service and the employee will be advised in writing. If the employee wishes, the Career Service will make an effort to arrange placement in another component within that Career Service. If such efforts fail, the Career Service will declare the employee excess to the

JA066

UNCLASSIFIED//AIUO

needs of the Career Service and will notify the employee, Chief, Human Resources, and D/OS, via SAS.

*c.*    A representative from SAS will then meet with the employee and determine if the employee wishes placement elsewhere in the Agency at the same or different grade. If the employee wishes placement elsewhere in the Agency, SAS will broker an Agency-wide placement effort. If the employee does not wish placement elsewhere in the Agency or if placement efforts are unsuccessful after a sufficient interval of time, SAS shall so notify Chief, Human Resources in writing. Chief, Human Resources shall then forward a recommendation to separate the employee to the Chief Operating Officer (COO) for decision. The PEB ordinarily will not be convened for separation of employees who have been determined to be excess to the needs of the service.

## 5.    Procedures for Termination of Employment of DNI/OSC Alien Employees

The D/DNI/OSC has developed procedures for the termination of DNI/OSC alien employees. These are the only procedures for termination of DNI/OSC alien employees and any change in these procedures must be reviewed by OGC prior to adoption of the changes. These standard procedures shall not affect the discretionary authority delegated to the D/DNI/OSC by Section III. below to terminate the employment of DNI/OSC alien employees without procedures.

## 6.    Procedures for Termination of Reserve Employment Prior to Not-to-Exceed Date of Reserve Employment

The employment of a Reserve Employee may be terminated by Chief, Human Resources at any time prior to the not-to-exceed date of the employee's appointment if Chief, Human Resources determines that the employee's services are no longer needed, the employee's performance has been inadequate, the employee is unsuitable for continued Agency employment, the employee's security clearance has been revoked, or Chief, Human Resources determines termination is otherwise deemed necessary or advisable in the interests of the United States. Before making such a determination, Chief, Human Resources shall follow the procedures set forth in AR 4-2 (formerly AR 13-3) and AR 4-6 (formerly AR 13-5) except that the decision of Chief, Human Resources is final and not appealable by the employee.

## D.    Termination Without Procedures

Pursuant to statutory authority, any employee may be terminated from the Agency at any time

UNCLASSIFIED//AIUO

without regard to any procedural steps set forth in this regulation or elsewhere when the D/CIA, in his discretion, deems it necessary or advisable in the interests of the United States. The decision by the D/CIA to exercise this authority is entirely discretionary. The D/CIA need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required. The existence or the exercise of this discretionary authority by the D/CIA is:

1.   Not constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law.

2.   In abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law.

## E.   Appeal of Termination Decision

1.   Contract employees, reserve employees, and DNI/OSC alien employees have no right of appeal.

2.   When employment is being terminated because of revocation of access to classified information, the procedures for all employees to appeal the revocation decision shall be those set forth in AR 7-7 (formerly AR 10-16).

3.   In all other cases, the termination decision may be appealed to the COO. SAS shall advise the employee that he/she has ten calendar days from the date of receipt of the notification of the termination decision to submit written comments to SAS. In cases where the employee requests access to Agency regulations or other relevant materials, the employee shall have ten calendar days from receipt of the requested materials or notice that the materials will not be provided to submit written comments to SAS. SAS shall make the employee's written comments available to the COO and notify the employee in writing of the COO's decision. In cases where the COO is the terminating authority, for example in cases where an employee is declared excess to the needs of the service, the employee may appeal directly to the D/CIA.

4.   Employees may appeal to the D/CIA in cases where the COO denies the initial appeal or where the COO serves as the terminating authority. The employee shall have ten calendar days from receipt of the COO's decision to submit written comments through SAS to the D/CIA. The employee must prepare any classified written comments to the COO or to the D/CIA at a secure facility designated by D/OS or designee. Upon receipt of an appeal, the D/CIA will decide, in his discretion, whether to terminate the individual's Agency employment pursuant to the D/CIA's statutory authority to do so. SAS

UNCLASSIFIED//AIUO

shall notify the employee in writing of the D/CIA's decision.

## F.     No Additional Rights Conferred

Nothing in this or any other Agency regulation or policy statement should be construed to create or confer on any person or entity any right to administrative or judicial review of Agency employment termination procedures, their implementation, or decisions or actions rendered thereunder. Neither this nor any other Agency regulation or policy statement creates or confers any right, benefit, or privilege, whether substantive or procedural, for continued Agency employment. Finally, neither this nor any other Agency regulation or policy statement creates or confers any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency, any Agency instrumentality, or any Agency officer or employee, or any other person acting for or on behalf of the Agency.

## G.     Opportunity to Resign: Resignation in Lieu of Termination

1.     An employee may proffer a resignation at any time before the meeting of an advisory board, as described in AR 4-2 (formerly AR 13-3), or if no advisory board meets, at any time before the decision of an appropriate official to separate the employee. In such circumstances, the separation will be recorded as a voluntary resignation unless the D/CIA, DD/CIA, COO, D/OS, Chief, Human Resources or, for DNI/OSC alien employees, D/DNI/OSC declines to accept the resignation. If a decision is made not to accept a resignation, the D/CIA, DD/CIA, COO, D/OS, Chief, Human Resources or D/DNI/OSC, as appropriate for the category of employee, may terminate the individual's employment and the employment termination will be recorded as an involuntary separation.

2.     An employee who resigns after a decision has been made by DD/OS to revoke the employee's access to classified information or a decision has been made by Chief, Human Resources, with concurrence by the Head of the employee's Career Service, to separate the employee for non-security reasons will be considered to have resigned in lieu of termination and the separation will be recorded as resignation in lieu of termination. An employee who resigns in such circumstances shall be ineligible for separation compensation under AR 5-16 (formerly AR 20-32). However, a resignation tendered and accepted as outlined above shall be deemed to constitute an involuntary separation solely for purposes of determining whether the individual is eligible for a discontinued service retirement annuity under the Civil Service Retirement System or the Federal Employees Retirement System.

3.     Once a final decision is made to involuntarily separate the employee, it will be recorded as an involuntary separation.

4.    The status of the employee's separation, that is, voluntary separation, resignation in lieu of termination, or involuntary separation will be described to state unemployment compensation authorities and/or private sector employers who properly inquire.

5.    An employee who submits a resignation before final COO, DD/CIA, or D/CIA review of an appeal will be notified prior to formal acceptance of the resignation that acceptance of the resignation will terminate further processing of the appeal.

6.    If, after a termination recommendation has been made, an employee submits a resignation effective at a future date, D/OS or designee will consult with appropriate officials and determine whether the interests of the U.S. require continuation of procedures to effect an earlier termination.

7.    D/OS, in his or her discretion and in accordance with applicable law, may waive any of the provisions of paragraphs 1 through 6 above if D/OS determines such a waiver or waivers would be beneficial to the interests of the Agency.

## H.    Disclosure or Dissemination of Reasons for Termination or Resignation of Employment

1.    Generally, the reasons for the termination or resignation of Agency employment shall not be disseminated outside the Agency to any private organization or Federal or other governmental body without the consent of the employee. Absent such consent, and subject to the exceptions noted below, responses to requests for information as to why an individual's employment was terminated shall be limited to a statement that the employment was terminated pursuant to statutory authority. Nothing in this section (section H) shall limit the dissemination of:

*a.*    Intelligence or counterintelligence information;

*b.*    Information relevant to lawful personnel, physical, or communications security investigation or proceeding or a hiring, licensing, or similar decision by another Federal agency;

*c.*    Information pursuant to a prior written acknowledgment of the employee that the information may be disclosed to other Federal, state, or local government agencies for investigative, administrative, or legal action;

*d.*    Information concerning possible violation of Federal criminal law, as required by section l.7(a) of Executive Order 12333 and/or 28 U.S.C. Sec. 535; and/or

*e.*    Information necessary to protect an individual's life or physical safety or the

UNCLASSIFIED//AIUO

public health or safety.

2.    The D/CIA, DD/CIA, COO, D/OS, or DD/OS in each official's discretion, may waive the provisions of this section (section H) and authorize a disclosure that otherwise would not be permitted under this regulation, provided that the disclosure is permissible under the Privacy Act of 1974, as amended (5 U.S.C. 552a), the Agency's Privacy Act regulations, and Executive Order 12333 and the implementing procedures for that order.

3.    This regulation does not require the D/CIA to disclose the reasons for termination of employment if, in the exercise of his discretion under law, he decides not to do so.

III.    (U) Responsibilities

The termination authority of the D/CIA is delegated to:

A.    The Deputy Director of the Central Intelligence Agency (DD/CIA) upon the recommendation of an advisory board.

B.    The Chief, Human Resources with respect to any employee who is:

1.    Recommended by the Personnel Evaluation Board (PEB) for termination for suitability reasons such as misconduct or substandard performance. (see AR 14-6 (formerly AR 13-5));

2.    Found to have abandoned his or her position;

3.    Judged to be legally incompetent; or,

4.    Serving under a Reserve Employee appointment [see AR 3-2 (formerly AR 20-2)].

C.    The Director of National Intelligence, Open Source Center (DNI/OSC) with respect to DNI/OSC alien employees.

D.    Directors or Heads of Independent Offices with respect to contract employees.

E.    The COO is delegated the authority to decide the first-level appeals of employees recommended for termination and to terminate the employment of such employees upon recommendation of an advisory board. The COO also has authority to terminate the employment of an employee who has been declared to be excess to the needs of the service.

F.    The COO, as Chairman of the Panel established under AR 7-7 (formerly AR 10-16) to review security decisions to revoke employees' access to classified information, is delegated authority to terminate employment of any employee whose security revocation has been upheld by the Panel.

UNCLASSIFIED//AIUO

**G.**    The Deputy Director, Office of Security (DD/OS) is delegated authority to terminate the employment of any employee who chooses not to appeal or request a review of a security revocation decision.

SECRET//NOFORN

18 February 2025

MEMORANDUM FOR:   Director of Security
Associate Director for Talent
Director, Office of Personnel Resources, Directorate of Support

FROM:   Director, Central Intelligence Agency

SUBJECT:   (U//AIUO) Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office

REFERENCES:   A. (U) Section 104A of the National Security Act of 1947, as amended, 50 U.S.C. § 3036(e)

B. (U) Agency Regulation 4-16, Termination of Employment

C. (U) Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 20 JAN 2025

D. (U) CIA Request for Voluntary Early Retirement Authority (Approved by the Office of Personnel Management, 5 FEB 2025)

1.   (U//AIUO) Action Required:  That you undertake the necessary actions to implement my decision, pursuant to Reference A and consistent with Reference B, to terminate the employment of the CIA employees who most recently served in the Agency's former Diversity and Inclusion Office (DIO) and are currently on administrative leave or, in lieu of termination, permit these employees to retire or resign (if eligible).

2.   (U//AIUO) Decision: To best effectuate the President's direction in Reference C as well as follow-on memoranda from the Acting Director of OPM, I have determined that it is necessary or advisable in the interests of the United States to terminate the employment of all of the employees of the former DIO pursuant to Reference A and consistent with Reference B.

SECRET//NOFORN

JA073

SECRET//NOFORN

SUBJECT: (U//AIUO) Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office

3. (U//AIUO) Please notify each of the employees, identified in the appended list at Tab A, of my decision at separate in-person meetings with the Agency on 18 February 2025. As previously notified to these employees by Agency representatives on or about 4 February 2025, any of these employees may choose to participate in the CIA's implementation of the Deferred Resignation Program (DRP) offered by the Office of Personnel Management (OPM) and retire (if eligible) or resign. Because the Agency must notify OPM of all CIA employees who will participate in the DRP no later than 20 February 2025, each employee who elects to participate in the DRP must notify the Agency representative of the employee's decision to participate in the DRP no later than 5 PM on 19 February 2025.

4. (U//AIUO) Pursuant to Reference A and consistent with Reference B, I also may determine that it is necessary or advisable in the interests of the United States to terminate the employment of additional employees as necessary to effectuate the direction in Reference C. Such determinations may be conveyed in separate memoranda.

5. (U//AIUO) If an employee in the former DIO elects to participate in the DRP, the employee will remain on administrative leave as follows:

- Employees who are not eligible to retire in calendar year 2025 will remain on administrative leave through 30 September 2025, and on 1 October 2025, their employment with the Agency must cease.

- Employees who are eligible to retire, or will become eligible to retire, on or before 30 September 2025 (whether pursuant to immediate retirement or early retirement pursuant to Reference D), will remain on administrative leave through 30 September 2025, and on 1 October 2025, their employment with the Agency must cease.

- Employees who will become eligible to retire after 30 September 2025 and on or before 31 December 2025 (whether pursuant to immediate retirement or early retirement pursuant to Reference D), will remain on administrative leave through the earliest date that they reach immediate or early retirement eligibility. Their employment with the Agency must cease the day after the earliest date of immediate or early retirement eligibility.

2

SECRET//NOFORN

~~SECRET//NOFORN~~

SUBJECT: (U//~~AIUO~~) Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office

6. (~~S//NF~~) If an employee in the former DIO elects not to participate in the DRP or declines to make any election regarding the DRP before 5 PM on 19 February 2025, the employee will remain on administrative leave through 19 May 2025, after which their employment must cease effective 20 May 2025. ██████████████ ████████████████████████████████████████████████████ This will facilitate transition from CIA employment and is consistent with Agency practice.

7. (U//~~AIUO~~) Any employee also may resign, effective immediately.

John L. Ratcliffe

Attachment:
   A.  (U//~~AIOU~~) List of Employees in Former DIO

3

UNCLASSIFIED//FOUO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JOHN DOE 1, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.  ) | Case No. 1:25cv300 (AJT/LRV) |
| ) | |
| UNITED STATES OFFICE OF THE ) | |
| DIRECTOR OF NATIONAL ) | |
| INTELLIGENCE, *et al.*, ) | |
| ) | |
| _____ Defendants. _____ ) | |

### (U) DECLARATION OF ROBERT A. NEWTON

(U) I, Robert A. Newton, declare as follows:

1.      (U//FOUO) I currently serve as the Deputy Chief Operating Officer for the Office of the Director of National Intelligence ("ODNI").  I have held this position since 2021.  As part of my current duties, I oversee all of the internal support operations for ODNI, to include ODNI Human Resource Management.

2.      (U) Through the exercise of my official duties, I am familiar with the subject of this litigation.  I make the following statements based on my personal knowledge and information made available to me in the course of my official duties.

3.      (U) On January 20, 2025, the President issued Executive Order 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*.  Among other things, the Order required that each "agency . . . head, in consultation with . . . the Director of OPM," "terminate, to the maximum extent allowed by law, all DEI [and] DEIA . . . offices and positions."  *See* EO 14,151 § 2(b)(i), 90 Fed. Reg. 8339.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

4.    (U) The Office of Personnel Management ("OPM") subsequently issued a
memorandum titled "Initial Guidance Regarding DEIA Executive Orders" further to EO 14,151,
in which OPM informed agency heads that they should, by January 22, 2025, "[s]end a
notification to all employees of DEIA offices that they are being placed on paid administrative
leave effective immediately as the agency takes steps to close/end all DEIA initiatives, offices,
and programs."

5.    (U) Subsequently, ODNI placed a number of ODNI employees on administrative
leave as of January 22, 2025.

6.    (U) The Director of National Intelligence ("DNI") has been conferred "discretion"
by statute to terminate the employment of any ODNI employee where the Director deems such
action to be "necessary or advisable in the interests of the United States."  *See* 50 U.S.C. §
3036(e) (providing this authority to the Director of the Central Intelligence Agency ("CIA")); 50
U.S.C. § 3024(m)(1) (providing the DNI with any authority as to ODNI personnel that the
Director of the CIA possessed with respect to CIA personnel as of December 17, 2004).
Terminations of ODNI employment are conducted pursuant to this statutory authority.

7.    (U) Where there is no ODNI regulation or instruction applicable, ODNI applies
CIA regulations.  Accordingly, ODNI follows a CIA regulation regarding termination of
employment, which specifies various circumstances in which employment may be terminated
and provides the manner in which such terminations may be carried out.  I understand that a copy
of this regulation is being provided to the Court with the Department of Justice's submission
today.

8.    (U) Under this regulation, ODNI follows various procedures applicable to various
circumstances in which employment with ODNI may be terminated.  But this regulation also

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

establishes—in a paragraph regarding "Termination Without Procedures"—that ODNI employment may be terminated by the DNI pursuant to the above-referenced statutory authority "without regard to any procedural steps set forth in" agency regulations when the DNI determines termination of employment is necessary or advisable in the interests of the United States. This regulation also establishes, consistent with the foregoing statute, that the DNI's invocation of termination without procedures is "entirely discretionary."

9.    (U) The employees previously designated for paid administrative leave, as referenced in paragraph 5, continue to be in that status. ODNI anticipates that it will pursue the separation of these individuals from the agency. To date, however, ODNI has not issued a final, documented decision regarding their anticipated separation from the agency or determined what, if any, procedures may be employed in relation to their separation, including as to any potential termination.

(U) Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

(U) Executed on February 20, 2025

_____
(U//FOUO) **Robert A. Newton**
Deputy Chief Operating Officer
Office of the Director of National Intelligence

UNCLASSIFIED//FOUO

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official | ) |
| capacity as Director of National Security; | ) |
| and | ) |
| | ) |
| JOHN RATCLIFFE, in his official | ) |
| capacity as Director of the Central | ) |
| Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

**INTRODUCTION**

Plaintiffs deserve an injunction restraining Defendants from terminating their employment as career United States intelligence officers, without due process and in violation of their First and Fifth Amendments, for reasons of domestic politics. Plaintiffs are likely to succeed on the merits of their constitutional claims, in particular. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging—according to a White House statement—in illegal and immoral activity. The balance of equities is in Plaintiffs' favor as termination causes them economic hardship. And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

<u>JA079</u>

Defendants' arguments to the contrary are unavailing. Defendants' authority to terminate non-partisan, career civil servants without due process is constitutionally limited to doing so only in the interests of national security, not in the service of a partisan ideological agenda. Defendants are terminating Plaintiffs from jobs in which they hold a Fifth Amendment property interest, because of their professional speech supporting civil rights laws, made while serving in DEIA-related roles, *and* for their assumed private support of civil rights laws, in violation of the First Amendment. Plaintiffs will suffer irreparable injury from their termination because of the genuinely extraordinary presidential statement that they engaged in illegal and immoral activities. And Defendants' scheme to terminate DEIA-related intelligence officers endangers human sources they are entrusted to protect.

## ARGUMENT

The parties concur about several key points in this matter.

Plaintiffs agree, as career intelligence officers, that the Director of the Central Intelligence Agency ("D/CIA") and Director of National Intelligence ("DNI") may, at their discretion, terminate any intelligence officer's employment whenever either Director deems the termination of employment of such officer "necessary or advisable in the interests of the United States." 50 U.S.C. §§ 3036(e)(1) and 3024(m)(1); *see also* CIA Reg. 4-16 at 1.2.

Defendants admit, as they must, that Plaintiffs have received no procedural due process, that Plaintiffs' lack recourse to the Merit Systems Protection Board ("MSPB"), and that Plaintiffs' constitutional claims under the First and Fifth Amendments fall within this Court's jurisdiction. Defendants are also correct that under the ultimatum issued to Plaintiffs on February 18, 2025—a day after Plaintiffs filed for injunctive relief—offers them ninety more days of administrative leave before termination.

2

Plaintiffs recognize that they have no cognizable claim for damages under the Administrative Leave Act ("ALA") , 5 U.S.C. § 6329a. And Plaintiffs acknowledge that temporary restraining orders and preliminary injunctions ought only to be granted, in this Court's words, "sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).

The parties disagree about the following six important matters.

Plaintiffs contend that Defendants' Gabbard and Ratcliffe's statutory termination authorities under Sections 3024 and 3036 are limited, by the terms of *Webster v. Doe*, 486 U.S. 592 (1988), to the termination of intelligence officers in the interests *of national security*, and that Regulation 4-16 stretches the Directors' termination authority beyond the constitutional breaking point.

Plaintiffs assert that they are being punished by Defendants both because of the professional speech they made in support of civil rights statutes while serving in DEIA-related roles, *and* for their assumed private beliefs in support of civil rights laws, which is why Defendants seek their termination, in violation of their right to free speech under the First Amendment.

Plaintiffs further assert that they do maintain Fifth Amendment property interests in their continued federal employment, even though they are not covered by the 5 U.S.C. § 2301 *et seq*. ("CSRA"), as they have engaged in no misconduct and pose no security risk.

Plaintiffs also assert that while the termination of government employment does not ordinarily constitute irreparable injury, Plaintiffs' case is a genuinely extraordinary situation because of the unprecedented and defamatory presidential public statement that they engaged in illegal and immoral activities.

3

Granting that Plaintiffs' received no due process yet lack recourse to the MSPB, this Court ought to exercise its jurisdiction over both Plaintiffs' constitutional claims and their statutory claims under the ALA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

Finally, Plaintiffs believe that the balance of equities in this case tilts in their favor. Defendants' scheme to terminate all suspected DEIA-related intelligence officers actually endangers the human sources Defendants Gabbard and Ratcliffe are supposed to protect, the sacred responsibility for which they were granted the statutory authority to terminate employees for national security reasons in the first place.

I.    **Defendants' authority to terminate intelligence officers without due process is constitutionally limited to doing so only in the interests of national security.**

The paperwork Defendants CIA and Ratcliffe issued to Plaintiffs on February 18, 2025 relies only upon the Director's statutory authority to dismiss them pursuant to the National Security Act ("NSA"), 50 U.S.C. § 3036(e), if he determines that to be "necessary and advisable in the interests of the United States."

In *Webster v. Doe*, 486 U.S. 592 (1988) (Rehnquist, C.J.), the Supreme Court upheld the CIA director's termination of a gay officer pursuant to the director's authorities under the NSA. *Id.* at 595, 600. In so doing, Chief Justice Rehnquist reasonably invoked the director's special responsibility "for protecting the identities of intelligence sources from unauthorized disclosure." *Id.* at 600.

The Chief Justice added, however, that the language and structure of the NSA "indicate that Congress meant to commit *individual employee discharges* to the Director's discretion, and that … accordingly precludes judicial review of these decisions under the APA." *Id.* at 601 (emphasis supplied). The Chief Justice continued to state that "a constitutional claim based on an individual discharge may be reviewed by the District Court" *Id.* at 603-04. In dissent, Justice

4

Scalia made clear that he objected to the Court allowing CIA officers' constitutional claims against the Agency or Director because of the risk that classified information might be mishandled during discovery. *See id*. at 621.

Chief Justice Rehnquist made the holding of *Webster* explicit in a subsequent case, *Tenet v. Doe*, 544 U.S. 1 (2005). He reiterated that *Webster* held that the Director's statutory authority under the NSA "not be read to exclude judicial review of the constitutional claims made by a former CIA employee for alleged discrimination. In reaching that conclusion, we noted the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id*. at 10 (internal citations and quotation marks omitted).

It is clear therefore from *Webster* that (1) the Director's statutory authority pertains to the termination of individual CIA officers, (2) that statutory authority is constitutional insofar as it pertains to national security concerns, (3) CIA officers may pursue First and Fifth Amendment claims against their employer, and (4) the dissenting argument against allowing CIA officers to pursue constitutional claims revolves around counterintelligence concerns.

On remand, the meaning of *Webster* becomes even clearer. According to CIA, the reason Doe was terminated was not simply because he was gay, but because of "*his clandestine and deliberately concealed* [homosexual] *activity." Doe v. Gates,* 981 F.2d 1316 (D.C. Cir. 1993)*,* at 120-21 (emphasis in original) (Sentelle, C.J.). The Court of Appeals found that "Doe's termination resulted not from a blanket policy but from the CIA's individualized determination that his own case represented a threat to the national security mission of the Agency … in light of the fact that he hid information about his involvement in homosexual activity … Doe's oft-expressed concern for the 'privacy' of his partners has led the Agency to conclude that he might well be susceptible

5

to threats of exposure directed against his past, present, or future homosexual partners." *Id*. at 1324.

The Court of Appeals therefore upheld the District Court's conclusion that "the discharge is rationally related to the legitimate government security interest in collecting foreign intelligence and protecting the nation's secrets." *Id*. In their concurrences, Circuit Judges Edwards and Randolph emphasized this point: "Doe points to no evidence that contradicts the Government's position that the CIA discharged him after an individualized assessment of the circumstances of his case, rather than pursuant to a blanket ban. The record plainly does not support a contention that Doe was dismissed because of the mere fact of his homosexuality;" and "I join only the portion of the opinion holding that Doe's termination resulted "from an individualized determination that his case represented a threat to the national security mission of the agency." *Id*. at 1325.

Again, the decisions in *Webster v. Doe* and *Doe v. Gates* upheld the Director's authority to dismiss that officer on the basis of an individualized assessment that he posed a particular counterintelligence concern as a closeted gay man worried about the privacy of his partners circa 1988—Doe was vulnerable back then to sexual blackmail by hostile foreign intelligence services. But the Director's termination authority under the NSA is not and cannot be plenary. Undoubtedly, if a CIA Director terminated all female officers, or all African-American officers, or all Jewish officers or all indeed gay officers, this Court would hear those officers' meritorious constitutional challenges to their terminations.

In the instant case, Defendants CIA and Director Ratcliffe have not made an individualized assessment about any of Plaintiffs; they are among a group of fifty-one (51) officers being terminated simply on the basis of their temporary DEIA-related assignments, a matter of domestic political controversy. Nor have any national security concerns about Plaintiffs been noted by CIA.

6

Indeed, Defendants CIA and Ratcliffe admit that Plaintiffs may keep their security clearances, indicating that they pose no counterintelligence or suitability problem at all.

Plaintiffs have a First Amendment right to believe in the civil rights laws of the United States, which DEIA (however it is defined) broadly seeks to uphold. Plaintiffs also have a Fifth Amendment right to due process before losing their property interest in their employment. And even taking Justice Scalia's concern in his dissent in *Webster* into account, there is no counterintelligence risk of disclosing classified information if Plaintiffs claims go forward in a case that revolves around a domestic political dispute regarding DEIA.

Defendant CIA's regulation stating that the D/CIA's authority is not limited to terminations in the interests of the national security, but only in the interests of the United States, *see* CIA Reg. 4-16 at 1.2, goes too far beyond the statutory and constitutional authority upon which it is based. Defendant CIA's internal regulation boldly claims that the D/CIA's termination authority is not "constricted, limited, affected or otherwise controlled by … any other regulation, document, or law" and abrogates "the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established" by any other law. This claim of such sweeping authority is more than a mere agency regulation can bear. Defendants may not lawfully terminate Plaintiffs, who are civil servants and not political appointees, without any due process and for reasons of partisan politics.

Defendants freely admit that Plaintiffs have received and will receive no due process. Defendant CIA's regulation seeks too ambitiously to expand the lawful authority of the D/CIA beyond what is permitted under Section 3036 and was upheld by *Webster*. Plaintiffs maintain rights to free speech under the First Amendment, to due process under the Fifth Amendment and

Administrative Procedure Act, and to a property interest in their employment, also under the Fifth Amendment, that Defendants CIA and Ratcliffe cannot simply wave away.

II.      **Defendants are terminating Plaintiffs because of professional speech supporting civil rights laws made while serving in DEIA-related roles, and for their assumed private support of civil rights laws, in violation of the First Amendment.**

Plaintiffs are being punished by Defendants both because of the professional speech they made in support of valid civil rights statutes while serving in DEIA-related roles, *and* for their assumed private beliefs in support of civil rights laws.  If Defendants sought only to squelch Plaintiffs' professional speech about civil rights, Defendants' disestablishment of Plaintiffs' DEIA-related positions would suffice to that unpleasant task.

But Defendants take matters a step further and, even though the Executive Order does not call for this, they terminate Plaintiffs only on the basis of their assumed personal beliefs in support of civil rights.  This is likely why Defendants are not simply transferring Plaintiffs to any of the myriad of non-DEIA related jobs in the Intelligence Community for which they are well-qualified. Defendants Gabbard and Ratcliffe evidently do not want managers within the IC in any leadership capacity who believe fundamentally in the enforcement of civil rights laws.

Plaintiffs' statements as nonpartisan, civil service intelligence officers supportive of the civil rights laws were in accordance with Executive Branch policy (until January 20, 2025) and the congressionally-mandated and funded IC programs in which they participated.  For having made such statements in the past, Defendants seek to purge them from the IC based upon Defendants Gabbard and Ratcliffe's suspicions that Plaintiffs do indeed support the civil rights laws.  (*See Memorandum From Charles Ezell to Agency Heads* (Jan. 24, 2025),[1] issued by the

---

[1] Available at https://www.opm.gov/media/0gpnja24/opm-memo-guidance-regarding-rifs-of-deia-offices-1-24-2025.pdf.

Office of Personnel Management, which states that Plaintiffs are only authorized to compete for open positions in CIA components that no longer exist. ("Ezell Memorandum")).

Defendants point to the *Webster* court's observation that "short of permitting cross-examination of the [CIA] Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests," a court could not determine a "basis on which a reviewing court could properly assess an Agency termination decision." Not so here.

Defendants freely admit that the basis upon which Director Ratcliffe seeks to terminate Plaintiffs is the Executive Order and the Ezell Memorandum. While Plaintiffs would enthusiastically welcome the opportunity to depose Directors Ratcliffe and Gabbard about their communications with the President and White House staff regarding the decision to terminate Plaintiffs, it is unnecessary for the purposes of deciding this motion: Defendants admit that the sole basis for their decision is the E.O. and Ezell Memorandum.

Plaintiffs presumed private beliefs in opposition to unlawful racial, religious or sexual discrimination, and in support of statutory requirements making their workplaces accessible to disabled people, are constitutionally protected free speech, and they have therefore stated a cognizable First Amendment claim.

III.   **Plaintiffs hold Fifth Amendment property interests in continued federal employment.**

Defendants are correct that cases from outside this jurisdiction, *see Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2014) (Chutkan, J.); *see also Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993), hold that employees who are not covered by the CSRA lack property interests in their continued employment. Yet *Lamb* and *Doe* may be distinguished from the case at bar regarding Plaintiffs' property interests.

