No. 25-1527
IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN DOE 4; JOHN DOE 5;
JOHN DOE 6; JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4;
JANE DOE 5;

*Plaintiffs-Appellees,*

---v.---

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; CENTRAL
INTELLIGENCE AGENCY; JOHN RATCLIFFE, in his official capacity as
Director of the Central Intelligence Agency; and TULSI GABBARD, in her
official capacity as Director of National Intelligence,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**CORRECTED BRIEF OF PLAINTIFFS-APPELLEES**

Kevin T. Carroll, VSB No. 95292
Kia Rahnama, VSB No. 93718
Fluet
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
krahnama@fluet.law
e-file@fluet.law
*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT OF THE CASE ............................................................................ 1

   I.   Statutory and regulatory background ..................................................... 1

   II.  Factual background .............................................................................. 5

SUMMARY OF THE ARGUMENT ................................................................. 12

ARGUMENT .................................................................................................... 16

   I.   *WEBSTER V. DOE* ALLOWS JUDICIAL REVIEW OF OFFICERS' CHALLENGES TO MASS TERMINATIONS. ................................... 16

     A.  *Webster* Did Not Sanction the Directors' Authority to Terminate Officers en Masse. ........................................................ 17

     B.  *Webster* and the National Security Act do not Preclude Judicial Review of Officers' Claims to Regulatory Rights. ........................... 18

     C.  *Webster* does not Preclude Judicial Review of Officers' Constitutional Claims ...................................................................................... 22

   II.  AGENCY REGULATION 4-16 AFFIRMS OFFICERS' DUE PROCESS RIGHTS TO POST-TERMINATION REMEDIES. ............................ 27

     A.  AR 4-16 Acknowledges Post-Termination Remedies ..................... 27

     B.  AR 4-16's Waiver Provisions Cannot Suspend an Independently Existing Constitutional Due Process Right to Post-Termination Remedies. ................. 30

   III.  THE DISTRICT COURT CORRECTLY DETERMINED THAT OFFICERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR *ACCARDI* CLAIM. ...................................................................................... 32

     A.  Under *Accardi*, Defendant Agencies are Constitutionally Required to Follow Their Own Procedures Governing Post-Termination Rights ................ 32

   IV.  THE EQUITABLE BURDEN OF REQUIRING ODNI AND CIA TO FOLLOW THEIR OWN REGULATIONS IS MINIMAL, COMPARED TO HARMS FACED BY OFFICERS TERMINATED DUE TO TEMPORARY DEIA ASSIGNMENTS. ......................................................................... 37

     A.  The Mass Termination Represents "Genuinely Extraordinary Situation" Favoring Injunction under *Sampson v. Murray*. ............................. 37

     B.  All Plaintiffs Face Irreparable Harm Absent Injunction. .................. 39

V. THE INJUNCTION IS NARROWLY TAILORED TO PROTECT
OFFICERS' CONSTITUTIONAL RIGHTS. ...................................................44

   A. The Injunction Does Not Interfere with the Director's Exercise of
   Discretion to Protect Classified or Sensitive Information. ...............................44

   B. The Injunction Serves the Public Interest. ...................................................49

CONCLUSION ........................................................................................................52

CERTIFICATE OF COMPLIANCE ......................................................................53

CERTIFICATE OF SERVICE ...............................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
 2025 WL 752378 (D.D.C. Mar. 10, 2025)......................................................41

*Ayala Chapa v. Bondi*,
 132 F.4th 796 (Mar. 24, 2025, 5th Cir.) ........................................................34

*Battle v. F.A.A.*,
 393 F.3d 1330 (D.C. Cir. 2005) ....................................................................34

*Board of Comm'rs, Wabaunsee Cty. v. Umbehr*,
 518 U.S. 668 (1996)........................................................................................31

*Board of Curators of the Univ. of Mo. v. Horowitz*,
 435 U.S. 78 (1978)................................................................................. 32, 33

*Board of Regents v. Roth*,
 408 U.S. 564 (1972)........................................................................................25

*Boechler P.C. v. Comm. Of Internal Rev.*,
 596 U.S. 199 (2022)........................................................................................21

*Crosby-Bey v. District of Columbia*,
 786 F.2d 1182 (D.C. Cir. 1986) ....................................................................32

*Demore v. Kim*,
 538 U.S. 510 (2003)........................................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
 591 U.S. 1 (2020)............................................................................................40

*Doe v. Gates*,
 981 F.2d 1316 (D.C. Cir. 1993) ....................................................................17

*Does 1-26 v. Musk*,
 2025 WL 840574 (D. MD. Mar. 18, 2025 ....................................................48

*Elhady v. Kable*,
   993 F.3d 208 (4th Cir. 2021)..........................................................39

*Jenner & Block LLP v. U.S. Dep't of Just.*,
   2025 WL 1482021 (D.D.C. May 23, 2025)...................................48

*Leslie v. Att'y Gen.*,
   611 F.3d 171 (3d Cir. 2010)..........................................................34

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)......................................................................20

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)......................................................................26

*Montilla v. I.N.S.*,
   926 F.2d 162 (2d Cir. 1991)..........................................................34

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)......................................................................25

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*,
   918 F.3d 353 (4th Cir. 2019)........................................................16

*Nelson v. I.N.S.*,
   232 F.3d 258 (1st Cir. 2000)........................................................34

*Paul v. Davis*,
   424 U.S. 693 (1976)......................................................................39

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   2025 WL 1276857 (D.D.C. May 2, 2025).....................................48

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010)......................................................................21

*Roe v. Department of Defense*,
   947 F.3d 207 (4th Cir. 2020)............................................... passim

*Sampson v. Murray*,
　415 U.S. 61 (1974)..................................................................................4, 37

*Smith v. Ashcroft*,
　295 F.3d 425 (4th Cir. 2002).......................................................................22

*United States ex rel. Accardi v. Shaughnessy*,
　347 U.S. 260 (1954)............................................................................. passim

*United States v. Caceres*,
　440 U.S. 741 (1979)......................................................................................34

*United States v. Heffner*,
　420 F.2d 809 (4th Cir. 1969)................................................................. 35, 39

*Webster v. Doe*,
　486 U.S. 592 (1988)............................................................................. passim

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
　2025 WL 1502329 (D.D.C. May 27, 2025)..................................................48

*Woodlands Pride, Inc.  v. Paxton*,
　694 F. Supp. 3d 820 (S.D. Tex. 2023) ........................................................40

**Statutes and Regulations**
5 C.F.R. § 351.402 ...................................................................................9, 13
5 C.F.R. § 752.404 .......................................................................................45
5 U.S.C. § 701............................................................................................2, 19
5 U.S.C. § 3502 ..........................................................................................9, 13
50 U.S.C. § 835.............................................................................................35
50 U.S.C. § 3024 .................................................................................... 1, 7, 12
50 U.S.C. § 3036 .............................................................................. 1, 7, 12, 23

**Other Authorities**
Exec. Order No. 14151
　90 FR 8339 (2025)............................................................................. 5, 6, 13

Howard M. Wasserman, *The Demise of "Drive-by Jurisdictional Rulings"*
　105 Nw. U. L. Rev. 947 (2011)...................................................................20

# STATEMENT OF THE CASE

## I.      Statutory and regulatory background

At issue in this case is the lawful scope under the Due Process Clause of the unique power afforded to Defendants the Director of National Intelligence ("DNI") Tulsi Gabbard, and Director of the Central Intelligence Agency ("CIA") John Ratcliffe, to terminate an intelligence officer whenever a Director deems this "necessary or advisable in the interests of the United States," 50 U.S.C. §§ 3024(m)(1) and 3036(e)(1)—even when Defendants clearly state that their exercise of that authority has nothing to do with national security, and that authority is applied to fifty-nine officers only because they executed congressionally-mandated programs helping to implement the civil rights laws of the United States. Plaintiffs[1] maintain that the District Court did not abuse its discretion or make a clear error when it enjoined Defendants from doing so.

Defendants claim that the scope of the Directors' discretion overcomes the terms of CIA's own Agency Regulation 4-16, which provides officers subject to reductions in force ("RIFs") with post-termination rights of appeal and to reconsideration for open jobs for which they are qualified.  Defendants claim on this basis that the Directors may rely upon Sections 3024 and 3036 to fire nearly

---

[1] Plaintiffs intend to file a motion to amend the case caption to have it conform with the Amended Complaint, which identifies the 19 Plaintiffs in this appeal. JA095.

sixty officers pursuant to an Executive Order that disparaged the employees and an Office of Personnel Management ("OPM") memorandum instructing the Office of the Director of National Intelligence ("ODNI") and CIA to conduct RIFs. Defendants further claim that the Directors' unprecedented exercise of this authority is effectively not subject to judicial review.

