Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

UNITED STATES GOVERNMENT

# Memorandum

TO : Orfeo Trombetta, Jr.
Security Office

DATE: Jan. 23, 1979

FROM : Peter M. Shane
Attorney-Adviser
Office of Legal Counsel

SUBJECT: Proposed Appeals Procedures for SCI
Access Denials

DOJ Review
Completed.

This memorandum responds to your January 9, 1979 request
for my legal opinion concerning the proposed Annex B to DCID
No. 1/14, dated November 8, 1978, which would direct the estab-
lishment of appeals procedures throughout the Intelligence
Community for persons denied access to SCI.  I conclude that
the proposed procedures are legally sufficient for the adjudi-
cation of suitability for SCI access, but that they should,
in part, be redrafted for greater clarity and internal con-
sistency.

It should be noted at the outset that, although they are
denominated "Appeals Procedures," the provisions of Annex B
merely set forth guidelines for the establishment of procedures
that will be the only procedures mandated in the adjudication
of SCI access.  No pre-decisional procedures whatever have been
prescribed.  The threshold question is thus not the constitu-
tionality or legal sufficiency of the proposed procedural guide-
lines as a form of appellate protection, but rather whether
procedures adopted in accord with the proposed guidelines will
meet whatever protective procedural standards apply to the
adjudication of SCI access.

Because no statute, executive order, regulation, or
administrative law decision of a federal court currently
requires any particular adjudicative procedure for SCI access,
it is necessary only that the decisional procedures adopted
meet the constitutional standard of procedural due process.
The Due Process Clause of the Fifth Amendment does not mandate
procedural protections with regard to every governmental
decision.  Procedural due process applies only to governmental



Form OBD-197
MAY 1978

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

decisions that may adversely affect recognizable interests in "liberty" or "property." Arnett v. Kennedy, 416 U.S. 134 (1974). 1/

The analysis as to whether a protectible property interest exists does not turn on traditional notions of title or ownership, but rather on whether statutes, legal rules, or some other explicit understandings independent of the Due Process Clause itself support a "legitimate claim of entitlement," Board of Regents v. Roth, 408 U.S. 564, 577 (1972), to a particular thing or benefit.  The Supreme Court has held, for example, that no property interest in continued employment existed with respect to a non-tenured university teacher whose contract was not renewed after its fixed one-year term.  Board of Regents v. Roth, 408 U.S. 564 (1972).  By contrast, a colorable property interest was held to exist in the case of a university teacher who had been hired for four successive terms prior to his dismissal, and who relied on a faculty handbook and university guidelines to prove the existence of a de facto tenure system.  Perry v. Sindermann, 408 U.S. 593 (1972).  The express wording of a statute or other rule on which a claimant to due process relies is not solely determinative of whether a "legitimate claim of entitlement" exists. In Perry, the Court held that the teacher would be allowed to try to prove his claim notwithstanding an express provision in his university's faculty handbook, stating:  "Odessa College has no tenure system."  408 U.S. at 600.  The legitimacy of a claim of entitlement depends on an interpretation of all the relevant rules in light of past practice.

Whether or not an individual has a property interest with respect to SCI access, that is, a legitimate claim of entitlement to SCI access, or to continued access, thus depends on whether such a claim would be reasonable under the existing rules and regulations governing SCI access, which are found in Exec. Order No. 12065, §4-2, 43 Fed. Reg. 28957 (1978) and DCID No. 1/14 (1976).

---

1/  The analysis as to whether a protectible liberty or property interest exists is apparently the same under the Due Process Clause of both the Fifth and Fourteenth Amendments. See discussion, infra, at pp. 2-8.

- 2 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

It might be argued that, merely because the Intelligence
Community has adopted standards under which SCI access is
to be determined, an individual desiring access to SCI has
a property interest in SCI access that may be abridged only
by a negative adjudication under constitutionally mandated
procedures.  The Supreme Court cases do not, however, support
that analysis.  In cases in which the legal rules governing
a particular decision necessarily imply such discretion on
the part of the decision-maker as to defeat any legitimate
expectation of entitlement to a favorable decision, the Court
has held that no property interest exists.  For example, in
Bishop v. Wood, 426 U.S. 341 (1976), the Court found that
a permanent employee of a police department had no legitimate
expectation of continued employment, for purposes of due
process analysis, under a city ordinance that permitted the
City Manager to dismiss any permanent employee who:

> fails to perform work up to the standard of the
> classification held, or continues to be negligent,
> inefficient, or unfit to perform his duties . . . .

