**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-1527**

─────────────

JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN DOE 4; JOHN DOE 5; JOHN DOE 6; JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE DOE 5,

    Plaintiffs - Appellees,

   v.

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; CENTRAL INTELLIGENCE AGENCY; JOHN RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency; WILLIAM PULTE, in his official capacity as Acting Director of National Intelligence,

    Defendants - Appellants.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, Senior District Judge. (1:25-cv-00300-AJT-LRV)

─────────────

Argued: December 10, 2025         Decided: July 2, 2026

─────────────

Before NIEMEYER, THACKER, and BERNER, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Berner wrote the majority opinion, in which Judge Thacker joined. Judge Niemeyer wrote a dissenting opinion.

─────────────

**ARGUED:** Jennifer L. Utrecht, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Kevin Thomas Carroll, FLUET & ASSOCIATES, PLLC, Tysons, Virginia, for Appellees. **ON BRIEF:** Brett A. Shumate, Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Charles W. Scarborough, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE,

Washington, D.C.; Erik S. Siebert, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellants.  Kia Rahnama, FLUET & ASSOCIATES, PLLC, Tysons, Virginia, for Appellees.

———————

BERNER, Circuit Judge:

Among the promises of the Fifth Amendment is the requirement that no person be deprived of life, liberty, or property, without due process of law. This promise of due process has been construed to require federal government agencies to adhere to their own binding regulations.

This case concerns efforts of the Central Intelligence Agency and Office of the Director of National Intelligence to terminate nineteen career national intelligence officers. Faced with impending termination, the Intelligence Officers seek to exercise rights afforded to them by the Agencies' regulations governing terminations. Specifically, they wish to seek reassignment to different positions and to appeal their terminations internally. After the Agencies made clear that they did not intend to honor these rights, the Intelligence Officers sought a preliminary injunction.

The district court granted the Intelligence Officers' request and issued a preliminary injunction requiring the Agencies to adhere to their own regulations. The Agencies timely appealed and, for the reasons that follow, we affirm.

## I. Background

We begin with a brief overview of the statutory and regulatory framework governing terminations within the Agencies. We next detail the factual background and procedural history relevant to this appeal.

3

A. Statutory and Regulatory Framework

The Intelligence Officers are career employees of either the Central Intelligence Agency (CIA) or the Office of the Director of National Intelligence (ODNI),[1] which we will refer to collectively as "the Agencies." The National Security Act vests broad discretion in the Agencies' directors (collectively, the Directors) to terminate employees "whenever the Director deems the termination . . . necessary or advisable in the interests of the United States." 50 U.S.C. §§ 3036(e)(1) (granting CIA Director discretion), 3024(l)(1) (granting Director of National Intelligence discretion commensurate with that of "the Director of the [CIA] with respect to [ ] personnel of the [agency]").[2] The procedures for such terminations are governed by Agency Regulation 4-16 (Termination Regulation).[3] The Termination Regulation reiterates that the Directors have broad discretion, conferred upon them by Congress, to terminate employees of their Agencies with or without cause. It also sets forth specific termination procedures that the Agencies

---

[1] ODNI is a cabinet-level agency charged with overseeing the federal government apparatus of intelligence agencies, including the CIA, the National Security Agency, and the Defense Intelligence Agency.

[2] The Civil Service Reform Act established a framework for evaluating adverse personnel actions taken against federal employees. *United States v. Fausto*, 484 U.S. 439, 443–44 (1988). It does not apply here, however, because the employees of the Agencies are expressly excluded from coverage. 5 U.S.C. §§ 2302(a)(2)(C)(ii)(I), 7511(b)(7)–(8).

[3] Although titled a regulation, the Termination Regulation is not a formal regulation published in the Federal Register. The CIA adopted the Termination Regulation to govern its internal termination procedures. Although it has not been formally adopted by ODNI, "[w]here there is no ODNI regulation or instruction available, ODNI applies CIA regulations. Accordingly, ODNI follows [the Termination Regulation]." Parties' Joint Appendix (J.A.) 77 (Declaration of ODNI Deputy Chief Operating Officer). The Termination Regulation is included in the Parties' Joint Appendix starting at page 62.

4

must follow in particular circumstances. Two of these procedures are relevant to this appeal.

First, Section II(C)(4) of the Termination Regulation provides an opportunity for certain employees to seek reassignment within their Agency rather than face termination. Specifically, when an employee is selected for termination because of what the regulation refers to as "excess personnel functions or needs," a representative of the Agency must meet with the employee to discuss possible alternative positions within the Agency. Termination Reg. §§ II(B)(9), II(C)(4)(c). If the employee expresses interest in reassignment, Agency staff are required to assist. *Id.*

Second, Section II(E) of the Termination Regulation provides a procedure for Agency employees facing termination to appeal internally. *Id.* § II(E)(3)–(4). This appeal provision covers nearly all termination decisions, including those at issue here. The provision exempts only employees "terminated because of revocation of access to classified information" and certain non-career employees, including, among others, contract and reserve employees. *Id.* § II(E)(1)–(2).

## B. Relevant Facts

Prior to learning that they were facing termination, the Intelligence Officers were all temporarily assigned to positions related to diversity, equity, inclusion, and/or

5

accessibility (DEIA) within their Agencies.[4] The duties of these positions, included, by way of example, implementing federal civil rights laws, such as the Civil Rights Act of 1964, the Rehabilitation Act, and the Age Discrimination in Employment Act.

On the first day of his second term, President Donald Trump issued Executive Order 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (DEIA Executive Order I). Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). It characterizes DEIA programs as "illegal and immoral," describes them as causing "immense public waste and shameful discrimination," and directs all federal agency and department heads to "terminate, to the maximum extent allowed by law, all DEI [and] DEIA . . . offices and positions." *Id.* §§ 1, 2(b)(i).

On the second day of his second term, President Trump issued another executive order, Executive Order 14173, aimed at eliminating DEIA programs in the federal government. This executive order is entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (hereinafter DEIA Executive Order II). Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025). DEIA Executive Order II purports to "enforce longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities," and directs "all executive departments and agencies" to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance,

---

[4] DEI stands for diversity, equity, and inclusion. The initialism DEIA includes the addition of accessibility. The parties and the relevant Executive Orders use the terms interchangeably.

regulations, enforcement actions, consent orders, and requirements." *Id.* § 2. It doubles down on the critiques of DEIA programs, describing them as "undermin[ing] our national unity," "threaten[ing] the safety of American men, women, and children across the Nation," and producing "disastrous consequences." *Id.* § 1.

The Office of Personnel Management (OPM), which serves as the chief human resources agency and personnel policy manager for the federal government, issued a memorandum implementing DEIA Executive Order I. This OPM memorandum directed federal government agencies to place all employees working in DEIA offices on paid administrative leave effective January 22, 2025, the day following the issuance of DEIA Executive Order II. The Agencies complied with this directive.

Two days later, OPM issued a second memorandum entitled "Guidance Regarding RIFs of DEIA Offices." J.A. 232. RIF is an acronym for "reduction in force," meaning the termination of employees in certain positions due reorganization or lack of work, among other reasons. *See* 5 U.S.C. §§ 3501 *et seq.*; U.S. Office of Personnel Mgmt., *Reductions in Force (RIF)*, https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/ [https://perma.cc/AAK9-TYK2]. In this second memorandum, OPM directed all federal agencies to implement RIF procedures immediately, targeting for elimination all DEIA positions and offices.

Three weeks later, the Agencies notified the Intelligence Officers, still on paid administrative leave, that they would be terminated. The Intelligence Officers were presented with several options regarding the timing of their final separation. The Agencies

informed the Intelligence Officers that if they declined to select an option within a day, they would be terminated immediately.