9

*Lamb* concerned an agent of the Federal Bureau of Investigation terminated for cause—gross misconduct involving a lack of candor in a sworn statement—asserting a Fifth Amendment claim of a property interest in the possibility of an extension of his health insurance. Judge Chutkan reasoned that as the option to elect COBRA[2] is not available to FBI personnel terminated for gross misconduct, Lamb lacked a property interest in his health insurance. *See id.* at 425.

*Doe* concerns the aforementioned CIA officer terminated pursuant to the Director's authority under the NSA pursuant to an individualized assessment that he posed a particular security concern regarding his vulnerability to sexual extortion by foreign intelligence services. The Court of Appeals for the D.C. Circuit found that Doe lacked a cognizable Firth Amendment property interest in his employment after being terminated pursuant to Section 3036. *See id.* at 1321.

Here, Plaintiffs are not accused of any misconduct, much less gross misconduct. And as discussed *supra*, Plaintiffs' termination under Defendant Director Ratcliffe's authorities under the NSA is a bridge too far. While Lamb lost his property interest in his insurance through gross misconduct, and Doe lost a cognizable property interest in his CIA employment when he became a counterintelligence problem, Plaintiffs who have engaged in no misconduct and pose no security risks (again, they maintain their clearances) do not lose their Fifth Amendment right to due process nor their property interest in their employment.

## IV.    Plaintiffs will suffer irreparable injury because of the genuinely extraordinary presidential statement that they engaged in illegal and immoral activities.

Defendants are correct that termination of government employment does not ordinarily constitute irreparable injury because of the possibility that adequate equitable relief will later be

---

[2] Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161–1168 and 42 U.S.C. §§ 300bb-1–300bb-8.

available.  *See Roe v. Shanahan*, 359 F. Supp. 3d 382, 419 (E.D. Va. 2020).  Plaintiffs' case is however just the kind of "genuinely extraordinary situation," *see Sampson v. Murray*, 415 U.S. 61, 92 (1974), that is the exception to this general rule.

The President's January 21 statement described DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."[3]

The issue is not whether Defendants will make a future statement in violation of the Privacy Act about the circumstances of Plaintiffs' looming terminations.  The fact is that the White House already made such a defamatory statement.  The horse has left the barn, the bell cannot be unrung, and the toothpaste cannot be squeezed back into the tube, via subsequent attempts at injunctive relief.

Plaintiffs are indeed serious when they maintain that the revelation that they were employed DEIA-related activities, described by the President as set forth *supra*, is akin to the type of stigma that attaches to an individual obligated to reveal that they are HIV-positive, as discussed in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020).  Few employers in 2025 would hesitate to hire an individual they know to be HIV-positive.  In contrast, almost all employers would hesitate, for reasons of negligent hiring alone, to hire an individual described by the President as engaged in illegal and immoral activities.

---

[3] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (Jan. 21, 2025) at § 1 (available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/).

11

Defendants contend that Plaintiffs do not face irreparable harm because their terminations may take place in ninety days. Defendants Gabbard and Ratcliffe are, or ought to be, well-aware as leaders of intelligence agencies of the unique difficulty intelligence officers have in seeking onward employment.

Unlike any other professional, their resumes are by necessity classified. Before retiring or resigning, intelligence officers go through a lengthy process of negotiation with the Prepublication Classification Review Board (PCRB) at CIA, for example, about what they may and may not tell prospective employers about their public service. Plaintiffs may be held criminally liable if they do not follow PCRB's guidance in this regard. Plaintiffs must also be unusually careful not to accidentally accept employment with a business beneficially owned by representatives of a hostile foreign power, and to avoid accidentally disclosing classified information or committing export control violations when sharing their professional knowledge and training with new employers. Intelligence officers need far more than ninety days to conduct a job search without violating Defendant CIA's own regulations.

Defendants present the Court with an incomplete view of the Supreme Court's guidance on how to analyze irreparable harm for terminated federal employees seeking injunctions. While Plaintiffs will certainly suffer irreparable financial and reputational harm as result of termination— and while that by itself should justify granting injunctive relief—the Supreme Court's decision in *Sampson* makes clear that the irreparable harm analysis has two aspects: first, evidence of any potential harm to the individual plaintiffs, and second, equally as important, the scope and gravity of the "procedural irregularities" that lead to the termination. *Sampson*, 415 U.S. at 91-2 (analyzing whether the "procedural irregularities" behind the termination decision justify irreparable harm).

12

In explaining how the courts should determine what constitutes "genuinely extraordinary situation[s]" for irreparable harm purposes, the Court explained in *Sampson* that the analysis is not limited just to "the resultant effect on the employe," but also requires reviewing "the circumstances surrounding an employee's discharge," including how "unusual [the] actions relating to the discharge itself" are and whether they constitute irreparable harm. *Sampson* at 92 n.68.

While Defendants challenge the scope and impact of the resultant effect on Plaintiffs, they present no evidence to rebut the fact the mass termination in this case involved grave "procedural irregularities" and that the actions leading to the discharge are unprecedented and unusual. As the Court itself noted in *Sampson*, that decision does not "foreclose[] relief in the genuinely extraordinary situation" where the circumstances surrounding the termination itself are extraordinary. Defendants rely on examples of cases where an individual employee's termination and the resultant impact on that employee did not justify irreparable harm, yet they have not provided any examples where the courts were presented with the type of "procedural irregularities" that are present in this case (an unprecedented mass-layoff through executive fiat, circumventing congressional mandates) and still found no irreparable harm.

In fact, in reviewing the impact of the procedural irregularities imposed by the recent series of similar executive orders, other courts have found such irregularities to justify irreparable harm. *See Air Evac EMS, Inc.* v. *McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (finding that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)); *PFLAG, Inc. v. Trump*, 2025 WL 510050 at *22 (D. MD. Feb 14, 2025) (finding that irreparable harm is met as a constitutional injury matter when the executive order authorizing the action likely violated congressional authorization); *Dellinger v. Bessent*, 2025 WL 471022 at *11 (D.D.C. Feb 12, 2025) (finding that the employee's

13

"loss of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief" and that injury "stems directly from 'extraordinary' circumstances" as *Sampson* requires); and *Harris v. Bessent*, 2025 WL 521027 at *8 (D.D.C. Feb. 18, 2025) (finding that permanent damage to "congressionally mandated independence" is the type of extraordinary case identified in *Sampson* which invites injunction).

## V.    This Court may exercise jurisdiction over Plaintiffs' statutory claims under the Administrative Leave Act and Administrative Procedure Act.

Plaintiffs recognize that they have no cognizable claim for damages under the ALA. Plaintiffs plead a violation of the ALA simply to show the lawless manner in which Defendants are proceeding in this matter, in derogation of a clear federal statute. Defendants appear to believe that the ALA simply does not apply to CIA or ODNI, in the same way that they ignore Plaintiffs' valid First Amendment concerns and Fifth Amendment and statutory due process concerns. Fundamentally, Defendants seek to hold themselves above the law and judicial review of their actions.

As Defendants do not claim to have extended Plaintiffs any due process at all regarding their termination, relying instead solely on the Director's authority under the NSA, Plaintiffs' claim of APA violations is arguably now both acknowledged as true, and moot. Yet Defendants claim that Plaintiffs lack recourse to either the MSPB or the courts regarding their statutory claims because of the CRSA, which Defendants acknowledge is a "counterintuitive" and "harsh" result. *Peter B. v. United States*, 570 F. Supp. 2d 78, 83 (D.D.C. 2008); *Lane v. Wynne*, 2006 WL 4711891 (D. Md. Jun. 23, 2006), *aff'd*, 218 F. App'x 262 (4th Cir. 2007).

The result Defendants propose is not only counterintuitive and harsh, but also wrong. Intelligence officers complaining of serious due process violations, Plaintiffs who in this case are all members of at least one protected class, may not blithely be denied by their Government

14

recourse to both administrative *and* judicial relief.  The MSPB lacks jurisdiction over Plaintiffs' due process claims, but this Court does not.

## VI.    Defendants' scheme to terminate DEIA-related intelligence officers endangers human sources they are supposed to protect.

Finally, Defendants claim that the public interest calls for denying Plaintiffs' request for injunctive relief.  The opposite is true.

Perversely, Defendants' scheme to terminate all suspected DEIA-related intelligence officers actually endangers the human sources Defendants Gabbard and Ratcliffe are supposed to protect, the sacred responsibility for which they were granted the statutory authority to terminate employees for national security reasons.  It is sometimes necessary for someone other than a young white man to securely handle an asset in a given location, without sticking out like a sore thumb to a foreign counterintelligence service as an American and a suspected intelligence officer.  Defendant CIA's human sources are less safe, not safer, if that agency lacks a diverse workforce of intelligence officers.

## CONCLUSION

Plaintiffs deserve an injunction restraining Defendants from terminating them.  Plaintiffs are likely to succeed on the merits of their constitutional claims, in particular.  Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging— according to a White House statement—in illegal and immoral activity.  The balance of equities is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all.  And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

Dated: February 21, 2025                    Respectfully submitted,

                                            */s/ Kevin T. Carroll*
                                            Kevin T. Carroll, VSB No. 95292
                                            **Fluet**
                                            1751 Pinnacle Dr., Ste. 1000
                                            Tysons, VA 22102
                                            T: (703) 590-1234
                                            F: (703) 590-0366
                                            kcarroll@fluet.law
                                            e-file@fluet.law

                                            *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.


                                            */s/ Kevin T. Carroll*
                                            Kevin T. Carroll, Esq.

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JOHN DOES 1-6; and | ) |
| | ) |
| JANE DOES 1-13, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official | ) |
| capacity as Director of National Security; | ) |
| and | ) |
| | ) |
| JOHN RATCLIFFE, in his official | ) |
| capacity as Director of the Central | ) |
| Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### FIRST AMENDED COMPLAINT

### NATURE OF THE CASE

1.     Plaintiffs are nineteen nonpartisan civil servants serving in vital national security

roles as highly-trained and expensively-vetted U.S. intelligence officers.  Most currently serve in

temporary assignments related to diversity, equity, inclusion and accessibility ("DEIA") within the

Intelligence Community ("IC") at the Office of the Director of National Intelligence ("ODNI")

and the Central Intelligence Agency ("CIA"), implementing federal civil rights laws within the

Executive Branch as mandated by Congress.

2.      Some officers are only suspected of doing so, only on the basis of having recruited for CIA at universities, for example, without intentionally violating civil rights laws.

3.      Collectively, they represent approximately two-hundred and eighty-seven (287) years of combined service as intelligence officers for our Nation.

4.      None of these officers' activities was or is illegal.  At no time have the agencies employing Plaintiffs contended that they individually engaged in any misconduct, nor are they accused of poor performance.

5.      On January 20, 2025 Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, described such programs as "illegal and immoral."  On January 21, 2025 a White House statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* described DEIA programs as, *inter alia*, "dangerous," stigmatizing and demeaning hardworking Americans, resulting in "disastrous consequences."

6.      E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law," all DEIA positions.  The executive order did *not* call for the termination of officers temporarily assigned to DEIA programs, and cautioned that the order shall be implemented consistent with applicable law.

7.      On January 22, 2025 Defendants ODNI and CIA, respectively, placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments believed by Defendants Gabbard and then Acting Director Tom Sylester and subsequently by confirmed Director Ratcliffe to relate to personnel functions involving DEIA.  The CIA officers received this notice only verbally.

8.      On February 14, 2025 most Plaintiffs received telephone calls from human resources officers advising them to report to the CIA visitors' center with their IC access badges,

but without counsel, as early as 8:00am on Tuesday, February 18. In Plaintiffs' many years of experience within the IC, this kind of summons is generally associated with a negative employment action, including termination.

9.   On or about February 18, 2025 CIA asked, in person or via email, most Plaintiffs to choose from the following three options. One, immediate resignation effective February 18, 2025; two, deferred resignation, including administrative leave until September 30, 2025; or three, termination including administrative leave effective May 20, 2025.

10.   Most Plaintiffs were told that if they declined to select an option by close of business on February 19, 2025, they faced termination "in accordance with the EO [Executive Order 14151], and pursuant [*sic*] the D/CIA's termination authority, as outlined in U.S.C. § 3036(e)."

11.   Defendants ODNI and CIA and their directors, Defendants the Hon. Tulsi Gabbard and the Hon. John Ratcliffe, violated the Administrative Leave Act by placing Plaintiffs on administrative leave for more than ten workdays, despite the absence of any individual accusation of misconduct or workplace danger.

12.   Defendants further violated the Administrative Procedure Act. While intelligence officers lack recourse to the Merit System Protection Board ("MSPB"), their own agencies classified internal regulations provide procedures for terminating officers. Officers' basic rights include notice, the development of a record, to consult with counsel, and the opportunities to be heard and to appeal. Plaintiffs received none of these rights.

13.   CIA directors, for example, maintain statutory authority to terminate an Agency officer when the Director determines that this is necessary or advisable in the interests of the United States. However, as the Supreme Court explained, this provision of the National Security Act is

3

constitutional only because of the Agency's directors' unique responsibility to protect intelligence sources and methods from unauthorized disclosure due to counterintelligence threats.

14.    Here, Plaintiffs—career intelligence officers—face termination *en masse* only because of their temporary assignment, and a domestic political dispute between the Republican and Democratic parties regarding the merits of DEIA programs within the Executive Branch, programs that are funded, mandated, overseen by and mandatorily reported to Congress.

15.    Plaintiffs' imminent termination is therefore arbitrary, capricious, an abuse of discretion, not in accordance with IC regulations, and unsupported by any evidentiary record whatsoever.  It is also contrary to Plaintiffs' constitutional rights under the First and Fifth Amendments.  Plaintiffs are being fired because of their personal *assumed* beliefs about a domestic political issue—the enforcement of federal civil rights laws—and losing their property interest in their employment without due process of law.

## JURISDICTION

16.    The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter arises under the First and Fifth Amendments to the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.; and the Administrative Leave Act, 5 U.S.C. § 6329a.

17.    The Court exercises personal jurisdiction over Defendants ODNI and CIA as they are federal agencies, and the Defendants Gabbard and Ratcliffe are named in their capacities as heads of their respective agencies.

4

## VENUE

18.     Venue in this District is proper because the constitutional and statutory violations took place in the Eastern District of Virginia, where Defendants' ODNI and CIA's headquarters are located, and where Plaintiffs are employed.

## THE PARTIES

19.     Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by ODNI and CIA to personnel functions, some of which involve DEIA matters.

20.     Defendants ODNI and CIA are U.S. Government agencies.

21.     The Hon. Tulsi Gabbard is the Director of National Intelligence, being confirmed in that role on February 12, 2025.  It is unknown if Defendant Gabbard possesses personal knowledge of the matters set forth in the Complaint.

22.     The Hon. John Ratcliffe is the Director of the Central Intelligence Agency, being confirmed in that role on January 23, 2025.  It is unknown if Defendant Ratcliffe possesses personal knowledge of the matters set forth in the Complaint.

## FACTUAL ALLEGATIONS

23.     Plaintiffs are nonpartisan civil servants serving in vital national security roles as U.S. intelligence officers.  Plaintiffs are not somehow "DEIA officers."  Plaintiffs are career intelligence officers of different career services who Defendants believe, in some cases inaccurately, now serve in temporary positions directly related to DEIA.  Under their agencies' regulations and practices, Plaintiffs serve in numerous different roles within their agencies as part of their career progressions.  They may be assigned to new roles within their agencies in response to the specific needs of their agencies.

5

24.    Plaintiffs are temporarily assigned (or believed by Defendants to be so assigned) by their agencies to carry out duties of implementing federal civil rights laws, fulfilling a perceived need of promoting DEIA in their workplace.  These duties included advancing the hiring, promotion and advancement of members of protected classes under the civil rights laws applicable to the federal government as an employer under, inter alia, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.  Congress appropriated funds to be spent by the Executive Branch on the specific tasks within the IC carried out by employees.

25.    Congressional oversight includes mandated annual demographic disparity reports, and related briefings to the House and Senate intelligence oversight committees.  These statistics are reported through CIA to ODNI and then to Congress.  Not only does Congress mandate and oversee IC diversity programs, but the Government Accounting Office also audits such programs.[1]

26.    None of these employees' activities was or is illegal, violated law or regulation, or are contrary to the well-established and regulatorily-supported interest of the federal government in prohibiting discrimination, retaliation, reprisal, harassment, bullying or the creation of hostile work environments for members of protected classes under the laws mentioned.  At no time did the agencies employing Plaintiffs contend that they individually engaged in any misconduct, nor are they accused of poor performance.

---

[1] *See U.S. Government Accountability Office, Intelligence Community: Additional Actions Needed to Strengthen Workforce Diversity Planning and Oversight* (Dec. 2020) (available at https://www.gao.gov/assets/gao-21-83.pdf).  *N.b.*, December 2020 was during the first Trump Administration.

27.    On October 28, 2023 Defendant CIA posted on the Agency's Facebook page that "At #CIA, we believe that DEIA enables mission."  That same post linked to CIA's 2024-2027 DEIA Strategy.

28.    The National Security Act as amended on December 23, 2024 states that the statutory responsibilities of Defendant the Director of National Intelligence include ensuring "that the personnel of the intelligence community are sufficiently diverse for purposes of the collection and analysis of intelligence through the recruitment and training of women, minorities, and individuals with diverse ethnic, cultural, and linguistic backgrounds."  50 U.S.C. § 3024(3)(A)(4).

29.    On January 15, 2025 Defendant John Ratcliffe stated under oath to the Senate Select Committee on Intelligence at his confirmation hearing to be Director of the Central Intelligence Agency that under his leadership, that Agency "will produce insightful, objective, all-source analysis, never allowing political or personal biases to cloud our judgement …".

30.    On January 20, 2025 Donald Trump was inaugurated the forty-seventh president of the United States.  That same day, the President issued Executive Order ("E.O.") 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, describing existing such programs as "illegal and immoral."  *Id.* at § 1.

31.    On January 21, 2025 the White House issued a statement, Ending Illegal Discrimination and Restoring Merit-Based Opportunity.  The statements describes DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."  *Id.* at § 1.

32.    Accordingly, E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions." Id. at § 2(b)(i). Similarly, the January 21 White House statement called upon the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id.* at § 2.

33.    Notably, E.O. 14151 and the subsequent White House statement did not call for the termination of officers temporarily assigned to DEIA programs. In fact, the E.O. cautioned that nothing in it impaired any legal authority granted to an executive agency, and that the order shall be implemented consistent with applicable law. See id. at § 8 (a)(i) and (b).

34.    On January 22, 2025 Defendants CIA or ODNI placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA, or inaccurate perceptions of the same.

35.    On February 14, 2025 most Plaintiffs received telephone calls from human resources officers advising them to report to the CIA visitors' center within the Eastern District of Virginia with their access badges, but without counsel, as early as 8:00am on February 18.

36.    On or about February 18, 2025 CIA asked, either in person or via email, or by phone, those Plaintiffs to choose from certain options, including: one, immediate resignation effective February 18, 2025; two, deferred resignation, including administrative leave until September 30, 2025; or three, termination including administrative leave effective May 20, 2025. Defendant CIA told these Plaintiffs that if they declined to select an option by close of business on February 19, 2025, they faced termination in accordance with E.O. 14151, and pursuant to the director's authority under Section 3036(e).

I.      **Administrative Leave Act**

37.     On January 16, 2025 Congress enacted and the Office of Personnel Management provided guidance on amendments to the Administrative Leave Act ("ALA"). Per 5 U.S.C. § 6329a(b)(1), an agency may now place an employee on administrative leave for no more than ten workdays. Investigative leave and notice leave are permitted, subject to statutory and regulatory requirements, only if an agency determines that an employee must be removed from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the continued presence of the employee in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in loss of or damage to Government property, or jeopardize legitimate Government interests.

38.     None of the specified conditions of the ALA are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments. Yet Plaintiffs have been on such leave since January 22, in an adverse employment action in violation of law.

II.     **Administrative Procedure Act**

39.     On the afternoon of February 14, 2025 Defendants advised most Plaintiffs—on a Friday headed into a federal holiday weekend—to report to the CIA visitors center starting first thing on the morning of the next workday, and to bring their IC access badges with them. This gave Plaintiffs virtually no time to consult meaningfully with counsel about likely impending personnel actions. On February 14, Jane Doe 1 asked Defendant CIA if she could bring security-cleared counsel to the February 18 meeting. The Agency denied her permission to do so.

40.     Most CIA and ODNI officers work inside Special Compartmented Information Facilities ("SCIFs"), and work on government computer and telephone systems specially designed

9

to handle classified information.  Plaintiffs cannot, without the IC's permission, even bring a paper copy of their own personnel file out of their workspaces.

41.    Unlike other federal civil servants, intelligence officers lack recourse to the Merit System Protection Board (MSPB): their agencies' regulations provide their only avenue of administrative appeal.  Pursuant to administrative regulations, which are classified, the IC has unique policies and procedures for terminating officers for misconduct, poor performance or unsuitability, such as CIA's Personnel Evaluation Board ("PEB") system.

42.    A redacted and unclassified version of CIA regulations available on the internet provides for example that CIA's executive director may "decide the first-level appeals of employees recommended for termination of such employees upon recommendation of an advisory board."  Termination of Employment at ¶ 8(b)(5) (available at https://irp.fas.org/cia/term.pdf).  Ten grounds for termination are set forth in the regulation, none of which apply to Plaintiffs.  An eleventh, catch-all reason, provides for when the Director "deems such determination necessary or advisable in the interests of the United States," ¶ 8(d), language taken from the National Security Act, 50 U.S.C. § 403(c), the constitutionality of which is explained by Chief Justice Rehnquist in *Webster v. Doe*, 486 U.S. 596 (1988), discussed *infra*.

43.    In Plaintiffs' case, they are to be terminated by Defendants with only a holiday weekend's worth of notice, no meaningful ability to consult with counsel, no record developed, no opportunity to be heard, and no right of appeal.

44.    Courts traditionally give the IC broad deference in its decisions to suspend or even terminate officers, for a good reason that is inapplicable to Plaintiffs.  The judiciary gives a wide berth to Defendants CIA and ODNI on personnel decisions because such matters are sometimes

inextricably entwined with sensitive counterintelligence information bearing upon officers' loyalty to the United States, or suitability to handle classified information.

45.    In *Webster*, Chief Justice Rehnquist set forth the reason for CIA directors to hold such broad discretionary power under the National Security Act, Section § 403(c), to terminate Agency employees "whenever he shall deem such termination necessary or advisable in the interests of the United States...".

46.    Writing for the Court, the Chief Justice reasoned that DCIs and their successors are responsible "for protecting intelligence sources and methods from unauthorized disclosure," "the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees," "employment with the CIA entails a high degree of trust that is perhaps unmatched in Government service," and as such "Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Id*. at 600-01 (citing *Snepp v. United States*, 444 U.S. 507, 510 (1980) and *CIA v. Sims*, 471 U.S. 159, 168-69 (1985)).

47.    Here, Petitioners are suspended and face imminent termination not because of any national security issues. Rather, these civil servants face personnel action only because of a domestic political dispute between the Republican and Democratic parties regarding the efficacy and legality of DEIA initiatives within the federal government, in which they, their careers and their families are collateral damage. The rationale set forth by the Supreme Court in Webster to uphold the legality of CIA directors' broad authority under Section 403 does not apply here.

48.    The Agency regulations further provide for "procedures for termination of employment," ¶ 8(e), none of which are being followed here. The regulation also provides for "termination without procedures" at the director's discretion under his Section 403 authority, and

claims (dubiously) that this discretionary authority is not limited by any other law. *See* Termination of Employment at ¶ 8(f). Even still, the Agency's regulation provides at ¶¶ (g)(3)-(4) a right of appeal to CIA's third-ranking official as well as the director. It appears Plaintiffs are not to receive that right of appeal.

### III.    The First Amendment and Fifth Amendments

49.    While called as a vocation to a special kind of public service, an intelligence officer possesses a cognizable property interest in his or her job, as does any federal employee. Concomitantly they possess a First Amendment right not to lose that interest only because of their perceived beliefs about the hot-button domestic political issue of DEIA being assumed only on the basis of their temporary assignments, and a Fifth Amendment right not to lose that interest without the benefit of due process of law—including adequate notice, a record, and the opportunities to be heard and to appeal.

50.    Petitioners are not career DEIA officials, they are career *intelligence officers*. Rather than terminate Petitioners, even under the terms of E.O. 14151 and its companion policy statement, Defendants CIA and ODNI could simply reassign them to duties not involving DEIA, duties they performed well for years before their most recent assignment.

51.    Indeed, several Plaintiffs' career services within ODNI and CIA immediately identified other open and mission-critical positions into which these officers could immediately be slotted. Each Plaintiff appraised of their career service's intention to offer those jobs expressed their willingness to accept them.

52.    Instead, the IC is opting for the draconian, illegal and unnecessary alternative of arbitrarily terminating (or placing on LWOP) good officers recruited, vetted and trained at great

12

taxpayer expense, capriciously wasting cumulatively over one-hundred of years of national security experience.

53.    Plaintiffs' termination is especially arbitrary as Congress authorizes and appropriates money to IC elements specifically for DEIA activities.  Once Congress makes that appropriation, there is no meaningful discretion by Executive Branch to not spend the money on DEIA activities, unless Congress approves a formal reprogramming request.  On information and belief, the classified annexes of the federal budget identify funds to be spent on DEIA programs within the IC.

54.    Plaintiffs were not only doing what their Executive branch managers assigned them to do within the IC, Plaintiffs were doing what Congress *mandated* the IC to do.  If Plaintiffs for some reason refused on principle to accept a DEIA-related assignment, another IC officer would have been assigned to the role, or else Congress would have complained to the IC about its failure to expend the appropriated funds earmarked for these programs.  *C.f.*, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq*.

55.    Leaving aside the question of the merit of DEIA programs in other government agencies, Defendant CIA for example holds specific national security reasons to value diversity. The Agency needs some operations officers with, *inter alia*, the ability to blend in racially with foreign populations, the capability to meet female sources in cultures in which unmarried adults of the opposite sex rarely meet in private, dual citizenship documentation, foreign language skills, overseas living experiences, and more.  Recruiting, developing and retaining a diverse Intelligence Community workforce is therefore a national security imperative.

## CLAIMS FOR RELIEF

### Count One:
### Violation of the Administrative Procedure Act,
### 5 U.S.C. § 706, by all Defendants

56.     Plaintiff incorporates the allegations in paragraphs 1-43 as if fully set forth herein.

57.     The Administrative Procedure Act ("APA") provides at 5 U.S.C. § 706 that a U.S. district court may hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. *See* § 706(2).

58.     Defendants' scheme to terminate Plaintiffs is a perfect example of arbitrary and capricious agency actions that amount to an abuse of discretion.  Plaintiffs' suspension two days after the issuance of the Executive Order, only on the basis of their temporary assignments to DEIA roles, and their anticipated firings, even though E.O. 14151 does not call for their termination, is the definition of arbitrary, capricious and abusive agency action.

59.     Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a *domestic* political issue, an issue which is irrelevant while they serve in agencies dedicated to collecting and analyzing *foreign* intelligence.  Plaintiffs planned termination is also contrary to their right under the Fifth Amendment to due process, including adequate notice and a record and the opportunities to be heard and to appeal, before being denied their property interest in their employment.

60.     The IC plans to terminate Plaintiffs without following *any* legal procedure, as called for by agency regulations, and without any evidentiary record at all, as could be presented by

14

Plaintiffs in their defense at a CIA PEB, for example.  Plaintiffs will receive no hearing at all, not even before the MSPB, nor will they receive rights of appeal.

61.    The APA permits the Court to review final agency action, as well as action for which there is no other adequate remedy.  *See* 5 U.S.C. §§ 702, 704.  Defendants appear to have already taken final agency action.  The IC presented Plaintiffs with *faits accompli* on February 18: thus, their insistence that Plaintiffs appear at their employers' external visitors centers, instead of their offices, and with their IC access badges, but without counsel.  Defendants took their final action.

62.    Because of press attention understandably being paid to current events, Plaintiffs' terminations amount to very public firings, crippling their ability to obtain private sector work within their professions, at defense and intelligence contractors for example.

63.    It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning, immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

64.    There is no other remedy than a judicial remedy for the harm Plaintiffs will suffer by termination.

### Count Two:
### Violation of the Administrative Leave Act, 5 U.S.C. § 6329a,
### by all Defendants

65.    Plaintiffs incorporate the allegations in paragraphs 1-53 as if fully set forth herein.

66.    The Administrative Leave Act provides that an agency may only place an employee on administrative leave for ten workdays unless it determines that an employee must be removed

from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the employee's continued presence in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in damage to Government property, or jeopardize legitimate Government interests.

67.    None of the ALA's conditions are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments.  Plaintiffs have been on such leave since January 22, an adverse employment action in violation of law.

**<u>Count Three:</u>**
**<u>Violation of U.S. Const. Amend. I,</u>**
**<u>by all Defendants</u>**

68.    Plaintiffs incorporate the allegations in paragraphs 1-55 as if fully set forth herein.

69.    The First Amendment provides in pertinent part that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for a redress of grievance, such as the issues raised by DEIA.  Plaintiffs' terminations are contrary to their constitutional right under the First Amendment to free speech about their assumed beliefs about a domestic political issue—the advancement and enforcement of the civil rights laws of the United States among American citizens—while serving in agencies dedicated to foreign intelligence. Plaintiffs carried out programs lawfully funded and mandated by Congress specifically to promote DEIA objectives within the IC.

**<u>Count Four:</u>**
**<u>Violation of U.S. Const. Amend. V,</u>**
**<u>by all Defendants</u>**

70.    Plaintiffs incorporate the allegations in paragraphs 1-57 as if fully set forth herein.

16

71.    The Fifth Amendment provides in pertinent part that no person shall be deprived of property without due process of law.  Defendants plan to terminate Plaintiffs with insufficient notice, without any of the agency administrative procedures required by law, and without any evidentiary record—no hearing at all, not even before the MSPB—or right of appeal.  Plaintiffs' impeding termination is contrary to their constitutional right to due process before being denied their property interest in their employment.