In *Webster v. Doe* the Supreme Court held that a CIA director's decision to terminate an *individual* Agency officer pursuant to the director's authority under the National Security Act ("NSA"), is not judicially reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, in a case in which that termination was for counterintelligence reasons. *See* 486 U.S. 592, 599 (1988).

The *Webster* Court also stated that "Congress meant to commit *individual employee discharges* to the Director's discretion." *Id.* at 603 (emphasis supplied). The Supreme Court cautioned that the CIA Director's statutory authority to terminate an Agency officer whenever the Director deems that officer's termination "necessary or advisable in the interests of the United States" should not be "be read to exclude review of constitutional claims" by the judiciary, and further noted that Civil Rights Act claims attacking CIA personnel policies "are routinely entertained in federal court." *Id.* at 593, 603.

While *Webster* can be read to allow a CIA director to terminate an individual officer with no pre-termination procedures, nothing in that decision addresses the officers' post-termination procedural rights to be considered for reassignment, or to appeal their termination. *See* Agency Regulation 4-16 §§ I and II(D). Here however, Defendants claim that their use of the Directors' authority to terminate fifty-nine officers because of their participation in congressionally mandated programs to implement civil rights laws, is not reviewable under the Due Process Clause of the Fifth Amendment. Defendants assert that judicial review is not available even when the District Court found that ODNI and CIA failed to follow a statute and regulations regarding RIFs in terminating these officers, and when the CIA Director specifically relied upon an OPM memorandum ordering RIFs to justify Plaintiffs' firings.

Also at issue in this case is whether the Due Process Clause requires an agency to follow its own regulations in accordance with *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In *Accardi*, the Supreme Court found a due process violation when the Board of Immigration Appeals, instead of reaching an independent decision based on a fair hearing as regulations required, improperly acted on a statement by the U.S. Attorney General that an alien was on a "confidential list of 'unsavory characters' whom he wanted deported" rather than the Board reaching an independent decision, at its own discretion, subsequent to a

fair hearing for the alien. *Id.* at 267. In this case, Defendants assert that the District Court may not enforce Plaintiffs' Agency Regulation 4-16's appeal and reconsideration rights as matters of constitutionally protected procedural due process.

Finally at issue in this case is the legal impact under the Due Process Clause of the President's stigmatizing public statements that the diversity programs in which these officers recently engaged represented illegal, immoral and un-American activities—a copy of which defamatory statement was emailed to the entire CIA workforce.

In *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), this Court affirmed an injunction against the U.S. Air Force discharging two airmen on the basis of their contracting human immunodeficiency virus ("HIV"). Among several reasons this Court upheld the injunction in *Roe* was that the Supreme Court recognizes that "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 229 (citing *Sampson v. Murray*, 415 U.S. 61, 92 (1974)).

The *Roe* court reasoned that the airmen, if discharged on the basis of being HIV-positive, which bore no relation to the ability to perform their military duties, would face an unfair stigma when seeking new employment. This stigma could

amount to irreparable harm not amenable to post-discharge remedies. *See id*. In this case, Defendants deny that Plaintiffs' termination pursuant to an executive order and presidential statement that they engaged in illegal, immoral and un-American activities, will similarly face unfair stigma when seeking new employment.

## II.     Factual background

On January 20, 2025 President Trump issued Executive Order 14151, *Ending Radical and Wasteful Government DEO Programs and Preferencing* ("the Executive Order"), which ended federal diversity, equity, inclusion and accessibility ("DEIA") activities and directed agency heads to terminate related offices and positions. The Executive Order further termed DEIA programs "illegal and immoral discrimination" causing "immense public waste and shameful discrimination." The Executive Order did *not* direct agency heads to terminate any personnel serving in positions those offices. It did, however direct that the order "shall be implemented consistent with applicable law . . . ." *Id.* at ¶ (4)(b).

On January 21, 2025 the President issued a statement supplemental to the Executive Order entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, which termed DEIA programs to be "dangerous," "demeaning," "discrimination," "egregious," "illegal," "immoral," and "tragic."

The president's statement alleged that DEIA programs:

". . . undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system.

Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex."

The presidential statement further asserted that DEIA programs "threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination." *Id*.

On January 23, 2025 the United States Senate confirmed Defendant Ratcliffe as Director of the CIA.

On January 24, 2025 an OPM memorandum implementing the Executive Order directed agency heads to conduct RIFs of personnel temporarily assigned to the closed DEIA offices. The OPM memorandum restricted these employees to applying for positions only in the DEIA offices that the Executive Order just closed—a classic Catch-22.[2]

On February 12, 2025 the U.S. Senate confirmed Defendant Gabbard as DNI.

---

[2] *See* Heller, J., *Catch-22, a Novel,* New York, The Modern Library (1961).

Over the Presidents Day weekend of February 15-17, 2025 Plaintiffs received orders from Defendants ODNI and CIA to report to their agencies' visitors centers on February 18 with their Intelligence Community identification badges. Plaintiffs knew from past observation of other officers that this was a sure precursor to their own termination.

On February 17, 2025 Plaintiffs sought a temporary restraining order prohibiting the Defendants from terminating them.

On February 18, 2025 Defendant Ratcliffe invoked his discretionary authority under 50 U.S.C. § 3036(e)(1) to terminate every officer (fifty-one in all) recently assigned to CIA's Diversity and Inclusion Office, as well as other officers who performed collateral personnel duties just tangentially related to DEIA. Defendant Ratcliffe deemed these officers' terminations "necessary or advisable in the interests of the United States." Defendant Ratcliffe specifically cited the Executive Order and OPM memorandum as the bases of his decision. Defendant Gabbard similarly notified eight of her own officers of their pending termination. ODNI and CIA offered Plaintiffs several administrative options to effectuate their terminations, either immediately or within months.

Never before had a DNI or CIA Director relied upon Sections 3024 or 3036 to terminate more than one officer at a time, much less fifty-nine officers. Also on

February 18, 2025 the District Court entered an administrative stay preventing Plaintiffs' termination while briefing and argument commenced. JA160.

On February 27, 2025 the District Court denied Plaintiffs' request for injunctive relief and lifted the administrative stay. JA196. However that court also expressed the view that Plaintiffs possessed post-termination rights to appeal to their directors the decisions to terminate their employment, and to be considered for reassignment to open positions for which they qualified. JA195.

Plaintiffs sought in writing to exercise those exact rights, but on March 17, 2025 CIA formally rejected the Agency Plaintiffs' requests (and the District Court's suggestion). JA251. On March 18, CIA ordered those officers to choose a termination option by March 31.[3] JA250. On March 27, Plaintiffs renewed their request for injunctive relief.

On March 31, 2025 the District Court enjoined Defendants from terminating any Plaintiff without that court's authorization, and only after Defendants extended to Plaintiffs their post-termination remedies, including considering Plaintiffs' written appeals of their termination and their request for consideration for reassignment to available positions for which they qualified, pursuant to AR 4-16. JA263–264.

---

[3] On March 20, 2025 ODNI acknowledged its officers' request to appeal their terminations and to be considered for reassignment, but the Plaintiffs from ODNI received no substantive response to their appeals from their employer.

Based on Defendant Ratcliffe's declaration, the Court found no dispute that that Ratcliffe terminated the CIA Plaintiffs only because of the Executive Order, the OPM memorandum entitled *Guidance Regarding RIFs of DEIA Offices* and Plaintiffs' assignments to the Agency's diversity office or related additional duties. JA257. The District Court found that Defendant Ratcliffe's reliance on the OPM memorandum terming these terminations a RIF triggered Plaintiffs' applicable post-termination rights in AR 4-16, as well as 5 U.S.C. § 3502(a) and 5 C.F.R. § 351.402, laws which should be "read and harmonized as a whole." JA255.

Section 3502 provides that OPM "shall prescribe regulations for the release of competing employees in a reduction in force." Section 351.402 requires agencies to "establish competitive areas in which employees compete for retention" during RIFs. The District Court observed that in contrast, AR 4-16 § II(D), the CIA regulation cited by Defendant Ratcliffe, which is based upon his statutory authority upheld in *Webster* to terminate an individual officer, "was clearly never intended to address a mass firing in furtherance of a reduction in force."