426 U.S. at 344 n. 5.  Most recently, the Supreme Court found,
in a per curiam opinion, no legitimate claim of entitlement
for a lawyer to appear in Ohio state court pro hac vice under
a rule that left such participation to the "leave of the judge
hearing such cause."  Leis v. Flynt, 47 U.S.L.W. 3477, 3477
n. 2 (U.S. Jan. 15, 1979).

The rules setting the standards for SCI access appear to
me to fall within the rationale of Bishop and Leis.  Under
DCID No. 1/14 (1976), the granting of access to SCI "shall be
controlled under the strictest application or the 'need-to-
know' principle."  (¶4.)  An individual, to be granted access,
"shall be stable; of excellent character and discretion and of
unquestioned loyalty to the United States."  (¶5(a).)  Further:

> Any doubt concerning personnel having access to
> SCI shall be resolved in favor of the national
> security.  The ultimate determination of whether
> the granting of access is clearly consistent with
> the interests of national security shall be an
> overall common sense determination based on all
> available information.

- 3 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

(¶15.)  These provisions confer such discretion on the adjudi-
cator as to defeat any legitimate claim of entitlement to
SCI access. 2/ Because no legitimate claim of entitlement
exists, no property interest in SCI access itself exists
for protection under the Due Process Clause.

Liberty interests protected under the Due Process Clause
are more difficult to categorize; those significant freedoms
that fall within the protectible scope of liberty include:

> the right of the individual to contract, to
> engage in any of the common occupations of
> life, to acquire useful knowledge, to marry,
> establish a home and bring up children, to
> worship God according to the dictates of one's
> own conscience, and generally to enjoy those
> privileges long recognized . . . as essential to
> the orderly pursuit of happiness by free men.

Meyer v. Nebraska, 262 U.S. 390, 399 (1923), quoted in Board
of Regents v. Roth, 408 U.S. 564, 572 (1972).  The liberty
interests of public employees thus far recognized by the
courts include an individual's interest in his "good name,
reputation, honor, or integrity," Wisconsin v. Constantineau,
400 U.S. 433, 437 (1971), and the "freedom to take advantage
of other employment opportunities," Board of Regents v. Roth,
408 U.S. 564, 573 (1972).

It does not appear that either the denial or revocation
of access to SCI would, by itself, so significantly injure an
individual's reputation, as to impinge on his liberty interest
in his good name.  In Paul v. Davis, 424 U.S. 693 (1976), the
Court held that the inclusion of the petitioner by state police
on a circulated flyer advising merchants of known "active"

---

2/    Although the proposed Annex A to DCID No. 1/14 requires
adjudicators to focus on particular factors in evaluating
candidates for SCI access, Annex A does not limit the consti-
tutional discretion of security officers to adjudicate individual
cases according to the broad standards set forth in DCID No.
1/14.

- 4 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

shoplifters did not so infringe on the petitioner's liberty interest in his reputation as to require due process, even though the petitioner had never been convicted of shoplifting. It seems unlikely that a denial of SCI access would, by itself, have nearly as adverse an impact on reputation as the impact that the Court held in Paul not to require the protection of due process. First, although the broad standards of SCI access suitability appear to reflect on personal character, the adjudicative factors under which access may be denied include objective standards clearly unrelated to personal integrity, e.g., immediate relationship to a citizen of a hostile nation. Further, disclosure of the reason for SCI access denial will not be a matter of public record, as was the defamation in Paul. Finally, even within the Government, the stigmatizing effect of SCI access denial would appear to be nominal. Under DCID No. 1/14, ¶3 (1976), denial of SCI access is not even a sufficient ground for revoking access to other kinds of classified information. It is thus highly unlikely that an adverse adjudication will so injure an individual's reputation as to require due process protection.