The Agencies have never suggested that any of the Intelligence Officers engaged in workplace misconduct or that the terminations were motivated by performance concerns. Rather, the Director of the CIA stated affirmatively that the decisions to terminate the Intelligence Officers were taken to "effectuate the directives in" DEIA Executive Order I and the corresponding OPM memoranda. J.A. 148. ODNI Deputy Chief Operating Officer also confirmed that the Agency acted in response to these same directives.

## C. Procedural History

The Intelligence Officers filed this action in the United States District Court for the Eastern District of Virginia. They allege that the Agencies violated their Fifth Amendment due process rights. Shortly after filing their complaint, the Intelligence Officers sought emergency relief asking the district court to issue a temporary restraining order prohibiting the Agencies from proceeding with the terminations. The district court denied this motion. Approximately one month later, the Intelligence Officers filed a second motion, this time asking for a preliminary injunction requiring the Agencies to comply with the Termination Regulation. The district court issued the preliminary injunction. We describe each stage of the proceedings in turn.

*(i) Request for Temporary Restraining Order*

The district court held a hearing on the Intelligence Officers' motion for a temporary restraining order and treated the motion as a request for a preliminary injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The district court reached only the first *Winter* factor, concluding that the Intelligence Officers were unlikely to succeed on the merits of their claims.

The district court explained that to prevail on a procedural due process claim a plaintiff must first identify a property or liberty interest to which due process rights attach. It concluded that the Intelligence Officers lack any such interest in their continued employment because the National Security Act gives each Director discretion to "terminate the employment of any officer or employee of [their Agency] whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interests of the United States." 50 U.S.C. §§ 3036(e)(1), 3024(l)(1). This discretion, the district court reasoned, functionally rendered the Intelligence Officers at-will employees.[5]

The district court noted, however, that because the Intelligence Officers were being terminated as part of a RIF, the Intelligence Officers were guaranteed two rights under the

---

[5] An at-will employee can be "terminated for no reason, or even for an arbitrary or irrational reason." *Shook v. NCG Acquisition, LLC*, 114 F.4th 242, 245 (4th Cir. 2024).

9

terms of the Termination Regulation. First, they were entitled to request reassignment. Second, they were entitled to an internal appeal from the termination decision. While the district court suggested that the Intelligence Officers might well succeed on a due process claim premised on these rights, it declined to issue a preliminary injunction because the Intelligence Officers had yet to invoke them. Consideration of claims premised on denial of these rights would therefore be premature, according to the district court. The district court went on to state that there was "no reason to think that [the Agencies] would not consider such requests in good faith," leaving open the possibility of considering a renewed request for relief as the facts developed. J.A. 195.

*(ii) Request for Preliminary Injunction*

Approximately one month later, the Intelligence Officers renewed their motion for a preliminary injunction. During the intervening period, the Intelligence Officers attempted to invoke their rights under the Termination Regulation to seek reassignment and internally appeal their terminations. The CIA altogether refused to provide access to these procedures. It informed the Intelligence Officers who worked at the CIA that they were not entitled to these rights. Although ODNI provided an avenue to appeal internally, the Intelligence Officers' appeals had not yet been decided at the time the renewed motion was filed.

In their renewed motion, the Intelligence Officers relied on two legal theories to secure their rights under the Termination Regulation. First, the failure to assure their rights violates the Fifth Amendment due process clause. Second, it violates the principle established by the Supreme Court in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S.

10

260 (1954), that an agency's failure to follow its own procedures and policies can constitute a violation of an individual's rights. The district court concluded that the Intelligence Officers were likely to succeed under both theories.

The district court first made a factual finding that the Agencies had terminated the Intelligence Officers as part of RIFs. In explaining this finding, the district court pointed to the declaration of the CIA Director—provided in connection with the litigation—stating that he implemented the termination decisions to execute DEIA Executive Order I and to carry out the directives in the corresponding OPM memoranda. The CIA Director stated that he "understood these directives, in combination, effectively prescribed terminating the employment" of the Intelligence Officers. J.A. 148. The district court pointed out that "those reasons clearly establish that the decision to terminate [the Intelligence Officers] was made to eliminate excess employees pursuant a reduction-in-force-action." J.A. 254–55. The district court noted that the ODNI Director offered no other reason for the termination decisions and, on the basis of the record evidence, concluded that both Agencies had carried out RIFs.

Turning to the merits, the district court identified the previously discussed rights to seek reassignment and internally appeal the terminations. Because the Intelligence Officers had been denied these rights, the district court concluded that they were likely to succeed on the merits of their Fifth Amendment due process claims. The court reached the same conclusion with respect to the Intelligence Officers' claims brought pursuant to the *Accardi* doctrine.

11

As for the second *Winter* factor, irreparable harm, the district court identified two sources of injury to the Intelligence Officers: 1) deprivation of their constitutional due process rights; and 2) reputational injury resulting from the DEIA Executive Orders' disparaging statements about DEIA programs. The district court observed that "once deprived," the rights assured by the Termination Regulation would be "difficult to restore or address through non injunctive remedies." J.A. 262.

Next, the district court addressed the third *Winter* factor, the balance of the equities. The district court found it significant that the Intelligence Officers "face[d] termination without any suggestion of wrongdoing or poor performance" and that most "were only temporarily assigned to DEI[A] roles." *Id.* It reasoned that, "[a]t bottom," the Intelligence Officers were "being penalized" for being in the wrong place at the "wrong time." *Id.* Moreover, "requiring the [Agencies] to follow [their] own regulations [would impose] a minimal burden compared to both the economic and reputational harm that would plague" the Intelligence Officers should they not be afforded their rights. *Id.* Thus, the district court concluded the balance of equities tipped in favor of the Intelligence Officers.

The district court then addressed the final *Winter* factor, the public interest, concluding that it too cut in favor of awarding preliminary injunctive relief. The district court pointed to "the wealth of talent and experience" that the Intelligence Officers possess and "offer in furtherance of the [ ] mission to protect the country from foreign and domestic threat." *Id.* at 263. It noted that, "[a]s the Supreme Court has repeatedly stated, there are few interests that can be more compelling than the nation's need to ensure its own security." *Id.* The district court reasoned that "the public would certainly benefit from an internal

12

reassignment over hiring new personnel who require significant onboarding and training to fill vital national security roles." *Id.*

Having concluded that preliminary injunctive relief was warranted, the district court enjoined the Agencies from "effectuating or implementing any decision to terminate the[ ] [Intelligence Officers] without further Court authorization." *Id.* at 264. It required the Agencies to provide the Intelligence Officers with the rights in the Termination Regulation to seek reassignment and to appeal the terminations.

The Agencies timely appealed from the grant of the preliminary injunction.

## II. Analysis

We review a district court's decision to grant or deny a preliminary injunction under the deferential abuse of discretion standard. *Real Time Med. Sys., Inc. v. PointClickCare Tech., Inc.*, 131 F.4th 205, 224 (4th Cir. 2025). "[W]e may not reverse so long as the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020)). Nevertheless, a clear error in factual findings or an error of law is grounds for reversal. *Id.*

We first address our subject-matter jurisdiction. We then proceed to the merits and hold that the district court acted within its discretion in granting the preliminary injunction.

## A. <u>Subject-Matter Jurisdiction</u>

The Agencies begin by questioning whether this court has jurisdiction to review the manner in which the Director of the CIA and the Director of ODNI terminated the Intelligence Officers. We hold that we do.