### JURY DEMAND

72.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all triable issues.

### PRAYER FOR RELIEF

73.    Wherefore, Plaintiffs respectfully request that the Court enter an award and judgment in their favor, against Defendants as follows:

(a) Injunctive relief under the First and Fifth Amendments, and/or the APA;

(b) Expenses and costs, including attorneys' fees, pursuant to 5 U.S.C. § 504; and

(c) Such other relief as the Court deems appropriate.

Dated: February 24, 2025                    Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
**Fluet**
1751 Pinnacle Dr., Ste. 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

/s/ Kevin T. Carroll
Kevin T. Carroll, Esq.

18

1

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   JOHN DOE 1, et al.,          )  Case 1:25-cv-300
                                  )
 4                 Plaintiffs,    )
                                  )
 5         v.                     )  Alexandria, Virginia
                                  )  February 24, 2025
 6   OFFICE OF THE DIRECTOR OF    )  1:03 p.m.
     NATIONAL INTELLIGENCE,       )
 7   et al.,                      )
                                  )
 8                 Defendants.    )
     _____)  Pages 1 - 34
 9

10       TRANSCRIPT OF CONTINUED MOTION FOR A TEMPORARY

11                    RESTRAINING ORDER

12         BEFORE THE HONORABLE ANTHONY J. TRENGA

13           UNITED STATES DISTRICT COURT JUDGE

14
     APPEARANCES:
15
     FOR THE PLAINTIFF:
16
           KEVIN T. CARROLL, ESQUIRE
17         FLUET & ASSOCIATES, PLLC
           1751 Pinnacle Drive, Suite 1000
18         Tysons Corner, Virginia  22102
           (703) 590-1234
19
     FOR DEFENDANTS:
20
           DENNIS C. BARGHAAN, JR., ESQUIRE
21         REBECCA S. LEVENSON, ESQUIRE
           OFFICE OF THE UNITED STATES ATTORNEY
22         2100 Jamieson Avenue
           Alexandria, Virginia  22314
23         (703) 299-3700

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1              P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Civil Action

 3    No. 1:25-cv-300, Doe 1, et al. v. Office of the

 4    Director of National Intelligence, et al.

 5              Counsel, will you please note your

 6    appearances for the record.

 7              MR. CARROLL:  Kevin Carroll and Kia Rahnama

 8    of the Fluet law firm.

 9              First it was 11, and now it's 19 identified

10    but unnamed U.S. intelligence officers, Your Honor.

11              THE COURT:  All right.  Welcome.

12              MR. BARGHAAN:  Good morning, Your Honor.

13    Assistant United States Attorney Dennis Barghaan on

14    behalf of the defendants.  With me today at counsel

15    table is Rebecca Levenson, also an Assistant United

16    States Attorney.  I will be arguing the cause on behalf

17    of the government this morning -- this afternoon.

18    Excuse me.

19              THE COURT:  All right.  Welcome, everyone.

20              We're here as a continuation of the hearing

21    last week.  I've received the briefing.  I'd be pleased

22    to hear further from counsel.

23              Let me ask you to first address what you view

24    as the Court's subject matter jurisdiction over what

25    claims at this point and, really, whether you're still
```

1  contending that there's subject matter jurisdiction

2  under the Administrative Leave Act or the APA.

3          MR. CARROLL:  Your Honor, I think the parties

4  agree that you do have subject matter jurisdiction

5  pursuant to *Webster v. Doe* over the First Amendment and

6  the Fifth Amendment claims.  I believe you do also have

7  jurisdiction over the Administrative Procedure Act

8  claim.

9          THE COURT:  How?

10         MR. CARROLL:  Because the plaintiffs do have

11 a property interest in their federal employment.

12 Because unlike the parties in the cases *Lamb* and also

13 *Doe*, they have not been accused of any misconduct, for

14 example.

15         THE COURT:  But even if that were the case,

16 wouldn't that simply be your constitutional claim and

17 not your APA claim?

18         MR. CARROLL:  Your Honor, I think we can cut

19 to the chase with the constitutional claims here

20 because there's no disagreement between the parties

21 that these intelligence officers have received no due

22 process whatsoever.  So as an academic point, I think

23 you can exercise jurisdiction over the statutory

24 claims, but you certainly can over the constitutional

25 claims.

1          THE COURT:  All right.

2          MR. CARROLL:  Your Honor, defendants claim

3  the authority to fire over 51 career nonpartisan civil

4  servants by executive fiat circumventing congressional

5  mandates with no Fifth Amendment due process and for

6  exercising their First Amendment free speech rights.

7  Defendants seek to do so for domestic political reasons

8  have nothing to do with national security.

9          THE COURT:  Why don't you speak more directly

10 to the First Amendment claim.  Based on the face of

11 what's been provided, which is the director's memo, it

12 would appear that these people are being terminated or

13 listed for termination because their positions that

14 they perhaps had the misfortune of occupying have been

15 eliminated.  Isn't that on the face of it what's

16 happened here?

17         MR. CARROLL:  Respectfully, no, Your Honor.

18 Because they would be able under APA circumstances, if

19 their position was eliminated, to go back to their

20 regular career services in the CIA, whether that's the

21 director of analysis --

22         THE COURT:  Well, that raises a different

23 issue of whether this case really is going to boil down

24 to whether they've complied with their regulations,

25 which the director says the terminations had to be

1  consistent with the regulations.

2          MR. CARROLL:  Your Honor, by getting rid of

3  the position, there's no longer sort of a risk -- you

4  have to look at it from the government's perspective --

5  of plaintiffs engaging in professional speech about

6  diversity.  But the fact they're being fired entirely

7  shows that they're going after their private beliefs in

8  defense of the civil rights laws as well.  There's no

9  reason to kick them out of the CIA or the intelligence

10  community altogether.  The executive order doesn't even

11  call for that.

12          THE COURT:  But isn't that the issue, whether

13  they can simply be terminated or whether under the

14  regulations they have the ability to be considered for

15  reassignment?

16          MR. CARROLL:  Your Honor, under the

17  regulations, they can be terminated pursuant to an

18  individual determination, as was made clear in the *Doe*

19  case.  There's no precedent that I'm aware of for 51

20  officers being terminated *en masse* without any

21  individualized determination being made whatsoever.

22          I think, as we discussed at the last hearing,

23  there's 11 different causes for which you can be fired

24  from the CIA.  There's a body of regulations about how

25  to do that, and then there's the one special exception

1  which pertains only to counterintelligence.

2          THE COURT:  Well, that's the issue:  Is it an

3  exception, or is it simply an additional grounds?  And

4  it seems -- just to sort of cut through this, and I'd

5  like both counsel to address this directly.  Is the

6  issue whether the director is acting under the

7  regulations -- I think it's I(B)(11) -- given the

8  reasons for it?  I understand he doesn't have to give

9  reasons, but he has given reasons.  Isn't the issue

10 whether his acting under that section brings this case

11 within the other regulations under I(B)(9) pertaining

12 to the termination of employees who have been deemed

13 excess and whether they're entitled before they're

14 being terminated to the procedures attributable to that

15 status, as well as the appeal rights under other

16 provisions of the regulations?

17         MR. CARROLL:  Your Honor, our position is

18 that the regulation as written goes too far.  For

19 example, it says that the CIA director has termination

20 authority not constricted by any other law and

21 abrogates any interest in his employment, which might

22 otherwise be established --

23         THE COURT:  Any other law or regulation?

24         MR. CARROLL:  Any other law?

25         THE COURT:  I'm talking about the regulations

```
 1   that were specifically adopted by the CIA for the
 2   purposes of regulating the rights and remedies of its
 3   employees.
 4          MR. CARROLL:  Your Honor, if any of the
 5   plaintiffs have been guilty of any misconduct, if they
 6   present any suitability issues regarding their agency
 7   employment, then the CIA is absolutely welcome to go
 8   through their usual procedures, which are lengthy, and
 9   make individualized determinations about their
10   continued employment.  Our position is what they're not
11   allowed to do is just swoop an ax and fire 51 without
12   any due process whatsoever and without judicial review
13   according to the government.
14          THE COURT:  All right.
15          MR. CARROLL:  Your Honor, I'd like to
16   additionally make clear -- you mentioned in the last
17   hearing that you were concerned about whether or not
18   there's irreparable harm here.  We think the
19   plaintiffs' terminations present a genuinely
20   extraordinary situation of imminent and irreparable
21   harm because of the unprecedented public statements by
22   the President of the United States that they engaged in
23   illegal and immoral acts.
24          We think the controlling case here is *Roe v.*
25   *Department of Defense*, which the Fourth Circuit upheld
```

1  an injunction against expelling two airmen from the Air

2  Force on the basis of being HIV positive.

3          And here, I think that the harm that's being

4  suffered by the plaintiffs is far worse.  Your Honor, I

5  don't think my law firm or the U.S. Attorney's Office

6  or your chambers would hesitate to hire somebody who is

7  HIV positive.  We would also hesitate to hire someone

8  who had to say that they were looking for a job because

9  they had engaged in illegal and immoral activity.  We

10 would open ourselves up to a cause for negligent hiring

11 if something went wrong after that.

12         And in *Sampson v. Murray*, in analyzing what's

13 a genuinely extraordinary situation of irreparable

14 harm, the court told us to look to the effect of an

15 employee and the circumstances surrounding the

16 discharge, including unusual actions related to the

17 discharge itself.  Your Honor, it's hard to think of a

18 more unusual set of circumstances than being fired

19 pursuant to a series of statements from the President

20 of the United States that you engaged in all sorts of

21 improper activities.

22         And we've seen just in the past two weeks

23 that several courts -- not in this jurisdiction but

24 nearby in Maryland and the District of Columbia -- have

25 upheld injunctions of these recent executive orders,

1  for example, in *PFLAG v. Trump*, because they likely

2  violated a congressional authorization, and in

3  *Dellinger v. Bessent*, because the employee lost his

4  ability to do what Congress directed him to do.

5          And here it's similar, Your Honor.  All of

6  these DEI programs that these plaintiffs were involved

7  in were congressionally mandated.  There are

8  congressional reporting statutes -- requirements that

9  they have to go to.  In fact, Defendants Gabbard and

10 Ratcliffe voted for these programs to be authorized and

11 funded while they were members of the House of

12 Representatives.

13         It really is also an immediate problem even

14 though, as counsel correctly points out, they'll have

15 90-plus days to look for a job before they're

16 terminated.  Your Honor, it takes a lot longer for 90

17 days for a CIA officer to find a job.  You have to get

18 your resumé cleared by the publication and

19 declassification of the review board.  That's typically

20 a lengthy process of negotiation about what can and

21 can't be said.  And then a wise officer wants to make

22 sure that he's not going to accidentally end up

23 disclosing secrets or being involved in an export

24 control violation, for example.

25         So it's not like the circumstance of some

1 other public servants who have been fired or had to

2 resign recently where they will be just simply welcomed

3 to a law firm and can get on with their lives. It's a

4 lengthy process.

5          Also, Your Honor, when it comes to the

6 balance of the equities and the public interest here, I

7 think the balance of the equities is clear. Some of

8 these plaintiffs are less than two years from their

9 pension vesting. There's just a very serious economic

10 hardship that's going to befall them. There's no

11 hardship to the government whatsoever in continuing the

12 *status quo*.

13          And as far as the public interest, Your

14 Honor, I know that DEIA is a controversial issue right

15 now, but it's different for the CIA and intelligence

16 community more broadly than it is for any other part of

17 the government. It's an operational concern. It's not

18 an ideological concern. I would stand out on the

19 streets of Beijing. An African-American officer would

20 stand out on the streets of Moscow. We'd both stand

21 out on the streets of Tehran. It's important for the

22 safe handling of human sources that there be diversity

23 in the intelligence community.

24          And so for the government to claim that the

25 public interest militates in favor of eliminating

11

1   people who have been associated with diversity programs

2   in the IC in the past, I think, just doesn't take into

3   account the special circumstances that are present when

4   it comes to the intelligence community.

5           THE COURT:  All right.

6           MR. CARROLL:  So, Your Honor, defendants seek

7   to fire civil servants who followed congressional

8   mandates with no due process and for exercising free

9   speech rights for domestic and political reasons having

10  nothing to do with national security and without

11  judicial review.

12          The plaintiffs are likely to succeed on the

13  merits.  They will suffer imminent, irreparable harm if

14  fired pursuant to defamatory presidential statements.

15  They will suffer the hardship of being fired short of

16  their pensions.  And as I explained, I think diversity

17  in the intelligence community serves the nation's

18  interest.

19          Your Honor, please grant these good Americans

20  a preliminary injunction.  They ought not lose their

21  distinguished public service careers in defense of our

22  nation without full review of the facts and the law

23  regarding the constitutionality of defendants'

24  attempted ideological purge of the intelligence

25  community of those leaders within it who personally

1  believe in the civil rights laws of the United States.

2             THE COURT:  All right.

3             MR. BARGHAAN:  Good morning, Your Honor.  May

4  it please the Court.

5             I think it's important at the outset to

6  remember the litigative context in which we are

7  presently engaged.  This is not a motion to dismiss.

8  This is not a motion for summary judgment.  This is not

9  a status conference.

10            The plaintiffs are asking for what the

11 Supreme Court and the Fourth Circuit have repeatedly

12 held to be extraordinary relief, that they must make a

13 clear showing not only that they will have a likelihood

14 of success on the merits but also that they will suffer

15 irreparable harm, not just a close question, not just a

16 grave question of likelihood of success, but a clear

17 likelihood of success on the merits.  And this they

18 cannot do primarily for a lot of the reasons that we

19 articulated in the opposition memorandum we tendered

20 last week.

21            There's a number of different claims and a

22 number of different arguments, and I will try to be

23 very brief on most of them and answer whatever

24 questions the Court may have.

25            There is no APA review in this current

13

1  circumstance for two reasons:

2          One, because the plaintiffs' resort to the

3  APA is precluded by the Civil Service Reform Act.  It

4  does not matter that they don't have rights under the

5  Civil Service Reform Act.  Both Fourth Circuit

6  authority -- that's *Mann v. Haigh*, a '97 decision of

7  the Fourth Circuit -- and a number of different

8  district court decisions stand for the proposition that

9  the CSR Act precludes all APA relief.

10          But even if that weren't the case, the

11  Supreme Court's decision in *Webster v. Doe* makes

12  crystal clear that when the director exercises the

13  statutory authority that is given to him by Congress in

14  50, United States Code, Section 3036(e), there is no

15  APA review because those decisions are committed to

16  agency discretion by law.

17          And it does not matter -- there is nothing in

18  the statutory language at all that precludes use of

19  that discretion to only instances in which national

20  security harms are at stake.  Now, of course,

21  primarily, that is when it is used, but it is not so

22  limited.  And what the Supreme Court was doing there

23  was applying what this Court applies in any number of

24  other agency decision-making contexts, which is Section

25  701(a)(1), is there any meaningful standard for this

1  Court to review.  The Supreme Court looked at the

2  statutory language and said no.  That is all that is

3  necessary to eliminate the plaintiffs' resort to the

4  APA as a potential cause of action.

5           Now, there was some discussion and some

6  colloquy between Your Honor and my colleague about the

7  agency's regulations.

8           THE COURT:  Right.

9           MR. BARGHAAN:  That is also an APA claim, and

10  if you look at footnote 7 of *Webster*'s decision --

11           THE COURT:  Does the Court, in your view,

12  have any ability to enforce --

13           MR. BARGHAAN:  I'm sorry, Your Honor?

14           THE COURT:  Does the Court have any ability

15  to enforce the agency's own regulations outside of the

16  APA?

17           MR. BARGHAAN:  I don't believe it does.

18           THE COURT:  What about as a matter of due

19  process?  Isn't there a due process right to have your

20  employment governed by specific regulations?

21           MR. BARGHAAN:  Only if there is a property

22  right that triggers the due process clause, and here

23  there is no property interest.  Courts have held

24  repeatedly that --

25           THE COURT:  There is no property interest in

```
 1   continued employment, but isn't there some kind of
 2   liberty or cognizable interest in having your
 3   employment governed by the very regulations the agency
 4   enacted in order to govern that relationship?
 5              MR. BARGHAAN:  Well, I would make two points
 6   to that.  I'm not sure that I concur with the Court's
 7   position about whether there is a property and liberty
 8   interest based on employment-related regulations.  But
 9   even if I were to concede that point -- and for the
10   record, I do not.  But if I were, these regulations
11   don't provide that kind of certainty, if you will, or
12   definitiveness that the Supreme Court has looked at in
13   various other contexts, like prison regulations and the
14   like, for the issuance of a property interest.
15              And in particular, I would look to Agency
16   Regulation 4-16, Section II(D), which I have confirmed
17   with the CIA is what was exercised here.
18              THE COURT:  Why?
19              MR. BARGHAAN:  Why?
20              THE COURT:  Yes.
21              MR. BARGHAAN:  Why was it, or why do I know
22   that?
23              THE COURT:  Why do you think it was exercised
24   under (D)?
25              MR. BARGHAAN:  This is what the agency is
```

16

1    telling me.

2              THE COURT:  It's not in the director's

3    memorandum.

4              MR. BARGHAAN:  It is not in the memorandum.

5    There are -- I am told that there is other materials

6    that they are trying to get into a form that can be

7    submitted to the Court.  Once I can do that, I'm happy

8    to do that for Your Honor.

9              THE COURT:  Well, I can only act on what's

10   before me.

11             MR. BARGHAAN:  I understand that.  But if the

12   precursor question is do these regulations provide

13   sufficient certainty to create a property interest

14   under the due process clause, I think the answer is no

15   because they contain the extraordinary discretion that

16   is in Section II(D).

17             It's difficult to imagine a regulation that

18   provides for vast discretion.  It says the employee can

19   be terminated, quote, without regard to any procedural

20   steps set forth in this regulation or elsewhere and

21   that, quote, the existence or the exercise --

22             THE COURT:  Well, why don't you finish

23   reading?  It says if the director makes that finding.

24             MR. BARGHAAN:  Correct.

25             THE COURT:  Right, which he didn't do in this

 1  case, at least on what I've seen.  In fact, he

 2  designated certain procedures that needed to be

 3  followed under the -- or he gave as options procedures

 4  that could be followed under the Deferred Resignation

 5  Program.  And the question for the Court is if he's

 6  acted not under (D) but under (A)(11), which was not a

 7  finding that procedures would not be observed.  And the

 8  question is how do you harmonize or how do you view the

 9  regulations as a whole?  His acting under that

10  provision seems quite clearly to invoke the

11  circumstance contemplated for termination of an excess

12  employee.  How else would you characterize it?

13          These positions are being eliminated.  The

14  people in those positions are being targeted for

15  termination as what?  Anything other than as excess

16  employees?  Which triggers rights under the regulations

17  to be considered for other reassignments within the

18  CIA, which is not being offered to them as far as I can

19  tell.

20          MR. BARGHAAN:  That is true.

21          Your Honor, I can't say anything more than

22  what I'm telling you, right?

23          THE COURT:  Right.

24          MR. BARGHAAN:  Which is that I have confirmed

25  with the CIA that the director has exercised his vast

18

1   discretion under Section II(D) of the regulation.   I

2   understand that you would say that it's not before you.

3   Again, we're here on a preliminary --

4           THE COURT:  That's not in his memo explaining

5   what he's doing.  Did he have second thoughts about it?

6   I don't quite understand how we're here based on some

7   secret, undisclosed intention other than his official

8   memorandum saying exactly what he is doing and why.

9   And in fact, he's stated that he's acting consistent

10  with the regulations.  And so it's up to the Court,

11  isn't it, to construe what the regulations mean?

12          MR. BARGHAAN:  I think especially with

13  respect to a regulation that is as broad as this one.

14  I think that the agency has the ability to construe its

15  own regulation and how it is acting pursuant to towit

16  (phonetic), notwithstanding what the Supreme Court said

17  in *Kisor*, right.  I think that's what Your Honor is

18  referencing, *Kisor v. Wilkie*.  I don't think there's

19  anything untoward about that at all.

20          But I come back to the notion that the only

21  way in which this becomes a cause of action or a claim

22  here is that if this regulation is sufficient to give

23  rise to a property interest or a liberty interest under

24  the due process clause.

25          THE COURT:  The due process claim.  That's

1  what --

2         MR. BARGHAAN:  A due process claim generally,

3  but as the Court is well aware --

4         THE COURT:  I mean, there are cases that say

5  it is the basis for a due process claim, to enforce

6  regulations that pertain to somebody's particular

7  interest.  I mean, you'd recognize that; wouldn't you?

8         MR. BARGHAAN:  I haven't read those cases in

9  some time, and my colleagues have not used them to

10  provide any support for their claim.  So to make that

11  clear, my understanding of those claims is that, yes,

12  there is a due process right to have an agency comply

13  with its own regulations but only when those

14  regulations are sufficiently firm, certain, and

15  definitive to give rise to a property interest that

16  triggers the Fifth Amendment in the first instance.

17         THE COURT:  All right.  I understand.

18         MR. BARGHAAN:  And what I am suggesting here

19  as a threshold point is that that's not what these

20  regulations do, especially when you have a section like

21  Section II(D) that creates such a vast discretion on

22  the part of the director and gives him or her the

23  ability to take action without regard to any other

24  procedures set forth in the regulation.

25         THE COURT:  All right.

1          MR. BARGHAAN:  In fact, if you look at

2   paragraph 2 of the director's memo, which we provided

3   to you --

4          THE COURT:  Right.

5          MR. BARGHAAN:  -- it says, I have determined

6   that it is necessary or advisable in the interest of

7   the United States to terminate the employment of all of

8   the employees of the former DIO, Diversity and

9   Inclusion Office, pursuant to reference A and

10  consistent with reference B.  That's the language

11  that's contained in Section II(D).

12         THE COURT:  Right, except that he hadn't gone

13  on to say that I am making the determination that we

14  should proceed in the interest of the United States

15  without regard to any procedures.  In fact, he set

16  forth procedures.

17         I looked also at the declaration of the ODNI

18  representative, who clearly made the distinction

19  between acting in the interest of the United States

20  with procedures and acting in the interest of the

21  United States without procedures.

22         And they hadn't made a decision yet, but that

23  person said they may make a decision one way or the

24  other.  Here, the decision was -- at least based on

25  what's been presented to me -- to proceed with these

1   terminations in the interest of the United States

2   without eliminating the procedures because he didn't

3   make the finding that it's in the United States'

4   interest to proceed without procedures, for good reason

5   I would think.  These are talented, experienced assets,

6   if you will, that would be in the interest of the

7   United States to try to reassign elsewhere if that need

8   existed.  And the regulations seem to recognize that as

9   an important aspect of their employment.  I, frankly,

10  don't quite understand why that's being resisted by the

11  agency.

12          MR. BARGHAAN:  I am not in a position to --

13          THE COURT:  Right.

14          MR. BARGHAAN:  -- you know, comment on that,

15  obviously.

16          I guess all that I can say is what I've said

17  already, which is that I don't believe these

18  regulations create a property interest or a liberty

19  interest that would trigger due process concerns.  I

20  believe that the language in the declaration is -- not

21  the declaration, the memorandum, is sufficient to

22  invoke Section II(D).

23          In fact, frankly, the DEIA could write a new

24  memo tomorrow and invoke that more expressly, and we'd

25  be back in the same position.

1              THE COURT:  What occurs to the Court is that

2    if, in fact, there were a finding that's in the

3    interest of the United States to proceed with these

4    terminations without any procedures at all that would

5    otherwise apply, I think it raised the specter that

6    counsel has raised, that these terminations are taking

7    place for reasons other than the fact that their

8    positions have simply been eliminated.

9              MR. BARGHAAN:  I don't think that's true,

10   Your Honor.  I think that you may be invoking the First

11   Amendment --

12             THE COURT:  Right.

13             MR. BARGHAAN:  -- claim.

14             I don't think that's true for a number of

15   reasons.  I think it's certainly not true on the law,

16   right.  The only allegation that we have here is a

17   conclusory allegation that these actions are being

18   taken because of their, quote, unquote, private beliefs

19   or speech.

20             THE COURT:  I understand and I agree with

21   that.  I think on the face of it, they're being

22   terminated simply because the positions that they held

23   are being eliminated, all right, which makes them

24   excess employees under the regulations as far as I can

25   tell, entitled to the rights of someone who is being

23

1    terminated as an excess employee.  But what's being

2    proposed is not in compliance with those regulations as

3    the director says he's doing.

4              MR. BARGHAAN:  I would argue, Your Honor,

5    that even if you were to get to that next step, the

6    specter, if you will, that's not nearly enough to

7    create not only a plausible First Amendment claim but a

8    First Amendment claim that they are clearly likely to

9    succeed on the merits with respect to.

10             Any employee in the same situation could make

11   the exact same claim.  In fact, the plaintiff in the

12   case that we cited, Judge Gibney's decision in

13   *Silverman v. Town of Blackstone*, could make that exact

14   same argument.  There you had a plaintiff that was

15   working at a local municipality's office and clashed

16   repeatedly with his supervisor about what he believed

17   was mismanagement of the sewer and water --

18             THE COURT:  I agree with you.  I don't think

19   there's a clear showing of a First Amendment violation

20   based on what's before the Court now.  That's what I'm

21   acting on.  But what's before the Court now seems to me

22   raises issues about whether these terminations are

23   being effected or proposed to be effected in compliance

24   with the regulations that the director states he's

25   following.

24

 1            MR. BARGHAAN:  I have made the argument I

 2    have on that point, Your Honor.

 3            THE COURT:  All right.

 4            MR. BARGHAAN:  I don't want to beat a dead

 5    horse or --

 6            THE COURT:  Well, absent (D), what's your

 7    position?  Absent acting pursuant to (D), acting based

 8    on what the director has already said, that he's simply

 9    made a finding that's in the interest of the United

10    States to eliminate these positions and terminate the

11    employees who are holding these positions?

12            MR. BARGHAAN:  So I've made two very legal

13    points about that.  Number one -- I think I've made

14    them already, but to make sure the record is clear, let

15    me make them again.  Number one is that my colleagues

16    have not made that claim, right.  Their claim is, I

17    have a property right to my continued employment under

18    the Fifth Amendment.

19            THE COURT:  I understand.

20            MR. BARGHAAN:  Right.  And so any TRO or PI

21    application has to be premised on the claims that are

22    presented in the complaint.  That's part one.

23            Part two is that the existence of

24    Subsection II(D) makes these regulations sufficiently

25    uncertain as to not trigger a due process right under

1  the Fifth Amendment.

2          And three is that this Court, I think, does

3  not have the authority under the APA to review the

4  agency's compliance with these -- not terminations,

5  these regulations in the context of the plaintiffs'

6  termination proceedings because of what the Supreme

7  Court said about the director's exercise of his

8  authority under 50, United States Code, Section

9  3036(e).

10         THE COURT:  Don't these employees have appeal

11 rights irrespective of under what provision?

12         MR. BARGHAAN:  They do not.  They do not.

13 That is the upshot of Section II(D).  It says the

14 existence or the exercise of this discretionary

15 authority by the DCIA is not constricted, limited,

16 affected, or otherwise controlled by any of the

17 procedures set forth in this regulation.

18         THE COURT:  With respect to the termination?

19         MR. BARGHAAN:  Correct.

20         THE COURT:  But under (E), doesn't it say

21 that in all cases other than contract employees and

22 where they're being terminated because of classified

23 information issues, the termination decision may be

24 appealed?

25         MR. BARGHAAN:  I'm not sure where --

1              THE COURT:  That's in (E).

2              MR. BARGHAAN:  I hear you, Your Honor.  But

3  even if the regulation isn't written as a model of

4  clarity, the section (D) says not just this section but

5  in this regulation at large.

6              THE COURT:  Right.

7              MR. BARGHAAN:  And so if the director is

8  exercising his discretion under Section II(D) with all

9  of that --

10             THE COURT:  Right, to terminate.

11             MR. BARGHAAN:  Correct, but it's a decision.

12             THE COURT:  This is an appeal from the

13  decision to terminate.

14             MR. BARGHAAN:  I don't think there's a

15  distinction between those two and this regulation, Your

16  Honor.

17             THE COURT:  Well, there seems to be in (E);

18  doesn't there?

19             MR. BARGHAAN:  I don't agree, with respect,

20  Your Honor.  I believe that when the regulation says

21  the existence or the exercise of this discretionary

22  authority is not restricted, limited, affected, or

23  otherwise controlled by any of the procedures set forth

24  in this regulation, an appeal that could somehow

25  overturn the decision that the director has made is

1  something that would constrict his termination

2  authority.  So reading the regulation empowering

3  criteria, I think that's the reading of the regulation.

4          THE COURT:  All right.

5          MR. BARGHAAN:  The only other thing that I

6  will say before taking my seat is on the irreparable

7  harm piece.

8          THE COURT:  All right.

9          MR. BARGHAAN:  We've said a lot about that in

10  our papers.  That is an independent requirement even if

11  Your Honor finds that we've not -- that the agency has

12  not complied with the regulations.  The plaintiffs

13  still need to show that.  There is -- no one is getting

14  terminated today, tomorrow, or the next day.  Right.

15  This is a 90-day process.

16          And as a result, that in and of itself cuts

17  against irreparable harm in the type of temporal sense

18  that is necessary for a TRO or a preliminary injunction

19  to issue.

20          Moreover, my colleague's attempt to shoehorn

21  the current debate in society over DEI procedures into

22  the exception in *Roe* for HIV positive disclosure really

23  misses the mark.

24          Not only here under the very same regulation

25  would the CIA not be required, in fact, it would be

1  prohibited from saying the particular reason why these

2  employees were separated from the agency.  But my

3  client's -- my colleague's own complaint says that this

4  is a policy dispute between one side of the political

5  sphere and the other.  That's very different than

6  disclosing a medical diagnosis that has caused people

7  to be shunned for decades.

8           And with that, Your Honor, I thank the Court

9  for its time.

10          THE COURT:  All right.  Counsel.

11          MR. CARROLL:  Just briefly, Your Honor, two

12  points.

13          As to irreparable harm, the issue is not

14  whether the CIA might or might not make a statement

15  about the employees' terminations in violation of the

16  Privacy Act.  A statement has been made by the

17  President of the United States already.  The bell can't

18  be unrung.  They've been described as being immoral and

19  illegal actors.

20          Your Honor, the regulation --

21          THE COURT:  You are effectively asking the

22  Court to set aside the executive order.  That's what it

23  really boils down to.

24          MR. CARROLL:  Your Honor, the executive order

25  was enjoined Friday night by a district judge in

 1  Maryland.  All we're asking you to do here is just

 2  issue a preliminary injunction to keep these people

 3  from being fired on grounds that are not clear.  The

 4  regulation is not a model of clarity, as my colleague

 5  said.  The director's statement is difficult to

 6  understand.  He apparently might be making another

 7  statement.

 8          Your Honor, I think the best way to

 9  understand the regulation is that in the exceptional

10  circumstance in which there is classified information

11  that goes to a counterintelligence vulnerability of an

12  individual loss, you can't overrule the director of

13  Central Intelligence on that.  That's his call and not

14  yours.  But when there's a set of regulations regarding

15  the termination of CIA officers for other reasons and

16  those regulations have not been followed, I think

17  somebody who has 18, 23 years in the CIA does have a

18  property interest in seeing that those regulations are

19  followed.

20          We agree that a CIA officer can't go to the

21  MSPB because of the Civil Service Reform Act.  It would

22  be a really unfortunate result if the law was to be

23  that they can't go to the MSPB and they can't get

24  review in front of a federal judge even in the case

25  where due process is not being followed.  I think the

1   property interest does attach.

2           THE COURT:  What if the director had acted

3   under (D)?  What would your position be?

4           MR. CARROLL:  If he was doing the reduction

5   in force -- if I recall, (D) is the reduction in force.

6           THE COURT:  No.  (D) is terminating interest

7   of the United States without any procedures.

8           MR. CARROLL:  It would have to be for a

9   counterintelligence reason, Your Honor, and that's --

10  especially when Doe went back -- so yeah, the Supreme

11  Court made its decision in *Webster* v. Doe.  It went

12  back down to the district court.  Doe lost again at the

13  district court.  He appealed to the D.C. Circuit.  All

14  three judges of the D.C. Circuit said that the key to

15  their decision was that this was an individual

16  determination regarding Doe and his very particular

17  situation as a closeted gay man who could be sexually

18  blackmailed in a context in 1988.

19          I think it has to be for a national security

20  reason; otherwise, I mean, I'm certain that the

21  director can say after --

22          THE COURT:  The regulation specifically says

23  it doesn't have to.  So what would override that?

24          MR. CARROLL:  What would override the

25  director's authority to --

 1              THE COURT:  Yes.  What would override the

 2    regulation that specifically says it doesn't have to be

 3    national security related?

 4              MR. CARROLL:  I think the constitutional

 5    right to due process would override it.

 6              THE COURT:  All right.

 7              MR. CARROLL:  Thank you, Your Honor.

 8              MR. BARGHAAN:  Your Honor, may I just make

 9    one quick clarifying point?

10              THE COURT:  Yes.

11              MR. BARGHAAN:  My colleague mentioned that

12    the executive order at issue here was preliminarily

13    enjoined by one of your colleagues in Maryland.  That's

14    not true.  There were at least two executive orders

15    that President Trump issued on the DEI initiatives.  My

16    understanding of the *PFLAG* decision in the District of

17    Maryland is that it relates to the DEI executive order

18    with respect to the private sector, not the federal

19    executive branch.  So...

20              THE COURT:  All right.  When we were last

21    here, the Court issued an administrative stay because

22    it didn't have enough information to make an

23    intelligent decision on this.  The Court finds itself

24    somewhat in the same position given the defendants'

25    position that the agency is purporting to act on

1   something that's not even before the Court.

2           Also, the recent briefing has given the Court

3   for the first time, really, the specific regulations

4   that are being relied on, and the Court has had a

5   chance to look at those.

6           What I do want to do is I want some

7   additional briefing on a number of issues:

8           The first, the core issue is whether as a

9   matter of due process the Court can enforce the

10  agency's regulations under the Fifth Amendment.

11          And secondly, whether under those

12  regulations, given what's before the Court, these

13  employees have a right to seek a consideration of

14  alternative assignments within the CIA under

15  Section I(C)(4).  And specifically, the Court wants to

16  know, as I mentioned, whether the director's decision

17  under I(B)(11) to terminate these people because they

18  held certain positions really constituted a finding

19  that they were excess employees entitled to be

20  considered for reassignment under the procedures set

21  forth in I(C)(4).

22          I also want briefing on whether -- regardless

23  of on what basis the director has acted -- whether

24  these employees have an appeal right under I(B).

25          All right.  And I'd like to have that by noon

1  on Wednesday, and I'm going to have a hearing at 10:00

2  Thursday morning.

3              And simultaneous briefing.  All right.

4              MR. BARGHAAN:  Your Honor, I'm sorry.  I

5  missed the time of the hearing.

6              THE COURT:  10 o'clock.

7              MR. BARGHAAN:  10 o'clock.

8              We have one housekeeping matter, if we could.

9              THE COURT:  Yes.  Also, let me just -- go

10  ahead.  You may be addressing the same thing but go

11  ahead.

12              MR. BARGHAAN:  Your Honor issued an order

13  Friday evening-ish --

14              THE COURT:  Yes.

15              MR. BARGHAAN:  -- with respect to a

16  particular list.

17              My clients have concerns that -- I think we

18  actually agree on this.  My clients have concerns about

19  security issues with the list.  We would ask that the

20  Court stay enforcement of that order so that we can put

21  things into place so that a provision of a list, even

22  if it is under seal, doesn't violate those security

23  issues.

24              THE COURT:  Any objection to that?

25              MR. CARROLL:  Your Honor, we have the names