The District Court reasoned that as an agency director, under Section 351.402 only Defendant Ratcliffe—not OPM—possessed the authority to define the "competitive area" within which Plaintiffs might apply for other positions. For CIA officers, Section II(C)(4) provides that this competitive area is first the

9

officer's career service, and then the entire CIA as part of an "Agency-wide placement effort."

The District Court observed that many Plaintiffs already received other offers of employment elsewhere within CIA. JA259. That court noted that Plaintiffs "possess significant national security experience, a vast majority of whom have already been working in the Intelligence Community for between ten to fifteen years, if not longer. Some are nearly pension-eligible." JA258–259.

Finding that AR 4-16's text prescribed certain post-termination rights such as right to appeal and reassignment that would apply to Plaintiffs, the District Court then adopted Plaintiffs' position that those rights can be enforced against the Agencies under the Supreme Court's decision in *Accardi*. JA259–261.

The District Court noted that the Courts of Appeal for the D.C. Circuit and the Second, Fifth, Tenth and Eleventh Circuits have found that *Accardi* may be relied upon to uphold due process rights. JA259–261. The District Court concluded that in Plaintiffs' case, AR 4-16 "may be enforced as a matter of constitutionally protected procedural due process." JA259–261.

The District Court held that given its analysis of the Executive Order, the OPM memorandum and CIA regulations, Plaintiffs are likely to succeed on the merits of their claim; and that while any deprivation of constitutional rights is irreparable harm, Plaintiffs "credibly raised" the prospect of additional irreparable

harm based on reputational injury, given the Executive Order's language, and related difficulties Plaintiffs may find in obtaining employment. JA261.

The District Court further found that the balance of equities weighed in Plaintiff's favor as:

> "Plaintiffs face termination without any suggestion of wrongdoing or poor performance, and represent a depth of experience that benefits the agencies in which they worked for years … most of them were only temporarily assigned to DEI roles and would have been transitioned out of those roles after their temporary duty assignment ended. At bottom, Plaintiffs are being penalized for being in the temporary place at the wrong time when E.O. 14151 was issued.
>
> Simply requiring the Government to follow its own regulations is a minimal burden compared to both the economic and reputational harm that would plague Plaintiffs if the procedures at issue are not followed."

JA261–262.

Finally, the District Court concluded that in Plaintiff's case:

> "[I]njunctive relief is in the public interest given the wealth of talent and experience these plaintiffs represent and offer in furtherance of the Agency's mission to protect the country from foreign and domestic threats … the public would certainly benefit from an internal reassignment over hiring new personnel who require significant onboarding and training to fill vital national security roles."

JA263.

# SUMMARY OF THE ARGUMENT

The District Court is right to reject Defendants' arguments that the National Security Act enables Defendants DNI Gabbard and CIA Director Ratcliffe to fire fifty-nine officers, absent any misconduct but pursuant to a stigmatizing presidential statement, and an OPM memorandum instructing agency heads to conduct RIFs—yet in contravention of rules regarding RIFs—and avoid judicial review of Defendants' due process violations.

No DNI or CIA Director ever relied upon 50 U.S.C. §§ 3024(m)(1) or 3036 to conduct a mass firing for any reason. Never did any Director rely upon these statutes to terminate officers because of their temporary assignments to congressionally-mandated duties implementing our nation's civil rights laws, latterly termed diversity, equity, inclusion and accessibility or "DEIA" activities. *Webster v. Doe*, the case upholding a CIA Director's unreviewable statutory authority to fire an individual officer believed to be a security risk, just as clearly also states that the National Security Act does <u>not</u> prevent judicial review of constitutional violations.

This Court of Appeals should join the D.C., Second, Fifth, Tenth and Eleventh Circuits in finding that *Accardi v. Shaughnessy* requires federal agencies to follow their own regulations as a matter of procedural due process. Under

*Accardi*, an agency head may not terminate career officers en masse, and contrary to law and regulation, simply because a president or appointee tells them to do so.

Once OPM ordered Defendants Gabbard and Ratcliffe to conduct a RIF, these Directors and their agencies are required to follow post-termination RIF procedures specifically set forth in CIA's *Procedure for Termination of Excess Personnel*, and more generally in 5 C.F.R. § 351.402 and 5 U.S.C. § 3502. These rules reasonably provide intelligence officers the right, during a RIF, to appeal their individual termination to their director, and to apply for other jobs in their agencies for which they are qualified.

Defendants failed to do so, despite Defendant Ratcliffe admitting that he terminated Plaintiffs on the basis of the OPM memorandum entitled *Guidance Regarding RIFs of DEIA Offices.* In so doing, Defendants violated Plaintiffs' procedural due process rights under the Fifth Amendment to the Constitution.

Plaintiffs suffered a further actionable due process violation when the President of the United States made stigmatizing statements about the reason their offices are now closed. In both Executive Order 14151 and a follow-up statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, President Trump described the DEIA programs Plaintiffs are associated with as, *inter alia*, illegal, immoral and un-American.

This Court of Appeals, and the Supreme Court, hold that the circumstances surrounding an employee's termination, and those circumstances' effect on an employee, may "so far depart from the normal situation" that they amount to an irreparable injury not amenable to post-termination relief. *Roe v. Department of Defense*, 947 F.3d at 229. Having the President publicly describe an officer's work as illegal and worse, and then firing the officer on that basis, is no normal situation.

If terminated under these circumstances, Plaintiffs will face an unfair stigma when searching for employment elsewhere in the federal government, in the national security sector, or indeed anywhere in this country, given the President's repeated (and illegal) attempts to punish private businesses that choose to employ those whom he considers to be his political enemies. Terminating Plaintiffs under these extremely unusual conditions threatens their Due Process Clause liberty interest in pursuing their professions going forward.

The District Court's injunction is narrowly-tailored. It enjoined Defendants from terminating any Plaintiff without that court's authorization, only after Defendants considered each Plaintiff's appeal of their termination, and also after each Plaintiff received consideration for reassignment to available positions for which he or she qualified. These rights of appeal and reconsideration are merely what Intelligence Community regulations, and more generally applicable laws, require when conducting a RIF of federal civil servants.

Defendants' reluctance to submit to any judicial review of the constitutionality of their termination procedures, only because the DNI and CIA Director lead intelligence agencies, is ill-founded. Judges and court-appointed federal monitors routinely enforce compliance with civil rights and employment laws in police and fire departments, for example. Judges also routinely handle national security matters such as Foreign Intelligence Surveillance Act applications,[4] proceedings involving the Classified Information Procedures Act, and arrest and search warrant applications in espionage and terrorism cases.

There is no such thing as a "DEIA officer" in the Intelligence Community. Plaintiffs are career intelligence officers recruited, vetted and trained at great expense to American taxpayers, and whose many years of professional experience make them valuable to the United States' national security going forward. None are accused of misconduct or poor performance; most received other offers of employment elsewhere within the Intelligence Community.

As the District Court summarized the matter, "Simply requiring the Government to follow its own regulations is a minimal burden compared to both the economic and reputational harm that would plague Plaintiffs if the procedures at issue are not followed." JA262. The District Court did not abuse its discretion.

---

[4] The Court may take judicial notice that Hon. Anthony J. Trenga, the District Judge who issued the decision on appeal, is also coincidentally the Presiding Judge of the Foreign Intelligence Surveillance Court.

Rather, Plaintiffs are likely to succeed on the merits of their constitutional due process claim. They will suffer irreparable harms absent injunctive relief. The balance of equities is in their favor, and the injunction serves the public interest by retaining Plaintiffs' intelligence expertise within their agencies.

## **ARGUMENT**

As stated by Defendants, a party seeking a preliminary injunction must establish its likelihood of success on the merits, the likelihood of irreparable harm absent the injunction, that the balance of equities is in its favor, and that the injunction is in the public interest. *See Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Courts of Appeal review grants of preliminary injunctions for abuse of discretion and review factual findings for clear error and legal conclusions *de novo*. *See id*.

## I. *WEBSTER V. DOE* ALLOWS JUDICIAL REVIEW OF OFFICERS' CHALLENGES TO MASS TERMINATIONS.

The District Court did not abuse its discretion in reviewing Defendants' decision to terminate Plaintiffs, nor was it clear error to find that intelligence officers maintain regulatory and constitutional rights of post-termination appeal of their terminations and efforts at reassignment.