A trickier problem is presented with respect to an employee's liberty to pursue his profession. It is not even remotely likely that an initial denial of access to a person will affect such an interest because no one is trained in this country for professions, the pursuit of which is contingent on eventual access to SCI. However, a person who currently has access may be pursuing a profession, the continued pursuit of which does depend on continued access to SCI. 3/ In that case, although revocation of access, by itself, is not a consequence that impinges on his liberty interest, the loss of job that will inevitably follow from his loss of access will prevent him from pursuing his profession and thus impinge on a constitutionally protected interest.

It thus appears that the denial or revocation of SCI access will impinge on constitutionally protected interests

---

3/ Cf., Greene v. McElroy, 360 U.S. 474 (1959), in which the Court appears to suggest that the petitioner's liberty interest in employment as an aeronautical engineer, seriously affected by the revocation of his security clearance, would be constitutionally protected. (SCI not identical)

- 5 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

only when such a denial can potentially result in a collateral
consequence, such as loss of job, rank, or pay, that affects
an interest in liberty or property.  As I have indicated, the
loss of job in a particular line of work may impinge on a
liberty interest in following a chosen profession.  Loss of
job, rank, or pay may also impinge on protected property
rights in employment status because, although the rules gov-
erning SCI access do not support a legitimate claim to con-
tinued access to SCI per se, the rules governing a person's
employment may support a legitimate claim of continuing em-
ployment or employment status that is a protected property
interest.  In any case in which a collateral consequence of
denial of access potentially impinges on a protected interest
in a job or job status, some procedural protection is consti-
tutionally due.

An analysis of the employment status of Intelligence Com-
munity employees suggests that the number of cases requiring
constitutional protection that are not already protected by
statute may be quite small.  One group of Intelligence Com-
munity employees, those who are in the "competitive service,"
5 U.S.C. §2102 (1976), or "preference eligible," 5 U.S.C.
§7511 (1976), have a legitimate claim of entitlement to con-
tinuing employment status, Arnett v. Kennedy, 416 U.S. 134 (1976).
However, these employees are already afforded procedural pro-
tections in cases of dismissal for reasons of national secur-
ity, or in cases of other adverse employment decisions.  5
U.S.C. §7501, 7512, 7531-2 (1976).

A second group of Intelligence Community employees, em-
ployees of the CIA, likely do not have a legitimate claim of
entitlement to continuing job status because the DCI is em-
powered by statute summarily to dismiss employees of the CIA
"whenever he shall deem such termination necessary or advis-
able in the interests of the United States," 50 U.S.C. §403
(1970).  As noted above, however, some of these employees may
be constitutionally protected because of their liberty interest
in particular professions that require continued access to SCI.
These employees are entitled to due process in revocation

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

decisions in which their jobs or current job status are at stake.

A third group of employees also exists: those who do not follow peculiar professions and who do not enjoy legitimate claims of entitlement to continuing employment status under the Civil Service laws. These non-competitive service employees may still have property interests in their jobs or job status depending on the rules governing their employment within their particular departments. See Paige v. Harris, No. 77-2204 (7th Cir. Sept. 12, 1978), in which the court held that HUD's Chicago area counsel, an excepted employee, had a legitimate expectation of continued employment, notwithstanding the non-competitive nature of his job.

I have talked to _____ of the DCI's Security Committee, who said that the likelihood of a person's suffering the kind of job or status loss that I have found to be constitutionally protected because of a denial of SCI access is remote. It might thus be administratively unwise to tailor the Annex B procedures to the constitutional requirements applicable to an unlikely set of hypothetical cases. However, in order not to risk an unconstitutional adjudication, I recommend expressly restricting Annex B's applicability to those individuals for whom the denial of access will not mean the loss of a job or reduction in rank or pay. The SECOM may wish to consider whether the Community's experience with SCI denials requires procedural protections to be expressly provided for adjudications of those cases in which the denial of access has adverse consequences with respect to constitutionally protected interests. 4/ This Office would be glad to participate in the process of identifying those procedures that would be constitutionally mandated in particular fact situations.

STAT

---

4/ Whatever procedural protections are required in cases affecting constitutionally protected interests depend on the seriousness of the potential impact of the government's decision on those interests, and the countervailing government interest in summary decision-making. Mathews v. Eldridge, 424 U.S. 319 (1976).