As we explained above, the National Security Act grants each Director discretion to terminate Agency employees. 50 U.S.C. §§ 3036(e)(1), 3024(1)(1). In *Webster v. Doe*, the Supreme Court held that this grant of discretion "precludes judicial review of these decisions under the [Administrative Procedure Act]." 486 U.S. 592, 601 (1998). The Supreme Court based this holding on the text of the National Security Act, which permits the Directors to terminate any employee whenever they "*deem* such termination necessary or advisable in the interests of the United States," and "not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600. This, reasoned the Court, means that there is "no basis on which a reviewing court could properly assess an Agency termination decision," "[s]hort of permitting cross-examination of the Director" about the reasons for the decision. *Id.*

The Court in *Webster* noted explicitly, however, that federal courts do possess jurisdiction over constitutional challenges to a Director's termination action. *Id.* at 603. Congressional intent to "preclude judicial review of constitutional claims . . . must be clear" because "serious constitutional question[s] [ ] would arise if a federal statute were construed to deny any judicial forum for" review of such claims. *Id.* at 603 (internal quotation marks omitted).

The National Security Act does not clearly evince congressional intent to preclude

judicial review of the Intelligence Officers' constitutional claims. Accordingly, we possess jurisdiction to review them.[6] *See id.*

## B. Preliminary Injunction

We now turn to our review of the preliminary injunction.

As a threshold matter, we hold that the district court did not err in finding that the Intelligence Officers were terminated as part of RIFs. The district court based this factual finding on the OPM memoranda directing all federal agencies to carry out RIFs, the CIA Director's declaration stating that he ordered the Intelligence Officers be terminated in response to OPM's "reduction-in-force" directive, and the ODNI Director's failure to offer any other reason for the terminations. Such a finding is certainly "plausible in light of the record viewed in its entirety." *Real Time Med. Sys., Inc.*, 131 F.4th at 224. Because the terminations were carried out pursuant to RIFs, the Agencies are bound to comply with the sections of the Termination Regulation pertaining to terminations of excess personnel.

To obtain a preliminary injunction a plaintiff must prevail on all four *Winter* factors: 1) likelihood of success on the merits, 2) irreparable harm, 3) the balance of the equities, and 4) the public interest. *Winter*, 555 U.S. at 20. We discern no abuse of discretion in the district court's conclusion that the Intelligence Officers met their burden on each factor.

---

[6] As the district court noted, this court has not determined whether a claim brought pursuant to the *Accardi* doctrine is constitutional in nature. We decline to dive into the "murky waters of the doctrine and its origins," *Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018), and rest our holding solely on the Intelligence Officers' due process claims.

15

*(i) Likelihood of Success on the Merits*

The Fifth Amendment assures that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Intelligence Officers allege that their procedural due process rights were violated when the Agencies refused to follow the Termination Regulation. The district court concluded that the Intelligence Officers were likely to succeed on the merits of their claims. It did not err in doing so.

To establish a procedural due process violation, a plaintiff must first identify a protected interest—namely, life, liberty, or property. *Strickland v. United States*, 32 F.4th 311, 347–48 (4th Cir. 2022). After identifying such an interest, the plaintiff must then show that she did not "receive the minimum measure of procedural protection warranted under the circumstances." *Id.* (quoting *Mallette v. Arlington Cnty. Emps.' Supplemental Retirement Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996)). The district court found that the Intelligence Officers possessed a property interest in the rights to reassignment and appeal. The Agencies deprived the Intelligence Officers of this right without any procedural protections. On appeal, the Agencies argue that the Intelligence Officers lack a property interest in the rights to reassignment and appeal. We disagree.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "[I]nstead, [she] must have a legitimate claim of entitlement to it." *Id.* An entitlement to a benefit can arise out of "rules and understandings, promulgated and fostered by [ ] officials." *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). A regulation creates an entitlement when it sets the substantive rules of decision in such a way that a

16

particular outcome is mandated when certain conditions are met. *Stewart v. Bailey*, 7 F.3d 384, 392 (4th Cir. 1993).

We provide two examples to illustrate this concept more tangibly. First, consider the creation of an entitlement. In *Strickland v. United States*, the court concluded that the Fourth Circuit's Employment Dispute Resolution Plan (EDR Plan) created property interests for employees. 32 F.4th at 347–50. These interests included "the right to be free from workplace discrimination, harassment, and retaliation, the right to equal opportunities for promotions, and the right to promotion according to [the employee's] experience, training, and demonstrated ability and without regard to sex." *Id.* at 348 (quotation marks omitted). Employees had a claim of entitlement to these interests because the EDR Plan repeatedly referenced employee "rights," detailed "what those rights are," and outlined "a detailed set of procedures for employees to follow if they believe[d] that any of the substantive rights afforded to them . . . h[ad] been violated." *Id.* at 349. The EDR Plan therefore constrained the discretion of decisionmakers, and mandated a particular outcome, under certain circumstances. If an employee alleged she had not been given an equal opportunity for promotion, the policy dictated that the issue be addressed in accord with procedures specified in the EDR Plan. *Id.* at 349–50.

In contrast, in *Stewart v. Bailey* this court found no claim of entitlement because the statute at issue reserved complete discretion to the decisionmaker. 7 F.3d at 392–93. More specifically, the statute prescribed procedures for when the director of a correctional facility "*may* . . . deliver" an incarcerated individual to an officer from another jurisdiction. *Id.* The statute did not mandate a particular outcome once certain conditions had been met.

17

*Id.* Instead, the director maintained complete discretion over the ultimate decision to transfer an incarcerated individual. *Id.* Accordingly, the applicable statute created no legitimate claim of entitlement to a transfer. *Id.*

Thus, the question before us is whether the Termination Regulation creates an entitlement to the rights of consideration for reassignment and internal appeal of a termination decision. We find that it does.

Start with reassignment. The Termination Regulation constrains the discretion of the Agencies in circumstances, like those here, where employees are terminated pursuant to a RIF. Section II(C)(4)(c) of the Regulation specifies that under such circumstances, "[a] representative from [the Agency] will . . . meet with the employee and determine if the employee wishes placement elsewhere in the Agency[.]" Termination Reg. § II(C)(4)(c). It goes on to make clear that when an employee wishes to take advantage of this procedure, the Agency "will broker an Agency-wide placement effort." *Id.* It further states that "[i]f the employee does not wish placement elsewhere in the Agency or if placement efforts are unsuccessful after a sufficient interval of time," the Agency representatives may then, and only then, recommend that the employee be formally terminated. *Id.* In this regard, the Termination Regulation provides no room for discretion. As long as the employee subject to termination chooses to pursue reassignment, the Agencies must attempt to reassign her. The regulation thus creates an entitlement to such reassignment procedures.

Next, internal appeal. In Section II(E), the Termination Regulation specifies that the right to appeal internally is available to all employees except those classified as "contract employees, reserve employees, and [ ] alien employees." *Id.* § II(E)(1), (3)–(4). It then

18

provides that, aside from circumstances when an employee is terminated "because of revocation of access to classified information," "the termination decision may be appealed[.]" *Id.* § II(E)(2)–(3). The regulation details the internal appeal process before reiterating that the Agencies' Directors ultimately retain discretion to decide whether termination is warranted. *Id.* § II(E)(3)–(4). In this way, Section (II)(E) of the regulation also constrains agency discretion. A covered employee is entitled to appeal a termination decision internally so long as she was not terminated because her access to classified information had been revoked. The Intelligence Officers were not terminated for this reason. The regulation accordingly creates an entitlement to appeal as well.

The Agencies marshal four primary arguments in opposition, largely echoed by the dissent. None of these arguments succeed.