```
 1   ready.  We'll give them --
 2              THE COURT:  Okay.  That would be great.
 3              Also, just to make clear, I would direct that
 4   the Deferred -- is it Resignation?
 5              MR. BARGHAAN:  The Deferred Resignation
 6   Program.
 7              THE COURT:  Right, that the deadline to
 8   respond to that continues to remain open pending the
 9   Court's decision on Thursday.
10              All right.  Anything further?
11              MR. CARROLL:  No, Your Honor.  Thank you.
12              MR. BARGHAAN:  No, Your Honor.  Thank you.
13              THE COURT:  All right.  Thank you.
14              Counsel is excused.
15              The Court will stand in recess.
16         -----------------------------------
                      Time:  1:42 p.m.
17
18
19
20
21
        I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23
24                              _____
                                        /s/
25                              Rhonda F. Montgomery, CCR, RPR
```

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599

UNCLASSIFIED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JOHN DOE I, et al.,

v.

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE, et al.,

Defendants.

Case No. 1:25-cv-00300

**DECLARATION OF JOHN L. RATCLIFFE, DIRECTOR
CENTRAL INTELLIGENCE AGENCY**

I, JOHN L. RATCLIFFE, hereby declare and state:

1.    I am the Director of the Central Intelligence Agency ("CIA" or "Agency"). I have held this position since 23 January 2025. I make the following statements based upon my personal knowledge and information provided to me in my official capacity.

2.    Through the exercise of my official duties, I am familiar with the above-captioned lawsuit filed against the Office of the Director of National Intelligence, the Director of National Intelligence, the CIA, and me in my official capacity. I am aware that in connection with this proceeding, the Court has requested additional information regarding the basis for my decision to terminate the Agency employment of CIA employees who

UNCLASSIFIED

UNCLASSIFIED

most recently served in the Agency's former Diversity and Inclusion Office ("DIO").

3.    On 20 January 2025, President Donald Trump issued Executive Order 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing." This Executive Order mandated the closure of all "diversity, equity, inclusion, and accessibility (DEIA)" programs in the Federal Government, to include the Agency's former DIO. On 24 January 2025, the U.S. Office of Personnel Management ("OPM") issued a Memorandum, entitled "Guidance Regarding RIFs of DEIA Offices," which required federal agencies to execute a reduction-in-force ("RIF") action with respect to employees who had most recently worked in their respective DEIA offices. The OPM Memorandum required that the "competitive area" for such a RIF be defined "solely in terms of the DEIA office where the employees [had] worked." I understood that these directives, in combination, effectively prescribed terminating the employment of these employees.

4.    I therefore determined that in order to best effectuate the directives in Executive Order 14151 and the 24 January 2025 OPM Memorandum with respect to CIA, I would exercise my authority under Section 104A(e)(1) of the National Security Act of 1947 (50 U.S.C. § 3036(e)(1), as amended) and Section II.D of

2

UNCLASSIFIED

UNCLASSIFIED

Agency Regulation 4-16 ("Termination Without Procedures") to terminate the Agency employment of those employees who had most recently served in the Agency's former DIO, or permit their retirement or resignation in lieu of termination (if eligible). These provisions authorize me to terminate the employment of any Agency employee when, in my discretion, I deem it "necessary or advisable in the interests of the United States."

5.    I memorialized my decision in an 18 February 2025 Memorandum ("Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office"), which I understand has since been introduced in this litigation. As I noted in that Memorandum, I determined that it was "necessary or advisable in the interests of the United States to terminate all of the employees of the former DIO." It was my intent then, and remains my intent now, that any such terminations should be effected under Section 104A(e)(1) of the National Security Act of 1947 and Section II.D of Agency Regulation 4-16.

*    *    *

3

UNCLASSIFIED

UNCLASSIFIED


   I hereby declare under penalty of perjury that the

foregoing is true and correct.


(U) Executed this __25th__ day of February, 2025.


_____
John L. Ratcliffe
Director
Central Intelligence Agency


4

UNCLASSIFIED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JOHN DOES 1-6; and | ) |
| | ) |
| JANE DOES 1-13, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official | ) |
| capacity as Director of National Security; | ) |
| and | ) |
| | ) |
| JOHN RATCLIFFE, in his official | ) |
| capacity as Director of the Central | ) |
| Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

As the Court is aware, Plaintiffs are nineteen nonpartisan career officers of the Central

Intelligence Agency ("CIA") and the Office of the Director of National Intelligence ("ODNI") who

were, or are suspected by the Intelligence Community ("IC") of having been, assigned to

temporary duties related to, or perceived to be related to, congressionally-mandated and

specifically funded diversity, equity, inclusion and accessibility ("DEIA") initiatives.

1

**INTRODUCTION**

Plaintiffs were placed on administrative leave on January 22, 2025.  Many were notified on February 14 to report to a CIA facility with their IC access badges starting on February 18, whereupon several received notice of the following:  Defendant Ratcliffe seeks to terminate Plaintiffs from CIA pursuant to Agency Regulation 14-6, *Termination of Employment*  ("AR 14-6"), as in his discretion he deems this action "necessary or advisable in the interests of the United States" in accordance with his authority under 50 U.S.C. § 3036(e), *Termination of employment of CIA employees*.  Defendant Ratcliffe did not, however, refer with specificity to which section of AR 14-6 he sought to rely upon in his memorandum *See* Def.'s Memo. Ex. B *Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office* (Feb. 18, 2024), ("Director's Memorandum"), ECF No. 14-2.

Rather, Defendant Ratcliffe referred in his memorandum specifically to Section 3036(e); Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025); "follow-on memoranda from the Acting Director of OPM," which Defendants identified in their pleadings as including a memorandum from Acting Director of the Office of Personnel Management Charles Ezell, *Guidance Regarding RIFs of DEIA Office* (Jan. 24, 2025); and AR 14-6 in general.

Plaintiff ODNI officers also remain on administrative leave, and await similar correspondence from Defendant Gabbard.

**ARGUMENT**

At oral argument on February 24, 2025 this Court presented the following questions for further briefing:

(1) Whether as a matter of due process this Court may enforce Defendant CIA's regulations under the Due Process Clause of the Fifth Amendment;

2

(2) Whether under Defendant CIA's regulations, on the record now before the Court, Plaintiffs have a right to seek alternative assignments within the Agency, before being terminated based upon a finding that they are excess officers; and

(3) Whether Plaintiffs have a right of appeal under Defendant CIA's regulations.

Plaintiffs assert that this Court may enforce Plaintiffs' due process rights under Defendant CIA's regulations, as they possess cognizable liberty interests, as well as property interests in their employer following its own employment regulations. Also, that Plaintiffs possess rights to seek alternative Agency assignments if they are found to be excess employees—indeed forward assignments have been offered to Plaintiffs by their career services. And finally, Plaintiffs possess rights to appeal any decision to terminate them.

## I.    This Court may enforce CIA's application of its regulations to Agency officers, pursuant to their liberty and property interests under the Due Process Clause.

The parties agree that Defendants did not comply with CIA procedures, as set forth in Agency Regulation (AR) 14-6, *Termination of Employment*, regarding Plaintiffs' proposed terminations.

Defendants grant that Plaintiffs may plead a Fifth Amendment Due Process cause of action within the jurisdiction of this Court if CIA regulations are sufficiently firm, certain and definitive to give rise to Agency officers' property interest in their enforcement, but argue that AR 14-6 is insufficiently firm, certain and definitive only because of the inclusion of Section II(D) within the regulation, *Termination Without Procedures*. Section II(D) states that pursuant to Section 3036, the CIA Director may terminate any officer "without regard to any procedural steps" when "in his discretion" he "deems it necessary or advisable in the interests of the United States."

At oral argument, Defendants stated that they are reliant upon Section II(D) of the regulation, and not Subsection B(11), which provides in language similar to Section II(D) for the CIA Director to terminate Agency officers at his discretion, but impliedly and under the principle

of statutory construction of *in pari materia*—and in contrast to Section II(D)—<u>with</u> procedures, as statutes that relate to the same subject should be interpreted together.

Plaintiffs submit that Defendant CIA's detailed, eleven-page regulation regarding terminations is indeed sufficiently firm, certain and definitive to give rise to Agency officers' property interest in these regulations' enforcement. *Contra* Defendants' argument, even if they rely upon Section II(D), that section's grant of procedure-less discretionary authority to Defendant Ratcliffe does not somehow make AR 14-6 infirm, uncertain or vague.

A.    **This court may enforce CIA regulations to protect officers' due process rights under *Webster v. Doe.***

As Plaintiffs have argued, both the language and subsequent history of *Webster v. Doe*, 486 U.S. 592 (1988), which upheld the constitutionality of an application of Section 3036(e), show that Defendant Ratcliffe's judicially unreviewable Section II(D) authorities are limited to individualized determinations regarding national security risks, not terminations of groups of nineteen or more officers such as Plaintiffs.[1]

As set forth in *Webster*, the National Security Act of 1947 created "CIA and gave its Director the responsibility for protecting intelligence sources and methods from unauthorized disclosure.' Section [3036(e)] is an integral part of that statute, because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Id*. at 601 (citing S.Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H.R.Rep. No. 961, 601 80th Cong., 1st Sess., 3–4 (1947)).

Defendants admitted at oral argument that Section 3036 is "primarily" used "only instances in which national security harms are at stake." (*See* Feb. 24, 2025, Oral Argument on Mot. for

_____

[1] *See* J. Barnes, *CIA Plans Largest Mass Firing in Nearly 50 Years*, NEW YORK TIMES (Feb. 20, 2025) (stating that Defendants plan the largest group termination of CIA officers since 1977).

4

TRO ("OA Tr.") at 13, ECF No. 19). While the answer may be classified, counsel suspects that Section 3036 has *only* ever been used in instances in which national security harms are at stake. Certainly, there are no reported cases in which the use of Section 3036 in pursuit of anything other than national interests has been upheld by any court. And nothing in this record allows the Court to find that these employees are to be terminated for national security reasons. Rather, Plaintiffs are being terminated only for domestic political reasons completely inapplicable and inappropriate to career civil servants in a foreign intelligence agency. Specifically, Plaintiffs are being fired for their implementation of congressionally-funded and -mandated DEIA programs, and the enforcement of valid civil rights statutes, at the direction of the President of the United States at that time.

AR 14-6's claim on the Agency's behalf that "a national security basis for the exercise of this authority is not required" is of course useful for Defendants CIA and Ratcliffe, but it is not grounded in the words of *Webster* and its progeny. The Supreme Court closely tied the legality of Section 3036(e) authority to the CIA Director's unique duty to protect human intelligence sources.

Upon remand and in subsequent appeals, the District of Columbia Circuit made plain that Director Webster's decision to exercise his Section 3036(e) authority in that case depended upon his individualized assessment of particular circumstances related to that plaintiff/respondent's personal vulnerability to sexual blackmail, and not generalizations about gay men. Here, Defendants CIA and Ratcliffe conducted no individualized assessments whatsoever of the nineteen Plaintiffs (or other thirty-two similarly-situated officers at CIA and ODNI), and Plaintiffs retain their security clearances, showing that they pose no counterintelligence threat or vulnerability at all.

Taken to its logical end, Defendants' extreme position would extend Section II(D) authority to allow Director Ratcliffe to fire not only all DEIA activity-related CIA officers simply for following the civil rights laws, but fire all Agency officers who are members of any protected class—and without either due process of law or the possibility of judicial review. Constitutionally speaking, this simply cannot be the case.

Plaintiffs are career officers who have held managerial roles. Some Plaintiffs have more than twenty years of Agency service. A sizable number of Plaintiffs have served as long as nineteen years within CIA, just short of the twenty years of hard service at which point an Agency retirement can deservedly vest (or be otherwise ineligible for the Voluntary Early Retirement Act option that Defendants CIA and Ratcliffe offered in lieu of termination). These retirements, if a Plaintiff is blessed with good health and longevity, can be worth, individually, millions of dollars. As career officers, each Plaintiffs is well aware that CIA regulations provide detailed procedures for terminating officers, and also grant the Director authority to terminate officers without procedures in the national interest.

It does not follow that the mere inclusion of Section II(D) in AR 14-6 somehow vitiates Plaintiffs' entire property interest under the Due Process Clause. Were Defendant Ratcliffe to make an individualized determination that any Plaintiff presented a security risk—which as continued security clearance holders, they do not—that would end any cognizable property interest in their employment. Absent such individualized determinations by Defendant Ratcliffe that each of them is somehow now a counterintelligence problem, Plaintiffs retain property interests in their employer following its own regulations regarding their employment—including in some cases many years of dangerous overseas work—in return for the promise of financially valuable pensions. Plaintiffs' legitimate and reasonable property interest in their employer playing by its

own codified rules may not now be taken from them, just short of the proverbial goal line in some cases, without granting them due process under the Fifth Amendment.

**B.   This Court may enforce CIA regulations to provide due process under the *Accardi* Doctrine.**

As a matter of due process, this Court may enforce an agency's own termination regulations against them if their failure to follow them constitutes a procedural due process violation. Defendants argue that when a regulation rests the exercise of discretionary authority in an agency, those harmed by the agency's enforcement—or lack thereof—are without the right to judicial review. Courts routinely reject such an unbounded view of agencies' discretionary power to depart from their own regulations. Courts may invalidate an ultimate administrative determination when an agency fails "to afford an individual procedural safeguards required under its own regulations." *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999).

This principle is rooted in the Supreme Court's decision *in United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), where the Court found that the Board of Immigration Appeals' failure to follow its own procedures violated due process. *See id*. at 268. The *Accardi* doctrine is a "constitutional rule-of-law provision" reflecting "a founding principle of this Republic." *Wilkinson v. Legal Serv. Corp.*, 27 F. Supp.2d 32, 48 (D.D.C. 1998). That simple founding principle is that "procedural rules confer procedural rights, and even if these procedural rights are not 'property' protected by the Due Process Clause, the Clause still authorizes judicial review to remedy injury caused to an individual by an agency's violation of its procedural rules." *Id*.

Therefore, under the *Accardi* doctrine, Plaintiffs possess a constitutionally-protected procedural interest in CIA following the Agency's own employment regulations that is on par with a constitutional property interest.

The Fourth Circuit acknowledges that the *Accardi* doctrine is applied "in a variety of contexts," against different agencies that having adopted regulations that protect procedural due process, fail to follow them, while attempting to rely on their own broad discretion to do so. *See Morgan*, 193 F.3d at 266 (collecting cases and holding that an agency, having adopted a policy or regulation, is bound to apply it because prejudice as result of agency's failure to follow its regulations may create a due process violation).

*Accardi* does not just empower courts in cases where an agency fails to exercise its own discretion, contrary to existing valid regulations, it also applies "where dismissal from federal employment falls 'substantially short of the requirements of the applicable departmental regulations.'" *Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959)). The dangerous path Defendants Ratcliffe and CIA commits themselves to here—termination at a snap of the Director's fingers, allegedly without the possibility of judicial review—falls substantially short of constitutional requirements as matter of fact, law, and history.

Courts of Appeal have found that intelligence agencies, including Defendant CIA, could run afoul of the Fifth Amendment liberty interests of their officers if they terminate them without due process.

The District of Columbia Circuit found that the National Security Agency ("NSA") did not deny a terminated employee due process regarding his liberty interest when:

> He was afforded notice of NSA's concerns resulting from his conduct; he submitted voluntarily to a psychiatric exam; he received consideration by a board of appraisal that recommended revoking his security clearance while specifically noting that it did not weigh the fact of his homosexuality in its decision; he submitted lengthy written materials in support of his argument; and he had an interview with the NSA Director. Thus, Doe had a meaningful opportunity to contest any allegation that his homosexuality presented a security risk.

8

*Doe v. Cheney*, 885 F.2d 898, 911 (D.C. Cir. 1989) (Wald, Chief Judge) (internal punctuation marks omitted).

Here, Plaintiffs were afforded little notice, they were examined by no one, nor considered by a board, had no opportunity to be heard, and certainly had no meeting with the CIA Director. Plaintiffs also had no opportunity to appeal their termination.

Earlier, the D.C. Circuit found that CIA did not deny a terminated employee due process regarding his liberty interest when he

> was given a meaningful opportunity to contest any allegation that his homosexuality presented a security risk—indeed, a meaningful opportunity that Doe and his counsel vigorously pursued. Doe had notice that the CIA was seriously concerned about his homosexuality. The CIA furthermore permitted Doe to examine the polygraph officer's report, and to submit lengthy written arguments on his behalf. Finally, Doe makes no allegation that either the Office of Security or the Director of Central Intelligence were biased. In the context of a very sensitive agency such as the CIA, we cannot say that the Constitution requires more.

*Doe v. Casey*, 796 F.2d 1508, 1524 (D.C. Cir. 1986)(Edwards, Circuit Judge).

Here again, Plaintiffs were afforded little notice, they were examined by no one, and had no opportunity to be heard, and Plaintiffs reasonably suspect that Defendants are biased against them. All nineteen Plaintiffs are members of at least one protected class. Their mass terminations would have a disparate impact upon minority employment in the Intelligence Community, and suggest Defendants' malintent to evade federal equal employment opportunity laws through misuse of Section 3036.

Plaintiffs also note that prior to January 20, 2025 *all* CIA employees were in some manner required to do work in the DEIA space. Such work was included in all Agency job notices and performance evaluations prior to January 22, 2025 and therefore, the entire CIA workforce could

be susceptible to being placed on administrative leave on the basis set forth by Defendants CIA and Ratcliffe.[2]

Courts' previous interpretations of national security employees' rights before termination, and the agencies' own regulations, create a liberty interest that Defendants Ratcliffe and CIA cannot then trample on with impunity. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by [other] laws or policies") (internal citation omitted); *see also Lopez v. FAA*, 318 F.3d 242 (D.C. Cir. 2003) (Agencies "cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination.") (*citing Mazaleski v. Treusdell*, 562 F.2d 701, 719 (D.C. Cir. 1977)). Therefore, "when agencies establish 'special' 'pre-termination procedures,'" they are bound to follow them. *Lopez*, 318 F.3d at 247 (*citing Doe v. Dep't of Justice*, 753 F.2d 1092, 1098 (D.C. Cir. 1985)).

Plaintiffs recognize that intelligence officers possess no property rights to their security clearances, which again, are not at issue in the case at bar. But in the context of drafting the appeal procedures for persons denied access to special compartmented information ("SCI") throughout the IC, Defendant CIA's own internal legal advice was that any pre-termination procedural guarantees, once officially adopted as regulations, must be adhered to—and that CIA's failure to comply will be subject to judicial review. *See* CIA, *Proposed Appeals Procedures for SCI Access Denials* (noting that "an appeals procedure is both rational and fair," and advising that once the

---

[2] Furthermore, Defendant CIA's application of what work is (or is not) DEIA-related is not being equally applied to all Agency positions and officers. There are officers who worked substantially in the DEIA space, but whose job title did not identify those activities as such, and so they were not placed on administrative leave on January 22, 2025. Even by Defendants CIA and Ratcliffe's own terms, they are not fairly implementing their own policy.

10

regulation "is adopted, the government will be bound" by its terms) (citing to *Vitarelli v. Seaton*, 359 U.S. 535 (1959)).[3]

Defendants CIA elected to adopt pre-termination rights that its officers reasonably relied upon, because of clear case law necessitating the Agency's own practice of adhering to it as compulsory. The extraordinary denial of those well-established rights to Plaintiffs, makes their termination process (such as it is) fall substantially short of what is procedurally and therefore constitutionally required, and what these officers reasonably expected and relied upon in choosing to spend their careers at CIA.

Therefore, this Court may hold Defendant CIA's decision invalid for violating the *Accardi* doctrine, and in turn the Due Process Clause, as the Agency failed to follow its own procedures regarding Plaintiffs. *See Sanchez v. McAleenan*, 2024 WL 1256264 (D. MD. Mar. 25, 2024) (applying the *Accardi* doctrine and finding that the U.S. Citizenship and Immigration Service's failure to follow its own provisional waiver application process violated due process).

**II.    Defendant Ratcliffe designated procedures to be followed in Plaintiffs' terminations as allegedly excess officers, which include a right to be considered for reassignment, but Defendant CIA did not comply with this procedure.**

Defendant Ratcliffe's memorandum on the terminations states that his termination of Plaintiffs will be "consistent with" AR 4-16. While there are no allegations of misconduct or unsuitability made by anyone against Plaintiffs,[4] AR 14-6 provides for eleven grounds for termination from CIA, one of which is "other circumstances" – *with* procedures, when "the D/CIA

---

[3] CIA-RDP96M01138R000600030011-9 (Jan. 23, 1979), *available at* https://www.cia.gov/readingroom/document/cia-rdp96m01138r000600030011-9.

[4] *E.g.*, failures to complete trial period satisfactorily, meet work and efficiency requirements, meet security standards, medical standards or Agency standards of conduct; abandonment of position or legal incompetence. *See* AR 14-6 at § II(b).

in his discretion, deems such termination necessary or advisable in the interests of the United States." *Id*. at § II(b)(11); *c.f. id*. at § D (*Termination Without Procedures*).[5]

Alone among the many reasons and procedures for termination specified in AR 14-6, the Director's memorandum can only be read to constitute a finding of excess under § II(B)(9), *Termination of Excess Personnel*, which triggers the rights and privileges listed under § IV, *Procedure for Termination of Excess Personnel* for the Plaintiffs. Critically, the memorandum describes the termination in language that clearly invokes excess finding, referencing an office that no longer exists. *See* Def.'s Memo. Ex. B ¶1, ECF No. 14-2 (defining the employees subject to termination as those who served "in the Agency's *former* Diversity and Inclusion Office"). Despite the fact that the Director's memorandum constitutes a finding of excess, Plaintiffs are not being afforded the rights and privileges AR 4-16 provides excess termination employees, such as reassignment.

Section § II(C)(4) provides that in considering whether an officer is excess to the needs of a CIA career service, Agency officials "will take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth." *Id*. at ¶ (a). An officer determined to be excess will be advised of this in writing, and if the officer so wishes, "the Career Service will make an effort to arrange placement

---

[5] While Defendants insinuated that the terminations may be pursuant to Section II(D), as the Court correctly noted during the oral argument, that Section is "not in the director's memorandum," and nothing in the record before the Court suggests that Section II(D) was exercised. *See* OA Tr. at 16-18. Therefore, resort to Section II(D) as a source of "secret, undisclosed" authority for termination is foreclosed to Defendants Ratcliffe and CIA. *Id*.

Court's review of the agency's decision is "limited to the agency's original reasons," and the Court must ensure that the decision "is not upheld on the basis of impressible '*post hoc* rationalization.'" *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 22 (2020) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

in another component within that Career Service." *Id*. at ¶ (b).  If such efforts fail, and the officer

wishes, "an Agency-wide placement effort" will follow.  *Id*. at ¶ (c).

Additional requirements under Section § II(C)(4), further to a different classified Agency

Regulation to which counsel does not have access, pertain to officers with disabilities.  *Id*. at ¶ (a).

Some Plaintiffs are indeed disabled, some in connection with their previous, honorable uniformed

service in the U.S. armed forces.

Every single one of the Plaintiffs in this case has had at least one currently vacant, suitable

and career service-appropriate position identified for them by their career service.  Most Plaintiffs

received offers of several such positions from their career service; one Plaintiff received as many

as seven.  Plaintiffs' continued service in CIA is, clearly, valuable to the national security.

Plaintiffs must be considered for reassignment before potentially being terminated by

Defendant Ratcliffe under Section II(b)(9) and granted all the rights and protections listed under

Section § II(c)(4).  Despite the facts that (a) Executive Order 14151 does *not* call for the

termination of personnel in Plaintiffs' position, and (b) Defendant CIA knows that currently vacant,

suitable and career service-appropriate positions are identified and waiting for Plaintiffs,

Defendant Ratcliffe still seeks to terminate rather than reassign them, in a clear violation of rights

to which excess employees are entitled.

As this Court stated at oral argument, Plaintiffs "are talented, experienced assets, if you

will, that would be in the interest of the United States to try to reassign elsewhere if that need

existed.  And the regulations seem to recognize that as an important aspect of their employment.

I, frankly, don't quite understand why that's being resisted by the Agency."

Plaintiffs contend that Defendants Ratcliffe and CIA are resisting simply reassigning them,

in accordance with both Agency Regulation 14-6 and the national interest in retaining expensively-

trained and highly-experienced intelligence officers, because of Plaintiffs' perceived private support for the advancement of the civil rights laws of the United States. This is why Defendants' failure to afford Plaintiffs due process impinges upon their Fifth Amendment property *and* liberty interests, as well as their First Amendment rights to free speech.

Even if the Court finds that the Director's memorandum was in effect an excess termination finding under § II(B)(9), and therefore find that Plaintiffs are entitled to Section II(C)(4) procedures, the Court must still independently analyze whether either § II(B)(9) or indeed any law or constitutional provision allows the head of any executive agency to identify a "class" of employees as excess solely based on the fact that they followed and were entrusted to discharge the lawful orders of the previous head of the agency and the previous President.

Executive branch employees are expected to follow the lawful direction of a President. Their termination for following the lawful direction of a previous President cannot legally be upheld as a "necessary or advisable" termination on that basis a subsequent President's CIA or ODNI Director. *See* Director's Memorandum at ¶ 4. Neither can the Defendant Ratcliffe's Memorandum permissibly define and target a class of employees to be eliminated as excess solely because an executive order now regards their views as "illegal and immoral," when Plaintiffs faithfully executed well-established civil rights laws as ordered by Congress and the former President they served under.

Given Plaintiffs' status as members of protected classes, it also suggests an unlawful effort by Defendants Ratcliffe and CIA to misuse the Director's unique national security-related authorities to evade federal equal opportunity laws in order to terminate, with disparate impact, underrepresented populations within the Agency and the Intelligence Community more broadly.

III.    **Defendant Ratcliffe designated procedures to be followed in Plaintiffs' terminations as allegedly excess officers include a right of appeal, but Defendant CIA did not comply with this procedure.**

Defendant Ratcliffe appears to be attempting to fire Plaintiffs under AR 14-6, *Termination of Employment*, §§ II(b)(11), *Termination in Other Circumstances* and IV, *Procedure for Termination of Excess Personnel*.

Agency Regulation 14-6 provides that in Plaintiffs' case, a termination decision may within ten days be appealed in writing to CIA's number-three official, its Chief Operating Officer ("COO"). Plaintiffs whose IC access badges were seized on February 18, 2025 also have a right to request Agency regulations and other materials for use in drafting their appeal. *See* § E(3), *Appeal of Termination Decision*.

If the COO denies a Plaintiff's appeal, he or she may within another ten days further appeal to Director Ratcliffe, again having access to a secure facility from which to write any written comments for the Director's consideration. *See id*. at § E(4).

As stated in Section I(B), plaintiffs are being denied regulatory rights of appeal to the COO and the Director, in further violation of their property interests under the Due Process Clause of the Fifth Amendment, rights that Defendant CIA itself acknowledges cannot be taken away without subjecting the Agency to judicial challenge. *See Lopez*, 318 F.3d at 55 ("where dismissal from employment is based on a defined procedure, even though generous beyond the requirements binding the agency, that procedure must be scrupulously observed…").

## CONCLUSION

This Court may indeed enforce Plaintiffs' due process rights under Defendant CIA's regulations, including rights to seek alternative Agency assignments, and to appeal any decision to terminate them.

Defendants seek to fire civil servants who simply followed congressional mandates and a previous President's orders regarding DEIA, terminating them with no due process, and for exercising free speech rights, only for domestic political reasons having nothing to do with national security, and without any judicial review.

Plaintiffs are likely to succeed on the merits of their Fifth Amendment due process claim, especially; they will suffer imminent irreparable harm if fired pursuant to defamatory statements by the President; many will suffer the hardship of being fired short of their pensions; and the efforts, knowledge and capabilities to create and maintain a diverse workforce in the Intelligence Community to serve the public's national security interest will be lost.  Plaintiffs therefore respectfully request a preliminary injunction to prevent their unlawful terminations for "illegal and immoral" activities falsely, publicly and repeatedly alleged against them by the President.

Dated: February 26, 2025                    Respectfully submitted,

                                            */s/ Kevin T. Carroll*
                                            Kevin T. Carroll, VSB No. 95292
                                            **Fluet**
                                            1751 Pinnacle Dr., Ste. 1000
                                            Tysons, VA 22102
                                            T: (703) 590-1234
                                            F: (703) 590-0366
                                            kcarroll@fluet.law
                                            e-file@fluet.law

                                            *Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 26, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.

17

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | ALEXANDRIA DIVISION |