Defendants are wrong that *Webster* "broadly forecloses judicial review of claims challenging the directors' termination determinations." Br. at 7. The *Webster* Court did not reach such a broad conclusion. *Webster* did not address the

scope of judicial review for any constitutional claims challenging the directors' mass termination authorities. *See Webster*, 486 U.S. at 597. *Webster* involved the narrower question of whether courts could review an individual CIA officer's challenge to his termination under the APA, not the Fifth Amendment.

A.     ***Webster* Did Not Sanction the Directors' Authority to Terminate Officers en Masse.**

The *Webster* Court acknowledged the CIA Director's power to terminate an individual CIA officer. That decision, however, does not authorize the Defendants' mass firing of fifty-nine officers. In *Webster*, the Court interpreted the National Security Act to "commit *individual* employee discharges to the Director's discretion," reducing the Court's role in reviewing such decisions. 486 U.S. at 601 (emphasis supplied). Based on evidence of the Director's individualized assessment of the discharged officer's security vulnerabilities, the Court determined that the termination decision was better left with the CIA Director than the courts.

The significance of this individualized assessment to the Court's decision is reflected in the Court of Appeals' decision on remand in *Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993), which emphasized that the issue of a Director's mass termination of officers based on "a blanket policy" was not before the Court, and would likely change the Court's assessment. *See id.* at 1323 (noting "abundant evidence" of the nonexistence of any such blanket policy).

17

Unlike *Webster*, which involved judicial deference to an individualized determination by a CIA Director that an officer posed a threat to national security, Plaintiffs are being subjected to a blanket policy firing any officer suspected of involvement with DEIA. Critically, the Court does not have to infer the Director's motivation or the absence of a national security nexus – the Government plainly stated the improper basis for termination. Nothing in the record indicates individualized assessments of any Plaintiffs by Defendants Gabbard and Ratcliffe. Instead, Plaintiffs are among a group of fifty-nine officers being terminated based on their temporary DEIA-related assignments, and the CIA Director's declared intent to effectuate a blanket policy announced in the Executive Order. Plaintiffs' security clearances remain intact, indicating that unlike the officer in *Webster*, these officers pose no counterintelligence or suitability problems.

**B.**      ***Webster* and the National Security Act do not Preclude Judicial Review of Officers' Claims to Regulatory Rights.**

*Webster* did not hold that Subsection 3036(e) forecloses judicial review of *all* constitutional and regulatory claims of officers' post-termination rights. Rather, the *Webster* Court solely reviewed the scope of judicial review of decisions made pursuant to the National Security Act when brought under the APA. *See* 486 U.S. at 598–99.

Because the Supreme Court only reviewed the relationship between the NSA and the APA, the question before the Court was not whether the NSA forecloses

18

judicial review, Br. at 13, but whether the termination decision was "committed to agency discretion by law." *See Id.* at 599 (noting that if a statutory grant of discretion is found to be "committed to agency discretion by law," Section § 701(a)(2) of the APA forecloses judicial review under the APA).

Therefore the application of *Webster* to the instant case is sharply limited, because the District Court did not find that Plaintiffs are likely to succeed on APA claims. *See* JA260 (the District Court analyzing whether appellees are entitled to relief "absent an APA claim"). Rather, the District Court correctly found that Plaintiffs are likely to succeed on their due process claims, and *Webster* plainly allows CIA officers to pursue constitutional claims against the Agency.

When Defendant CIA in *Webster* attempted to establish non-justiciability based on the NSA's text—separate from the APA's "committed to agency discretion by law" standard—the Supreme Court refused to adopt that position. The *Webster* Court reasoned that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear" and involve more than committing an agency decision to an official's discretion. *See* 486 U.S. at 603. This aspect of *Webster*'s holding has since solidified and is an additional reason to reject Defendants' over-broad reading that the National Security Act renders all statutory and regulatory claims nonjusticiable.

In that regard, Defendants' suggestion that the NSA renders all statutory and regulatory challenges to termination decisions nonjusticiable disregards developments in the justiciability of regulatory and statutory claims since *Webster*. Such a broad reading of the NSA would require this Court to disregard both the Supreme Court's post-*Webster* admonitions against so-called "drive-by" jurisdictional readings, and the Court's endorsement of broader APA judicial review in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

First, to the extent that the Court finds *Webster*'s APA-focused analysis of scope of judicial review instructive, the *Webster* Court's ruling should be viewed in light of *Loper Bright*, which tasked courts to "decide all relevant questions of law" and "interpret constitutional and statutory provisions" by "applying their own judgment" instead of blindly deferring to unfettered agency discretion. *Id.* at 392. *Loper Bright* provides guideposts for courts to judge whether any exercise of Subsection 3036(e)(1) authority is lawful.

Second, any suggestion that *Webster* bars all judicial review of Defendants' decisions must be squared against the Supreme Court's more recent and "almost uninterrupted retreat" from reading statutes to strip judicial review when they do not even use the word "jurisdiction." *See* Howard M. Wasserman, *The Demise of "Drive-by Jurisdictional Rulings,"* 105 Nw. U. L. Rev. 947 (2011). *Webster* foreshadowed *Loper Bright* by declining CIA's invitation to read the National

Security Act to foreclose all judicial review, and the Supreme Court stated that to justify such holding, the statute would need to include a clear congressional statement of intent to strip the courts of jurisdiction. *See* 486 U.S. at 603.

Indeed, since *Webster*, the Supreme Court all but ceased granting unfettered discretion to agency officials in favor of broader judicial review. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161–62 (2010) ("Our recent cases evince a marked desire to curtail such 'drive-by jurisdictional rulings,' which too easily can miss the 'critical difference[s]' between true jurisdictional conditions and non-jurisdictional limitations on causes of action").

The NSA provision granting the Director broad discretion—making no mention of the word "jurisdiction"—is susceptible to multiple plausible interpretations that maintain its force without stripping courts of their inherent power of judicial review. *See Boechler P.C. v. Comm. Of Internal Rev.*, 596 U.S. 199, 200 (2022) (finding that courts should not read statutes as removing courts' jurisdiction only because such an interpretation is "plausible" or "better").

The best way to read Subsection 3036(e)(1) is that it grants the CIA Director authority to terminate an employee without adhering to many pre-termination procedural that are customary among other non-national security agencies, *see infra* Section V, and, while preserving judicial review, demands that the court grant a higher-than-normal degree of deference to a Director's termination decision.

21

Because Subsection 3036(e)(1) does not clearly displace judicial review, and because the *Webster* Court rejected such broad reading of that statute's scope outside of the APA context, the Court should reject Defendants' argument that the National Security Act forecloses judicial review of statutory and regulatory challenges. But even if the Court does not reach that decision, the District Court's decision should be affirmed because Plaintiffs established a justiciable constitutional due process claim.

### C. *Webster* does not Preclude Judicial Review of Officers' Constitutional Claims.

#### 1. *The National Security Act creates a due process interest subject to judicial review under Smith v. Ashcroft.*

As the *Webster* Court acknowledged, even the National Security Act cannot deny a judicial forum to a colorable constitutional claim. *See* 486 U.S. at 604–5. Correctly following *Webster*, the District Court found that Plaintiffs established a constitutional claim of a procedural due process violation. JA261. Defendants challenge the District Court's finding that for a due process claim to exist, there must be "an entitlement to the benefit as directed by statute" that limits the "discretion of the decision-makers." Br. 30 (citing to *Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002)). The District Court correctly held that the NSA recognizes a liberty interest in post-termination rights that serves as a basis for a due process claim.

Defendants argue that the "express grant of discretionary authority" to the Director to terminate employees means that the NSA does not allow for intelligence officers' due process rights.  Br. at 30.  Defendants' position ignores a key aspect of the District Court's finding below: rights of appeal and reassignment are *post*-termination rights and as such, Plaintiffs' due process interest in Defendants' following those procedures is distinct from the Directors' discretionary right to terminate them.  *See* JA189 (District Court characterizing the right to reassignment as a "post-termination right"); and JA175 (noting that appeal rights are "post-decision" rights).

Therefore, the correct inquiry on whether the National Security Act creates a due process interest in appeal and reassignment rights is not Subsection 3036(e)(1)'s language on the Director's broad power to terminate, but rather Subsection 3036(e)(2), which covers the employees' post-termination rights.  That Subsection states: "Any termination of employment of an officer or employee under paragraph (1) shall not affect the right of the officer or employee to seek or accept employment in any other department, agency, or element of the United States Government if declared eligible for such employment by the Office of Personnel Management."