- 7 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

It is obvious that a denial or revocation of SCI access may have an adverse impact on a particular government employee, even if it does not affect a constitutionally protected interest.  It may result in the loss of an unprotected job. It may limit the breadth of intelligence-related experience that he can acquire and the consequent likelihood of his eventual promotion.  For this reason, an appeals procedure is both rational and fair.  Once Annex B is adopted, though, the government will be bound by the non-constitutional rule of administrative law that an agency, once it adopts a regulation, is bound by its terms.  United States v. Nixon, 418 U.S. 683 (1974); Service v. Dulles, 354 U.S. 363 (1957); Vitarelli v. Seaton, 359 U.S. 535 (1959).  It is thus essential that the rules of Annex B be clear and internally consistent.

One source of confusion in the current draft concerns the provisions regarding notice.  It appears from ¶5 that no notice will be required of the fact of SCI access denial, the basis for the denial, or the existence of appeals procedures. It is not specified, however, whether the purpose of these limitations is to avoid cases in which the granting of an appeal would pose an unacceptable security risk, or simply to ease the administrative burden that might be imposed if notice were required in all cases.  In any event, ¶2 as now written states:

> It is the policy of the Director of Central Intelligence that any individual who has been denied

- 8 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

> access to SCI ... shall be afforded an
> __opportunity__ to appeal such denial. ***

(Emphasis supplied.)  Because the notice provisions of ¶5 are
not entirely clear, and because the policy of ¶2 as now worded
seems to guarantee an opportunity to appeal to any individual
denied access, the possibility exists that a court, in con-
struing ¶5, would find that the government bound itself to a
notice requirement in all cases in which the denial of notice
would effectively deny the individual involved an opportunity
to appeal.

For this reason, I recommend redrafting ¶2 to state pre-
cisely the DCI's policy with respect to affording opportunities
to appeal.  If the policy is to afford an opportunity to
appeal in all cases in which an appeal does not pose an un-
acceptable risk to the national security, that policy should
be so stated.  Paragraph 5 might then be rewritten to afford
notice automatically except in cases of unacceptable risk.
Alternatively, if, for administrative purposes, the policy is
to afford an opportunity to appeal only to those individuals
who request it, that policy should be stated, and ¶5(c) should
be rewritten to indicate that the opportunity to present in-
formation on an individual's behalf depends on the individual's
request to present such information.* As a matter of policy,
a question could be raised whether such an appeals procedure,
in which even the protection afforded by notice is contingent
on an individual's request, will accomplish the objective of
overall procedural fairness.  Either procedure would be legally
sufficient but should, if adopted, be consistently stated.

A second source of potential uncertainty arises because
of ¶4.  Findings of ineligibility, according to ¶4, may be
based on failures to meet minimum investigation standards or
failures to meet personnel security standards under DCID 1/14,
¶5.  It is unclear, first, why an inadequate investigation is
a ground for a finding of ineligibility, as opposed to a
ground for a continued investigation.  Second, because DCID
1/14 seems, in this respect, to speak for itself, it is unclear
why Annex B should attempt at all to reiterate the standards
under which SCI access is to be adjudicated.  The specification
in Annex B of DCID 1/14, ¶5 and 11 as providing the grounds

*handwritten notes in margins: "DCI", "agree", "good point", "agree"*

- 9 -

\* provided that such appeal does not pose an
unacceptable risk to the National security

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9

for findings of ineligibility might be construed, for example, to preclude SIO's from denying SCI clearances in cases in which a need-to-know, as required under DCID 1/14, ¶4, has not been demonstrated.  Unless Annex B is intended thus to limit the discretion of adjudicating officers under DCID 1/14, that portion of ¶4 that appears after the first sentence would appear to be unnecessary and confusing.

A final question of policy arises because of an apparent inconsistency between the purpose of Annex B as declared in ¶1 and the procedural provisions of ¶5.  It is the stated purpose of Annex B "[t]o establish uniform [appeals] procedures." Yet ¶5 specifies no procedures; rather, it limits appeals to cases in which review is requested, and states that individuals denied access shall have opportunities to present information on their behalf.  It is readily foreseeable, therefore, that Annex B will not, as written, produce uniform procedures.  As a matter of policy, not as a legal requirement, we recommend either a more precise statement of purpose or the establishment of procedures that will accomplish the purpose of Annex B as stated.

- 10 -

Approved For Release 2008/02/07 : CIA-RDP96M01138R000600030011-9