First, the Agencies note that the Termination Regulation repeatedly reaffirms that the Directors possess broad discretion to terminate employees. This is beside the point. The Intelligence Officers do not claim a right to continued employment, and the district court did not rule on this basis. It is undisputed that no such right exists. Rather, the Intelligence Officers claim entitlement to two specific rights, both of which, as explained above, are prescribed in the Termination Regulation. The fact that the Directors possess discretion to terminate employees thus bears no relevance to the question of whether the Intelligence Officers are entitled to the rights of reassignment and appeal.

Second, the Agencies point to broad language in the Termination Regulation disclaiming the creation of employee rights. Section II(A) states, for example, that "nothing in this [R]egulation . . . shall be construed as creating for any employee any property or

19

other interests or privileges in his or her employment." *Id.* § II(A). Section II(F) further states that the regulation does not create "any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency[.]" *Id.* § II(F). Significantly, however, most of this disclaiming language relates solely to termination authority, which, as explained above, is beside the point.

While the Termination Regulation's disclaiming language is admittedly broad, we are compelled to construe regulations holistically. *U.S. Nat. Bank of Oregon v. Ind. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993). This means, "at a minimum," that we consider the "full text." *Id.*; *see also Strickland*, 32 F.4th at 348–52 (reviewing EDR Plan in full). Considering the Termination Regulation in full, the best reading of the disclaiming language is that it too reiterates that Agency employees lack a property interest in *continued employment*. Requiring the Agencies to comply with their own termination procedures does not call into question the discretion of the Directors to effectuate terminations. As the district court correctly noted, the reassignment and appeal rights are wholly separate rights, to which the Intelligence Officers may legitimately claim entitlement.

Third, the Agencies argue that requiring the provision of internal reassignment and appeal rights would be nonsensical. They point out that any internal appeal, if granted, would come before the same Director that effectuated the termination in the first place. Termination Reg. § II(E)(4). Thus, the Agencies question what sense it would make to provide these rights. As we have explained, the rights at issue are mandated by the regulation. The Directors could certainly have a change of heart. It is also possible that the

Intelligence Officers may secure reassignment to positions elsewhere in the Agencies, hence avoiding termination altogether.

Finally, the Agencies suggest that they need not provide the rights to reassignment or appeal because they did not follow the Termination Regulation in carrying out the RIFs. The Termination Regulation details how the Agencies are to terminate excess personnel. *Id.* § II(C)(4). To be sure, the Agencies did not follow these procedures. Prior failure to follow the Termination Regulation, however, does not absolve the Agencies of their duty to it going forward. The Agencies may not ignore their own procedures and then use such noncompliance as an excuse to evade future obligations. The rights to reassignment and appeal are triggered not only when lower-level Agency employees direct a termination, but also when termination is directed from the top. Because, as the district court aptly found, the terminations took place as part of RIFs, the Agencies must follow those sections of the Termination Regulation respecting RIF terminations.

Thus, we conclude the Intelligence Officers identify a property interest in reassignment and appeal. Because we hold that the district court did not abuse its discretion in finding that the Intelligence Officers were likely to succeed on the merits of their constitutional due process claims, we need not address the district court's ruling on the Intelligence Officers' claims brought pursuant to the *Accardi* doctrine. *Roe*, 947 F.3d at 225 n.3 (upholding grant of a preliminary injunction based on likelihood of success of one theory while declining to address district court's alternative theory).

21

*(ii) Irreparable Harm*

The Intelligence Officers must also show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe*, 947 F.3d at 229 (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)). The district court found that the Intelligence Officers met their burden on this factor. This was not an abuse of discretion.

The district court correctly noted that the denial of a constitutional right constitutes irreparable harm. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). The district court further reasoned that reassignment and appeal rights, "once deprived [would] be difficult to restore or address through non-injunctive remedies." J.A. 262. Accordingly, we agree with the district court that the Intelligence Officers' likelihood of success on their constitutional claims supports a finding of irreparable harm. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017) ("[O]ur finding that Plaintiffs are likely to succeed on the merits of their constitutional claim counsels in favor of finding that in the absence of an injunction, they will suffer irreparable harm."), *vacated on other grounds*, 583 U.S. 912 (2017).

The district court also found that the Intelligence Officers were likely to suffer irreparable reputational harm "given the language of" the DEIA Executive Orders. J.A. 261. It suggested the Intelligence Officers may struggle to find gainful employment in the future and suffer from stigma as a result of the DEIA Executive Orders' disparaging

22

statements about DEIA work. This was in error because the Intelligence Officers suffer this harm with or without the preliminary injunction.

"The role of a preliminary injunction is to protect the plaintiff from suffering new or additional irreparable harm between the time the preliminary injunction is entered and the case's final resolution." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 372 (4th Cir. 2026). The preliminary injunction in this case assures the Intelligence Officers their rights to reassignment and appeal but does nothing to remediate reputational injury caused by the DEIA Executive Orders. Reputational injury thus cannot serve as the basis for irreparable harm that could result absent injunctive relief.

We nevertheless affirm the district court's conclusion that this factor weighs in favor of the Intelligence Officers. The constitutional violations alone suffice. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (explaining that a likelihood of success on the merits of constitutional claims weighs in favor of a finding of irreparable harm).

*(iii) Balance of the Equities and Public Interest*

We may consider the final *Winter* two factors—assessing the balance of the equities and weighing the public interest—in tandem when the government is the party opposing injunctive relief. *Roe*, 947 F.3d at 230. The district court did not abuse its discretion in concluding that both favor granting the Intelligence Officers' request.

The district court explained that "requiring the government to follow its own regulations is a minimal burden," particularly when compared to the "harm that would plague [P]laintiffs if the procedures at issue are not followed." J.A. 262. It further concluded that "injunctive relief is in the public interest given the wealth of talent and

23

experience these [P]laintiffs represent and offer in furtherance of the agency's mission to protect the country from foreign and domestic threats." J.A. 263. In so reasoning, the district court determined the balance of the equities and the public interest favored a preliminary injunction to maintain the status quo during the litigation. This was well within its discretion. *Roe*, 947 F.3d at 231.

### (iv) Breadth of the Preliminary Injunction

Finally, the Agencies argue that the preliminary injunction is overly broad and, as such, improperly intrudes on the Directors' discretionary authority to terminate employees. We disagree.

This court reviews the scope of a district court's injunction, too, for abuse of discretion. *Id.* "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). To be sure, "[i]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe*, 947 F.3d at 321 (quoting *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)). This deferential standard makes good sense in light of the equitable and discretionary context. "The district court is better positioned than we are to weigh the costs and benefits" of preliminary injunctive relief. *Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 217 (4th Cir. 2015). We grant deference to the district court's determination in such weighing. *See Roe*, 947 F.3d at 231.

24

The preliminary injunction is narrow. It requires that the Agencies comply with the two provisions of the Termination Regulation at issue in the litigation. The district court also enjoined the Agencies "from effectuating or implementing any decision to terminate the [Intelligence Officers] without further Court authorization." J.A. 235. The Agencies argue that this requirement curtails the Directors' statutory discretion to terminate employees. The district court's injunction does not prevent the Directors from terminating the Intelligence Officers. Rather, it simply prevents the Directors from implementing such decisions without notifying the court in advance. Such notification would provide an opportunity for the court to confirm that the Agencies complied with the Termination Regulation. J.A. 235 (the district court would "assess the extent to which any [affected Intelligence Officer] has received the appeal and consideration for reassignment he or she was entitled to receive[.]").

It was not an abuse of discretion to include this requirement. The Agencies had already indicated that they had no intention to provide the rights assured by the Termination Regulation. The court can only protect the rights of the Intelligence Officers if it has the opportunity to confirm that the Agency followed the Termination Regulation. Accordingly, we leave the scope of the preliminary injunction undisturbed.