```
 3  JOHN DOE 1, et al.,          )  Case 1:25-cv-300
                                 )
 4              Plaintiffs,      )
                                 )
 5       v.                      )  Alexandria, Virginia
                                 )  February 27, 2025
 6  OFFICE OF THE DIRECTOR OF    )  10:01 a.m.
    NATIONAL INTELLIGENCE,       )
 7  et al.,                      )
                                 )
 8              Defendants.      )
    _____)  Pages 1 - 29
 9
```

```
10       TRANSCRIPT OF CONTINUED MOTION FOR A TEMPORARY

11                    RESTRAINING ORDER

12       BEFORE THE HONORABLE ANTHONY J. TRENGA

13          UNITED STATES DISTRICT COURT JUDGE

14
    APPEARANCES:
15
    FOR THE PLAINTIFF:
16
         KEVIN T. CARROLL, ESQUIRE
17       FLUET & ASSOCIATES, PLLC
         1751 Pinnacle Drive, Suite 1000
18       Tysons Corner, Virginia  22102
         (703) 590-1234
19
    FOR DEFENDANTS:
20
         DENNIS C. BARGHAAN, JR., ESQUIRE
21       REBECCA S. LEVENSON, ESQUIRE
         OFFICE OF THE UNITED STATES ATTORNEY
22       2100 Jamieson Avenue
         Alexandria, Virginia  22314
23       (703) 299-3700

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

```
1              P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Civil Action

3   No. 1:25-cv-300, Doe 1, et al. v. Office of the

4   Director of National Intelligence, et al.

5          Counsel, will you please note your

6   appearances for the record.

7          MR. CARROLL:  Kevin Carroll and Kia Rahnama

8   from the Fluet law firm for 19 identified but unnamed

9   U.S. intelligence officers, 10 of whom are in the court

10  today, Your Honor.

11         THE COURT:  All right.  Welcome.

12         MR. BARGHAAN:  Good morning, Your Honor.

13  Again, Dennis Barghaan, Assistant United States

14  Attorney, on behalf of the defendants.  With me again

15  at counsel table is Rebecca Levenson, also an Assistant

16  United States Attorney.  And I, again, will be arguing

17  the cause for the government today.

18         THE COURT:  All right.  This is a

19  continuation of our hearing from last week.  What I'd

20  like to do is give counsel an opportunity to reply to

21  what was filed by the other side.

22         Mr. Carroll.

23         MR. CARROLL:  Thank you, Your Honor.  It's

24  good to be before you again.

25         You're well aware of the facts of the case.
```

1 I think the end of the last hearing was that it was not

2 clear whether the government was relying upon the

3 termination with procedures or termination without

4 procedures, part of the CIA regulation.  Subsequently,

5 the CIA director came back with a declaration saying

6 that he was relying upon the termination without

7 provision of the regulation.

8           We think that the termination with procedures

9 should apply.  Those procedures would include, for

10 example, a right to appeal, which would be reasonable,

11 and importantly, the offer of other jobs to the

12 individuals that are about to be fired.

13           We have ten of the individuals here.  As you

14 may know, we submitted, I think, 19 affidavits last

15 night, one from each of the plaintiffs, stating that

16 they had been offered other jobs.  One of the

17 intelligence officers I was speaking to right outside

18 before is a data scientist, who I believe had received

19 nine other offers within the intelligence community;

20 yet, she is to be fired despite the fact that it's

21 obviously in national security --

22           THE COURT:  Have they been told they can't

23 accept those offers?

24           MR. CARROLL:  Yes, Your Honor.  That's my

25 understanding is that their peers, their colleagues in

1  the intelligence community, have offered them these

2  jobs, supervisors in some cases; yet they're being told

3  pursuant to the Ezell memorandum by Director Ratcliffe

4  that they may not transfer, that they may need to be

5  hired because there's some sort of stigma upon them

6  because they previously worked in something related to

7  DEI.

8           THE COURT:  I'm sorry.  Say that again.

9           MR. CARROLL:  There's a stigma related to

10  them because they previously worked on something

11  related to --

12           THE COURT:  That's what they've been told?

13           MR. CARROLL:  I shouldn't say they've used

14  the word "stigma."  They've been told they can't accept

15  the jobs.

16           Your Honor, we think this is not just

17  unacceptable but illegal because all they were doing

18  was working on congressionally funded, congressionally

19  mandated programs that had to be reported back to

20  Congress about DEI.  And it was the policy of the

21  President of the United States through January 20 that

22  the United States government would pursue DEI as a

23  policy.  They would have been wrong to refuse these

24  assignments.

25           In any case, they were assigned to do these

1  duties and now are being fired just for having followed

2  the lawful orders of the last President of the United

3  States.

4         So, Your Honor, what I think the government

5  is going to do, what the defendants are going to do,

6  based on the memorandum from Director Ratcliffe last

7  night, is rely on his statutory authority to fire

8  intelligence officers for any reason whatsoever, as

9  they claim, without any judicial review.

10        As Your Honor is aware, our view is that this

11  is an authority, as ruled by the *Webster* court and in

12  Chief Justice Rehnquist's opinion, that is very tightly

13  tied to individual determinations regarding the

14  counterintelligence suitability of people.

15        The respondent in *Doe* was a closeted gay man

16  who was very, very sensitive about the exposure of the

17  identities of his romantic liaisons.  The judge said he

18  could be blackmailed by a foreign intelligence service

19  for that reason.  Chief Justice Rehnquist found that

20  that determination by Director Webster, in his role as

21  CIA director, was not reviewable.

22        Here, this is very different.  It's not an

23  individual.  It's 51 people at least, 19 of whom are

24  plaintiffs here, who are being fired *en masse*.

25        And if Director Ratcliffe's position was

1   taken to its logical end, he could fire all blacks, all

2   women, all Jews, all gays, whatever he wanted to within

3   the CIA, and say that it's unreviewable by the courts

4   even though it's a complete lack of due process.  I

5   think that just stretches Section 3036 beyond the

6   breaking point and that this would be a good point to

7   say that the authority of the director of the CIA to

8   fire anybody without judicial review is limited to

9   individuals and limited to national security reasons.

10          THE COURT:  All right.

11          MR. CARROLL:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Barghaan.

14          MR. BARGHAAN:  Thank you, Your Honor.

15          Let me begin with Mr. Carroll's rather

16  provocative statement at the end, that the director has

17  the authority to fire -- and I wrote this down -- all

18  blacks, all Jews, all gays.  He does not have that

19  authority.

20          THE COURT:  Right.

21          MR. BARGHAAN:  The authority would have been

22  provided in Section 3036(e) because the discretion that

23  he has in that section is limitless.  That's what the

24  *Webster* court said.  The *Webster* court said, as Your

25  Honor had with Mr. Carroll in colloquy at the last

1  hearing, does not limit the director's authority to

2  Section 3036(e).  But what does limit the director's

3  authority to do what Mr. Carroll suggests is Title 7 of

4  the Civil Rights Act of 1964, which the *Webster* court

5  expressly said still applies despite Section 3036(e).

6         And there's a lot of discussion in the

7  plaintiffs' papers about various protective classes the

8  plaintiffs belong to.  If they believe that they have a

9  claim under Title 7, they are free to go to the

10  agency's EO office and start that exhaustion process.

11  But they can't come directly to this Court.  Suffice it

12  to say there is no Title 7 claim in this case.

13         The other thing that I would say is if you

14  read our papers with respect to the constitutionality,

15  if you will, of the procedures that are otherwise

16  contained in Regulation 4-16, that is, put more simply,

17  whether this Court can impose on the director via the

18  due process clause an insistence to follow those

19  procedures.

20         So there are two comments to that.  Number

21  one, we now have a declaration from the director of the

22  CIA that says unequivocally that I intended then and I

23  intend now to rely on Section II(D) of Agency

24  Regulation 4-16.

25         And so there is no violation of any of those

8

1  procedures.  And the reason for that is, as Your Honor

2  and I discussed at the last hearing, that section of

3  the regulation askews all other procedural protections

4  in the regulation.

5          THE COURT:  In connection with the decision

6  to terminate?

7          MR. BARGHAAN:  In connection with the

8  decision which, if I am reading the Court's inference,

9  includes an appeal.

10          THE COURT:  Well, that's a post-decision

11  issue.

12          MR. BARGHAAN:  I don't believe that it is,

13  Your Honor.

14          THE COURT:  All right.  I understand your

15  argument.  I understand your position.

16          MR. BARGHAAN:  I'm sorry, Your Honor?

17          THE COURT:  I understand your position.

18          MR. BARGHAAN:  Okay.  I think that

19  Section II(D) is extremely clear when it talks about

20  any procedure in the entire regulation, either before

21  Section II(D) or after Section II(D).

22          So there is no need for this Court or no

23  ability for this Court even to get to the property

24  interest due process clause question that was to be

25  briefed in the last round of supplemental briefing

9

1  because there is no violation of the agency's

2  regulations here.

3          But even if there were, for the reasons that

4  we've stated in our papers, there is no property

5  interests that would trigger due process protections in

6  CIA or ODNI employment, end of story.  That is what

7  *Webster* holds.  That is what the D.C. Circuit on remand

8  from *Webster* said in *Doe v. Casey*.

9          So for that reason, Your Honor, whatever the

10 Court's views of the decision here -- and it's not my

11 place here to defend the merits of that decision or the

12 righteousness of it.  My task is to represent the

13 agencies of the United States against legal claims.

14 There is no legal claim here.  Or at the very least,

15 there has been no clear showing of likelihood of

16 success on the merits so as to justify the type of

17 extraordinary relief that they are asking at this stage

18 of the litigation.

19         As always, Your Honor, I thank the Court for

20 its time.

21         THE COURT:  All right.  What's the

22 defendants' position on the issue that I raised in my

23 supplemental order?  What's the status of these offers

24 that have been extended?

25         MR. BARGHAAN:  So with the great hesitation

1  of not wanting to sound obstreperous, we have done our

2  best to investigate those circumstances in the 18 hours

3  since Your Honor's order issued.  There are two

4  questions in Your Honor's order.

5          THE COURT:  Yes.

6          MR. BARGHAAN:  One is the accuracy of the

7  factual assertions and sort of the upshot of the

8  accuracy of those factual assertions.  As to the

9  factual assertions, there's sort of two points there, I

10  think.  One is was there an identification of a new job

11  from the plaintiffs' career service, and secondly, were

12  there offers extended to the plaintiffs?

13          So this is an answer that differs based on

14  ODNI or CIA.  ODNI does not use the career service

15  rubric.  So that's for starters.  As to the CIA, given

16  the short time that we've had to investigate the

17  assertions, we don't concede the assertion in full, but

18  we can't at this time contest the assertion that the

19  potential positions for plaintiffs were identified by

20  their respective career services.

21          The information that we have as to that

22  second point, though, suggests that, in fact, most

23  plaintiffs did not have formal offers for other

24  positions.

25          Now, let's assume for the sake of argument

1  that that's incorrect, that my colleague's factual

2  assertions are completely accurate.  The second part of

3  Your Honor's order was what stops them from accepting

4  those officers.

5          What stops them is the determination under

6  Section II(D) that they were to be separated from the

7  agency's employment, as the director explained in his

8  memorandum, based on his reading of OPM's Ezell

9  memorandum.

10         THE COURT:  Why would that subsequently

11  preclude them from being rehired, if you will, or

12  reassigned to those positions?

13         MR. BARGHAAN:  My understanding from the

14  agency is that there is a big difference between

15  transferring from one position to another and being

16  hired into a new position.  That is especially the case

17  given what is unquestionably in the news cycle, let's

18  say, about the desire of the new administration to cull

19  the federal workforce.

20         THE COURT:  Well, that's a different issue.

21  If the positions aren't going to be filled, that's one

22  thing, but if these are open positions that are going

23  to be filled, I think that's a different situation.

24         MR. BARGHAAN:  I am telling you what the

25  agency has told me, and that's all the information that

1    I have.

2           THE COURT:  Particularly since you have a

3    90-day window, as I understand, under these options

4    before the separation would actually take place.

5           MR. BARGHAAN:  I think, Your Honor, that

6    highlights the nature of the litigative position or

7    procedure that we're here about, right.  This is a case

8    that is brought at this point seeking a preliminary

9    injunction at the beginning of the case.

10           And I think that what Your Honor is

11    suggesting goes to the question of irreparable harm,

12    that at worst, these employees, if they were to choose

13    the termination option that was given to them -- as

14    Your Honor notes, there is sort of a menu of options

15    that these employees can take.

16           THE COURT:  Right.

17           MR. BARGHAAN:  One of which keeps them on the

18    agency's rolls until September, end of September.  The

19    other, if they choose to select it, would keep them on

20    the roll for 90 days.  And I don't know and I certainly

21    would never suggest to predict.  Things might change in

22    that time.  I don't know.  I have no indication that

23    they would.  I want to make that clear.

24           But all that that suggests is that this is

25    not an emergent situation.  While I feel for the

1  plaintiffs and I understand the difficulty of their

2  position, the law surrounding preliminary injunctive

3  relief is such that this is not irreparable harm.

4          THE COURT:  All right.  I understand.

5          MR. BARGHAAN:  Thank you, Your Honor.

6          THE COURT:  All right.  Mr. Carroll, anything

7  else?

8          MR. CARROLL:  Very briefly, Your Honor.

9          THE COURT:  Yes.

10          MR. CARROLL:  The plaintiffs do have Title 7

11  claims.  Just as a matter of law firm management, what

12  we've done is we're representing these 19 plaintiffs

13  here trying to get injunctive relief to keep them from

14  getting fired.  Separately, most of the 19 have

15  retained another partner at my firm to file equal

16  opportunity complaints, which had to be done on an

17  individualized basis for reasons you understand.  Some

18  of them might want to settle; some of them might not.

19  They have to be handled as individuals and not as a

20  group.  What we're hoping to do is just freeze the

21  situation with injunctive relief to keep them from

22  getting fired in the meantime.

23          Your Honor, as we said in the papers, we

24  believe that they do have a property interest, not in

25  the security clearance, not in their employment, but in

1  their employer following the rules of employment that

2  the employer has set out.  That's a cognizable Fifth

3  Amendment due process property interest, and we think

4  that it should be followed.

5         Your Honor, we don't hold Director

6  Ratcliffe's position against the Department of Justice

7  here, but we do think that there is malintent on the

8  part of Director Ratcliffe here in firing these

9  individuals who are public servants, who are very

10 highly trained, very experienced, are serving our

11 national security.  And they're being fired for reasons

12 related to domestic politics, which is completely

13 inappropriate for career civil servants in a foreign

14 intelligence service.

15        The President of the United States has said

16 that the plaintiffs that are standing behind me are

17 engaged in illegal and immoral activity.  And we would

18 submit that the person who is engaged in illegal and

19 immoral activity here is Director Ratcliffe in trying

20 to fire people just for doing what they were told and

21 carrying out the civil rights statutes of the United

22 States, Your Honor.

23        THE COURT:  All right.  Mr. Barghaan, I'll

24 give you the last word if you have anything else to

25 say.

15

1          MR. BARGHAAN:  I think I've said plenty.

2     Thank you, Your Honor.

3          THE COURT:  All right.  Clearly, it's a

4  difficult situation, and if fairness and good judgment

5  were the guiding principles, it would be an easy case.

6  But the Court is obligated to consider the applicable

7  regulations and statutes at issue.

8          We're here on a motion for a temporary

9  restraining order, which given the participation of the

10  parties and the briefing, the Court is going to convert

11  into a motion for a preliminary injunction.

12          The plaintiffs here are employees of the

13  Central Intelligence Agency and the Office of Director

14  of National Intelligence.  On January 22, 2025,

15  plaintiffs were placed on administrative leave with

16  pay.  On Friday, February 14, 2025, the CIA plaintiffs

17  were instructed to report to work with their

18  credentials on Tuesday morning, February 18, 2025.  The

19  ODNI plaintiffs were not so instructed, but for the

20  purposes of this litigation, the ODNI has advised the

21  Court that the ODNI terminations are imminent and it

22  does plan to pursue the separation of certain employees

23  previously working in DEI positions.  And so for the

24  purposes of this ruling and the Court's analysis, the

25  Court's decision on this preliminary injunction motion

16

1    will be applicable to all parties.

2              Following the receipt of instructions to

3    report on February 18, the plaintiffs fearing immediate

4    termination filed this action on Monday, February 17,

5    and on the same day moved for a temporary restraining

6    order.  The Court held a hearing on February 18

7    following which it entered an administrative stay in

8    order to obtain additional briefing and continued the

9    hearing to Monday, February 24.

10             That hearing took place as scheduled, upon

11   which time the Court ordered supplemental briefing on

12   specific issues, and having received that briefing,

13   continued the hearing to today.  Given the parties'

14   extensive briefing and the opportunity to be heard, as

15   I've indicated, the Court will treat this as a motion

16   for preliminary injunction.

17             The plaintiffs seek an injunction at this

18   point enjoining the defendants from terminating their

19   employment.  And in support of that claim, they've

20   asserted three causes of action, one under the

21   Administrative Leave Act, one under the Administrative

22   Procedure Act, and two constitutional claims, one under

23   the First Amendment and one under the due process

24   clause of the Fifth Amendment.

25             In order to obtain a preliminary injunction,

1  plaintiffs must make a clear showing of a likelihood of

2  success on the merits, a clear showing of irreparable

3  imminent harm in the absence of injunctive relief, and

4  that the balance of equities are in their favor and

5  that the issuance of a preliminary injunction is in the

6  public interest.

7          The Court first takes up the issue of its

8  jurisdiction.  Before proceeding to an assessment of

9  the merits, the Court must first satisfy itself that it

10 has subject matter jurisdiction over the plaintiffs'

11 claims.

12         First, in accordance with *Webster v. Doe*, the

13 Supreme Court case, the parties concede that this Court

14 has subject matter jurisdiction over plaintiffs' claim

15 for injunctive relief under the First and Fifth

16 Amendments.  However, it is also clear that there is no

17 subject matter jurisdiction as to either plaintiffs'

18 Administrative Leave Act claim or the APA claim.

19         With respect to the Administrative Leave Act

20 claim, every defendant in this action is a federal

21 agency or person acting in their capacity as the head

22 of the CIA or the ODNI.  Jurisdiction over any suit

23 against the government requires a clear statement from

24 the United States waiving sovereign immunity.  The

25 terms of consent to be sued may not be inferred but

1  must be unequivocally expressed.  And because there is

2  no express waiver of sovereign immunity in the statute,

3  the Court has no jurisdiction over the Administrative

4  Leave Act claim.

5          The Court also observes that the

6  Administrative Leave Act claim would likely fail on the

7  merits given the definition of "administrative leave"

8  applicable in this case.

9          It also is clear that the Court does not have

10  subject matter jurisdiction over the Administrative

11  Procedure Act claim, which is foreclosed by the Civil

12  Service Reform Act, which provides the exclusive means

13  of judicial review for certain claims brought by civil

14  servants relating to the termination of their

15  employment.  As relevant here, the Civil Service Reform

16  Act precludes APA actions challenging personnel

17  decisions and adverse actions.

18          The CSRA also precludes claims that in taking

19  a particular adverse personnel action, an agency

20  violated its own regulations.

21          Plaintiffs' claim that the defendants are

22  violating their own regulations by not considering

23  plaintiffs for reassignment before their separation and

24  terminating plaintiffs despite there being no national

25  security concerns, unacceptable performance, or other

improper conduct.  Because reassignment decisions are
personnel actions covered by the CSRA under 5 U.S.C.
§ 2302(a)(2)(A)(iv) and plaintiffs' terminations are
adverse employment actions covered by the CSRA under 5
U.S.C. § 7512(1), judicial review of plaintiffs' APA
claims are also foreclosed.

That leaves the constitutional claims over
which the Court does have subject matter jurisdiction.

Let me first address the First Amendment
claim.  With respect to plaintiffs' First Amendment
claim, plaintiffs allege that their termination
violated their right to freedom of speech because the
termination was motivated because of the professional
speech they made in support of civil rights statutes
while serving in DEI-related roles and for their
assumed private beliefs in support of civil rights.

When bringing a First Amendment claim, the
plaintiffs bear the initial burden of proving that
their exercise of First Amendment rights was a
substantial or motivating factor in the employer's
decision to terminate him or her.  And if the plaintiff
satisfies that burden, the defendant will avoid
liability if he can demonstrate by a preponderance of
the evidence that he would have made the same
employment decision absent the protected expression.

1   But where a public employee makes statements in line

2   with their official duties, the statements are not

3   entitled to First Amendment protections.

4           Here, the evidence before the Court at this

5   point is that these plaintiffs were slated for

6   termination not because of their speech but simply

7   because they had the misfortune of having been last

8   assigned to a DEI program.  Even if the decision was

9   made based on some imputed speech, these statements

10  were made in the employee's official duties and are not

11  protected speech.

12          As to the plaintiffs' assertions that the

13  firing was based on their perceived beliefs,

14  plaintiffs' claim, again, rests on the fact that they

15  were in an employment position that the executive order

16  ordered to be eliminated, not that any speech or

17  political beliefs regarding that position motivated the

18  firing.

19          So given that there's no evidence at this

20  point or insufficient evidence at this point that the

21  firings were motivated by anything except the desire to

22  terminate all personnel in DEI offices in accordance

23  with the executive order, the First Amendment claim is

24  not likely to succeed on the merits.

25          That leaves the plaintiffs' due process

1   claim, which is based on the position that the

2   plaintiffs have a protectable property interest in,

3   first, their continued employment; second, reassignment

4   within the agency; and third, protectable reputational

5   interest.

6          To advance a due process claim, the

7   plaintiffs must first establish that he or she had a

8   property or liberty interest at stake.  To have a

9   property interest in a benefit, a person clearly must

10  have more than an abstract need or desire for it, more

11  than a unilateral expectation of it, and instead, a

12  legitimate claim of entitlement to it.  The types of

13  interests protected as property are varied and, as

14  often as not, intangible, relating to the whole domain

15  and social and economic fact.

16         Here, plaintiffs have failed to establish a

17  likelihood of success on their claim that they have a

18  protectable due process interest in their continued

19  employment.  The regulations at issue and the statute

20  pursuant to which they were promulgated makes clear

21  that the employees have no such property right.  In

22  effect, they are at-will employees.  The regulations

23  clearly state that there's no expectation of property

24  interest in the employment that they have.  As stated

25  in the declaration submitted by the CIA director, he

1  exercised his complete discretion to terminate the
2  plaintiffs' employment because he deemed it to be in
3  the interest of the United States.
4          The Court has concluded, whether that was
5  technically pursuant to Section II(B)(11) or Section D,
6  that right is not conditioned on compliance with any
7  other procedural steps, including those for
8  pretermination consideration of reassignment under
9  Agency Regulation 4-16, paragraph II(C)(4) or any other
10 provision.
11         The ability of the director to terminate
12 without regard to any other procedures is embedded in
13 the discretion that those regulations confer upon him,
14 and the Court cannot conclude that the director's
15 discretion in this regard is somehow abrogated
16 constitutionally based on the facts presented at this
17 time.
18         So for those reasons, the plaintiffs have not
19 made a clear showing of a likelihood of success on the
20 claim that they were denied due process by the
21 director's decision to terminate them based on the
22 elimination of their positions.
23         Less clear, however, are plaintiffs' due
24 process claims based on reputational injury or their
25 claims to post-termination consideration for

 1  reassignment.

 2          With respect to reputational injury, the
 3  Court has recognized a protected liberty interest in
 4  one's reputation if the government is defaming
 5  plaintiff and taking a corresponding adverse employment
 6  action against him or her.  Where a person's good name,
 7  reputation, honor, or integrity is at stake because of
 8  what the government is doing, that person's liberty
 9  interest is on the line, meaning that notice and an
10  opportunity to be heard are essential.

11          To establish a reputation-based due process
12  violation, the plaintiffs must demonstrate that there
13  exists, first, a statement stigmatizing their good name
14  and damaging their standing in the community; second,
15  some type of dissemination or publication of the
16  statement; and third, some other government action that
17  alters or extinguishes one of their legal rights.

18          As to the third prong, the Fourth Circuit,
19  among other courts, have recognized that a public
20  employer's stigmatizing remarks may infringe on an
21  employee's liberty interest if such remarks are made in
22  the course of a discharge or significant demotion.

23          Here, the plaintiffs allege that they
24  performed well for years before their most recent
25  assignment, they have engaged in no misconduct, they

1   pose no security risks, and the CIA has determined that

2   they may maintain their clearances upon the planned

3   separation.

4           But despite their exemplary performance,

5   plaintiffs contend that President Trump's description

6   of DEI programs, including the actions of those

7   involved in those programs, as dangerous, demeaning,

8   immoral, and illegal can together or separately be

9   understood to insinuate dishonesty and other serious

10  character defects on the part of these plaintiffs,

11  thereby irreparably harming the plaintiffs' reputations

12  within the tight-knit intelligence community.

13          At bottom, the plaintiffs have an

14  understandable concern that their future employment

15  prospects will be affected were defendants to publicize

16  by name that they were terminated pursuant to the

17  executive order, which evidences an intent to not

18  employ individuals who have held DEI roles, and making

19  it quite plausible that were these plaintiffs to apply

20  for positions elsewhere in the federal government,

21  defendants would inform their prospective employers why

22  plaintiffs were terminated and they would be adversely

23  affected by the description of those reasons.

24          Nevertheless, on this current record, there's

25  no clear showing of reputational injury based on the

1  relationship between their termination and the

2  motivation behind the executive order.  Much would

3  certainly depend on the uncertain unfolding of future

4  events, including whether information would be

5  disseminated, to whom, what that information is, and

6  actions or decisions were taken in response to that

7  information.  The Court, therefore, cannot find that

8  the requirements for immediate injunctive relief at

9  this time have been met.