This subsection limits the Directors' termination discretion by providing officers with more than a mere expectation that a Director will not exercise the

termination power in a way that undermines or interferes with the "*the right of* the officer or employee" in future public employment.  (Emphasis added.) Therefore, applying the Fourth Circuit's test in *Ashcroft*, Plaintiffs maintain their entitlement to post-termination procedural rights, and the District Court's acknowledgement of post-termination rights of appeal and reassignment as constitutionally-protected procedural due interest rights is correct.

Congress and the courts allowing an intelligence agency's director nearly unfettered discretion to immediately remove an officer's access to classified information and to their colleagues and workplace by terminating them, makes sense as a time-sensitive necessity, for example if that agency received a tip that the officer served as a double agent.  But such a tip may always be wrong, and this is why neither Congress nor the Supreme Court denied intelligence officers post-termination remedies as a matter of due process.  (Again, Plaintiffs in the instant case do not stand accused of presenting any counterintelligence threat, and maintain their security clearances.)

> 2.  *A post-termination due process interest also exists under Mathews v. Eldridge.*

The *Ashcroft* test put forward by Defendants is not the only way to identify Plaintiffs' colorable due process claim.  Alleging due process violations does not always involve analyzing underlying regulations or statutes because constitutional rights exist independent of statutory and regulatory rights.  *See Demore v. Kim*, 538

U.S. 510, 521 (2003) (finding that rights cannot be solely defined by referencing statutes and regulations because "[i]n the exercise of its broad power," the government "regularly makes rules that would be unacceptable if applied to citizens"); *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (finding that "due process is flexible and calls for such procedural protections as the particular situation demands"). Therefore, courts also possess the authority to independently inquire if an agency's procedures for decision-making violate procedural due process—regardless of the underlying statute and regulation.

This view is also shared by Defendant CIA's own legal memorandum from 1979 regarding establishment of appeal procedures for personnel decisions. This memorandum stated:

> "The analysis as to whether a protectible property interest exists does not turn on traditional notions of title or ownership, but rather on whether statutes, legal rules, or some other explicit understandings independent of the Due Process Clause itself support a 'legitimate claim of entitlement,' [] to a particular thing or benefit."

JA161 (CIA Memorandum re: *Proposed Appeals Procedures for SCI Access Denials* ("CIA 1979 Memo") at 2 (Jan. 23, 1979) (citing to *Board of Regents v. Roth*, 408 U.S. 564 (1972)).

As Defendant CIA's own memo indicated, "the express wording of a statute or other rule on which a claimant to due process relies is not solely determinative of whether a 'legitimate claim of entitlement' exists." *Id*. To decide whether,

separate from statutes or regulations, a due process interest exists, courts evaluate whether "the private interest that will be affected by the official action," is at "the risk of an erroneous deprivation" through government processes, and whether "the probable value" of "additional or substitute procedural safeguards" overweigh "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 339–49 (1976).

Under the *Eldrige* test, Plaintiffs maintain procedural due process rights to seek appeal and reassignment because absent rights to appeal and reassignment— and under Defendants' view of their rights—the risk of an erroneous decision is at zenith, as Plaintiffs' future employment prospects will be determined by a single individual. *See* JA191 (finding that Plaintiffs' concern that their future employment prospects will be harmed without the chance of appeal and reassignment to be reasonable). Where the delegation of decision-making to an individual increases the risk of error, courts may shape procedural due process rights independently from a statute or regulation provides. *See Eldridge*, 424 U.S. at 344–45 (finding that "procedural due process rules are shaped by the risk of error inherent in the truth finding process").

When the issue of termination is left solely to a Director's discretion, and when such decision may be made based on statements that can injure an

employee's reputation (as the District Court found here), the potential injury to the employee and risk of error from relying on an individual's assessment is so high that fundamental due process demands protection of the employee through post-termination remedies that can cure any potential injury, even if that right cannot be readily traced to any statutory or regulatory language.

Because Plaintiffs' due process rights exist separate from the statutes and regulations, Defendants' misplaced emphasis on boilerplate disclaimer language in AR 4-16 ought to be immaterial to the Court's analysis.

## II. AGENCY REGULATION 4-16 AFFIRMS OFFICERS' DUE PROCESS RIGHTS TO POST-TERMINATION REMEDIES.

### A. AR 4-16 Acknowledges Post-Termination Remedies.

The District Court did not abuse its discretion or make a clear error in finding that intelligence officers maintain regulatory rights of post-termination appeal of their terminations and efforts at reassignment.

Defendants next argue that the District Court erred in "concluding that AR 4-16 creates any judicially enforceable procedural or substantive right." Br. at 9. To support this claim, Defendants rely on AR 4-16's waiver provisions to state that "the unpublished regulation repeatedly disavows any intent to create binding rights . . . ." *Id*. In particular, Defendants rely on sections II.A, II.D, and II.F of AR 4-16 as defeating Plaintiffs' claims of entitlement to post-termination appeal and reassignment rights. The "clear language" of these provisions, Defendants

contend, "cannot plausibly be read as imposing substantive or procedural rights that constrain the Director of the CIA's discretionary authority," to terminate employees.  Br. at 30–32.

Defendants again ignore the premise of the District Court's finding that neither the rights to reassignment nor appeal constrain the Director's discretionary authority to terminate employees, because those rights are *post*-termination rights. JA189; JA175.  Sections II.A, II.D, and II.F therefore do nothing more than reiterate the Director's discretionary authority under Subsection 3036(e)(1) to terminate employees without any prior notice or hearing—which would make sense in an emergency counterintelligence situation in which sensitive information indicated that an officer needed, for security reasons, to be immediately removed from access to classified information, his or her intelligence agency colleagues, and agency facilities.

Yet these same provisions cannot suspend any post-termination rights because AR 4-16's reassignment and appeal rights provisions can be traced to enforcement of Subsection 3036(e)(2) of the National Security Act, which guarantees post-termination rights, and not Subsection 3036(e)(1) which speak to termination power.  As rights to reassignment and appeal are necessary to ensure compliance with Subsection 3036(e)(2), Agency Regulation 4-16 cannot suspend those statutorily-guaranteed rights through regulatory waiver.

All three waiver provisions indicate that their scope does not reach any post-termination rights:

- II.A states: "Except as provided by this regulation and AR 13-5, *the termination of* an Agency employee is not subject to appeal under the provisions of any regulation, document, or law." (Emphasis added.)

- II.D states: "Pursuant to statutory authority, any employee *may be terminated* from the Agency at any time without regard to any procedural steps set forth in this regulation or elsewhere when the D/CIA, in his discretion, deems it necessary or advisable in the interests of the United States." (Emphasis added.)

- II.F. states: that AR 4-16 should not be construed to create any right to "administrative or judicial review of Agency employment termination procedures, their implementation, or decisions or actions rendered thereunder," to avoid establishing a right to "continued Agency employment."

The District Court acknowledged that Plaintiffs do not maintain a right to continued ODNI or CIA employment, but found a constitutionally-protected rights to appeal and reassignment because those are separate from any pre-termination rights. *See* JA188 (refusing to find due process right in continued employment); JA189 (distinguishing "post-termination" due process claims).

As the District Court found, compliance with the right to appeal provisions of AR 4-16 "is not a procedural step necessary before a termination decision can be made, nor does it condition or undo the director's decision to slate these plaintiffs for termination simply by the filing of such an appeal." JA194. Similarly, the District Court found that the right to reassignment is a "post-decision right."

29

JA194. Plaintiffs' claims that the Agency must follow its own regulations protect a due process interest separate from asserting any right "to continued agency employment," or disturbing the Director's termination powers. (JA126–127 (COURT: "There is no property interest in continued employment, but isn't there some kind of liberty or cognizable interest in having your employment governed by the very regulations the agency enacted in order to govern that relationship?")).

## B.   AR 4-16's Waiver Provisions Cannot Suspend an Independently Existing Constitutional Due Process Right to Post-Termination Remedies.

Even if the Court adopts a broader reading of AR-4-16's waiver provisions than the District Court, AR 4-16's waiver provisions cannot displace Plaintiffs' constitutional due process entitlements, which exist separate from statutes and regulations. *See* CIA 1979 Memo (noting that "the express wording of a statute or other rule on which a claimant to due process relies is not solely determinative of whether a 'legitimate claim of entitlement' exists").