## III. Conclusion

For the reasons above, we affirm the district court's order granting a preliminary injunction.

*AFFIRMED*

25

NIEMEYER, Circuit Judge, dissenting:

Responding to the President's Executive Order No. 14151, dated January 20, 2025, which directed agencies to close their diversity, equity, and inclusion offices on the ground that they functioned to discriminate, the Director of the Central Intelligence Agency (Director-CIA) and the Director of National Intelligence (Director-ODNI), exercising their statutorily authorized discretion, terminated the employment of more than 50 employees in the CIA and the ODNI. In doing so, the Directors relied on their discretionary authority, conferred by statute, "to terminate the employment of any . . . employee" when the Director "deems" it "necessary or advisable in the interests of the United States." 50 U.S.C. §§ 3036(e)(1), 3024(m)(1). They also relied on CIA Regulation 4-16 ("Termination of Employment"), which confirms that the Directors may terminate "any employee" "at any time without regard to any procedural steps set forth in this regulation or elsewhere." AR 4-16(II)(D).[1]

Nineteen of the employees who were advised that their employment was being terminated commenced or later joined in this action and sought a preliminary injunction to prohibit it. They alleged, among other things, that the directives terminating their employment denied them the benefit of the procedural rights set forth in CIA Regulation 4-16, namely their right to be considered for placement elsewhere in the Agency, see AR 4-16(II)(C)(4), and their right to appeal the termination decision, see AR

---

[1] Because the Director-ODNI's authority is the same as the Director-CIA's authority, see § 3024(m)(1), and the ODNI's procedures here are the same, I sometimes hereafter refer to the two collectively by reference to the Director-CIA and the CIA's procedures.

4-16(II)(E), and that those procedures provided them property interests in their continued employment, protected by the Due Process Clause of the Fifth Amendment. The district court granted the plaintiffs a preliminary injunction, concluding that they were likely to succeed on the merits because the Directors denied the employees their property interests in the two procedural rights, in violation of the Due Process Clause of the Fifth Amendment. The court held that "given the specific regulations at issue, CIA Regulation 4-16 may be enforced as a matter of constitutionally protected procedural due process." The court accordingly prohibited the Directors from implementing the terminations and ordered them to apply the two procedures in AR 4-16 to the plaintiffs.

The majority now affirms, mostly on the district court's reasoning, concluding that AR 4-16 "creates an entitlement to . . . reassignment procedures" and "to appeal" a termination decision which, the majority agrees, are protected as property interests under the Fifth Amendment's Due Process Clause. *Ante* at 19. Accordingly, the majority concludes that the plaintiffs are likely to succeed on the merits and therefore affirms the district court's preliminary injunction.

The district court's and the majority's holdings, I conclude, fail with double F's. First, the regulation on which they rely — AR 4-16 — is *irrelevant* because it does not, by its own terms, purport to regulate the discretion of the Directors. Rather, the regulation establishes procedures for lower level employees in the agency to follow and provides that their decisions can be appealed to the Director. Second, the unfettered discretion that Congress gave the Directors to terminate the employment of agency employees precludes the employees from having any *entitlement* to their employment and therefore precludes a

27

finding that they had a property interest protected by the Fifth Amendment. In short, the procedures for employment termination do not confer property interests protected by the Due Process Clause.

I also add that the district court erred in concluding that the plaintiffs would suffer irreparable harm absent injunctive relief. And even more egregiously, the district court's preliminary injunction inappropriately ordered that the Directors obtain the district court's *prior approval* before terminating any plaintiff's employment in the future, usurping the Executive function that the Constitution and Congress unambiguously committed solely to the Executive, especially in the context of national security.

The preliminary injunction entered in this case is unlawful and should have been promptly vacated. Now, unfortunately, that can only be done by the Supreme Court, which I can hope will consider this wrongful intrusion, which has far-reaching and unfortunate precedential effects.

I

A

The National Security Act of 1947 authorized both the Director-CIA and the Director-ODNI, in their discretion and "*[n]otwithstanding the provisions of any other law*," "[to] terminate the employment of any officer or employee . . . whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interests of the United States." 50 U.S.C. § 3036(e) (emphasis added); *see also id.* § 3024(m)(1). And CIA Regulation 4-16 provides similarly that the Director may, "at any

28

time *without regard to any procedural steps set forth in this regulation or elsewhere,*" terminate the employment of any employee when he, "in his discretion, deems it necessary or advisable in the interests of the United States." AR 4-16(II)(D) (emphasis added). The regulation adds that the Director's decision "to exercise this authority is entirely discretionary," that he "need not provide to anyone the reasons for exercising this authority, and that a national security basis for the exercise of this authority is not required." *Id.* And it further confirms that the existence and exercise of the Director's discretionary authority is (1) "[n]ot constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law," and (2) "[i]n abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law." *Id.*

This unfettered discretion conferred on the Directors is necessary in the context of their responsibilities in connection with highly confidential and sensitive national security matters, especially because termination proceedings themselves could compromise sensitive information.

The Supreme Court has confirmed the breadth of the discretion given by Congress to the Directors, explaining:

> This standard [as stated in 50 U.S.C. § 3036(e)] fairly exudes deference to the Director, and appears to us *to foreclose the application of any meaningful judicial standard of review*. Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision.

29

*Webster v. Doe*, 486 U.S. 592, 600 (1988) (emphasis added). The Court explained that § 3036(e) "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* (cleaned up). It concluded therefore that "[a] discharged employee thus cannot complain that his termination was not necessary or advisable in the interests of the United States, since that assessment is the Director's alone." *Id.* at 603 (citations omitted). And Justice O'Connor added in her separate opinion:

> The functions performed by the Central Intelligence Agency and the Director of Central Intelligence lie at the core of the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations.

*Id.* at 605–06 (O'Connor, J., concurring in part and dissenting in part) (cleaned up).

The Directors in this case — the Director-CIA and the Director-ODNI — relied on their discretion to personally terminate the plaintiffs' employment, conveying to the plaintiffs that the Directors "deem[ed]" the terminations to be "necessary or advisable in the interests of the United States." And as *Webster* observed, the Directors' exercise of such broad discretion is essentially unreviewable. 486 U.S. at 600.

B

On January 20, 2025, President Trump issued Executive Order 14151 directing agencies to take action within 60 days to "terminate, to the maximum extent allowed by law, all DEI [diversity, equity, and inclusion] . . . *offices and positions*." *Ending Radical*

30

*and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151, 90 Fed. Reg. 8339, 8339, § 2(b)(i) (January 20, 2025) (emphasis added).

On February 18, 2025, after the Director-CIA had placed affected employees on administrative leave, he sent a memorandum to Agency leadership announcing his "Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office." The memorandum explained, "To best effectuate the President's direction in [E.O. 14151] . . . it is necessary or advisable in the interests of the United States to terminate the employment of all of the employees of the former [diversity and inclusion office] pursuant to [50 U.S.C. § 3036(e)] and consistent with [CIA Regulation 4-16]." The memorandum also instructed agency leadership to provide employees with the options of voluntary resignation or early retirement, if they were eligible. The Director later confirmed that he had "determined that it was 'necessary or advisable in the interests of the United States to terminate all of the employees of the former [diversity and inclusion office]'" and that he had effected the terminations under 50 U.S.C. § 3036(e)(1) and AR 4-16(II)(D) specifically, which authorizes "Termination Without Procedures."

In early March 2025, the Director-ODNI initiated a similar process, notifying affected employees that she was likewise closing ODNI's diversity and inclusion office and that the employees had the option, in lieu of being terminated, of voluntarily resigning or, for eligible employees, retiring early.