10        Likewise, less clear is the plaintiffs' right

11 to be considered for reassignment after their

12 termination.  On the one hand, the applicable statutes

13 and regulations make clear that consideration for

14 reassignment was not required before the director made

15 the decision to slate these plaintiffs for termination.

16        However, plaintiffs may have a cognizable

17 protective right to compete for open positions within

18 the agency or elsewhere post that termination decision

19 and certainly within the period of time during which

20 they continue to be employed by the agency pending the

21 effective date of their termination.  Such a position

22 doesn't condition those terminations or somehow require

23 the termination would be somehow held in abeyance, but

24 simply a post-decision remedy or right that these

25 plaintiffs may have.

1              The OPM memorandum that the director appears

2    to have relied on appears to recognize such a right to

3    be considered for reassignment following what is

4    characterized as a RIF, which really is what has

5    happened here.  But that memorandum effectively

6    eliminates any open positions for that purpose by

7    defining the competitive unit as the

8    soon-to-be-shuttered DEI offices.

9              The CIA director seems, in effect, to think

10   that his ability to define a competitive unit beyond

11   the DEI office was constrained by the OPM memorandum,

12   but given the uncabined discretion that the director

13   enjoys and has relied upon in this litigation, that

14   claim seems questionable, particularly in light of the

15   applicable statutes and regulations, including 5 U.S.C.

16   § 3502(a), which describes rights and processes for

17   retention of employees in a RIF, 50 U.S.C. § 3036(e)(2)

18   describing the CIA director's responsibilities,

19   5 C.F.R. 351.402 defining competitive areas of

20   employment in a RIF action, and Agency Regulation 4-16.

21             In any event, at this point, particularly in

22   light of what may be ongoing discussions concerning

23   reassignment, what particular course any particular

24   plaintiff may take in response to the options offered

25   to them, the Court cannot say that the plaintiffs made

27

1   a clear showing of success on the merits or that they

2   at this point will suffer immediate irreparable harm

3   absent immediate injunctive relief.  The Court is

4   certainly available for future consideration of this as

5   the facts may unfold over the next several months.

6          One final issue does need to be mentioned,

7   and that is the right under the regulation for these

8   plaintiffs to have reviewed the director's decision to

9   terminate their employment.  In that regard, the

10  regulations state explicitly that the right to have

11  reviewed a termination decision exists in every case

12  other than in two instances not applicable here.

13         Compliance with this issue is not a

14  procedural step necessary before a termination decision

15  can be made, nor does it condition or undo the

16  director's decision to slate these plaintiffs for

17  termination simply by the filing of such an appeal.  It

18  is merely a post-decision right that is, in effect, a

19  request for reconsideration that is directed to the

20  director himself and his discretion, whose decision is

21  not reviewable administratively and judicially.

22         It is unclear at this point whether any of

23  these plaintiffs will attempt to invoke such a review,

24  and much will depend, again, on how they actually

25  proceed under the separation options offered by the

1  CIA.  But it would be perfectly understandable if some

2  of these plaintiffs would, for example, want the

3  director to review aspects of their termination,

4  including whether they were properly included on the

5  list of employees to be terminated or whether they

6  should continue in their other ongoing duties

7  unaffected by the shuttering of the DEI office.

8          I certainly have no reason to think that the

9  director would not consider such requests in good faith

10 such that no further consideration or action on the

11 Court's part at this time is warranted.

12         So for all of these reasons, the Court will

13 order that the administrative stay entered on

14 February 18, 2025, is vacated with the direction that

15 the plaintiffs' deadline to respond to the Deferred

16 Resignation Program and other employment options made

17 available to them under the CIA director's February 18

18 memorandum be extended to at least 5:00 p.m. on Monday,

19 March 3 and that the plaintiffs' motion for temporary

20 restraining order, which the Court treats as a motion

21 for preliminary injunction, is denied.

22         Is there anything further?

23         MR. BARGHAAN:  No, Your Honor.

24         MR. CARROLL:  No, Your Honor.

25         THE COURT:  All right.  Thank you.

29

1          The Court will stand in recess.

2      ------------------------------------
3                  Time:  10:36 a.m.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21      I certify that the foregoing is a true and

22  accurate transcription of my stenographic notes.

23

24                              _____
                                        /s/
25                              Rhonda F. Montgomery, CCR, RPR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| JOHN DOES 1-6, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 25-300 (AJT/LRV) |
| | ) | |
| U.S. OFFICE OF THE DIRECTOR OF | ) | |
| NATIONAL INTELLIGENCE, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

As acknowledged by the Court on February 27, 2025, Plaintiffs—nineteen career, civil service intelligence officers of Defendants the Central Intelligence Agency ("CIA") and Office of the Director of National Intelligence ("ODNI"), facing termination from the Intelligence Community ("IC") for suspected participation in legally required and congressionally-mandated diversity, equity, inclusion and accessibility programs—may possess cognizable Fifth Amendment Due Process claims. Plaintiffs' constitutional claims are based on a lack of due process from (1) reputational injury suffered from defamatory presidential statements about their termination, and (2) a lack of post-termination consideration for reassignment to positions for which they are qualified.

The Court previously ruled that Plaintiffs' claim for reputational injury is not yet ripe. The Court also held that it did not yet need to grant an injunction to protect Plaintiffs' right to have any termination decisions reviewed, as it was unclear at the time if "any of these plaintiffs will attempt to invoke such a review." (Feb. 27, 2025 Hearing on Pl.'s Mot. for TRO ("TRO Tr.") at 27:22-28:7). Similarly, the Court acknowledged that Plaintiffs may indeed have a right to reassignment

but that at the time, "particularly in light of what may be ongoing discussions concerning reassignment," there was no need to grant an injunction pending further developments. *Id*. at 26:21-27:3; *see also* 25:16-25 (recognizing a "post-decision remedy" of reassignment in the event that a termination decision is made).

After the Court's order, Plaintiffs invoked their right under CIA regulations to the review of their terminations, including especially whether they may be reassigned within the IC rather than terminated. CIA takes the position that no such right of review exists.

Because Plaintiffs invoked their right to request review and reassignment, and because CIA rejected those requests, Plaintiffs renew their request for preliminary injunctive relief to (1) stay their looming terminations; (2) order Defendant John Ratcliffe, the CIA Director, in accordance with Agency regulations, to review and reconsider his termination decisions on an individualized basis; (3) order Defendants Ratcliffe and Gabbard, pursuant to *Webster v. Doe*, to state why each individual termination somehow serves the national interest; and (4) allow each Plaintiff to be considered for reassignment within the IC in accordance with their civil service grades and their skills.

The Court stated on February 27, 2025 that a "perfectly understandable" desire by Plaintiffs to have Defendant Ratcliffe review aspects of their termination, "including whether they were properly included on the list of employees to be terminated or whether they should continue in their other ongoing duties unaffected by the shuttering of the DEI office," should be considered in good faith by the Director. TRO Tr. at 28:1-11. Plaintiffs' request has not been so considered by Defendant Ratcliffe.

Brushing aside Plaintiffs' appeal of their terminations, Defendant Ratcliffe blithely ignores his subordinates' earnest and repeated requests, the Court's words, and the plain language of their

2

Agency's own regulations—to which the Court patiently directed the new Director's attention.

Plaintiffs therefore renew their request for preliminary injunctive relief.

## PROCEDURAL AND FACTUAL HISTORY

### I.    Procedural history

Plaintiffs assume the Court and the parties' familiarity with the facts of this case.

Procedurally, Plaintiffs moved for a temporary restraining order ("TRO") on February 17, 2025.

The Court issued an administrative stay on February 18.   The Court heard further argument and

extended its stay on February 24.   The Court denied Plaintiffs' motion for injunctive relief, and

lifted its stay, on February 27.

Denying Plaintiffs' motion, the Court stated:

> [I]t would be perfectly understandable if some of these plaintiffs would … want the
> director to review aspects of their termination, including whether they were
> properly included on the list of employees to be terminated or whether they should
> continue in their other ongoing duties unaffected by the shuttering of the DEI
> office.  I certainly have no reason to think that the director would not consider such
> requests in good faith such that no further consideration or action on the Court's
> part *at this time* is warranted.

TRO Tr. at 28:1-11 (emphasis added).

To support their argument that they may terminate Plaintiffs without due process or judicial

review, Defendants rely upon Executive Order 14151, *Ending Radical And Wasteful Government*

*DEI Programs And Preferencing* (Jan. 20, 2025).   Subsequent to the Court's last hearing on

Plaintiff's motion for a preliminary injunction, on March 10 and 17, 2025, the enforcement of E.O.

14151 was, for other reasons, enjoined by two other District Judges within the Fourth Circuit.  *See*

*American Ass'n of Colleges for Teacher Educ. v. McMahon,* 2025 WL 833917 at *25 (D. Md. Mar.

17, 2025) (Rubin, J.); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025

WL 750690 at *4 (D. Md. Mar. 10, 2025) (Abelson, J.).

3

Also since the Court last heard argument, yet another District Judge within this Circuit stayed the terminations, pursuant to Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 11, 2025), of approximately 25,000 employees of eighteen federal departments and agencies, ordering some reinstated. *See Maryland v. U.S. Dep't of Agriculture*, 2025 WL 800216 at *27 (D. Md. Mar. 13, 2025) (Bredar, J.).

**II.    Subsequent factual developments**

On March 7, 2025 the ODNI Plaintiffs received word from Defendant ODNI to anticipate termination notices received on March 10. Similar to termination notices received by the CIA Plaintiffs on February 18, these ODNI notices offered three options: deferred resignation, resignation or termination. *See* Ex. 1.

However unlike notices earlier received by the CIA Plaintiffs, and consonant with the Court's suggestion of February 27, notices received by the ODNI Plaintiffs included the following language: "I understand that if I do not elect the ODNI [deferred resignation program] or resignation, that I may submit a request to the DNI [Director of National Intelligence] for reconsideration of the termination decision." *See id*.

On March 18, 2025 ODNI Plaintiffs appealed to the DNI, Defendant Tulsi Gabbard, *see* Ex. 2. On March 20, Defendant ODNI acknowledged receipt of the same. As of March 27, the ODNI officer Plaintiffs received no response to their appeal.

On March 17, 2025 the CIA Plaintiffs received word from Defendant CIA that they too should anticipate termination notices, received on March 18. Similar to the February 18 termination notices, the notices received by the CIA Plaintiffs on March 18 offered three options: retirement, resignation or termination. *See* Ex. 3. Yet unlike the ODNI Plaintiffs, the CIA Plaintiffs

4

were *not* advised of any opportunity to petition Defendant Ratcliffe for reconsideration of his termination decision.  *C.f.* Ex. 1.

On March 17, 21 and 24, 2025 the CIA Plaintiffs requested that Defendant Ratcliffe reconsider his termination decisions, on an individualized basis, and for them to be considered for reassignment within CIA, as the Court suggested on February 27.  On March 25, Defendant CIA informed the undersigned counsel through email that there will be no appeal of Defendant Ratcliffe's decision within the Agency, as in their view, the governing regulation does not offer appeal under these circumstances.  The CIA Plaintiffs' choice of termination option is due to Defendant CIA by March 31.

On March 20, 2025 several Plaintiffs met with the bipartisan staff of one of the Intelligence Community's congressional oversight committees of jurisdiction, a meeting approved in advance by both Defendants CIA and ODNI.  Some of Plaintiffs' statements prepared for that meeting are quoted below; undersigned counsel did not edit any Plaintiff's statement. *See* Ex. 4.

## STANDARD OF REVIEW

The standard for granting a preliminary injunction is a four-fold test:  (1) whether plaintiffs are likely to succeed on the merits of their claim, (2) whether plaintiffs are likely to suffer irreparable harm in the absence of an injunction, (3) whether the balance of hardships weighs in plaintiffs' favor, and (4) whether an injunction serves the public interest.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325-26 (4th Cir. 2021) (enjoining the implementation of E.O. 13888, *Enhancing State and Local Involvement in Refugee Resettlement* (Sep. 26, 2019)).  The standard for a renewed motion is the same as for the original motion. *See e.g., Coreas v. Bounds*, 457 F. Supp. 3d 460, 462 (D. Md. 2020).

# ARGUMENT

Plaintiffs are likely to succeed on the merits of their Fifth Amendment Due Process claim; Plaintiffs will suffer irreparable economic and reputational harm in the absence of an injunction, whereas Defendants will face no hardship from following CIA regulations to allow Plaintiffs to appeal their termination, and to seek employment elsewhere in the IC; and an injunction serves the American public's interest.

## I.    Plaintiffs are likely to succeed in their Fifth Amendment Due Process claim.

Defendants rely upon three authorities to terminate Plaintiffs without due process rights to appeal and to seek reassignment:

- 50 U.S.C. § 3036(e), *Director of the Central Intelligence Agency.*  Section 3036(e) provides that notwithstanding any other law, the CIA Director may, in his discretion, terminate any CIA officer whenever he deems the officer's termination "necessary or advisable" in the interests of the United States.[1]

- E.O. 14151 § 2(b)(1), which orders the termination, "to the maximum extent allowed by law," all DEIA [diversity, equity, inclusion and accessibility] offices and positions.

- An Office of Personnel Management (OPM) memorandum, *Guidance Regarding RIFs of DEIA Offices* (Jan. 24, 2025) (Ex. 5), closing executive branch DEIA offices and limiting employees subject to those closures to applying to jobs in the closed DEIA offices.[2]
  E.O. 14151 calls for the termination of offices and positions, not personnel, but the

executive order and OPM memo together deliberately seek to present Plaintiffs with a Catch-22: they can only apply for work in shuttered offices.  Defendant Ratcliffe offers no explanation for why Plaintiffs' curt terminations are in the national interest of the United States.  Rather, Defendant

---

[1] The correlative statute for the DNI is 50 U.S.C. § 3024(m), *Responsibilities and authorities of the Director of National Intelligence.*

[2] *See* Memorandum of Charles Ezell, Acting Director, U.S. Office of Personnel Management, *available at* opm-memo-guidance-regarding-rifs-of-deia-offices-1-24-2025.pdf.  Acting Director Ezell refused a U.S. District Court order to testify on March 13, 2025 in another case challenging the legality of recent mass firings of federal workers.  *See* E. Sullivan, *Trump Official Will No Longer Testify in Challenge to Mass Firings*, NEW YORK TIMES (Mar. 12, 2025).

6

Ratcliffe points to the E.O. and OPM memo and states—*ipse dixit*, arbitrarily and capriciously—that he "determined that it was 'necessary or advisable in the interests of the United States' to terminate all of the employees of the former [DEIA office.]"[3]  Most likely, discovery will show that the White House or the so-called Department of Government Efficiency simply ordered Defendant Ratcliffe to terminate Plaintiffs for domestic political and ideological reasons, and the Director meekly did so without exercising any independent judgment or mature reflection in his new role as leader of Defendant CIA.

Defendants therefore ask the Court to embrace a breathtaking expansion of the CIA Director's authority under Section 3036(e), to conduct mass firings of Agency officers, without due process, against CIA regulations and subject to no judicial review, for reasons completely unrelated to national security.  This, the Court ought to decline to do.

    a.    Defendant CIA's regulations clearly give Plaintiffs a right to appeal their terminations.

As the Court pointed out in oral argument, Defendant CIA's "regulations state explicitly that [an officer's] right to have reviewed a termination decision exists in every case other than in two instances not applicable here." (TRO Tr. at 27:10-12).  The Court is of course correct.

Agency Regulation 4-16, *Termination of Employment*, states that except for contract, reserve and alien employees, and those terminated for revocation of access to classified information, "[i]n *all other cases*, the termination decision may be appealed" to CIA's chief operating officer, and ultimately to the Director.  Def.'s Memo. in opposition to Pl.'s Mot. for TRO, Ex. A, Dkt. #14-1 at ¶ E, *Appeal of Termination Decision* (emphasis supplied).  None of those categories applies to any Plaintiffs, who maintain their security clearances.

---

[3] *See* Def.'s Supplemental Mem. in opposition to Pl.'s Mot. for TRO, Ex. 1, Dkt. #20-1, *Declaration of John L. Ratcliffe, Director, Central Intelligence Agency*, at ¶ 3.

For comparison, in a case in which the Court of Appeals for the District Columbia upheld the constitutionality of the dismissal of an individual National Security Agency ("NSA") officer for counterintelligence reasons, one of the reasons the D.C. Circuit upheld the dismissal from a due process challenged was specifically the facts that the petitioner in that case received the opportunity to personally appeal his dismissal to the NSA Director, albeit ultimately without success. *See Doe v. Cheney*, 885 F.2d 898, 911 (D.C. Cir. 1989) (Wald, Chief Judge).

Plaintiffs are being given no such opportunity here, for individual consideration of their particular cases, despite the strong prodding of Defendant Ratcliffe by the Court to grant them just such a hearing. A congressional grant of discretion to an agency official never means that this power can be wielded with no regard for due process guarantees in the Constitution, and other laws and regulations. *See e.g., Wilburn v. Dep.'t of Transportation*, 757 F.2d 260, 262 (Fed. Cir. 1985) (finding that RIF regulations must be interpreted to reflect "the congressional concern for fairness" and that an agency's "assertion of absolute discretion" in conducting a RIF does not satisfy its decision). Here, AR 4-16(E), *Appeal of Termination Decision*, grants a post-termination right. The right to reassignment, as the Court recognized, is a post-termination right. Therefore, even if Defendants CIA and ODNI's unreasonably broad interpretation of their Directors' termination powers is correct, that discretion does not address post-termination rights.

b.    <u>Most Plaintiffs had minimal involvement with DEIA throughout their careers.</u>

As this Court well knows, the IC is made of up more than just operations officers and analysts. Plaintiffs here include specialists in data analytics, government contracting, graphic design, health care, human resources, information technology, law, rare earth elements, security, software development, strategic communications and technical intelligence. None are specialists in DEIA, as there is no such career service in the IC.

Several Plaintiffs already had formally secured onward reassignments in their original career fields when they received termination notices. Almost all quickly received such job offers from other offices when word spread that they faced termination; a data scientist received *eight* such offers.

Within the IC, as in many organizations focused on human capital—such as the U.S. Marine Corps for example—recruiting young Americans to perform public service is career-enhancing duty. Personnel likely to be attractive as role models to potential recruits are selected for it; e.g., picture a Marine recruiting sergeant. Also as in the U.S. military, a joint duty tour with a different organization than one's own career service is—understandably—required for promotion to senior ranks and selection to billets with interservice/interagency responsibilities. In the IC, this includes administrative or human resources assignments; one Plaintiff also had a similar "broadening" tour with the Federal Bureau of Investigation ("FBI"), for example. Plaintiffs are not "woke." Rather, they are dedicated, humble and patriotic American intelligence officers.

As one Plaintiff stated, "I was not a diversity bureaucrat. I was an empowerment strategist—equipping officers with the skills and knowledge to do their jobs better." Approximately *ninety percent* of DEIA programs in the federal government are related to accessibility for the disabled. One Plaintiff noted that his chief contribution to DEIA was to direct a video podcast about another officer's battle with cancer, only to highlight available CIA resources for those similarly situated, something presumably Defendant Ratcliffe might support. Academic ivory tower identity politics, this was not.

Some Plaintiffs hold graduate and professional degrees, including doctoral degrees, some in STEM (science, technology, engineering and math) subjects; one was his program's valedictorian. They include veterans, including a retired U.S. Navy Chief Petty Officer. Many

focused, given the nature of threats to our nation since 2001, on counterterrorism and cyber operations.

As one Plaintiff stated about his reason for joining CIA, "Part of the reason I had chosen to accept the Agency's offer of employment was because I had been searching for a professional sense of Mission, to do something that had more meaning and substance than the pursuit of money." As one Plaintiff put it, "None of us were hired specifically for DEI positions. We all have mission critical skills and belong to skills-based career services. I wish for nothing more than to continue my employment at the CIA and to continue to protect the American people from all enemies, foreign and domestic."

One Plaintiff explained how recruiting positions, now associated by Defendant Ratcliffe with DEIA, focused on Defendant CIA's operational needs:

> I was in the Regional Recruiter Program, which had existed as an independent unit for many years prior. This program ensured CIA visited all 50 states to engage a wide berth of Americans, engaged with high caliber sources of academic talent, and connected with programs and organizations that aligned to Agency-established high-priority hiring requirements.

> Everything was based on data, received approval through Talent Acquisition Office leadership and supported outreach priorities and hiring requirements across more than 150 occupations. I planned and executed on-campus and virtual engagements to identify and inform top-tier talent on Agency opportunities, often pivoting to focus on immediate high priority hiring needs or hard-to-fill positions.

Many Plaintiffs are justifiably proud of their long family traditions of uniformed and other public service, especially in wartime. One stated, "every member of my immediate family serves, whether it be in healthcare, law enforcement, military, or federal service."

Assuming *arguendo* that it is somehow constitutionally permissible to terminate Plaintiffs for involvement in these legally required and congressionally-mandated DEIA-related activities— without due process or judicial review—in some cases, individual Plaintiffs' involvement in such

activities was *de minimis*.  Some Plaintiffs' work in DEIA-related roles represents a small fraction of their IC service; one served in diversity roles for three months of a nine-year career, another for five months of ten years.

These Plaintiffs' brief assignment to DEIA programs is miniscule compared to their many years of yeoman's intelligence work in the IC.  The flimsy factual basis for terminating these career civil servants shows why CIA officers maintain a regulatory right to appeal unjust terminations to the Agency's director.  The absence of any evidentiary support for these Plaintiffs' terminations also shows why a detail-intensive inquiry by the CIA director is needed to in order make the kind of individualized determination of an officer's suitability for continued Agency service required by *Webster v. Doe*, 486 U.S. 592 (1988), as discussed *infra*.  The thin ice upon which these Plaintiffs' terminations rest shows why no CIA director ever before attempted to rely upon Section 3036(e) authority for a mass firing of officers, much less for domestic ideological reasons, as opposed to national security reasons.

      c.      <u>Defendants seek powers under Section 3036 far beyond those upheld by *Webster v. Doe.*</u>

Thirty-three Senate-confirmed Directors of Central and Directors of National Intelligence over the last seventy-eight years, appointed by presidents of both parties, never once to our knowledge exercised Section 3036(e) authorities to terminate a group of officers, nor any officer for a reason other than national security.  These directors all properly understood that they lacked such authority under the statute.  It is unlikely that Defendants Ratcliffe and Gabbard are the first directors to have discovered a heretofore latent but lawful power.  It is far more likely that this supposedly dormant power does not lawfully exist.

Defendants' gross overreach risks destroying the Intelligence Community as a nonpartisan entity.  The application of Section 3036(e) untethered to individualized suitability determinations

related to national security, with neither due process nor judicial review to temper any abuses, could turn CIA into what its main adversary the KGB was during the Cold War: the servant of a party and its leaders, and not a nation's best interests.[4]

    *Webster* upheld the constitutionality of terminating a single CIA officer, pursuant to Section 3036(e) and without due process, specifically based upon (1) the Agency Director's individualized determination that this one officer presented an unacceptable counterintelligence risk, only because as a closeted gay man in the 1980s, he was uniquely susceptible to sexual blackmail regarding his sensitivity to the confidentiality of the identity of his similarly closeted paramours; (2) the Director's "responsibility for protecting intelligence sources and methods from unauthorized disclosure;" and (3) "because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Id*. at 601 (citing S.Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H.R.Rep. No. 961, 601 80th Cong., 1st Sess., 3–4 (1947)).

    There are *no* reported cases of the use of Section 3036 to terminate a group of CIA officers, nor to terminate any officer for anything other than national security reasons. Plaintiffs are not being terminated for counterintelligence concerns; in fact, they maintain their security clearances. Plaintiffs are instead being terminated for domestic ideological reasons inapplicable and inappropriate to career civil servants in a foreign intelligence agency. Specifically, Plaintiffs are being fired only for their suspected roles in the implementation of congressionally-funded and -mandated DEIA programs (subject to stringent reporting requirements back to Congress), and the

---

[4] Indeed, the KGB's motto was, "Sword and Shield of the Communist Party" – not of the Soviet Union, or Russia. Richard Lacayo, *The Shakeout: Blunt Sword, Dented Shield*, TIME (Sept. 2, 1991), *available at* https://time.com/archive/6718484/the-shakeout-blunt-sword-dented-shield/.

enforcement of valid civil rights statutes, all at the direction of both Congress *and* the previous President of the United States.

While reassignment within the IC for the closeted CIA officer in *Webster* might have been impractical given the manners and mores of his time and the specific justification for his termination, that reasoning does not apply to officers CIA is terminating for dubious reasons. At best, assuming that CIA is terminating Plaintiffs because they are determined to be excess, CIA's regulations reasonably provide for placement services within the Agency for such officers. *See* AR 4-16(C)(4)(b)-(c). These regulations also provide that when terminating an officer in the interests of the United States, Defendant Ratcliffe "need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required," and that the exercise of this authority is not limited by any other law, and abrogates any interest an officer might have under the regulation. *See id.* at ¶ (D)(1)-(2).

*Webster* upheld the Director's Section 3036(e) authority to terminate an individual officer for specified national security reasons, without constitutional due process or judicial review. AR 4-16(D) goes beyond the remit of *Webster* in asserting that a Director need not provide a court his reasons for exercising this authority on a basis other than national security. And, if an officer is being terminated for other than counterintelligence reasons, it is not clear why that officer would not be entitled to placement services within the Agency, as provided for by regulation, like those services afforded to officers simply determined to be excess. AR 4-16, and Defendants' misapplication of it to Plaintiffs in this case, stretches the authority granted by Section 3036(e) and narrowly upheld by *Webster* beyond its constitutional breaking point.

Defendants seek to press their reasonable counterintelligence authorities under Section 3036(e) too far. Under the Government's vastly expansive reading of the powers granted by this

statute, a future CIA director appointed by a Democratic president could, for example, fire any Agency officer shown to be registered to vote as a Republican. Or to have donated to his defeated opponent's campaign. Or to an interest group irrelevant to national security concerns, such as a pro-life or traditional marriage organization, or one opposed to gender theory. Such nakedly partisan, albeit hypothetical, misuse of Section 3036(e) would not differ in kind from Defendants' attempted abuse, for their own domestic ideological reasons, of their statutory authority in this case against those suspected of commitment to our civil rights laws.

In fact, the Government argued last week that it could do something strikingly similar: *see* J. Ornedo, *DOJ Argues Trump Could Fire All Agency Heads Who Are Women or Over 40*, DAILY BEAST (Mar. 18, 2025). The judiciary should decline any invitation to ratify any such blatant and ill-intentioned abuses of executive power.

Furthermore Section 3036(e) and *Webster*'s grant of authority to CIA directors presupposes a Senate-confirmed Cabinet-level official, subject to congressional oversight, exercising his independent good judgment, carefully balancing the fate of an individual Agency officer against the national security interests of the United States, on the basis of a factual record. Here Director Ratcliffe shrugs, and points helplessly to his perceived need to blindly implement an executive order and a memo from an (acting) OMB chief, to fire over fifty officers. He does so without any substantive explanation to his terminated officers or the Court as to *why* any individual Plaintiff deserves to be fired. Neither is there any invocation of the state secrets privilege, as there are no security accusations against Plaintiffs.

This weak beer of an explanation by Defendant Ratcliffe is not enough to overcome the constitutional presumptions for the need of due process subject to judicial review before terminating CIA officers, absent any allegation of misconduct or security risk on their part.

14

II.    **Plaintiffs will suffer irreparable economic and reputational harm absent an injunction.**

Plaintiffs acknowledge that the Court found on February 27 that discussion of the reputational harm they are suffering, for being terminated pursuant to a defamatory statement by the President of the United States that they engaged in dangerous, demeaning, illegal and immoral activity, is a subject for another day.[5]

However, Plaintiffs are already suffering irreparable economic harm.  Faced with imminent termination from the IC, absent requested judicial intervention, Plaintiffs are applying for other employment.  When Plaintiffs do so, prospective employers reasonably ask a standard question: have you ever been terminated from a job, and if so, why?

Even in advance of impending termination, Plaintiffs are losing out on job opportunities when they truthfully state that they are indeed in the process of being terminated.  They must honestly explain—at a minimum—that they are being fired pursuant to an executive order issued by President eager to punish businesses employing those he sees as ideological opponents.[6]

Over thirty potential employers asked Plaintiffs what post-employment restrictions apply them as former IC personnel, such as termination codes and cooling off periods.  Plaintiffs received no answers to some of these questions from Defendants, making it a practical impossibility for them to find work in their career fields.  Undersigned counsel is further aware of defense

---

[5] *See* the White House statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* of January 21, 2025.  The President continued to state that Plaintiffs undermined national unity and traditional American values "in favor of an unlawful, corrosive, and pernicious identity-based spoils system" that stigmatizes and demeans hardworking Americans, resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."

[6] *See, e.g. Addressing Risks from Paul Weiss* (Mar. 14, 2025); *Addressing Risks from Perkins Coie* (Mar. 6, 2025); and *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025) (regarding Covington & Burling); *available at* https://www.whitehouse.gov/presidential-actions/.

15

contractors in the Washington, DC area seeking legal advice on what unique new post-employment restrictions may apply to former federal employees terminated as a result of executive orders. As this question is *sui generis* and presents a matter of first impression, the answers are not readily clear, further diminishing Plaintiffs' private sector employment prospects.

As the Court of Appeals found in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), a preliminary injunction was appropriate when the Air Force sought to discharge servicemembers based on Human Immunodeficiency Virus. That court found that the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id*. at 229. These airmen faced "a particularly heinous brand of discharge … that bears no relationship to their ability to perform their jobs," and servicemembers could not address these harms through post-discharge procedures. *Id*.; *see also Does 1-26 v. Musk*, No. 25-cv-00462, 2025 WL 840574 at *27-8 (D. MD. Mar. 18, 2025) (finding that when defendants' "public statements regarding the reasons" for termination of agency employees "go far beyond the ordinary," the resultant "likely harm to the reputation of personnel who worked" for the agency satisfies likelihood of irreparable harm).