Nothing in AR 4-16 can waive a constitutional right. While employees do not possess a judicially cognizable interest in continued employment, federal employment is nonetheless a benefit offered by the government. Once that benefit is offered to the employees, under the unconstitutional conditions doctrine, the government may not deny the benefit in a manner that infringes constitutionally protected rights. *Board of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668,

674 (1996) (finding that even when there is no underlying entitlement to a benefit, the government may not deny that benefit on a basis that otherwise infringes on constitutionally protected rights).

Therefore, if the Court finds that Plaintiffs maintain entitlements to post-termination appeal and reconsideration as a matter of due process not based on any regulation, the waiver provisions of AR 4-16 should also be disregarded as "unconstitutional conditions" on the offer of employment.

While Plaintiffs maintain that AR 4-16's waiver provisions do not reach the post-termination remedies acknowledged by the District Court, even if they did, their application cannot suspend a due process entitlement existing separate from AR 4-16. Having correctly found that Defendants' regulations regarding post-termination remedies protected a colorable due process interest, the District Court correctly decided that Plaintiffs could vindicate violations of agencies' own regulations as a matter of constitutional right under *Accardi*.

## III. THE DISTRICT COURT CORRECTLY DETERMINED THAT OFFICERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR *ACCARDI* CLAIM.

The District Court did not abuse its discretion in following the strong trend in cases before the Courts of Appeal and finding that *Accardi* requires federal agencies to follow their own regulations as a matter of constitutional due process.

### A. Under *Accardi*, Defendant Agencies are Constitutionally Required to Follow Their Own Procedures Governing Post-Termination Rights.

The District Court found that under *Accardi*, agencies are constitutionally bound to follow their own rules. Defendants argue that "neither the Supreme Court nor this Court has ever endorsed the proposition that an Agency's alleged failure to follow its own regulations, without more, constitutes a violation of constitutional due process." Br. at 27.

#### 1. *The Supreme Court Views Accardi as a Constitutional, and not an Administrative, Rule of Law.*

Defendants seek to rebut the District Court's finding that *Accardi* articulates a constitutional due process doctrine on the basis of a footnote of dicta. Defendants position that *Accardi* should be viewed as an administrative rule of law relies on a footnote from the Supreme Court's decision in *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 n.8 (1978) and a *per curiam* D.C. Circuit finding in *Crosby-Bey v. District of Columbia*, 786 F.2d 1182, 1186 (D.C. Cir. 1986). Br. at 33–34. Neither citation possesses the force claimed by Defendants.

The Supreme Court's footnote in *Horowitz* is nothing more than dicta, because the High Court stated that the issue of whether petitioners in that case needed to follow their own rules could be resolved on factual grounds, eliminating the need to analyze *Accardi* in depth. *See Horowitz*, 435 U.S. at 92 n.8. Defendants' reliance on the *Horowitz* footnote also disregards the conclusion of that sentence, which stated that *Accardi* "enunciate[d] principles of federal administrative law rather than of constitutional law *binding upon the States*." (emphasis added.) The Supreme Court's reference to "federal administrative law" is not a finding that *Accardi* should be relegated to the status of an administrative rule, but rather that due process interests protected through *Accardi* are typically recognized in a *federal* administrative law context—as in this case—and not in a state administrative law context.

The question before the *Horowitz* Court was whether the petitioner maintained a cognizable property interest under Missouri state law. *See* 435 U.S. at 82. In the footnote, the Supreme Court simply refused to extend *Accardi* to state law cases.

The prevailing trend in Courts of Appeal is to endorse *Accardi* as a constitutional due process right. As the District Court noted, "the Fifth Circuit reaffirmed just this last month that an agency's violation of its regulations may support a procedural due process claim." JA260; s*ee also Ayala Chapa v. Bondi*,

132 F.4th 796, 799 (Mar. 24, 2025, 5th Cir.) ("An agency's violation of its regulations may support a procedural due process claim"); *see also Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2d Cir. 1991).[5]

The limited reach of the footnote of dicta in *Horowitz* is clear from the Supreme Court's later decision in *United States v. Caceres*, 440 U.S. 741 (1979). In dissent, Justice Marshall summarized the *Accardi* line of cases as rooted not in administrative law, but rather in constitutional due process. Justice Marshall stated:

> "Underlying these decisions is a judgment central to our concept of due process, that government officials no less than private citizens are bound by rules of law. Where individual interests are implicated, *the Due Process Clause requires* that an executive agency adhere to the standards by which it professes its action to be judged."

*Id.* at 758. (Emphasis added.)

> 2. *The Fourth Circuit Views Accardi as a Constitutional, and not an Administrative, Rule of Law.*

Defendants' next mistake is to argue that this Court never endorsed the proposition that an agency's failure to follow its own regulations, without more, constitutes a violation of constitutional due process. On the contrary, in *United*

---

[5] The First and Third Circuits also recognize the application of *Accardi*, but it is not clear that these Courts of Appeal consider *Accardi* to be a matter of constitutional as opposed to administrative law. *See Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000); *see also Leslie v. Att'y Gen.*, 611 F.3d 171, 178–79 (3d Cir. 2010).

*States v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969) the Fourth Circuit found that based on *Accardi*, the Internal Revenue Service ("IRS") is bound to follow its own internal policies, captured in informal internal instructions, regarding notice of a noncustodial statement of rights to those voluntarily interviewed by the IRS, as that notice impacted individuals' rights. The Court rejected the argument, adopted by Defendants here, that the "unpublished" status of an agency rule bears upon the application of *Accardi*. *See* Br. at 8 and 9. The Court stated: "Nor does it matter that these IRS instructions to Special Agents were not promulgated in something formally labeled a 'Regulation' or adopted with strict regard to the Administrative Procedure Act," as the "*Accardi* doctrine has a broader sweep." 420 U.S. F.2d at 812.

That the Fourth Circuit's holding in *Heffner*, that *Accardi* applies even to agency instructions not promulgated under the Administrative Procedure Act, means that *Accardi* serves a purpose separate from the APA. *Accardi* fills the gap left by the APA, which only provides a cause of action over agency decisions formally adopted as final regulations.

Furthermore, as CIA officers' ability to resort to APA claims is sharply limited, *see* 50 U.S.C. § 835, the District Court's finding that *Accardi* provides a remedy "absent an APA claim" is consistent with Fourth Circuit law. JA 260.

Moreover, as stated in *Heffner*, regardless of the publication status of the agency rule, it is enough that the agency's policy declarations create an expectation of adhering to a certain policy or regulation for *Accardi* to be applicable to its enforcement as a matter of constitutional law. Here, Plaintiffs provided the District Court with evidence that despite its unpublished status, even Defendants themselves viewed the officers' rights as binding upon their agencies. CIA characterized existence of an appeal right as "rational and fair," and as such, once captured in a regulation, this will mean that "the government will be bound by the non-constitutional rule of administrative law that an agency, once it adopts a regulation, is bound by its terms." *See* CIA 1979 Memo at 8.

Defendants' incorrect characterization of this rule as "non-constitutional" notwithstanding, the language in the CIA memo establishes that the agencies had notice that appeal regulations created an expectation of future adherence. Similar to how this Court held in *Heffner*, if Defendants evince an understanding that a procedure is to be followed, an arbitrary departure from that procedure provides grounds for reversing that action, pursuant to *Accardi*, as a due process violation. Therefore, the District Court is correct in holding that Plaintiffs are likely to succeed on their *Accardi* claim.

The Court should also reject Defendants' undue emphasis on the unpublished status of AR 4-16, simply because there is no evidence in the record

suggesting that *any* CIA regulations are *ever* published in the Code of Federal Regulations. CIA and ODNI, as intelligence agencies, certainly maintain good reasons not to publish all of their internal regulations to a worldwide audience including the United States' adversaries. This need for security does not properly place the constitutionality of *all* of Defendants' regulations, or the important question of whether these regulations are being arbitrarily ignored, as beyond the reach of federal judicial review. This would unwisely place U.S. intelligence agencies above the law.