Neither Director gave the employees whose employment was terminated any option to consider placement elsewhere in their agency, as provided in AR 4-16(II)(C)(4). The Director-ODNI allowed her terminated employees to "submit a request to [her] for

31

reconsideration of the termination decision." And later in March 2025, several CIA employees, who are plaintiffs here, attempted to appeal the Director-CIA's termination decisions, but they were informed that no such process existed.

Originally, 11 plaintiffs commenced this action and later, when 8 more joined, they all requested a preliminary injunction under the Due Process Clause of the Fifth Amendment, among other laws, as the Directors "plann[ed] to terminate [them] with insufficient notice, without any of the agency administrative procedures required by law, and without any evidentiary record" such that their "impe[n]ding termination [was] contrary to their constitutional right to due process before being denied their *property interest in their employment*." (Emphasis added). The plaintiffs argued that they were denied constitutionally protected rights to reassignment consideration under AR 4-16(II)(C)(4) and to appeal under AR 4-16(II)(E).

The district court agreed with the plaintiffs and entered a preliminary injunction enjoining the Directors from

> effectuating or implementing any decision *to terminate the Plaintiffs* without further Court authorization. To the extent that any such decision to terminate any Plaintiff is submitted to the Court for approval, the Court will assess the extent to which any such Plaintiff has received the appeal and consideration for reassignment he or she was entitled to receive.

(Emphasis added). The injunction further ordered that the Directors "provide Plaintiffs a requested appeal from any decision to terminate him or her, consistent with the steps set forth in CIA Regulation 4-16" and that they "consider any Plaintiffs' request for reassignment for open or available positions . . . consistent with CIA Regulation 4-16 Section II. C. 4." In support of its order, the court concluded that the plaintiffs were likely

to succeed on the merits because they were denied the *right* to be considered for placement in another component within the Agency and the *right* to appeal the Director's termination decision, referring to AR 4-16(II)(C) and (II)(E).  Thus, the court concluded:

> After reviewing the relevant jurisprudence, the Court concludes that under the circumstances of this case, given the specific regulations at issue, CIA Regulation 4-16 may be enforced as a matter of *constitutionally protected procedural due process*.

(Emphasis added).

The majority's opinion parrots the district court's opinion, without assessing its reasoning in any critical manner.  The majority concludes that the regulatory provisions regarding (1) consideration for placement with another component of the Agency and (2) appeal of the Directors' termination decisions create *entitlements*, thus providing the plaintiffs with property interests protected by the Fifth Amendment.  As the majority states:

> As long as the employee subject to termination chooses to pursue reassignment, the Agencies must attempt to reassign her.  The regulation thus creates *an entitlement* to such reassignment procedures.
>
> *            *            *
>
> A covered employee is entitled to appeal a termination decision internally . . . [and] the regulation accordingly creates *an entitlement* to an appeal as well.

*Ante* at 19 (emphasis added).

## II

The district court's and majority's conclusion that the plaintiffs had property rights in their employment protected by the Due Process Clause of the Fifth Amendment is fundamentally flawed.  First, the proposition is grounded in an inapplicable regulation.

The district court and the majority fail to recognize that Congress provided the Directors with unfettered discretion to terminate employees — for national security reasons or not — and that any regulation that might constrict that discretion would clearly have to yield to Congress's directive. Indeed, the text of the regulation explicitly recognizes and reaffirms the Director's broad, unfettered discretion. CIA Regulation 4-16 instead regulates agency employees' conduct and provides terminated employees a right to appeal lower level employee termination decisions to the Director, whose decisions are unreviewable. Thus, AR 4-16, on which the district court and the majority rely, is simply *irrelevant* to the analysis.

Second, the Agency's procedural regulation governing the termination of employment does not create a property interest for employees that is protected by the Due Process Clause.

I address these points in order.

A

CIA Regulation 4-16, entitled "Termination of Employment," provides procedures that certain agency personnel must follow when terminating employees. It also states that most termination decisions may be appealed to the Director. The regulation, however, does not regulate the Director's conduct or limit his discretion. To the contrary, it repeatedly disavows application to the Director. The first section states:

> By the terms of [50 U.S.C. § 3036(e)], to terminate the employment of an Agency officer or employee, the Director of the Central Intelligence Agency (D/CIA) need only deem employment termination necessary or advisable in the interests of the United States. . . . *Notwithstanding any provisions of this*

34

> *regulation* or any other regulation, document, or law, the [Director] need not
> provide to anyone the reasons for such termination if he decides not to do
> so. . . .  Employment may be terminated by the [Director] or by an official of
> the Agency to whom the [Director] delegates appropriate authority.

AR 4-16(I) (emphasis added).  The regulation then specifies the officials other than the

Director who are authorized to terminate employees — naming the Deputy Director, the

Chief of Human Resources, directors or heads of the independent offices, the Chief

Operating Officer, the Deputy Director of the Office of Security, and the Director of

National Intelligence.  *See id*. 4-16(III).

The regulation next describes substantively every employee's relationship with the

Agency, providing:

> Agency employees do not have tenure and their employment may be
> terminated pursuant to the terms of the National Security Act of 1947, as
> amended, *without regard to the procedural requirements of this regulation*
> or any other provisions of law. . . .  Notice is hereby given that *nothing in
> this regulation* or in any other regulation, document, or law *shall be
> construed as creating for any employee any property or other interests or
> privileges in his or her employment*.

AR 4-16(II)(A) (emphasis added).

The regulation then provides a list of grounds by which the authorized Agency

officials can terminate employees.  *See* AR 4-16(II)(B).  That list, however, is capped with

the obvious reservation, consistent with Section I, that "an employee may have his or her

employment be terminated whenever the [Director], in his discretion, deems such

termination necessary or advisable in the interests of the United States."  *Id*. 4-

16(II)(B)(11).

Finally, the regulation provides various termination procedures. But that list, too, is again capped with the same reservation that "any employee may be terminated from the Agency at any time without regard to any procedural steps set forth in this regulation or elsewhere when the [Director], in his discretion, deems it necessary or advisable in the interests of the United States." AR 4-16(II)(D).

Addressing specifically the "Procedure for Termination of Excess Personnel" (commonly, a reduction in force), which is the first of two sections that the district court and the majority found to create a property interest for the plaintiffs, the regulation provides:

> If the *head of a component* determines that an employee is excess to the needs of the component, both the Head of Career Service and the employee will be advised in writing. If the employee wishes, the Career Service will make an effort to arrange *placement in another component* within that Career Service. If such efforts fail, the Career Service will declare the employee excess to the needs of the Career Service and will notify the employee, Chief, Human Resources, and [Director of Office Security], via [Special Activity Staff].

AR 4-16(II)(C)(4)(b) (emphasis added). The reduction-in-force procedure thus governs when the "head of a component" makes that determination. And if the affected employees are unable to secure a "placement in another component" satisfactory to either the employee or the Agency, the regulation provides that the Chief Operating Officer makes the decision to "separate" the employee from service. *Id*. 4-16(II)(C)(4)(c).

Addressing the right to appeal, which is the second section that the district court and the majority found to create a property interest for the plaintiffs, the regulation provides that employees may appeal *to the Director* decisions made by the Chief Operating Officer. The regulation provides in relevant part:

36

> [A] termination decision may be appealed to the [Chief Operating Officer]. . . .  In cases where the [Chief Operating Officer] is the terminating authority, for example in cases where an employee is declared excess to the needs to the service, the employee may appeal directly to the [Director].
>
> Employees may appeal to the [Director] in cases where the [Chief Operating Officer] denies the initial appeal or where the [Chief Operating Officer] serves as the terminating authority. . . .  Upon receipt of an appeal, the [Director] will decide, *in his discretion*, whether to terminate the individual's Agency employment *pursuant to the [Director's] statutory authority to do so*.