Plaintiffs are similarly situated to the airmen wrongfully discharged in *Roe*, under circumstances impacting their employment prospects. Few employers in 2025 would hesitate to hire an HIV-positive employee. Today, law firms as powerful as WilmerHale remove biography pages from their websites regarding partners as eminent as former Special Counsel, FBI Director, Assistant Attorney General, U.S. Attorney and combat valor-decorated Marine Vietnam veteran Robert Mueller, only for fear of drawing the negative attention of this White House.[7] If

---

[7] *See* J. Henry, *Big Law Firms Scrub Mueller Ties as Trump Targets Enemies*, BLOOMBERG LAW (Mar. 21, 2025).

WilmerHale is now afraid to admit employing a great American such as Director Mueller, what chance does a previously-anonymous junior CIA officer—fired by the Agency's Director, further to his understanding of an order by the sitting president, regarding that officer's allegedly illegal and immoral activities—stand in a job interview process with a government contractor?

Institutions as powerful, prestigious and previously independent as the Paul Weiss law firm and Columbia University are forced to pay $40 million and $400 million in Dane-geld, respectively, to the President, and give him substantial control over their firm's hiring and school's admissions, in an attempt to escape his wrath.[8]  Defense contractors where Plaintiffs might seek to use their skills are even more vulnerable to such pressure than white shoe law firms and Ivy League universities.

If Plaintiffs' terminations are actually finalized, beyond a painful and frightening period for them and their families of potential long-term unemployment, several officers will also lose valuable pension benefits if they are unable to secure follow-on employment, despite years of hard and often physically dangerous service on behalf of our country since 9/11.

The knock-on effects extend to CIA itself.  As one Plaintiff explained,

The Agency claims the Director has unilateral authority to remove officers under "national interest," bypassing legal frameworks passed by Congress, due process and oversight.

This unchecked power sets a dangerous precedent—if intelligence officers can be sidelined for executing lawful orders, what prevents future purges based on shifting political priorities?

The chilling effect is already evident: employees fear advocating for themselves, and some have been explicitly told not to discuss morale with Congress.

---

[8] *See* M. Schmidt, *How a Major Democratic Law Firm Ended Up Bowing to Trump*, NEW YORK TIMES (Mar. 21, 2025)); T. Closson, *Academia Confronts a Watershed Moment at Columbia*, NEW YORK TIMES (Mar. 22, 2025); *see also* R. Kipling, *Dane-geld, A.D. 980-1016* (1911), *available at* https://www.kiplingsociety.co.uk/poem/poems_danegeld.htm.

**III.    The balance of hardships weighs in Plaintiffs' favor.**

In contrast to the irreparable economic and reputational harms Plaintiffs will suffer in the absence of an injunction, as set forth *supra*, Defendants will face no hardship from simply allowing Plaintiffs to appeal their terminations in accordance with CIA regulations, allowing them to seek employment elsewhere in the IC, and staying their terminations in the meantime.

As one Plaintiff stated,

If terminated from my employment at the Agency, I will lose access to my physical, dental, and mental health care, resulting in a significant decline in my mental and physical health.

One year shy of vesting, **I would lost part of my retirement savings and pension savings, and my student loan payments will be unaffordable, causing severe financial hardship**. I expect the job market, currently flooded with applicants, to be biased against me for being terminated from my most recent position in addition to recently working in a DEI office.

(Emphasis in original.)

A second Plaintiff confidentially shared, "I have since been forced pursue FERS [Federal Employees Disability System] disability retirement due to the trauma and deterioration of my well-being resulting from these actions." A third Plaintiff related that "Being exiled and terminated from the Agency has been, and continues to be, a traumatic and excruciating experience, as well as crippling from an employment perspective." The careers of intelligence officers, as a fourth Plaintiff put it, "have been arbitrarily destroyed."

A fifth Plaintiff stated,

Thousands of Americans volunteer themselves to the scrutiny of the national security clearance process, forfeit more lucrative opportunities in the private sector and make themselves a target to our adversaries in exchange for stability, a strong sense of duty and purpose, and, most of all, an opportunity to serve a country that has provided us with the freedom and community to pursue lives we couldn't elsewhere.

When that contract is severed in a manner that is void of respect, dignity, justification or humanity, it risks dismantling the foundation on which the entire trusted workforce is built.

A sixth Plaintiff noted, Director Ratcliffe once said that the best job he ever had was to be a federal prosecutor, as "it was an apolitical position. I stood up always to represent the United States of America.' Much like the Director, I loved standing up for and defending this country. Everyone in this case shares that calling—but we have been unceremoniously dismissed by D/CIA."

Finally a seventh Plaintiff observed,

When Director Ratcliffe, in his nomination hearing to become D/CIA, invoked Bill Donovan and said, "…the ideal recruit for the Agency would be a Ph.D. who could win in a bar fight," I took that to heart. I have a Ph.D., and while I have the strength to win in a bar fight, I have the wisdom not to be in one. My mission was never about division—it was about removing barriers, breaking down exclusion, and strengthening the workforce. And for that, I was punished.

## IV.    An injunction serves the American public's interest.

Plaintiffs' continued service as expensively recruited and well-trained, highly-experienced, career intelligence officers obviously serves the American public's economic and national security interests. Our nation faces myriad threats from foreign adversaries, and indeed our armed forces are in combat in the Middle East.

It is a curious time indeed for Defendants to choose to throw away *over eight-hundred years* of accumulated agency service among the fifty-eight CIA and ODNI intelligence officers being terminated for some association with DEIA. The average length of service of those identified for termination is seventeen years of service; one served for *thirty-five years*. Perhaps not coincidentally, at least fifty-six of these officers are members of at least one protected class under equal opportunity laws, including *inter alia* veterans with service-related disabilities.

In contrast, Plaintiffs' contemplated terminations present a growing risk of a politicized CIA, beginning with Defendants Ratcliffe and Gabbard purposefully stripping the IC of officers, almost all of them members of minority groups, trained in and dedicated to the implementation of our civil rights laws.

As one Plaintiff stated,

I have dedicated almost 15 years to the Agency's mission and service to the Nation, and I have loved my ability to serve apolitically, without fame or glory, but with the knowledge that my work has pre-empted threats and protected American lives.

Having served as a talent acquisition officer, I know that the Agency has struggled to find individuals with skillsets and talents that are critical to national security. Hence, I cannot understand why the CIA is weakening our national security posture by sidelining career intelligence professionals simply because of political optics surrounding "DEIA." Our officers were serving federally mandated roles involved in protected civil rights activities, and targeting us sets a precedent that any intelligence officer serving in any position or issue that falls out of political favor could be subject to similar harm and lack of due process.

Defendant Ratcliffe begins his tenure as CIA Director by ignoring the Court's strong suggestion on February 27, 2025, and his own Agency's regulations, in refusing to even listen to Plaintiffs' request for the opportunity to appeal their terminations. Defendants' insistence on terminating Plaintiffs, instead of simply reassigning them to other duties for which they are well-qualified, even though the Executive Order 14151 does *not* call for their firing, suggests (as the Court implied, *see* TRO Tr. at 15:3-5) at least unfairness and poor judgment by Defendants. It may be more than that: given current events, it may signify malintent.

Plaintiffs' request for injunctive relief is not made in a vacuum. Their terminations could be a first step towards Defendants CIA and ODNI engaging in activities prohibited by the National Security Act of 1947. Defendants Gabbard and Ratcliffe are openly contemptuous of the oversight authority of Congress; *see*, *e.g.*, A. Hauslohner, *Gabbard, Ratcliffe face fresh questions from House on Yemen war chats*, WASHINGTON POST (Mar. 26, 2025), leading to a U.S. Representative

20

accusing them of perjury for their testimony to the intelligence committees.[9]  Defendants Gabbard and Ratcliffe's representations about Plaintiffs' terminations therefore ought not be taken at face value.  We unfortunately live in a time in which senior Executive Branch officials, such as the Vice President, openly contemplate violating final court orders.[10]  The President has further called for imprisoning his perceived domestic enemies, "scum" who should be investigated for suspected crimes,[11] even those for which they received pardons.[12]  And these are only the wave-tops of the most recent outrageous comments from the senior officials of the Executive Branch.  These are dangerous times.

President Harry Truman's fear of politicized intelligence agencies is what led him to disband the Office of Strategic Services in 1945, despite the exemplary wartime record of Major General William Donovan's OSS.  Congress, in establishing CIA through the National Security Act of 1947—the same law that provides what is now Section 3036(e)—shared President Truman's concerns and sought to sharply limit the Agency's domestic role.  Changes to an original draft of the National Security Act of 1947, such as those forbidding CIA to issue subpoenas or exercise police powers, "have been effected in order to … protect against the possible development of the Central Intelligence Agency into a Gestapo-type Organization."  80th Congress, 1st Session, Report No. 961 at 10-11 (Jul. 16, 1947).  It does not stand to reason that a president and a Congress

---

[9] *See Nadler calls for Gabbard and Ratcliffe to be prosecuted for perjury following latest Signal-gate release*, *available at* https://nadler.house.gov/news/documentsingle.aspx?DocumentID=396301.

[10] *See* C. Savage, *Vance Says 'Judges Aren't Allowed to Control' Trump's 'Legitimate Power*, NEW YORK TIMES (Feb. 9, 2025).

[11] N. Riccardi, *'Scum,' 'crooked' elections and 'corrupt' media. What Trump said inside the Justice Department*, ASSOCIATED PRESS (Mar. 15, 2025).

[12] P. Smith, *Trump claims Biden's pardons for Jan. 6 committee are 'void' because he used an autopen*, NBC NEWS, (Mar. 17, 2025).

21

so concerned about a foreign intelligence service adopting an improper internal security role, would simultaneously empower the CIA director with the unreviewable authority to summarily fire an unlimited number of Agency officers only because of their supposed views on domestic issues, much less support for civil rights.

In balancing the equities, now is exactly the *wrong* time for the judiciary to approve giving IC leaders the unprecedented power to purge their agencies of good intelligence officers perceived to be political opponents only because they believe in civil rights laws—presumably to replace them with officers who do not similarly share those deeply American beliefs.

**Conclusion**

As one Plaintiff stated, the decision to terminate him "was sudden.  It was unjust. And it was wrong.  In the wake of my expulsion, a colleague reached out to say my termination was a 'terrible loss for the Agency' and praised my 'moral courage and ability to speak truth to power.' Now, I ask you to speak truth to power for me—because I no longer can."

As another Plaintiff put it,

Both I and my colleagues were resigned to the fact that that the diversity and inclusion related work that we had been legally and appropriately doing as of 22 January 2025 was no longer available nor even politically sanctioned.

What we were NOT expecting was to be scapegoated and discarded, and not even in the administratively proscribed manner set forth in our own Agency / Government regulations, with no opportunity for re-assignment, redress or even rights of common decency.
Our treatment is wrong, it is un-American, and it needs to be addressed and corrected.

The Executive Order in question is already enjoined for good if separate reasons by two judges in this Circuit, while a third judge within the Circuit halted the mass firings of tens of thousands of officers pursuant to another recent E.O.  Plaintiffs are likely to succeed on the merits of their Fifth Amendment Due Process claim; Plaintiffs will suffer irreparable economic and

reputational harm absent an injunction, whereas Defendants will face no hardships from following CIA regulations allowing Plaintiffs to appeal their terminations, and also to seek employment elsewhere in the IC; and finally, an injunction serves America's truest long-term public interests at this fraught time in our nation's history.

Plaintiffs therefore respectfully request the following preliminary injunctive relief:

(1) Stay their and other similarly situated individuals' terminations from the IC;

(2) Order Defendant Ratcliffe, in accordance with CIA regulations, to personally review and reconsider his termination decisions of Plaintiffs and other similarly situated Agency officers on an individualized basis;

(3) Order Defendants Ratcliffe and Gabbard, pursuant to *Webster v. Doe*, to state why each individual termination somehow serves the national interest; and

(4) Allow Plaintiffs and other similarly situated individuals to be considered for reassignment within the IC to positions commensurate with their civil service grades and their skills.

Dated: March 27, 2025                      Respectfully submitted,

                                           */s/ Kevin T. Carroll*
                                           Kevin T. Carroll, VSB No. 95292
                                           Kia Rahnama, VSB No. 93718
                                           **Fluet**
                                           1751 Pinnacle Dr., Ste. 1000, Tysons, VA 22102
                                           T: (703) 590-1234
                                           F: (703) 590-0366
                                           kcarroll@fluet.law
                                           krahnama@fluet.law
                                           e-file@fluet.law

                                           *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 27, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

_/s/ Kevin T. Carroll_
Kevin T. Carroll, Esq.

24

JA220

# Exhibit 1

**Deferred Resignation Program Only**

### Election Sheet for ███████████████████████████

I understand that the below options are available to me. I have initialed next to my election.


_____      **ODNI Deferred Resignation Program (DRP):** ODNI is offering the DRP under the ODNI's authorities, which is structured similarly to the OPM deferred resignation program. Your effective resignation date would be 30 September 2025, and you would remain on administrative leave until that time. If you elect participation in the ODNI DRP, you will also have to sign a separate ODNI DRP agreement.

_____      **Resignation:** You may elect to resign, effective the date you sign this election sheet, but no later than tomorrow, 11 March 2025 by 5 p.m. If you elect to resign, you will receive no additional administrative leave after the date of your resignation.

_____      **Termination:** You may elect for the DNI to proceed with termination of your employment with the ODNI. You would remain on administrative leave for 90 days from today, 10 March 2025, which is through 08 June 2025. You would be terminated from ODNI employment effective on 09 June 2025.


I understand that by electing to be terminated or declining to select an option by tomorrow, 5:00 p.m. EST, 10 March 2025, will result in the termination of my employment with the ODNI pursuant to the DNI's termination authority in 50 U.S.C. § 3024(m) and 50 U.S.C. § 3036(e)

I understand that if I do not elect the ODNI DRP or resignation, that I may submit a request to the DNI for reconsideration of the termination decision. Such request must be submitted in writing to Jessica Brauer (email Jessica.L.Brauer@odni.gov) no later than 5:00 p.m. EST, 10 calendar days from today. After the DNI's review of the request, an officer from ODNI Human Resource Management will notify you in writing of the DNI decision.


_____      _____
Employee Signature                                    Date

# Exhibit 2



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

<u>**VIA EMAIL and US MAIL**</u>                                                                    March 18, 2025

The Hon. Tulsi Gabbard
Director of National Intelligence
Office of the Director of National Intelligence
Washington, DC 20511

Via:    Dennis C. Barghaan, Esq.
        Chief, Civil Division
        United States Attorney's Office
              for the Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, VA 22314

**Re:    *Doe v. U.S. Office of the Director of National Intelligence*, 1:25-CV-300, EDVa**

Dear Director Gabbard:

We represent Plaintiffs Jane Does 11 and 12 in the above-captioned action.

On March 10, 2025, Plaintiffs received notice of their pending termination by the Office of the Director of National Intelligence ("ODNI"). We understand that, in accordance with the February 27, 2025, verbal opinion and order of the Hon. Anthony J. Trenga, United States District Judge for the Eastern District of Virginia, Plaintiffs are to be accorded the right to appeal their terminations to you as the Director of National Intelligence.

As you may recall, Judge Trenga stated on February 27 that

[I]t would be perfectly understandable if some of these plaintiffs would … want the director to review aspects of their termination, including whether they were properly included on the list of employees to be terminated or whether they should continue in their other ongoing duties unaffected by the shuttering of the DEI office.

I certainly have no reason to think that the director would not consider such requests in good faith such that no further consideration or action on the Court's part at this time is warranted.

Transcript at 28:1-11.

In that spirit of good faith, Plaintiffs set forth the following for your consideration.



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

Jane Doe 11 served for fourteen years in the Intelligence Community ("IC"), first as a contractor and then as an ODNI officer. She converted to "blue badge" status in December 2024, and is a GS-13.

Jane Doe 11 received multiple written commendations from ODNI employees, multiple merit salary increases from her company, and a bonus from her company during her five years at ODNI. Written commendations from ODNI employees include comments regarding her exemplary support of the mission, superior organization and research skills, willingness to learn, and professionalism in support of rapidly changing environments. Her work is recognized as being highly valued, enabling leadership to efficiently and effectively execute requirements of national missions. Also during her time at ODNI, a director at the Defense Media Activity (DMA) wrote the National Insider Threat Task Force director thanking her for her professionalism and her hands-on collaborative approach that led to DMA's Insider Threat Program's attainment of Full Operating Capability Status against National Minimum Standards.

Prior to ODNI, Jane Doe 11 was recognized by an assistant director of the Federal Bureau of Investigation ("FBI") for exceptional performance in publishing an intelligence product that identified lessons learned and recommended improvements to prevent and reduce future risk to the FBI.

Jane Doe 11 worked as a contractor supporting insider threat and operations security missions in the National Counterintelligence and Security Center's Enterprise Threat Mitigation Directorate (ETD). Her ODNI offer of employment for inclusion into a hiring pool of Intelligence Research Specialists highlights that candidates in this pool are used to fill positions including intelligence and targeting analyst, integration manager and program analyst. There are multiple offices and roles that fit Jane Doe 11's analytic skill set, jobs she would have accepted with enthusiasm.

As of January 22, 2025, when she was placed on administrative leave, Jane Doe 11 held the position of Analytic Methodologist. Jane Doe 11 holds a Bachelor of Arts in International Political Science from ████████████████ and a Master of Arts in Diplomacy from the ████████████████████████ ████████████████ Jane Doe's entire professional career has been in the IC.

Jane Doe 12 served for thirteen years at the Central Intelligence Agency ("CIA") as an attorney and human resource officer. She converted from CIA to ODNI in July 2024, and is a member of the Senior National Intelligence Service. Jane Doe 12 served overseas and received over fifteen exceptional service awards and commendations during her years at CIA, including multiple Meritorious Unit Citations, Foreign Language Acquisition awards, and Agency and IC-level awards for distinguished service. Jane Doe 12's significant contributions to the IC's mission were recognized by the Directorate of Analysis, the Directorate of Operation's Special Activities Center, the

Page 2 of 3



(703) 590-1234 Tel          1751 Pinnacle Drive, Suite 1000
(703) 590-0366 Fax          Tysons, VA 22102
                            www.fluet.law

Counterterrorism Mission Center, and Brigadier General Mark S. Martins when he
served as the Chief Prosecutor for the Office of Military Commissions.

    Immediately prior to January 22, when she was placed on administrative leave,
Jane Doe 12 interviewed as a highly competitive candidate for the position of Assistant
Director for the Office of Economic Security and Emerging Technologies, a job she
would have accepted with enthusiasm.

    As of January 22, Jane Doe 12 held the position of Chief, Intelligence Community
Diversity, Equity, Inclusion, and Accessibility ("DEIA"). She holds a Bachelor of Arts in
Government and Politics from ███████████████████, as well as a Juris Doctor from
███████████████████████████████.

    On February 27, Judge Trenga observed that "if fairness and good judgment
were the guiding principles," Plaintiffs' complaint "would be an easy case."  Transcript
15:4-5.  The Court acknowledged that Plaintiffs may possess due process rights to post-
termination consideration for reassignment, *see* Transcript at 22:23-23:1, and "a
cognizable protective right to compete for open positions within the agency or
elsewhere post that termination decision …".  Transcript at 25:16-18.

    Jane Does 11 and 12 together spent twenty-seven years in the IC, in positions of
increasing responsibility.  Together they spent just eight months working exclusively on
DEIA-related issues for ODNI immediately before you became DNI.  Their previous
intelligence service, for which they received numerous awards, included work on
counterintelligence, counterterrorism, security and special activities issues, and
interagency work regarding the CIA, FBI and military.  Both women hold advanced
degrees.  Like any IC officer, they were recruited, vetted and trained at great expense to
American taxpayers.  They are able to leverage their experiences to give many more
years of valuable service to the IC and the Nation.

    We believe that ODNI ought to recognize Plaintiffs' due process rights to post-
termination consideration for reassignment, and that fairness and good judgment
suggest that Plaintiffs' outstanding performance in the IC and qualifications and
potential for further service within it mark them as deserving of consideration for
reassignment within ODNI.  Thank you.



                    Very respectfully,

                    *[signature]*

                    Kevin Carroll
                    Partner



Page 3 of 3

# Exhibit 3

Election Sheet for ▮▮▮▮▮▮▮

I understand that the below options are available to me. I have initialed next to my election.

_____    **Retirement**: You are eligible to retire and may chose a retirement date prior to 30 September 2025. You will remain on administrative leave until your effective retirement date which can be no later than 1 October 2025.

_____    **Resignation:** You may choose to resign, effective the day you sign this form. If you choose to resign, you will receive no additional administrative leave after the day you sign the form.

_____    **Termination** – You may choose termination of your employment with the CIA. You would remain on administrative leave for 90 days from 31 March 2025, which is through 29 June 2025. You would be terminated from CIA employment effective 30 June 2025.

I understand that by electing to be terminated or declining to select an option by 5 pm on Monday, 31 March 2025 will result in the termination of my employment with the CIA pursuant the D/CIA's termination authority, as outlined in 50 U.S.C. § 3036(e).

_____        _____
Signature                                                     Date

_____        _____
Witness Signature                                       Date

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| JOHN DOES 1-6, *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE, *et al*. | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF KEVIN T. CARROLL

I, KEVIN T. CARROLL, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over eighteen years old and competent to testify.  I make this Declaration on personal knowledge, in support of a renewed motion for preliminary injunction.  I am admitted to practice law in Virginia, New York and the District of Columbia.  Fluet PLLC represents John Does 1-6 and Jane Does 1-13, Plaintiffs in this matter.

2.      Plaintiffs, appearing pseudonymously in this matter, provided me with statements in preparation for a meeting with the security-cleared bipartisan staff of the U.S. House of Representatives Permanent Select Committee on Intelligence, statements which contain some identifying personal details.  I excerpt these statements in the memo of law supporting this motion, attest that these are accurate excerpts of Plaintiff's statements, and can produce the original statements if needed.  I declare under penalty of perjury that the foregoing is true.

/s/ Kevin T. Carroll
Kevin T. Carroll
Partner, Fluet

Date: March 27, 2025

Case 1:25-cv-00300-AJT-LRV    Document 33-5    Filed 03/27/25    Page 1 of 2 PageID# 406

# Exhibit 5



**The Director**

**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

# MEMORANDUM

**TO:**          Heads and Acting Heads of Departments and Agencies

**FROM:**      Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:        January 24, 2025

**RE**:            Guidance Regarding RIFs of DEIA Offices

---

Pursuant to its authority under 5 U.S.C. § 1103(a)(1) and (a)(5), the U.S. Office of Personnel Management ("***OPM***") is providing the additional guidance to agencies regarding the President's executive order titled, "*Ending Radical and Wasteful Government DEI Programs and Preferencing*."

In accordance with that order, each agency, department, or commission head shall take action to terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions within sixty days.

OPM's initial guidance required agencies to submit written plans no later than January 31, 2025, for executing a reduction-in-force (RIF) action regarding the employees who work in a DEIA office. However, agencies **can and should begin issuing RIF notices to employees of DEIA offices now**. Agencies are reminded to define the competitive area solely in terms of the DEIA office where the employees worked. *See* 5 C.F.R. § 351.402.

Please contact DEIAreports@opm.gov if you have any questions regarding this memorandum. OPM can provide sample RIF documents upon request.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors, Chiefs of Staff

| | |
|---|---|
| **From:** | Barghaan, Dennis (USAVAE) |
| **To:** | Kevin Carroll |
| **Cc:** | Kia Rahnama; Levenson, Rebecca S (USAVAE) |
| **Subject:** | Does v. ODNI (E.D. Va.) |
| **Date:** | Monday, March 17, 2025 2:47:06 PM |
| **Attachments:** | SAMPLE Retirement Form.docx |
| | SAMPLE VERA Form.docx |
| | SAMPLE DRP Form.docx |

Kevin --

On February 27, Judge Trenga vacated the Administrative Stay in the above-referenced litigation. Following that decision, the Director of the CIA reaffirmed his termination decision regarding the affected CIA officers. There is no process to appeal this decision within the Agency or otherwise seek reassignment within the Agency. Accordingly, the Agency is moving forward with the separation of these officers. The Agency asked us to send this email to you to ensure that you were aware of what was happening, and could pass along this information to your clients.

Today, non-lawyers with the Agency will be contacting affected CIA officers, including your CIA-affiliated clients, with whom it met on February 18. The Agency is advising this subset of your clients simply that a document will be sent to them by email or made available for pickup at the visitor's center, depending on their status with the Agency. Attached are samples of the forms that will be sent or made available to your clients; they outline the separation options offered to each officer. The attached documents are the versions that will be emailed; the versions available for pick up will contain slight, non-substantive variations in wording. However, all of the forms, whether emailed or made available for pick up, are unclassified and may be shared with you and others.

To finalize their separation selection, your clients should indicate their preferred option on the form provided, sign the form, and return it to the Agency. Your clients who receive the form by email should send it via a response to the email in which they receive the form. Your clients who collect the form at the visitor's center will be provided a telephone number to call to arrange a time to deliver the completed form at the visitor's center.

The Agency requests that your clients return the completed form no later than 5:00 p.m. on Monday, March 31, to select the option they prefer. For officers who do not return the completed form by that time, the Agency will proceed by exercising the termination option contained in the attached documents.

Please confirm your receipt of this email.

Many thanks.

Dennis

Dennis Barghaan
Chief, Civil Division
United States Attorney's Office
Eastern District of Virginia
(703) 299-3891

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN DOE 1, *et al.*,       )
                                 )
        *Plaintiffs*,        )
                                 )
v.                               )     Civil Action No. 1:25-cv-300 (AJT/LRV)
                               )
U.S. OFFICE OF THE DIRECTOR     )
OF NATIONAL INTELLIGENCE, *et al.*,   )
                               )
       *Defendants*.       )

**PRELIMINARY INJUNCTION ORDER**

On March 31, 2025, the Court held a hearing on Plaintiffs' Renewed Motion for a Preliminary Injunction, filed on March 27, 2025, [Doc. No. 32] (the "Motion"), following which, the Court in open court granted the Motion in part, and denied the Motion in part, and in further memorialization of its ruling, the Court issues this written Order. Accordingly, for the reasons stated from the bench in open court, it is hereby

**ORDERED** that Plaintiffs' Renewed Motion for a Preliminary Injunction [Doc. No. 32] be, and the same hereby is, **GRANTED** in part, as set forth herein, and is otherwise **DENIED**; and it is further

**ORDERED** that Defendants, and any of Defendants' officers, agents, servants, employees, and attorneys, as well as other persons who are acting in concert with them, be, and the same hereby are, **ENJOINED** from effectuating or implementing any decision to terminate the Plaintiffs without further Court authorization. To the extent that any such decision to terminate any Plaintiff is submitted to the Court for approval, the Court will assess the extent to which any such Plaintiff has received the appeal and consideration for reassignment he or she was entitled to receive as set

1

forth on the record during the hearing; and Plaintiffs shall continue to remain on administrative leave with pay and benefits, or be otherwise reinstated, pending further Court order; and it is further

**ORDERED** that Defendants provide Plaintiffs a requested appeal from any decision to terminate him or her, consistent with the steps set forth in CIA Regulation 4-16, including to permit Plaintiffs to submit "written comments" explaining why they should not be terminated, to provide Plaintiffs with a written notification of the Director's decision, and to provide reasonable notice of the status of any pending appeal. *See* [Doc. No. 14-1] § II. E. ("Appeal of Termination Decision"); and it is further

**ORDERED** that Defendants consider any Plaintiffs' request for reassignment for open or available positions, in accordance with their qualifications and skills, without regard to the definition of a "competitive area" in the January 24, 2025 OPM Memorandum, and consistent with CIA Regulation 4-16 Section II. C. 4., including an Agency-wide review of available positions that Plaintiffs may be qualified for, notwithstanding any election that a Plaintiff may have made in response to the requirement that each Plaintiff select whether to retire, resign, or be terminated; and it is further

**ORDERED** this Order shall issue and be in full force and effect, with the Court finding that, under the circumstances of this case, the posting of a bond by Plaintiffs is not necessary or proper.

The Clerk is directed to forward copies of this Order to all counsel of record.

Alexandria, Virginia
March 31, 2025

Anthony J. Trenga
Senior United States District Judge

2

1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   JOHN DOE 1, et al.,          )  Case 1:25-cv-300
                                  )
 4                 Plaintiffs,    )
                                  )
 5         v.                     )  Alexandria, Virginia
                                  )  March 31, 2025
 6   OFFICE OF THE DIRECTOR OF    )  2:00 p.m.
     NATIONAL INTELLIGENCE,       )
 7   et al.,                      )
                                  )
 8                 Defendants.    )
     _____ )  Pages 1 - 29
 9

10      TRANSCRIPT OF PLAINTIFFS' MOTION FOR A PRELIMINARY

11                     INJUNCTION ORDER

12        BEFORE THE HONORABLE ANTHONY J. TRENGA

13          UNITED STATES DISTRICT COURT JUDGE

14
     APPEARANCES:
15
     FOR THE PLAINTIFF:
16
           KEVIN T. CARROLL, ESQUIRE
17         KIA RAHNAMA, ESQUIRE
           FLUET & ASSOCIATES, PLLC
18         1751 Pinnacle Drive, Suite 1000
           Tysons Corner, Virginia  22102
19         (703) 590-1234

20   FOR DEFENDANTS:

21         DENNIS C. BARGHAAN, JR., ESQUIRE
           REBECCA S. LEVENSON, ESQUIRE
22         OFFICE OF THE UNITED STATES ATTORNEY
           2100 Jamieson Avenue
23         Alexandria, Virginia  22314
           (703) 299-3700
24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Civil Action

 3    No. 1:25-cv-300, Doe 1, et al. v. Office of the

 4    Director of National Intelligence, et al.

 5              Counsel, will you please note your

 6    appearances for the record.

 7              MR. CARROLL:  Kevin Carroll and Kia Rahnama

 8    from the Fluet Law Firm for 19 U.S. intelligence

 9    officers, Your Honor.

10              THE COURT:  All right.  Welcome.

11              MR. BARGHAAN:  Good afternoon, Your Honor.

12    Assistant United States Attorney Dennis Barghaan on

13    behalf of the defendants.  And with me again today is

14    Rebecca Levenson, also an Assistant United States

15    Attorney.  Once again, I'll argue the cause on behalf

16    of the government today.