IV. **THE EQUITABLE BURDEN OF REQUIRING ODNI AND CIA TO FOLLOW THEIR OWN REGULATIONS IS MINIMAL, COMPARED TO HARMS FACED BY OFFICERS TERMINATED DUE TO TEMPORARY DEIA ASSIGNMENTS.**

A. **The Mass Termination Represents "Genuinely Extraordinary Situation" Favoring Injunction under *Sampson v. Murray*.**

The District Court did not abuse its discretion or make a clear error in finding that the balance of equities favors granting Plaintiffs a preliminary injunction. Defendants argue that the District Court abused its discretion by citing to *Sampson v. Murray* for the proposition that only a "genuinely extraordinary situation" warrants such relief. 415 U.S. 61, 92 n.68 (1974). Yet Defendants cannot seriously deny that Plaintiffs' situation is, indeed, genuinely extraordinary. Defendants do not dispute that this is the first time in the Defendant agencies' histories (since 1947 and 2005, respectively) where Directors conducted a mass

37

termination of fifty-nine intelligence officers pursuant to a series of statements from the President of the United States that they engaged in what the President viewed as illicit activities.  This case is by no means akin to a "'routine' employment case[]," as Defendants characterize it.  Br. at 38.

However, it is not only the sheer size and unprecedented nature of the terminations that creates a genuinely extraordinary circumstance but the stigmatizing character of the terminations.  *Sampson*'s standard for injunctive relief in "genuinely extraordinary situation" echoed through this Court's opinion later in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020) where extraordinary nature of circumstances was tied to risk of stigma.  In *Roe*, this Court enjoined the U.S. Air Force from discharging two airmen solely because they had contracted human immunodeficiency virus ("HIV").  As the Court articulated "a particularly heinous brand of discharge … that bears no relationship" to the "ability to perform the[] jobs."  *Roe*, at 229.  Therefore, like this case, the Defendants cannot justify the needlessly unceremonious and unfairly publicized termination as matters of "internal affairs."  Br. at 43.

Defendants compound their error by arguing that the availability of other compensatory relief somewhere down the road nullifies the need for an injunction. Defendants even challenge the District Court's finding that "a denial of Plaintiffs' constitutional rights constitutes *per se* irreparable injury."  Br. at 38.  The District

Court's finding is squarely in line with this Court's guidance about appropriate relief for constitutional violations, and specifically for *Accardi*-related violations of due process. The Fourth Circuit acknowledges that when underlying claims target the arbitrary nature of agencies' due process violations—especially in *Accardi* cases—the correct remedy is to require agencies to reverse course immediately. *See Heffner*, 420 F.2d at 813 (stating that the "*Accardi* doctrine furthermore requires reversal irrespective of whether a new trial will produce the same verdict").

### B. All Plaintiffs Face Irreparable Harm Absent Injunction.

Having correctly found that Plaintiffs are likely to succeed on the merits of their *Accardi* claim, the District Court is also correct to find that Plaintiffs credibly raised the prospect of irreparable harm based on reputational injury. Plaintiffs' claims meet all three elements of "stigma-plus" injury: (1) "a statement stigmatizing his good name" and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that "alter[s] or extinguishe[s] one of his legal rights." *See Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (alterations in original) (*relying on Paul v. Davis*, 424 U.S. 693, 706–711 (1976)). The District Court correctly found that the statements in the executive order are public statements traced to

Plaintiffs through Defendants' actions to terminate them, and as such, these defamatory statements altered Plaintiffs' legal rights.

The President's libelous statements obviously garnered nation-wide media attention due to the nature of his high office, and in addition were emailed to every CIA officer. Defendants argue that "Plaintiffs have not alleged that CIA or ODNI have disseminated, or will disseminate, any information about their termination," without supporting that statement with any legal authority, from the Fourth Circuit or otherwise, that requires the publication to be directly tied to Defendants themselves. Br. at 45.

The correct inquiry for determining whether an agency decision is marred by invidious discriminatory purpose is to analyze all relevant "contemporary statements" that shed light on the Agency's decision. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020); *see also Woodlands Pride, Inc. v. Paxton,* 694 F. Supp. 3d 820, 847 (S.D. Tex. 2023) (analyzing social media posts and public statements to determine constitutionality and impact on protected constitutional rights).

The court's below finding is line with other district courts' approach to granting injunctions in the specific context of swift agency decisions that followed the series of expansive executive orders this year, similar to this case. *See e.g., Aids Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400

(AHA), 2025 WL 752378 at *15 (D.D.C. Mar. 10, 2025) (finding irreparable harm by analyzing contemporaneous statements made by the President and other officials and social media posts when they could shed light on the reasons behind the agency's actions).

The Executive Order and presidential statement's derogatory language about DEIA pertains to Plaintiffs. Defendants argue that Plaintiffs made no attempt to "demonstrate that the broad, government-wide statements" in the Executive Order can be tied to them. Br. at 40. However, Defendants themselves tie the Executive Orders' language to Plaintiffs. The declaration submitted by Defendant CIA Director John Ratcliffe to the District Court stated plainly that he carried out Plaintiffs' terminations to effectuate the language of the Executive Order. JA148. Defendants cannot shield themselves from the fact that they effectuated the stigmatizing statements published by the White House. These defamatory statements apply directly to Plaintiffs as individuals through Defendants' conduct.

As this Court recognized in *Roe*, when there is a specter of animus and the possibility that servicemembers were discharged for reasons unrelated to their ability to perform their jobs, then the district court's finding that they suffered irreparable harm is well-founded. 947 F.3d at 229.

While this evidence of reputational harm is enough to support a finding of irreparable harm based on stigma-plus injury, the Court does not need to reach this

question because the District Court correctly found that Defendants' denial of Plaintiffs' post-termination rights is an independent constitutional due process violation amounting to irreparable harm. JA261 (finding that "as for the risk of irreparable harm, it's well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury, with the constitutional rights at issue here being procedural due process rights," before reaching irreparable harm based on reputational injury). While Defendants dispute the District Court's finding that the agencies violated Plaintiffs' constitutional rights, Defendants cannot argue that a due process violation is not *per se* irreparable injury.

The Court should also reject Defendants' argument that the risk of harm is lowered or absent for a specific class of Plaintiffs "for whom no final determination regarding the termination of their employment has been made." Br. at 47. The District Court's finding of irreparable harm is likely influenced by Defendants' commitment that they are not legally required to provide *any* of the Plaintiffs post-termination rights of appeal and reassignment.

In denying Plaintiffs' first motion for preliminary injunction, the Court acknowledged Defendants' broad discretion in terminating officers but found that irreparable harm would be absent if Plaintiffs are provided with adequate post-termination right to correct their records or eliminate the risk of impact on future employment. JA195 (denying preliminary injunction based on the finding that the

Director has no reason to not consider requests for appeal and reconsidering in "good faith").

Only after Defendants informed the District Court that the agencies believed that no officer is entitled to any post-terminations rights, did that court grant Plaintiffs' renewed motion for preliminary injunction, finding that with no post-termination remedies there is no way to remove the impact of statements in "the record of certain employees in their job searches and the general reduction in federal employment opportunities." JA126.

There is no discernible difference between Plaintiffs who received termination notices, and Plaintiffs scheduled to receive such notices, as Defendants confirmed that no officer would receive to post-termination rights to appeal or reassignment.[6] Such a clearly stated denial of due process constitutes *per se* irreparable harm. The relief granted by the District Court enjoined Defendants from firing Plaintiffs until this Court can resolve the legality of their firing. The risk of irreparable harm is equally imposed on all Plaintiffs and weighs in their favor.

---

[6] Two Plaintiffs assigned to ODNI received word that Defendant Gabbard would, on a voluntary basis, receive appeals of their terminations. These Plaintiffs submitted appeals, to which they received no substantive response.

## V.    THE INJUNCTION IS NARROWLY TAILORED TO PROTECT OFFICERS' CONSTITUTIONAL RIGHTS.

### A.    The Injunction Does Not Interfere with the Director's Exercise of Discretion to Protect Classified or Sensitive Information.

Despite Defendants' alarmist view, the District Court's injunction does not disturb the Directors' "broad discretion to act swiftly to separate employees," nor improperly entangle the judiciary in matters involving "classified information or other sensitive information."  Br. at 44.  The injunction is narrowly tailored to address both concerns and is in line with the Supreme Court's guidance in *Webster*.