AR 4-16(II)(E)(3)–(4) (emphasis added).  The Regulation thus does not provide for an appeal of any decision made *by the Director*.  Indeed, he is the one to whom appeals are authorized.

It is thus textually clear that CIA Regulation 4-16, by its own language, does not regulate the Director's discretion.  The "right" of employees to placement in another component is given when the "head of a component" orders a reduction in force, and his decision is reviewable by the Chief Operating Officer.  And the "right" to appeal a termination decision refers only to the ability to appeal a decision of the Chief Operating Officer to the Director.

Moreover, when concluding that the regulation is relevant, the majority fails to recognize that applying the regulation to the Director would be inconsistent with the statutory authority that Congress conferred on the Director, which provides him with virtually unfettered discretion to terminate the employment of agency employees.  That discretion is based on what the Director "deems" is in the interest of the United States, which is a judicially unreviewable standard.  *See Webster*, 486 U.S. at 600.

37

At bottom, the regulation on which the district court and the majority relied to confer property rights on the plaintiffs does not even apply to the circumstances here, *where the decisions to terminate the employees were made by the Directors*.  AR 4-16 is *simply irrelevant*.

The majority's errors are compounded by its failure to address and account for the many provisions of AR 4-16 that preserve the Director's unfettered discretion, such as AR 4-16(I), AR 4-16(II)(B)(11), and AR 4-16(II)(D), and that limit the applicability of the two provisions on which the majority relies to lower level officials.  Yet, the majority claims to be "constru[ing] [the] regulation[] holistically."  *Ante* at 20.  Obviously, it does anything but.

More particularly, the majority argues that while the Director has discretion to effectuate *terminations*, AR 4-16(II)(C)(4) requires consideration of *reassignment*, which is not a "termination," and that such consideration is mandatory.  But the reassignment procedure textually regulates only the "head of a component," the "Head of the Career Service," the Chief of Human Resources, and the Chief Operating Officer.  It does not regulate the Director, yet this action is filed against the Director to prohibit his *termination* of the plaintiffs' employment, in which the plaintiffs claim to have a property interest.  Moreover, the regulation provides that such *terminations* can be made by the Director "without regard to *any procedural steps set forth in this regulation* [AR 4-16]."  *Id*. 4-16(II)(D) (emphasis added).

The majority likewise errs in arguing that the right to appeal is not a *termination*, and therefore the right to appeal in AR 4-16(II)(E)(4) must be given.  But again, the

38

regulation addresses only the right to appeal decisions of the Chief Operating Officer, not the Director. And yet again, this action is filed *against the Director* to prohibit the *termination* of the plaintiffs' employment — a termination not governed by any procedural regulation.

Finally, as the regulation is repetitive, AR 4-16(II)(A) again provides that all terminations effected pursuant to the National Security Act of 1947 are effected "*without regard to the procedural requirements of this regulation.*" And the same section further provides that it must not be construed "as creating for any employee any property or other interests or privileges in his or her employment." *Id.*; *see also id.* 4-16(II)(F).

The majority ran through every such limitation in the regulation, all the while claiming to be construing the regulation holistically.

At bottom, CIA Regulation 4-16 provides nothing relevant to the question whether the Director's decision *to terminate* the plaintiffs' employment can be enjoined.

B

Relying on *Webster*'s holding that, although the Directors' discretion is not subject to judicial review, "colorable constitutional claims arising out of [their] actions" can be judicially reviewed, *see* 486 U.S. at 603, the plaintiffs argued before the district court that their "impe[n]ding termination [was] contrary to their *constitutional right* to due process before being denied their *property interest* in their employment," (emphasis added). The district court agreed, enjoining the Directors "from effectuating or implementing any *decision to terminate* the Plaintiffs without further court authorization." (Emphasis added).

39

And the majority concurs, affirming the district court. Yet, along the way, the plaintiffs' interest has been recharacterized from a property interest in their *continued employment* to one in *the procedures of "reassignment and appeal." Ante* at 21. (Emphasis added). The majority, however, cites no authority for the conclusion that *procedures* for the termination of at-will employment confer a property interest to the employees, and in fact, the case law rejects that view.

The foundational principles are well established. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. And to constitute a property interest protected by the Fifth Amendment, a plaintiff "must have a legitimate claim of *entitlement* to it." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (emphasis added); *see also Stewart v. Bailey*, 7 F.3d 384, 392 (4th Cir. 1993) (holding that a regulation creates an entitlement when it sets the substantive rules of the decision in such a way that a particular outcome *is mandated* when certain conditions are met).

The plaintiffs suggest, and the majority agrees, that the Directors could not have terminated the plaintiffs' employment without following the procedural steps created by CIA Regulation 4-16 because the steps were mandatory. The regulation, however, provides explicitly and repeatedly that the Director can terminate Agency employees "without regard to any procedural steps set forth in this regulation." AR 4-16(II)(D); *see also id.* 4-16(I), (II)(A), (II)(B)(11); *accord id.* 4-16(II)(F). So the procedures are plainly not mandatory *for the Director. See Doe v. Casey*, 796 F.2d 1508, 1519–20 (D.C. Cir. 1986) (observing, in construing nearly identical sections of a prior CIA regulation, "We

40

cannot imagine how the CIA could have more plainly expressed its intent to protect the discretion granted it by [§ 3036(e)(1)]"), *aff'd in part and rev'd in part on other grounds*, *Webster v. Doe*, 486 U.S. 592 (1988); *see Doe v. Gates*, 981 F.2d 1316, 1319–20 (D.C. Cir. 1993) (reaffirming on remand *Casey*'s finding that the CIA's regulation "clearly intended to protect" the Director's statutory discretion).

More egregious, however, is the majority's apparent belief that — despite its statement to the contrary — mandatory procedures of the kind in AR 4-16 could somehow create a property interest in the object or benefit of the procedure, *i.e.*, the employee's continuing employment. But that logic is wanting. Procedural steps themselves have not, to my knowledge, ever been considered a property interest apart from the object or benefit of those procedures, *i.e.*, here, in continuing employment. *See Bd. of Regents v. Roth*, 408 U.S. 564, 570–71 (1972) ("to determine whether due process requirements apply in the first place, we must look . . . to the nature of the *interest at stake*" and whether "the interest is within the Fourteenth Amendment's protection of liberty and property" (emphasis added)). Indeed, the Supreme Court has rejected the view that we should look to regulatory procedures to define a property interest in continuing employment. In *Cleveland Board of Education v. Loudermill*, the Court explained:

> The point is straightforward: the Due Process Clause provides that certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures. The categories of *substance and procedure are distinct*. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty.

41

470 U.S. 532, 541 (1985) (emphasis added).  And to identify a substantive property interest, a plaintiff must point to a statute or regulation that creates for him an "entitlement to *the benefit*" at stake, and the statute or regulation must "act to limit meaningfully the discretion of the decisionmakers" to confer *the benefit*.  *Smith v. Ashcroft*, 295 F.3d 425, 429–30 (4th Cir. 2002) (emphasis added) (cleaned up).  Thus, where the underlying benefit remains within the decisionmaker's discretion, there is no protected interest.

In this case, the district court enjoined the *termination* of plaintiffs' employment, and to affirm that order, the majority, of necessity, must be concluding that the regulatory procedures give the plaintiffs a property interest in *continuing employment*.  The majority's own argument thus undermines that which is necessary to affirm, *i.e.*, the finding of a property interest in the plaintiffs' *continuing employment*.