17              THE COURT:  All right.  We're here on the

18    plaintiffs' renewed motion for a preliminary

19    injunction, which I've reviewed together with the

20    opposition brief.  I'd be pleased to hear further from

21    counsel.

22              Mr. Carroll, I know you haven't had a chance

23    to file a reply.  So if you would, take this

24    opportunity to say anything you'd like in response.

25              MR. CARROLL:  Thank you very much, Your
```

1    Honor.

2           As for a reply, we would disagree with the

3    government and say that this is not an ordinary

4    employment law case.  This is a case with important

5    civil rights and civil liberties with implications

6    nationally.

7           Your Honor, we're here today, again, contrary

8    to the defendants' position, we think two important

9    things have happened in the last month:

10          One, the director of Central Intelligence,

11   Ratcliffe, has decided not to grant any right of appeal

12   to the plaintiffs despite what we understood to be the

13   Court's instruction that that take place in good faith.

14          And, two, that the imminent and irreparable

15   harm has grown worse.  Over 30 employers at this point

16   have engaged with the plaintiffs about possible onward

17   employment.  All have asked the obvious question:  Have

18   you ever been discharged from a job before?  If so,

19   why?  What are the legal implications of being fired

20   under an executive order from the President of the

21   United States?

22          The question is almost impossible to answer.

23   My law firm is separately being approached by defense

24   contractors for the answers to those questions.  And

25   because it is a *de novo* sort of situation, we really

1 don't know.  We can give advice, but we can't say

2 exactly what the employment obligations are of the

3 employer.

4          And in addition, again, contrary to what

5 defendants state, the issue here is not what Director

6 Ratcliffe or Director Gabbard may say pursuant to the

7 termination; the defendants -- plaintiffs, rather, have

8 all been defamed by a shotgun blast of statements by

9 the President of the United States and the White House

10 generally about how they were engaged in illegal and

11 immoral activity.

12          And then we see the way that the President of

13 the United States is very aggressively going after law

14 firms, universities, other such organizations in civil

15 society for employing people, even years ago, who might

16 have been legal opponents of his or presumed

17 ideological opponents of his.  It's perfectly

18 understandable why plaintiffs are having difficulty in

19 finding employment using their skills.

20          Your Honor, as you pointed out at the last

21 hearing, Agency Regulation 14-6(E), as in echo, states

22 that in all cases other than contract, reserve, or

23 alien employees who were deemed to be a security risk,

24 there will be a right of review, a right of appeal to

25 the director of Central Intelligence, which has not

1  been granted here despite the request of plaintiffs.

2            I think all sides acknowledged the last time

3  we met that Agency Regulation 14-6 is not the most

4  clearly written regulation in the Code of Federal

5  Regulations.  But here I think the tie should go to the

6  runner.  You know, if there's a provision that says

7  that you get a right of appeal to the DCIA unless

8  you're in one of these narrow categories of people --

9  none of which applies to plaintiffs, who, again, are

10 keeping their security clearances -- that they should

11 receive that right.

12           One of the things that we believed Your Honor

13 was asking to be looked into at the last hearing was

14 whether the individual plaintiffs were properly

15 included in some sort of purge of people involved in

16 DEIA functions.  Leaving aside whether it's

17 constitutional to fire people for their support of the

18 civil rights statutes of the United States, we inquired

19 of each of them.  And the involvement of them with DEIA

20 in those cases was *de minimus.*

21           For example, one of them had spent three

22 months with additional duties related to DEIA.  Another

23 had ten years with CIA and had five months with

24 experiencing related to DEIA.  So it was what, I think,

25 Your Honor may have feared.  These people were having

1  entire careers of difficult and often hazardous service

2  to the United States thrown away because of a temporary

3  assignment for just a few months in carrying out

4  congressionally mandated, specifically congressionally

5  funded programs related to the civil rights laws.

6         And, Your Honor, we continue to believe that

7  the way that Section 3036(e) here is being applied goes

8  beyond what was upheld by the Supreme Court in *Webster*.

9  The government has pointed out a single case --

10  actually, I give them credit for finding it; I couldn't

11  find it in a diligent search -- of an MSPB decision

12  from 1984 in which somebody is let go from the CIA for

13  reasons of poor performance.

14         And the way I read the case this morning,

15  when it was brought to my attention, was that it was

16  holding simply that the MSPB didn't have jurisdiction

17  over firing someone from the CIA, which I think we all

18  agree.

19         The government reason for the additional

20  statement, which I thought was *dicta* -- but for what it

21  is saying, it didn't have to be a national security

22  reason.  Your Honor, the name of the statute for which

23  3036(e) authority is drawn is the National Security Act

24  of 1947, not the Domestic Politics Act of 1947.  No

25  other previous director of Central Intelligence, no

1  other previous director of National Intelligence has

2  thought that they had the power to fire an entire group

3  of officers ever.  Nor has anyone to my knowledge

4  ever -- any of these directors ever thought that they

5  had the authority under the statute to fire someone for

6  ideological or domestic political reasons.

7          And here, the government is asking the Court

8  to embrace a vast expansion of such power by the

9  director of Central Intelligence.

10         Your Honor, I think that this happens in a

11  wider context of, as I said, an assault on civil rights

12  and civil liberties and related institutions in this

13  country.  We have the bar.  We have the courts.  We

14  have universities.  We have other organizations that

15  are under attack.

16         This is the worst possible time to have a

17  politicized foreign intelligence agency that people can

18  just be dismissed, again, because of their belief in

19  the civil rights laws of the United States.

20         THE COURT:  All right.  Thank you.

21         Mr. Barghaan.

22         MR. BARGHAAN:  Thank you, Your Honor.  I'll

23  be very quick, Your Honor.  These issues we've

24  band-aided about quite a bit.  This is our fourth time

25  here before Your Honor on these issues, and I don't

1   want to belabor points that we've made already from

2   podium that I know that Your Honor has already digested

3   and those that we made in our paper this morning.

4           Primarily, the factual picture here hasn't

5   changed all that much since the last time that we were

6   before you.  It is still the case that no one, even if

7   they select the termination option, is being terminated

8   tomorrow.  The plan, the option, allows them to select

9   that option but not until 90 days have passed.

10          It is still the case that the CIA's

11  regulation bars the agency from saying anything

12  substantive about the rationale for the end of the

13  tenure with the agency.  And it is still the case that

14  this Court would have the authority, should my

15  colleague prove an entitlement to relief under their

16  constitutional claims, to authorize or to order

17  equitable relief that would not only reinstate those

18  individuals but provide them with -- make whole relief

19  at that time.

20          Now, the other thing, of course, is, as we

21  mentioned in our papers, is that not all the plaintiffs

22  are similarly situated here.  The director of National

23  Intelligence in her extra regulatory discretion has

24  authorized a process of reconsideration that is still

25  ongoing as to those two individual plaintiffs.

1          The one thing that has changed, of course, is

2    the legal landscape, and I don't mean that in the sense

3    of the jurisprudential authority or statutory authority

4    on which we premise our arguments but rather the

5    narrowing of the claims that my colleagues suggest are

6    the basis of their claim for extraordinary equitable

7    relief at this early stage.

8          In that respect, they only seek relief with

9    respect to their Fifth Amendment claims.  We very

10   thoroughly, I hope, addressed those claims in our

11   opposition that we filed this morning.  And I won't go

12   through them in any detail, only to say that my

13   colleague's last comment about *Webster* and 50, United

14   States Code, Section 3036(e) still fails to recognize

15   that that statute does not say that the director can

16   terminate an employee so long as whatever he determines

17   that the employee's continued employment is against the

18   national security interests of the United States.

19         It simply says the interest of the United

20   States.  It does not need to be a national security

21   rationale for the termination using that extraordinary

22   statutory discretion.

23         On the question of reassignment and appeal,

24   we've articulated the bases for our view on why the

25   regulation does not authorize an appeal and the

10

1  difference between appeal and reconsideration.  I don't

2  need to say much more about that.  I would only add to

3  my colleague's position in that respect that he failed

4  to address a threshold question, which is whether a

5  violation of those regulations is itself a

6  constitutional mandate or a Fifth Amendment claim it

7  would make.

8          And as for the reasons we've stated, there

9  isn't a whole lot of binding authority for the

10 proposition that what is known as the *Accardi* doctrine,

11 that is, that there is a claim -- an individual may

12 make a claim in an Article III court that an agency is

13 not following its own regulations finds its genesis in

14 the Constitution's Fifth Amendment, and that's super

15 important here because as this Court held in its past

16 order, unless it is a Fifth Amendment claim, they have

17 no right to relief.  This Court has no jurisdiction

18 over it.

19         And finally, the question about state bar

20 reputational interests that my colleague raised,

21 there's no authority for the proposition that a former

22 employee's self-publication of the rationale for their

23 termination creates liability in the employer.  The

24 law, we think, is quite clear.  The Fourth Circuit's

25 decision in *Stone*, we think, stands for this

1  proposition, and that is that it is only a termination

2  when the employer also adds a detrimental comment about

3  morality that the Fifth Amendment is implicated.

4         And before I continue to stutter anymore, I

5  will take my leave.  I thank the Court for its time.

6         THE COURT:  All right.  Counsel, I'll give

7  you the last word.

8         MR. CARROLL:  Your Honor, the defamatory

9  statement doesn't have to be re-self-published by the

10 defendants here.  It was on the front page of the *New

11 York Times* and *The Washington Post*.  The government

12 can't unring the bell here.  Any lawyer will tell an

13 employer to be very careful about what they say about

14 the termination of an employee.  Instead, here, the

15 President of the United States did precisely what is

16 being discussed here, stated that the plaintiffs were

17 involved in illegal and immoral activity.  And it's a

18 very unique set of facts.  I think it makes it an

19 exceptional case and, as I said, not an ordinary

20 employment law case, Your Honor.

21        THE COURT:  All right.  Thank you.

22        The Court is going to take a brief recess,

23 and I'll return shortly with my ruling.

24        The Court will stand in recess.

25     (Recess from 2:17 p.m. until 2:34 p.m.)

1          THE COURT:  The Court has had the opportunity

2    to review the briefing in this case.  It's a

3    disappointment that we're here again, frankly.  I

4    thought after the last hearing the Court's views were

5    fairly clear as far as its hope as far as how things

6    would progress.

7          But in any event, the Court is now presented

8    with the plaintiffs' renewed motion for a preliminary

9    injunction, which I've reviewed together with the

10   supporting and opposition memoranda and the related

11   exhibits, and with the benefit of counsel here today,

12   the Court is prepared to rule.

13         The plaintiffs seek to, first, order

14   Defendants Ratcliffe and Gabbard to state why each

15   plaintiff's termination serves the national interest;

16   secondly, order defendants to review and reconsider

17   plaintiffs' termination decisions on an individualized

18   basis within a reasonable period of time; third, order

19   defendants to consider each plaintiff for reassignment

20   to open positions in the intelligence community in

21   accordance with their qualifications and skills; and

22   fourth, to enjoin defendants from terminating

23   plaintiffs' employment while those appeals and

24   reassignment actions are pending.

25         These procedural rights plaintiffs assert are

13

1    established in federal law, federal regulations, and

2    defendants' internal procedures, such that plaintiffs

3    can vindicate their rights under the Fifth Amendment.

4    Separately, plaintiffs request that this Court exercise

5    its authority to enforce the agency's own regulations

6    as a matter of constitutionally mandated procedural due

7    process under *United States ex rel. Accardi v.*

8    *Shaughnessy*, a 1954 Supreme Court decision.

9           Approximately one month ago, on February 27,

10   2025, this case was before the Court on plaintiffs'

11   first motion for a temporary restraining order to

12   enjoin the termination of their employment.  At that

13   time, the Central Intelligence Agency had communicated

14   to plaintiffs that they would be terminated from their

15   current roles, and the Office of the Director of

16   National Intelligence had expressed its intent to do

17   the same.  However, ODNI had not yet determined the

18   procedures it would adopt to effectuate the

19   terminations.

20          Upon consideration of plaintiffs' motion, the

21   Court did not enjoin the anticipated terminations.

22   Nevertheless, the Court expressed the view that the

23   plaintiffs had a right to appeal any decision to

24   terminate their employment, understanding that the CIA

25   director and director of National Intelligence would be

1   the ones to consider any appeal displacing any concerns

2   that the directors' broad discretion would be usurped

3   in some manner.

4           Additionally, the Court expressed the view

5   that plaintiffs had post-decision rights to be

6   considered for reassignment, with that right limited

7   only by the availability of open positions and each

8   plaintiff's qualifications.

9           The Court also concluded that the CIA and

10  ODNI employees are entitled to the same rights and

11  protections under the National Security Act, so that

12  the Court's analysis of the merits and the Court's

13  determination as to the scope of plaintiffs' rights

14  were applicable to all the parties.  Because plaintiffs

15  had not yet filed internal appeals or represented that

16  they were barred from reassignment, neither issue was

17  ripe for further adjudication at that time.

18          In the intervening month, plaintiffs have

19  sought to invoke their rights to appeal and

20  reassignment.  In that regard, on March 18, 2025, the

21  plaintiffs employed by the CIA received notices

22  offering them the three resignation and termination

23  options previously offered to them on February 18.  The

24  notices requires CIA plaintiffs to choose one of three

25  resignation options by 5:00 p.m. today, March 31, 2025,

1   or be terminated.

2          Both the February 18 and March 18 notices

3   omit any reference to plaintiffs' appeal rights.

4   Nevertheless, consistent with the Court's comments at

5   the February 27 hearing, certain CIA plaintiffs

6   requested appeals and to be considered for reassignment

7   within the agency.

8          The CIA e-mailed plaintiffs' counsel on

9   March 17 to assert that in the agency's view the

10  governing regulation does not offer a process to appeal

11  the termination decision within the agency or otherwise

12  seek reassignment within the agency.

13         As for the plaintiffs employed by the ODNI,

14  they first received a termination notice on March 7,

15  2025, that contained the three resignation and

16  termination options previously offered to the CIA

17  plaintiffs in mid-February.  The ODNI notice, however,

18  unlike the CIA notice, expressly recognized plaintiffs'

19  right to an appeal.

20         Accordingly, the ODNI plaintiffs appealed and

21  requested consideration for reassignment on March 18,

22  and defendants acknowledge receipt of the same on

23  March 20.  As of March 27, plaintiffs had not received

24  an appeals decision or an indication that they would be

25  considered for reassignment.  With this change of

16

circumstances since the last hearing, the Court has
considered plaintiffs' renewed motion for a preliminary
injunction.

As the Court had previously stated, in order
to obtain a preliminary injunction, a plaintiff must
show a likelihood of success on the merits; irreparable
harm in absence of injunctive relief; that the balance
of equities tip in plaintiff's favor; and that the
issuance of a preliminary injunction is in the public
interest.

As a threshold matter, plaintiffs seek to
vindicate their rights under two routes, relying on the
Fifth Amendment due process clause and the principle in
*Accardi* that agencies must follow their own procedures
and policies.

Specifically, the Court must consider based
on the plaintiffs' current position the likelihood of
success on three issues:  First, whether the plaintiffs
have a right to receive individualized reasons for
termination that must be related to national security;
second, whether plaintiffs have a right to be
considered for reassignment and the scope of that
right; and third, whether plaintiffs have the right to
appeal their terminations for reconsideration by their
respective directors.

1           With respect to the likelihood of success on

2    the first issue, plaintiffs argue that the Court should

3    obligate Defendants Ratcliffe and Gabbard to state why

4    each individual termination serves the national

5    interest based on their understanding that such a

6    finding is prerequisite for termination.

7           The Court finds that argument fails for two

8    reasons:

9           First, *Webster v. Doe* considered this

10   question and found in allowing termination whenever the

11   director shall deem it necessary or advisable and not

12   simply when the dismissal is necessary or advisable.

13   Section 102(c) fairly exudes deference to the director

14   and forecloses the application of any meaningful

15   judicial standard of review for assessing a termination

16   decision short of permitting cross-examination.

17          Second, CIA Regulation 4-16 states

18   unequivocally that the CIA director need not provide to

19   anyone the reasons for exercising his authority, and a

20   national security basis for the exercise of this

21   authority is not required.

22          The language of that statute, however, is

23   somewhat irrelevant at this point since, in any event,

24   even though the directors need not provide their

25   reasoning for terminating plaintiffs and those reasons

1   do not have to relate to national security, the CIA

2   director has, in fact, stated his reason for the

3   decision to terminate, and the only reason for his

4   decision to terminate these plaintiffs was the

5   elimination of the positions that they were assigned to

6   within the DEI office in implementation of Executive

7   Order 14151 and the January 24, 2025, OPM memorandum.

8   The director of National Intelligence has not offered

9   any other reason for presenting the ODNI plaintiffs

10  with the same three termination options.

11          So the issue before the Court then is whether

12  this expressed reason for the decision to terminate

13  triggers other post-decision rights that are spelled

14  out in the agency's regulations and other federal

15  statutes and regulations that address specifically the

16  rights of employees who are affected by a

17  reduction-in-force termination.

18          The executive order at issue was entitled

19  "Ending Radical and Wasteful Government DEI Programs

20  and Preferencing," and the OPM memorandum was entitled

21  "Guidance Regarding RIFs of DEIA Offices."  The CIA

22  director described those directives as requiring

23  federal agencies to execute a reduction-in-force action

24  with respect to employees who had most recently worked

25  in their respective DEIA offices.  Those reasons

19

 1   clearly establish that the decision to terminate

 2   plaintiffs was made to eliminate excess employees

 3   pursuant to a reduction-in-force action.

 4          This reason plainly falls within

 5   Section II(C)(4) of the CIA Regulation 4-16 that

 6   defines the rights of such employees, as well as

 7   federal statute 5 U.S.C., Section 3502(a) and related

 8   Regulation 5 C.F.R., Section 351.402 entitling these

 9   employees to consideration for reassignment.  In short,

10   these regulations need to be read and harmonized as a

11   whole.

12          The CIA Regulation 4-16 addresses specific

13   circumstances under which an employee may be terminated

14   and sets out specific rights with respect to a

15   termination under those circumstances.  As a catchall,

16   CIA Regulation 4-16 includes the relied-upon

17   Section II(B)(11), conferring the CIA director with

18   broad discretion as to how such employment terminations

19   may be affected.  As that section states, it is,

20   however, specifically in addition to the regulations

21   pertaining to specific circumstances of termination,

22   one of which is the excess employee situation.  It is

23   not in derogation of or rather than or a nullification

24   or elimination of the other regulations specifically

25   addressing the specific circumstances involved in a

1  decision to terminate an employee.  And the director's

2  stated reason for his decision to terminate plaintiffs

3  placed them squarely within the specific regulation

4  pertaining to employees who become excess employees

5  because of a reduction-in-force action.

6          By its nature, Section II(D), as reflected in

7  the prior circumstances under which it has been invoked

8  by the agency and interpreted by the courts was not

9  intended to address the specific situations addressed

10 in the other parts of the regulations specifically

11 pertaining to the reasons for termination and was

12 clearly never intended to address a mass firing in

13 furtherance of a reduction in force.

14         To interpret Section II(D) as effectively

15 eliminating the operation of the other parts of that

16 regulation specifically violates the principle that

17 laws and regulations are to be read as a whole so that

18 no part becomes superfluous, void, or insignificant.

19         To put a finer point on this, plaintiffs'

20 right to compete for reassignment after the decision

21 has been made to terminate their current position is

22 rooted in at least three sources previously mentioned:

23 Title 5 of the United States Code, Section 3502(a)

24 describing rights and processes for retention of

25 employees in a RIF action; 5 C.F.R., Section 351.402

1  defining competitive areas for employees in a RIF

2  action; and CIA Regulation 4-16 describing the rights

3  and processes for CIA employee terminations.

4        This latter provision provides that

5  plaintiffs may be considered for placement within their

6  career service and agency-wide at the same or different

7  grade for employees with certain qualifications,

8  skills, experience, and training so long as there are

9  available positions.

10       In support of the decision to deny affected

11 plaintiffs their right to reassignment consideration,

12 the CIA director represented in his declaration to the

13 Court that the OPM memorandum required that the

14 competitive area for such a RIF be defined solely in

15 terms of the DEIA office where the employees had

16 worked.

17       As this Court stated at the February 27,

18 2025, hearing, it's difficult to square the director's

19 assertion of his uncabined discretion with the

20 director's assertion that he's bound by the OPM acting

21 director's definition of a competitive area for

22 reassignment purposes.  But in any event, the federal

23 statutes and regulations at issue unequivocally empower

24 the respective agencies, not OPM, to define the

25 competitive area.

1         As mentioned above, 5 C.F.R. 351.402
2  provides, quote, Each agency shall establish
3  competitive areas in which employees compete for
4  retention under this part.
5         Here, the CIA's own regulations have already
6  established the applicable competitive area applicable
7  to an employee's reassignment, namely, placement within
8  their career service and agency-wide at the same or
9  different grade for employees with certain
10 qualifications, skills, experience, and training so
11 long as there are available positions.
12        In fact, CIA Regulation 4-16 provides that an
13 employee may seek elsewhere in the agency at the same
14 or different grade, and in that case, the agency,
15 quote, will broker an agency-wide placement effort.
16        Here, the evidence before the Court is that
17 some of these plaintiffs have already been deemed
18 qualified for reassignment to available and open
19 positions and have received offers for them.
20        Without question, the plaintiffs in this case
21 possess significant national security experience, a
22 vast majority of whom have already been working in the
23 intelligence community for between 10 to 15 years, if
24 not longer.  Some are nearly pension eligible, and as
25 of the filing of the declarations, multiple plaintiffs

have received or would have received a job offer for a
non-DEIA role if they were not placed on administrative
leave.

      Critically, some plaintiffs have already
interviewed for, accepted, and been in the process of
transitioning to new roles when the reassignments were
withdrawn.

      With respect to likelihood of success on the
appeal, as for plaintiffs' right to appeal the
director's decision to terminate, the Court already
expressed its conclusion that such a right exists under
a plain reading of the regulations which state that the
right of appeal exists in every case of termination
except in two instances not applicable here.  The Court
recognizes that, unlike the CIA notice, the ODNI notice
issued on March 10 provided a procedure for appealing
plaintiffs' terminations, and two plaintiffs have
pursued that appeal but have not yet received a
response.

      The defendants contend that any violation of
these appeal rights cannot be vindicated under the
Fifth Amendment -- a violation of any of these rights,
both the appeal rights and the rights of reassignment,
cannot be vindicated under the Fifth Amendment as a
violation of due process because plaintiffs' lack of

1  property interest in continued employment, nor can such

2  rights be addressed under the *Accardi* doctrine, which

3  defendants contend has been relegated to an

4  administrative principle, not a constitutional mandate.

5           With respect to the *Accardi* doctrine, the

6  Fourth Circuit has not yet expressly addressed whether,

7  absent an APA claim, the *Accardi* doctrine is applicable

8  to vindicate constitutional and due process rights.  A

9  brief review of the case law demonstrates that there is

10 a circuit split on the question of whether the *Accardi*

11 doctrine has a constitutional dimension.  The Second,

12 Fifth, Tenth, and Eleventh Circuits have characterized

13 the *Accardi* doctrine as supporting a constitutional due

14 process claim.

15          Indeed, the Fifth Circuit reaffirmed just

16 this last month that an agency's violation of its

17 regulations may support a procedural due process claim.

18          The D.C. Circuit in *Battle v. F.A.A.*, which

19 is a 2005 decision, considered an *Accardi* claim based

20 on the merits where there was no corresponding APA

21 claim.

22          Nor has the Supreme Court squarely addressed

23 that issue.

24          And for their position, defendants rely

25 heavily on a footnote in a 1978 Supreme Court case,

1  *Board of Curators v. Horowitz*.  That is simply little

2  more than *dicta*.

3          After reviewing the relevant jurisprudence,

4  the Court concludes that under the circumstances of

5  this case, given the specific regulations at issue, CIA

6  Regulation 4-16 may be enforced as a matter of

7  constitutionally protected procedural due process.

8          With respect to the element of irreparable

9  harm in the absence of injunctive relief, as for the

10 risk of irreparable harm, it's well established that

11 the deprivation of constitutional rights unquestionably

12 constitutes irreparable injury, with the constitutional

13 rights at issue here being procedural due process

14 rights.

15         Plaintiffs have now also credibly raised the

16 prospect of irreparable harm based on reputational

17 injury given the language of Executive Order 14151,

18 pursuant to which the decision was made to terminate

19 their employment, the characterization of the DEI

20 office in that order, and the effect that

21 characterization would have on the people who held

22 those positions, as well as the experiences now placed

23 in the record of certain employees in their job

24 searches and the general reduction in federal

25 employment opportunities.

26

1          Moreover, the deprivation of plaintiffs'
2    appeal and reassignment rights once deprived will be
3    difficult to restore or address through non-injunctive
4    remedies given the inherent delays and lost
5    opportunities the deprivation of those rights may
6    cause.  Based on the record before the Court, the Court
7    finds that in the absence of injunctive relief, the
8    plaintiffs will likely suffer irreparable harm.

9          With respect to the balance of equities, the
10   Court also finds that the balance of equities weigh in
11   favor of the plaintiffs and injunctive relief.  Here,
12   the plaintiffs face termination without any suggestion
13   of wrongdoing or poor performance and represent a depth
14   of experience that benefits the agencies in which they
15   worked for years.  As plaintiffs repeatedly emphasize,
16   most of them were only temporarily assigned to DEI
17   roles and would have been transitioned out of those
18   roles after their temporary duty assignment ended.  At
19   bottom, plaintiffs are being penalized for being in the
20   temporary place at the wrong time when E.O. 14151 was
21   issued.

22         Simply requiring the government to follow its
23   own regulations is a minimal burden compared to both
24   the economic and reputational harm that would plague
25   plaintiffs if the procedures at issue are not followed.

1          Likewise, injunctive relief is in the public
2   interest given the wealth of talent and experience
3   these plaintiffs represent and offer in furtherance of
4   the agency's mission to protect the country from
5   foreign and domestic threats.  As the Supreme Court has
6   repeatedly stated, there are few interests that can be
7   more compelling than the nation's need to ensure its
8   own security.

9          As evidenced by the prospects for
10  reassignment already extended to some of these
11  plaintiffs, there appears multiple open and available
12  positions that need filling.  And although it was
13  unclear how many of these positions could be filled by
14  these plaintiffs, the public would certainly benefit
15  from an internal reassignment over hiring new personnel
16  who require significant onboarding and training to fill
17  vital national security roles.

18         So for all of those reasons, it will be the
19  order of this Court that the plaintiffs' renewed motion
20  for a preliminary injunction is granted in part as set
21  forth herein and is otherwise denied.

22         And it is further ordered that the defendants
23  and any of defendants' officers, agents, servants,
24  employees, and attorneys, as well as other persons who
25  are acting in concert with them, be, and the same are

1    hereby enjoined from effectuating or implementing any
2    decision to terminate these plaintiffs without further
3    Court authorization.
4              To the extent that any such decisions to
5    terminate any plaintiff is submitted to the Court for
6    approval, the Court will assess the extent to which any
7    such plaintiff has received the appeal and
8    consideration for reassignment that he or she was
9    entitled to receive as set forth herein, and plaintiffs
10   shall continue to remain on administrative leave with
11   pay and benefits pending further court order.
12             It is further ordered that the defendants
13   provide plaintiffs a requested appeal from any decision
14   to terminate him or her consistent with the steps set
15   forth in CIA Regulation 4-16, including to permit
16   plaintiffs to submit written comments explaining why
17   they should not be terminated, to provide plaintiffs
18   with a written notification of the director's decision
19   and to provide reasonable notice of the status of any
20   pending appeal.
21             It is further ordered that the defendants
22   consider any plaintiff's request for reassignment for
23   open or available positions in accordance with their
24   qualifications and skills, without regard to the
25   definition of a competitive area in the January 24,

29

1    2025, OPM memorandum and consistent with CIA Regulation

2    4-16, Section II(C)(4), including an agency-wide review

3    of available positions that plaintiffs may be qualified

4    for, notwithstanding any election that a plaintiff may

5    have made in response to the requirement that each

6    plaintiff select whether to retire, resign, or be

7    terminated.

8              It is further ordered pursuant to Federal

9    Rule of Civil Procedure 65 that no bond is required

10   under the circumstances of this case.

11             That will be the ruling of the Court.  The

12   Court will issue a written order as well.

13             Anything further?

14             MR. CARROLL:  No, Your Honor.

15             MR. BARGHAAN:  No, Your Honor.

16             THE COURT:  All right.  Counsel is excused.

17             The Court will stand in recess.

18        ------------------------------------
                    Time:  2:56 p.m.
19

20

21
        I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                                    _____
25                                         /s/
                                    Rhonda F. Montgomery, CCR, RPR


     Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

JA265

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Case No. 1:25cv300 (AJT/LRV) |
| | ) |
| UNITED STATES OFFICE OF THE | ) |
| DIRECTOR OF NATIONAL | ) |
| INTELLIGENCE, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' NOTICE OF APPEAL**

Pursuant to Federal Rule of Appellate Procedure 3, and 28 U.S.C. § 1292(a)(1), defendants

hereby appeal to the United States Court of Appeals for the Fourth Circuit from the Preliminary

Injunction entered in this action on March 31, 2025 (Dkt. No. 39).

Dated: May 6, 2025                Respectfully submitted,

                                ERIK S. SIEBERT
                                UNITED STATES ATTORNEY

                                _____/s/_____
                                DENNIS C. BARGHAAN, JR.
                                Chief, Civil Division
                                REBECCA S. LEVENSON
                                Assistant United States Attorneys
                                Office of the United States Attorney
                                Justin W. Williams U.S. Attorney's Building
                                2100 Jamieson Avenue
                                Alexandria, Virginia 22314
                                Tel:     (703) 299-3891/3760
                                Fax:     (703) 299-3983
                                Email: dennis.barghaan@usdoj.gov
                                Rebecca.s.levenson@usdoj.gov
                                *Attorneys for Defendants*