Defendants' invocation of the risk of judicial intrusion into the realm of classified information and intelligence operations is detached from the reality of modern judicial practice and negated by *Webster* itself.  Defendants ignore that district judges routinely review decisions that involve national security, such as Foreign Intelligence Surveillance Act applications and trials involving the Classified Information Procedures Act, and magistrate judges handle arrest and search warrant applications in espionage and terrorism cases.  As the *Webster* Court noted, federal courts are capable of exercising "the latitude to control any discovery process in order to balance respondent's need for access to proof against the CIA's extraordinary need for confidentiality."  486 U.S.  at 593.  District judges and court-appointed lawyers also routinely serve as federal monitors of local police

and fire departments, whose responsibilities are as important and sometimes as sensitive as those carried out by intelligence agencies.

The injunction in no way slows the pace of a Director's swift decision to terminate an officer in order to remove their access to classified information and protect intelligence sources and methods, as anticipated by Subsection 3036(e)(1) of the National Security Act. What the NSA enshrined in law through that provision, and what the *Webster* Court reiterated, is an acknowledgment of a Director's ability to terminate officers without any pre-termination procedural rights.

These pre-termination procedural rights are employment rights under Title 5 of the U.S. Code, which covers nearly all federal agencies. For example, heads of all agencies are required to provide federal employees with proposed notice of termination at least thirty days prior to making a termination decision. 5 C.F.R. § 752.404 ("An employee against whom an action is proposed is entitled to at least 30 days' advance written notice," unless certain exceptions are met). Agencies are obligated to provide federal employees with the right to address the basis for proposed termination, in writing and verbally at a hearing.

It bears repeating that Plaintiffs are accused of no misconduct and maintain their security clearances. But if an intelligence agency director receives sensitive information that an officer may present a counterintelligence or security threat, he

or she cannot always give that officer thirty days' notice and an opportunity to address the basis for their termination. For example, a U.S. intelligence officer might be identified and accused through classified information as being a possible agent for a hostile foreign power. Given thirty days' notice of this accusation and their pending termination, that officer might well defect to a U.S. adversary, to avoid arrest by the Federal Bureau of Investigation, and cause great damage to America's interests.

The National Security Act therefore granted Directors with broad discretion to terminate intelligence officers without adhering to generally applicable pre-termination requirements, to ensure that a director can act swiftly to restrict officers' access to classified information and their colleagues and workplaces. As *Webster* Court put it, judicial review of pre-termination procedures would interfere with the Director's discretion to decide if officers need to "be separated immediately and without regard to any suggested procedural steps." 486 U.S. at 598.

Of course not every allegation of misconduct is true; officers are sometimes misidentified as threats in what is aptly termed a counterintelligence "wilderness of mirrors." As long as an intelligence agency commits to comply with constitutional due process rights by providing officers with post-termination remedies, nothing in the District Court's decision slows down a director's power to terminate an officer

to protect national security. To the extent that the injunction requires the Directors to "seek the court's blessing before finalizing a termination," as Defendants claim, that order rested on the agencies' stated commitment to deprive Plaintiffs' of their due process rights after the termination, not because the District Court opposed the Directors' discretion to bypass pre-termination procedures before finalizing a termination decision.

Post-termination remedies did not present an issue in *Webster*. Perhaps cognizant of CIA's duty under Subsection 3036(e)(2) to ensure that the Director's exercise of discretion does not hinder an officer's future employment prospects, the Agency in *Webster* advised the officer that it would "give him a positive recommendation" in a search for a job not requiring him to handle classified information. *See Id.* at 595. Unlike in *Webster*, here Defendants' adoption of President Trump's defamatory statements undoubtedly interferes with Plaintiffs' future employment prospects.

The District Court's finding that the stigma imposed by derogatory statements from the President can constitute irreparable harm is in step with other district courts' understanding of what *Sampson* and *Roe* dictate in such unusual circumstances. For example, in *Does 1-26 v. Musk*, a district court found that derogatory public statements from high-level government officials about employees of the U.S. Agency for International Development prior to their

termination went "far beyond the ordinary" and therefore the resultant "likely harm to the reputation of personnel who worked" for that agency was serious enough to satisfy the likelihood of irreparable harm.  *See* No. 25-cv-00462, 2025 WL 840574 at *27–8 (D. MD. Mar. 18, 2025).

The courts' approach has also been the same in the similar context of the President's repeated (and illegal) attempts through executive orders to punish private businesses that choose to employ those whom he considers to be his political enemies.  While economic harm, like loss of employment, by itself does not traditionally establish irreparable harm, courts acknowledge that the risk of ongoing future impact changes the analysis and justified irreparable harm.  *See e.g.*, *Perkins Coie LLP v. U.S.  Dep't of Just.*, No.  25-CV-716, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025); *Jenner & Block LLP v. U.S.  Dep't of Just.*, No. 25-CV-916, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, No. 25-CV-917, 2025 WL 1502329, at *33–34 (D.D.C. May 27, 2025).

Defendants also argue that the injunction is overboard because it intrudes on the Director's authority because the District Court did not explain "how an appeal could be taken from a decision of the Director when there is no higher authority to which the appeal could be noticed."  Br. at 43.  Yet the District Court's order is in line with *Accardi*, because the due process interest protects a right to independent

review, regardless of the decision-makers' relationship to each other. In *Accardi*, the Supreme Court found a due process violation when the Board of Immigration Appeals did not conduct an independent review of a statement by the Attorney General about "unsavory characters." The Court's finding did not rest on the relationship between the Board and the Attorney General, but rather on the need for an independent and fair hearing for the alien. *See* 347 U.S. at 267.

What Defendants demand as deference to the Directors' discretion in the instant case is a far cry from what the Supreme Court acceded to in *Webster*. Here, Defendants seek to exclude the federal courts entirely from their agencies' decisions to conduct a mass firing of officers, at moment's notice, and without any individualized explanation, good cause or opportunity to reduce the impact of termination. This violates the National Security Act, goes far beyond what the Supreme Court sanctioned in *Webster* and violates Plaintiffs' procedural due process rights.

**B.**    **The Injunction Serves the Public Interest.**

Defendants barely address the public interest and merely state that the Directors are the sole arbiters of what is in the best interests of the United States. Br. at 47–48. Yet as the District Court found, the public maintains an interest in the continued employment of Plaintiffs. The District Court noted "the wealth of talent

and experience these plaintiffs represent and offer in furtherance of the Agency's mission to protect the country from foreign and domestic threats." JA263.

Plaintiffs' roles cannot be reduced to career DEIA officers—as no such role even exists in the Intelligence Community. Plaintiffs are career intelligence officers of a variety of professional disciplines with extensive transferable skills. They have garnered years of experience and training as intelligence officers through great investment by American taxpayers. None are accused of misconduct or poor performance; most received other offers of employment elsewhere within the Intelligence Community, and maintained unblemished disciplinary records.

The executive order that closed DEIA offices did not call for the termination of personnel temporarily assigned to those offices. As the District Court found, the right remedy in this case is to return Plaintiffs to remaining positions of record within their agencies.

Furthermore if officers may be fired without rights of appeal, reassignment and judicial review, despite reasonable beliefs that they executed lawful (indeed congressionally-mandated) programs, often with the explicit advice of their agencies' general counsel, solely because a subsequent presidential administration disagrees with those programs, it will be very difficult for agency directors to staff offices associated with new and potentially controversial programs.

Allowing Defendants—political appointees—to misuse their National Security Act authorities terminate officers for domestic ideological reasons, without giving these civil servants rights of appeal and reassignment, and without judicial review, would potentially allow an intelligence agency director to fire every officer registered to vote for a particular party, or who contributed to a particular candidate. This would hopelessly politicize U.S. intelligence agencies.

As the District Court acknowledged "the public would certainly benefit from an internal reassignment over hiring new personnel who require significant onboarding and training to fill vital national security roles," especially given the particular skills and experience this group of Plaintiffs' possess, noting that "[w]ithout question, the plaintiffs in this case possess significant national security experience, a vast majority of whom have already been working in the intelligence community for between 10 to 15 years, if not longer." JA258.

## **CONCLUSION**

For the foregoing reasons, the District Court's preliminary injunction should

be affirmed.

Dated: August 7, 2025

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
Kia Rahnama, VSB No. 93718
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
krahnama@fluet.law
e-file@fluet.law
*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,345 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: August 1, 2025

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
Kia Rahnama, VSB No. 93718
**Fluet**
1751 Pinnacle Dr., Ste. 1000,
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
krahnama@fluet.law
e-file@fluet.law
*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2025 I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

Fourth Circuit by using the appellate CM/ECF system.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292