By the very terms of their employment, the plaintiffs have no property interest in its continuation.  CIA Regulation 4-16 provides that agency employees have no tenure and that "nothing in this regulation . . . shall be construed as creating for any employee *any property or other interests*."  AR 4-16(II)(A) (emphasis added).  The regulation also conveys expressly that the Director has unfettered discretion to terminate them *without following any procedures* in the regulations or otherwise.  *Id*. 4-16(II)(D).  And if the regulation was not clear enough, it further underscores that "[t]he existence or exercise of [the Director's] discretionary authority . . . is . . . *[i]n abrogation of the existence of any interests . . . of any employee in his or her employment* which might otherwise be created or established by this regulation."  *Id*. (emphasis added).

As the Supreme Court has noted, "stated simply, [the government] creates a protected [property] interest by placing *substantive limitations* on official discretion." *Thompson*, 490 U.S. at 462 (cleaned up); *see also Hewitt v. Helms*, 459 U.S. 460, 472 (1983) (recognizing that a property interest is established only by "substantive predicates" that govern official decisionmaking).  Here, AR 4-16 does not place any substantive limitation on the Director's discretion, and therefore there was no basis for the district court to find a property interest at stake.  *See, e.g.*, *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990) (noting that where the purported benefit "depends on an affirmative act of discretion by the granting official," there is no constitutionally protected right); *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) (noting that "[t]he notion of an individual property right in access to the nation's secrets — by definition a limitation on Executive discretion — is utterly inconsistent with th[e] principle[]" that the Executive has the responsibility for national security).

In the absence of a likely Fifth Amendment violation, which is the only law on which the district court relied to enter its preliminary injunction, the court could not have ordered the Directors to refrain from implementing the termination of the plaintiffs' employment.

## III

While the double-F failures are ample grounds on which to reverse, vacate, and otherwise render the preliminary injunction null from its unlawfulness, I add also that the district court clearly erred in concluding the plaintiffs were likely to suffer irreparable harm

absent injunctive relief, an additional requirement for entering the injunction. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Demonstrating irreparable harm is no easy feat. Plaintiffs must make a clear showing that they are likely to suffer irreparable harm before the court renders a decision on the merits. *See W.V. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, __ F.4th __, 2026 WL 1579491, at *7 (4th Cir. 2026). And a harm that is "compensa[ble] by an award of money damages at judgment" is generally not irreparable. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

The district court found that the plaintiffs would suffer two forms of irreparable harm: (1) a harm merely from the violation of their constitutional rights, and (2) reputational harm based on the allegedly pejorative reasons given in the President's Executive Order for eliminating DEI offices and positions. Neither withstands scrutiny.

As to the first, because the plaintiffs failed to demonstrate a colorable constitutional violation — as I explain above — it was error to find injury of this kind. Moreover, if the mere allegation of a constitutional violation suffices to demonstrate irreparable harm, then almost every plaintiff who could claim a wrongful government termination could show irreparable harm, and this would be contrary to the Supreme Court's admonitions that a preliminary injunction is an extraordinary form of relief, *see Winter*, 555 U.S. at 24, and that irreparable harm is exceedingly rare in government employment-termination cases, *see Sampson v. Murray*, 415 U.S. 61, 91–92, 92 n.68 (1974) (concluding that harms associated with lost employment, including "loss of income" and that one's "reputation would be damaged as a result of the [discharge], . . . fall[] far short of the type of irreparable

44

injury" necessary for preliminary relief because such harms are routine in employment actions); *accord, e.g.*, *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021) (explaining that it is "well settled . . . that adverse employment consequences are not the type of harm that usually warrants injunctive relief because economic harm resulting from employment actions is typically compensable with money damages" (citing *Sampson*, 415 U.S. at 91–92)) (per curiam).  The requirement of irreparable harm requires a far greater showing than that made by the plaintiffs.

And because the majority is reversing the district court's conclusion that the plaintiffs suffered reputational harm, I need not address that claimed injury, as I agree with the majority on this.  *See Sampson*, 415 U.S. at 91–92; *accord, e.g.*, *Bedrossian v. Nw. Mem. Hosp.*, 409 F.3d 840, 845–46 (7th Cir. 2005) (noting that under *Sampson*, "humiliation, damage to reputation, and loss of income due to [a] purportedly wrongful termination" do not constitute irreparable harm); *We The Patriots USA, Inc.*, 17 F.4th at 294–95 (similar).

IV

Finally, I note that the injunction entered by the district court inappropriately regulates exclusively Executive functions by requiring the Director-CIA and the Director-ODNI to obtain *prior court approval* before terminating the employment of any plaintiff. While the injunction already prohibits the Directors from implementing their earlier decisions to terminate the plaintiffs, it *also* requires the Directors to obtain court approval before implementing any future decision to terminate the plaintiffs.  Purportedly, if a

45

plaintiff were now to be found to have, for example, compromised national security or even engaged in spying against the United States, the Directors could not, under the terms of the injunction, fire him without obtaining court approval. This aspect of the injunction is inconsistent with applicable separation-of-power principles twice over.

First, the Executive has the exclusive authority to protect national security, and a court impermissibly intrudes on that authority by requiring the Executive to seek judicial approval before taking action that it has "deem[ed] . . . necessary or advisable in the interests of the United States." 50 U.S.C. § 3036(e)(1); *see, e.g.*, *Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013) (emphasizing that "'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs'" and should not "second-guess[] the discretionary judgment of an executive agency assessing national security risks" (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988))); *El-Ganayni v. Dep't of Energy*, 591 F.3d 176, 185 (3d Cir. 2010) ("For reasons of institutional competence, separation of powers, and deference to the Executive on national security matters," courts cannot review, weigh, or second guess an agency's discretionary national-security decisions (cleaned up)).

Second, Congress has bestowed upon the Director the statutory authority to effect employee terminations that he or she "deems" necessary, so it is again a violation of separation-of-powers principles for a court to impede the Director from acting within his statutorily designated authority. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936). As we have previously recognized, "[t]he discretionary nature of the decision" to terminate an employee "combined with the constitutional

46

delegation of the obligation to protect national security to the Executive Branch" is such that a court cannot "be permitted 'to intrude upon the authority of the Executive . . .' absent specific authorization from Congress." *Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1206 (4th Cir. 1990) (quoting *Egan*, 484 U.S. at 527–30). This is especially so when Congress, through 50 U.S.C. § 3036(e)(1), has told us not to do so.

Furthermore, the injunction entered by the district court *mandates* that the Directors hereafter apply CIA Regulation 4-16 to circumstances to which the regulation does not apply. Nowhere in the regulation is the Director required to provide an employee whose employment he has terminated with an option for placement in another component. And it is absurdity to require the Director to grant an appeal to himself of his own discretionary decision. As explained, the regulation for termination of employment establishes procedures within the Agency that are subject to ultimate review by the Director. But both the regulation's express terms, as well as logic, dictate that the Director himself or herself is not regulated by it. It was legal error for the court to require the Directors to apply the regulation to their decisions when the regulation does not regulate them or their broad discretion.

\* \* \*

The Director-CIA and the Director-ODNI terminated the plaintiffs' employment because the Directors "deem[ed]" it to be in the national interest. Congress has conferred this broad discretion on them for good reason, and the Supreme Court has held that courts essentially lack the ability to question what the Directors "deem[ed]." Moreover, the CIA regulation governing the "Termination of Employment" repeatedly preserves the

47

Director's unbridled discretion to terminate employees at any time, without regard to any procedural steps set forth in the regulation.  At bottom, regardless of what one thinks of these termination decisions, the Directors' conduct violated no constitutional provision, and both the injunction and the majority's affirmance are egregious instances of judicial overreach and gratuitous excess.

I would reverse and vacate the preliminary injunction entered in this case on March 31, 2025.